**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**CASE NO. 10-40610**

**THE ARANSAS PROJECT, Plaintiff-Appellee**

**v.**

**BRYAN SHAW, *et al.*, Defendants**

**v.**

**TEXAS FARM BUREAU; AMERICAN FARM BUREAU FEDERATION; SAN ANTONIO WATER SYSTEM; UNION CARBIDE CORPORATION, Movants-Appellants**

**CITY PUBLIC SERVICE, City of San Antonio acting by and through the City of San Antonio Public Service Board, Intervenor Defendant-Appellant**

**CASE NO. 10-40633**

**THE ARANSAS PROJECT, Plaintiff-Appellee**

**v.**

**BRIAN SHAW, *et al.*, Defendants**

**v.**

**SAN ANTONIO RIVER AUTHORITY, Movant-Appellant**

**JOINT MOTION FOR STAY OF PROCEEDINGS PENDING APPEAL OF TEXAS FARM BUREAU, AMERICAN FARM BUREAU FEDERATION, UNION CARBIDE CORPORATION, SAN ANTONIO WATER SYSTEM, CPS ENERGY, AND SAN ANTONIO RIVER AUTHORITY**

COME NOW Texas Farm Bureau and the American Farm Bureau Federation ("AFBF") (jointly "TFB"), Union Carbide Corporation ("UCC"), San Antonio Water System ("SAWS"), the City of San Antonio acting by and through the City of San Antonio Public Service Board ("CPS Energy"), and the San Antonio River Authority ("SARA"), appellants in the above-entitled and -numbered action (collectively, "Appellants"), and move the Court to stay proceedings in the case below, *The Aransas Project v. Bryan Shaw*, *et al*., No. C-10-75, United States District Court for the Southern District of Texas, Corpus Christi Division, pending the resolution of the merits of Appellants' appeals to this Court from the orders of the district court dated June 17, 2010 (ROA 901)[1] and June 21, 2010 (ROA 1125) (SARA) denying Appellants' respective Motions to Intervene.[2] Plaintiff-Appellee The Aransas Project ("TAP") opposes the motion.

## I. Jurisdiction and prerequisites

Appellants' appeals are from a final order of the district court as to each of them. This Court has jurisdiction under 28 U.S.C. § 1291. Filing a notice of appeal confers jurisdiction on a court of appeals. *Griggs v. Provident Consumer*

[1] Citations to the Record on Appeal ("ROA") are to the pagination of the Record on Appeal. The First Supplemental Record on Appeal and the Second Supplemental Record on Appeal are cited as "ROA-1 xxx" and "ROA-2 xxx," respectively.

[2] The San Antonio River Authority ("SARA") has appealed the denial of its intervention separately, but SARA's appeal has been consolidated with the appeals of the other parties to this motion by the clerk's order dated July 23, 2010.

Case: 10-40610 Document: 44 Page: 3 Date Filed: 07/23/2010

*Discount Co.*, 459 U.S. 56, 59 (1982). Appellants each have filed a timely notice of appeal. Appellants have met all jurisdictional prerequisites by first having filed a motion for stay in the district court,[3] ROA-2 43, which that court denied. ROA-2 72. This Court has authority to hear this Motion under FED. R. APP. P. 8 or as an inherent part of "its traditional equipment for the administration of justice." *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9-10 (1942); *see also* FED. R. APP. P. 8(a) advisory committee's note. Relevant record parts are attached as exhibits as required by FED. R. APP. P. 8.

## II. Background.

In its complaint filed March 10, 2010, Plaintiff-Appellee The Aransas Project ("TAP") seeks declaratory and injunctive relief under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.*, against five State of Texas officials ("State Defendants"), including three commissioners of the Texas Commission on Environmental Quality ("TCEQ"). TAP Complaint ("Compl."), ROA 20-53. TAP asks the district court to declare that the State Defendants, through an alleged failure to adequately regulate use of surface water in the Guadalupe and San Antonio River basins, have violated Section 9 of the ESA, 16 U.S.C. § 1538, by "taking" whooping cranes, including by significantly modifying

[3] The other parties to this Joint Motion for Stay did not join TFB's motion in district court, but only for the purposes of efficiency of their appeals. No purpose would have been served by filing multiple motions to stay in the district court. The motions would have been duplicative.

Case: 10-40610 Document: 44 Page: 4 Date Filed: 07/23/2010

and destroying crane habitat and "harassing" cranes; and that the State's water use and diversion laws are preempted by federal law to the extent they result in "takes" of cranes. Compl. at 32-33, ROA 51-52. Relief sought by TAP includes, among other things, curtailment of water uses by irrigators, municipal and industrial users holding water rights permits from the State of Texas, and exempt users.[4] Compl. at ¶¶ 186-88, ROA 45. As this Court noted in similar circumstances in *Sierra Club v. Glickman*, 82 F.3d 106, 109 (5th Cir. 1996), water rights holders such as Appellants are real parties in interest in such a case.

Appellants here, all would-be intervenors below, include TFB, SAWS, CPS Energy, SARA and UCC. All are water rights holders in the Guadalupe or San Antonio River basins (TFB members are rights holders in both), and have vested property interests that are potentially affected by TAP's complaint.[5] Each Appellant's interests are distinct from the interests of any currently-admitted parties to this litigation[6] and from each other's interests.

## A. Interests of the Appellants

### 1. Texas Farm Bureau

---

[4] "Exempt" uses include water for domestic and livestock purposes. TEX. WATER CODE §§ 11.042, 11.303(l), 11.323(e).

[5] Both permit rights and exempt rights are vested property rights under Texas law. *See, e.g., Tex. Water Rights Comm'n v. L.A. Wright*, 464 S.W.2d 642, 647 (Tex.1971).

[6] The Guadalupe-Blanco River Authority ("GBRA") and the Texas Chemical Council ("TCC") were granted intervention. ROA 5 321 (GBRA); Order (TCC), ROA 921.

Case: 10-40610 Document: 44 Page: 5 Date Filed: 07/23/2010

TFB represents both adjudicated water rights holders, permitted irrigation water rights holders, and exempt users in the Guadalupe and San Antonio River basins. Of the approximately 1150 water rights holders in those basins, of which 720 are irrigation rights, at least 130 are owned by TFB members; TFB members comprise over 11% of the total permit holders and 18% of the irrigation permit holders in those river basins. ROA 519-522. TFB members have substantial legally-protected interests in three different categories of water rights that are potentially affected by Plaintiff's suit: TFB members include (a) agricultural water users who hold adjudicated water rights and irrigation rights permits in the Guadalupe and San Antonio River Basins, and (b) exempt users of water from those rivers and watersheds for domestic and livestock uses.[7]

**2. SAWS**

SAWS is an agency of the City of San Antonio and provides water, wastewater and/or reclaimed water services to approximately 1.3 million people, pursuant to the authority of Texas Local Government Code section 402.142 and City Ordinance number 75686 dated April 30, 1992. SAWS holds vested surface-water interests, including appropriative rights and rights of re-use of discharged water, by reason of permits issued by the Texas Commission on Environmental

[7] TFB members also include pumpers and owners of underground water rights in the Edwards Aquifer, which feeds the San Marcos and Comal Springs, which provide substantial flows to the San Marcos and Comal Rivers, both tributaries to the Guadalupe River. ROA 520-522.

Case: 10-40610 Document: 00511184532 Page: 6 Date Filed: 07/23/2010

Quality ("TCEQ"), a state agency administered by some of the State Defendants.

**3. CPS Energy**

CPS Energy is the exclusive provider of electrical service to over 1.7 million people in the greater San Antonio area. ROA 858. It is the nation's largest municipally-owned energy utility providing both natural gas and electrical service. ROA 857. CPS Energy owns significant adjudicated water rights to divert, impound, and consumptively use surface water from the San Antonio River basin. ROA 859-860. CPS Energy uses these waters to cool electrical generating units at two power plant complexes located adjacent to large impoundment reservoirs: Braunig Lake and Calaveras Lake. ROA 858-860. The surface water rights are critical and necessary for CPS Energy to provide electricity to the greater San Antonio area and for electrical generation that is a critical part of Texas's electrical grid managed by the Electric Reliability Council of Texas. ROA 858, 861.

**4. UCC**

UCC owns and operates a chemical manufacturing complex located near Seadrift, Texas. The plant has been in operation since 1954. Operation of the plant requires a reliable firm supply of water, which UCC obtains under surface water appropriation permits issued by the TCEQ, and firm water supply contracts with Intervenor-Defendant Guadalupe-Blanco River Authority ("GBRA").

**5. SARA**

Case: 10-40610 Document: 44 Page: 7 Date Filed: 07/23/2010

The San Antonio River Authority ("SARA") is a governmental entity and political subdivision of the State of Texas. Pursuant to the legislation creating SARA, SARA holds title to the bed and banks of the San Antonio River, including those tributaries within SARA's jurisdiction, down to the confluence of the San Antonio and Guadalupe Rivers. SARA has legislative and constitutionally mandated duties which only SARA is authorized to exercise within the San Antonio River Basin. Additionally, SARA holds water rights and represents the interests of a diverse range of constituents.

**B. Denial of interventions**

The orders of the district court denying Appellants' interventions held that, although Appellants' interests satisfied requirements for intervention by right in all other respects, their interests would be adequately represented by existing parties – the Texas Chemical Council ("TCC") in the case of private rights holders TFB and UCC; and TCC and other parties in the case of SAWS, SARA and CPS Energy. ROA 921; ROA 1125 (SARA). TCC is a trade association of chemical manufacturing facilities in Texas organized to protect that industry's common interests. ROA 904. TCC's Motion to Intervene was granted in the same order that denied Appellants' interventions. ROA 916. As explained below, TCC cannot represent the interests of TFB's members or of UCC.

Case: 10-40610 Document: 00511184532 Page: 8 Date Filed: 07/23/2010

Similarly, the district court's orders denied the interventions of SAWS, SARA and CPS Energy, determining that each was adequately represented by already-admitted parties. ROA 901, 1125 (SARA). Curiously, the district court also concluded that, while each of the State Defendants, TCC and Intervenor-Defendant GBRA would be unable *alone* to represent CPS Energy and SAWS (and by extension, SARA), they could *together* represent them. ROA 923, 1125.

The district court erred in excluding Appellants because none is adequately represented by currently admitted parties, so Appellants request a stay of district court proceedings pending appeal of the denial of their motions to intervene.

**III. Standard for Decision.**

This Court has authority to stay the district court proceeding pending appeal. *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). In determining whether to issue a stay pending appeal, a court must assess four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where lies the public interest.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987);[8] *In re Tex. Health Enters., Inc.*, 255 B.R. 185, 187-88 (Bankr. E.D. Tx. 2000). These four factors cannot be reduced to a set of rigid rules, and it is sufficient merely to show that the stay

[8] Although *Hilton* involves a motion for a stay brought under Federal Rule of Civil Procedure 62(c), consideration of the factors enumerated is generally appropriate in this case.

applicant can demonstrate a strong case on the merits. 481 U.S. at 777, 778. A movant for a stay "need only present a substantial case on the merits . . . and show that the balance of the equities weighs heavily in favor of granting the stay." *United States v. Baylor Univ. Med. Ctr*, 711 F.2d 38, 39 (5th Cir. 1983).

## IV. Appellants have a Substantial Case on the Merits and are Likely to Succeed on the Merits.

This Court requires only a demonstration that there is a serious legal question and that the movant for a stay has presented a substantial case on the merits. *Id.* at 39. Appellants have demonstrated a substantial case on the merits.

### A. Three of the four requirements for intervention as of right are undisputed.

Federal Rule of Civil Procedure 24(a)(2) governs intervention as of right. A four-factor test governs intervention:

> (1) the applicant must file a timely application; (2) the applicant must claim an interest that is the subject matter of the action; (3) the applicant must show that disposition of the action may impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties to the litigation.

*Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 422 (5th Cir. 2002). Rule 24 is to be construed liberally and any doubts should be resolved in favor of intervention. *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 248 (5th Cir. 2009).

The district court found that Appellants satisfied the first three elements for intervention: The motions for intervention were timely filed. ROA 920, ROA

Case: 10-40610 Document: 44 Page: 10 Date Filed: 07/23/2010

1125 (SARA). Each Appellant established the required legal interest in the subject matter of the case, *id.*, and that the disposition of the case would "impair their ability to protect existing water rights." *Id.* However, the district court erroneously concluded that Appellants' interests could be adequately represented by TCC or other parties. Thus, the issue of adequate representation is the only issue for decision on appeal. The right to intervene is a legal issue, reviewed de novo by this Court. *E.g.*, *Sierra Club v. Glickman*, 82 F.3d 106, 108 (5th Cir. 1996), *citing Sierra Club v. Espy*, 18 F.3d 1203, 1205 (5th Cir. 1994).

**B. Appellants' interests are not adequately represented by TCC or any other admitted party.**

Rule 24 favors intervention generally, and the burden to demonstrate the fourth prong of the intervention test – inadequate representation of the party's interests – is "minimal". *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 636 n.10 (1972). The applicant only need show that representation of its interests by existing parties "may be" inadequate. *Sierra Club v. Espy*, 18 F.3d at 1205.

**1. TFB's interests**

The district court acknowledged that TFB members have a significant legal interest in the outcome of this case, but denied TFB intervention, stating that TCC will be able to "ensure the interests of private consumers are adequately represented." ROA 921. While TFB and TCC members' "uses of the water at

Case: 10-40610 Document: 00511184532 Page: 11 Date Filed: 07/23/2010

issue differs," the district court "fails to see the relevance of this difference as it relates to representation of users' interests in this litigation." ROA 922. TCC and TFB members may all be private users of water, but they represent distinct water rights and water rights users. TCC represents industrial facilities that use water via surface rights that they either hold or purchase and, unlike TFB, its members do not have rights in irrigation permits, groundwater, or exempt domestic and livestock uses,[9] or interest in such uses. ROA 904.

No other currently-admitted party or Appellant represents the interests of agricultural water users, which are the largest single group of permit holders in the San Antonio and Guadalupe River Basins. Agricultural users differ from other water users in a number of ways. Their use is primarily seasonal in nature and therefore will have a different impact on bays and estuaries; tends to increase during drought periods, making competition with water for the bays and estuaries more direct; and once crops are growing, the impact of cutting off irrigation water is much more severe than reducing water supplies for many other purposes. Similarly, only TFB represents the interests of exempt domestic and livestock

[9] Significantly, TCC *expressly disclaimed* that it represents the interests of TFB members. In its Motion to Intervene, TCC stated that "[t]he industrial uses of water by TCC's members present different needs and solutions than, for example, residential and agricultural users . . . ." ROA 549. In its later opposition to TFB's Motion to Stay in the district court, TCC stated that (i) none of its members have the water rights interests of TFB's members (*i.e.*, agricultural users with water and irrigation rights, exempt domestic and livestock users, and groundwater users) and (ii) that "the results desired by members of TCC [in the proceeding] could possibly be different than the results desired by members of TFB." ROA-2 60.

users and irrigators from the Edwards Aquifer, interests that are legally distinct and often superior to permitted water rights. Plaintiff has specifically targeted exempt users in its pleadings[10] but they are not represented by any existing party or any of the Appellants.

**2. SAWS's interests**

SAWS provides water, wastewater and/or reclaimed water services to approximately 1.3 million people, under permits issued by the TCEQ. ROA 745-746. SAWS's interests intrinsically diverge from, and thus cannot be represented adequately by, its regulators – the State Defendants. Likewise, the interests of Intervenor-Defendant GBRA diverge from those of SAWS. SAWS's immediate interest in this case stems from its rights in surface water in the San Antonio River, while GBRA's interests lie in the Guadalupe River. ROA 754-757. In addition, GBRA and SARA are Texas state agencies, created by statute, with a general mission to control water use, whereas SAWS is a water purveyor and consumer. Nor does SAWS share the industry-specific or company-specific interests of Intervenor-Defendant TCC, Appellant CPS Energy or Appellant UCC.

**3. CPS Energy's interests**

CPS Energy's interests are not represented by any currently-admitted party

[10] *See* Compl. ¶ 204, ROA 47 ("It is reasonably foreseeable that future use of existing water permits and exemptions authorized by Defendants will result in additional prohibited takes of Whooping Cranes unless and until such activities are enjoined."); ¶ ¶ 186-88, ROA 45.

Case: 10-40610 Document: 44 Page: 13 Date Filed: 07/23/2010

or other Appellant. ROA 846-851. CPS Energy's interests diverge from and cannot be adequately represented by the State Defendants, who must consider broader statewide interests and who are regulators of surface water rights and permits upon which CPS Energy relies. Intervenor-Defendant TCC and Appellants TFB and UCC have industry-specific, company-specific, or private rights-holder interests distinct from CPS Energy's public mission of impounding surface water for generating and providing electric energy. Intervenor-Defendant GBRA and Appellant SARA are statutorily-created river authorities whose interests are focused on water supply and flood control, not electrical generation and supply; and GBRA's jurisdiction does not include the San Antonio River basin. SAWS is a water purveyor with no responsibility for generating or supplying electric energy, and is also on the opposite side of a contract with CPS Energy that involves the discharge and diversion of SAWS's treated wastewater effluent from the San Antonio River. CPS Energy is the only electric utility that has sought intervention in this case.

**4. UCC's interests**

No existing party in the case, including TCC, can adequately represent UCC's particularized interests in this case; nor can any of the other Appellants. UCC is a direct industrial water user and is dependent on its direct water rights and its contract supplies for its operations in this part of the state. TCC, however,

represents the "chemical industry's common interest at the state level" and "has a broader interest than any one single industrial user." ROA 549. Because TCC acts on a consensus basis for its members who have distinct interests, and since TCC has broad state policy concerns, TCC's interests may diverge from UCC's. Other parties' interests also may diverge from UCC's: the State Defendants are UCC's permit regulators and have broader state policy concerns; GBRA administers UCC's and other competing water supply contracts; and the other public entities including Appellants SAWS and CPS Energy, and SARA, have public mission interests distinct from UCC's private, for-profit interests in this case.

### 5. SARA's interests

SARA is a conservation and reclamation district created by special act of the Texas Legislature that requires SARA to manage and conserve the waters in the San Antonio River basin and participate in state water planning for the basin; and gives SARA ownership of the bed and banks of the San Antonio River and its tributaries within SARA's jurisdiction. ROA 1072-1083. Those interests are geographically, practically and politically distinct from GBRA's interests in the Guadalupe River basin, to which GBRA's jurisdiction is limited.[11] Additionally, SARA owns multiple water rights authorizing the use and reuse of waters diverted from the San Antonio River and its tributaries. ROA 1073-1074. Neither the State

[11] *See Tri-City Freshwater Supply District No. 2 v. Mann*, 142 S.W.2d. 945-948 (Tex. 1940); *South Plains La Mesa Railroad v. High Plains UWD No. 1*, 52 S.W.3d. 770 (Tex.App.-Amarillo 2001, no writ).

Case: 10-40610 Document: 44 Page: 15 Date Filed: 07/23/2010

Defendants, TCC, GBRA or any of the Appellants share the specific interests and obligations of SARA, and are incapable of representing SARA's interests.

**C. Interests of water right holders diverge for purposes of mediation, settlement, and formulation of remedies.**

Representation of Appellants' interests clearly will be inadequate if the district court reaches the remedy stage and Appellants are not parties. Any current alignment seeking to dismiss TAP's complaint likely will end during mediation[12] or settlement discussions, or if the district court ultimately provides some or all the relief sought by TAP. Plaintiff seeks the curtailment or conditioning of all water uses, including for irrigators, exempt users, industrial users, and municipal and other public users. At the remedy stage, or in mediation or settlement discussions, the interests of rights holders of all stripes will be pitted against each other.

In particular to TFB, neither TCC nor the other Appellants would have any obligation or incentive to advocate on behalf of TFB members at the remedy stage. For example, if water use reduction were mandated, TCC, UCC, GBRA and the other public entity Appellants as well could be expected to argue that municipal and industrial water uses have higher priority and value than agricultural or exempt uses, advocating curtailment or reduction of TFB members' water rights in favor of the rights of TCC members. *See* ROA-2 60.

---

[12] Mediation has already been ordered by the district court. ROA 317.

Similarly, the interests of each other Appellant is sufficiently distinct from those of existing defendant parties and the other Appellants, that their interests could not be adequately represented by those other parties. As noted above, TCC cannot represent UCC's particularized interests. None of the other Appellants have industrial interests at heart, much less UCC's particular rights. Not even GBRA, which both provides UCC water as a customer and manages water rights co-owned with UCC by contract, has interests fully aligned with UCC; GBRA has unique water diversion and impoundment rights, other competing customers and contracts, and broader goals and duties mandated by state law.

The interests of the three public entity Appellants – SAWS, SARA and CPS Energy – each diverge from those of the State Defendants, GBRA, TCC, UCC and TFB, and from each other.

In order to mediate or attempt settlement of this proceeding or, should this action proceed to trial and TAP prevail in any substantial way, in order to fashion a remedy in which all affected parties' legal rights are represented, all the Appellants are necessary parties, as holders of vested property rights.

## V. Absent A Stay, Appellants Will Be Irreparably Injured.

The district court has established an accelerated schedule leading to trial of this case beginning March 2, 2011. ROA 312-313. In a major case of this nature, involving legal issues unresolved in the Fifth Circuit (*e.g.*, does the state have a

Case: 10-40610 Document: 00511184532 Page: 17 Date Filed: 07/23/2010

duty to regulate, independent of state law, to prevent "takes" of endangered species?), factual and scientific complexity (freshwater inflow requirements of the estuarine ecosystem and their impact on a seasonal population of whooping cranes), and potentially impacting thousands of water right holders and well over a million people throughout two river basins, such an accelerated schedule makes every day essential.

Absent a stay, given the accelerated trial schedule, Appellants will be unable to participate in discovery or at trial, and would be precluded from appealing the outcome. Appellants would be unable to put on evidence regarding their uses of water resources or rebut TAP's claims of those uses' impact on the Whooping Crane. Absent a stay, even should this Court ultimately reverse and allow intervention, Appellants would be forced to "play catch up" which efforts might, at an advanced point in the pretrial process, nonetheless be impaired. Further, as discussed above, Appellants' inability to participate in mediation, settlement discussions, or fashioning any potential legal remedy could result in compromise of Appellants' vested rights.

## VI. Delay Resulting from a Stay Will Cause No Harm to Plaintiff.

### A. Plaintiff does not seek temporary relief.

The need for an accelerated resolution of this case is far from clear. TAP does not seek preliminary injunctive relief or a temporary restraining order. *See*

Case: 10-40610 Document: 44 Page: 18 Date Filed: 07/23/2010

Compl., ROA 51-52. TAP alleges no imminent harm sufficient to support a request for interim or expedited relief. A temporary stay of the proceeding in order to determine what parties should have a right to intervene will cause no harm to TAP or the current defendant parties. Indeed, neither the State Defendants nor GBRA opposed a stay when requested below. ROA-2 54.

**B. Drought conditions that impacted freshwater inflows no longer exist.**

TAP briefly acknowledges that the record Texas drought of 2008-09 caused low freshwater inflows into the San Antonio Bay estuary. *See* Compl. at ¶¶ 85, 101, ROA 33, 35. However, heavy rains that have fallen since September 2009 across much of the state have ended the severe drought conditions that diminished freshwater inflows in the San Antonio and Guadalupe Rivers.[13] The drought of 2008-09 – one of the most severe on record in much of Texas – has ended, eliminating the complained-of conditions and mitigating any potential harm of a stay of district court proceedings.

**C. Appellants have requested expedited appeal.**

Appellants seek a stay of the district court proceeding only in the interest of justice, and will seek to minimize delay to the extent possible. Appellants have

---

[13] *See*, e.g., NOAA U.S. Seasonal Drought Outlook (Valid July 1, 2010 – September 1, 2010), *available at* http://www.cpc.noaa.gov/products/expert_assessment/season_drought.gif (Attached to TFB's Motion to Stay in the district court, **Exhibit G**); James C. McKinley Jr., *Heavy Rains End Drought for Texas*, N.Y. TIMES, January 8, 2010, *available at* http://www.nytimes.com/2010/01/09/science/earth/09drought.html.

Case: 10-40610 Document: 44 Page: 19 Date Filed: 07/23/2010

filed motions with this Court to expedite their appeals, and have proposed an aggressive briefing schedule. If granted, this would minimize any delay of the proceedings below that might result from a stay.

**VII. The Public Interest Favors Granting a Stay.**

Appellants represent well over a million consumers of water and electric power, major industrial interests, municipal users, water re-users, agricultural users and exempt domestic and livestock users. Appellants' interests are not represented by other parties either regarding Appellants' uses of water or the legal character of the specific water rights held. Plaintiff TAP seeks to reduce Appellants' specific uses and modify Appellants' rights, but Appellants – real parties in interest here – are not represented by any admitted party or, indeed, by any other Appellant. Any mediation, settlement, or legal remedy that Plaintiff seeks necessarily would affect Appellants' rights in ways that may be different from, and likely would compete with, those of the State Defendants, TCC and GBRA, and also of each other.

Intervention is favored. *Heaton*, 297 F.3d at 422. Appellants have shown a likelihood of success on the merits of their appeals seeking intervention. Given the accelerated proceeding below, the absence of harm likely from a stay, and the importance of the vested property interests involved, and considering the policy favoring intervention, the public interest would best be served by granting the request for stay of the district court's proceedings pending those appeals, so that

Case: 10-40610 Document: 00511184532 Page: 20 Date Filed: 07/23/2010

when Appellants ultimately are granted intervention, their ability to participate fully below to protect their rights will not have been materially compromised or curtailed.

## VIII. Conclusion and Prayer

Plaintiff TAP's complaint presents serious legal questions and seeks remedies that may impact the water rights and livelihoods of TFB members, and the water rights and interests of SAWS, CPS Energy, SARA and UCC. Appellants have presented a substantial case on the merits that their interventions should be of right. They have requested expedited appeal. Little if any harm to existing parties would result from a stay; in contrast, given the aggressive schedule by the district court set, Appellants' ability to participate below would be compromised should proceedings not be stayed pending the appeals. The equities weigh heavily in favor of staying the proceeding of district court until the appellate court has an opportunity to address and resolve the legal issues of whether TFB, UCC, SAWS , SARA and CPS Energy have rights of intervention. Accordingly, this Court should stay this proceeding pending resolution of the Appellants' appeals.

Case: 10-40610 Document: 44 Page: 21 Date Filed: 07/23/2010

Respectfully submitted,

*s/ Sydney W. Falk, Jr.*
Douglas G. Caroom
Lead Counsel
Texas Bar No. 03832700
Sydney W. Falk, Jr.
Texas State Bar No. 06795400
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638
dcaroom@bickerstaff.com
sfalk@bickerstaff.com

Attorneys for Appellants Texas Farm Bureau and American Farm Bureau Federation

*s/ Stephen G. Tipps*
(by consent 7/23/10)
Stephen G. Tipps
Texas Bar No. 20070500
Federal I.D. No. 00805
Cristina Espinosa Rodriguez
Texas Bar No. 00793701
Federal I.D. No. 20575
BAKER BOTTS L.L.P.
910 Louisiana
Houston, Texas 77002-4995
Telephone: (713) 229-1543
Facsimile: (713) 229-7943
stephen.tipps@bakerbotts.com
cristina.rodriguez@bakerbotts.com

Attorneys for Appellant Union Carbide Corporation

*s/ J. Michael Klise*
(by consent 7/23/10)
J. Michael Klise
D.C. Bar No. 412420
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
jmklise@crowell.com

Attorneys for Appellant San Antonio Water System

*s/ Russell S. Johnson*
(by consent 7/23/10)
Russell S. Johnson
Tex. Bar No. 10790550
Carl R. Galant
Tex. Bar No. 24050633
MCGINNIS, LOCHRIDGE &
KILGORE, LLP
600 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 495-6000
Facsimile: (512) 505-6374
rjohnson@mcginnislaw.com
cgalant@mcginnislaw.com

Attorneys for Appellant City of San Antonio by and through the City Public Service Board ("CPS Energy")

Case: 10-40610 Document: 00511184532 Page: 22 Date Filed: 07/23/2010

*s/ Edmond R. McCarthy, Jr.*
(by consent 7/23/10)
Edmond R. McCarthy, Jr.
Texas Bar No. 13367200
JACKSON, SJOBERG, MCCARTHY & WILSON, LLP
711 West 7th Street
Austin, Texas 78701
Telephone: (512) 225-5606
Facsimile: (512) 480-8963
emccarthy@jacksonsjoberg.com

Attorneys for Appellant San Antonio River Authority

## CERTIFICATE OF CONFERENCE

I hereby certify that on July 21, 2010, I conferred with counsel for the parties to this proceeding regarding the Joint Motion for Stay of Proceedings Pending Appeal of Texas Farm Bureau, American Farm Bureau Federation, Union Carbide Corporation, San Antonio Water System, CPS Energy and San Antonio River Authority. Plaintiff-Appellee TAP is opposed to the motion.

*s/ Douglas G. Caroom*
Douglas G. Caroom

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 23rd day of July, 2010, I caused a copy of the foregoing Joint Motion for Stay of Proceedings Pending Appeal of Texas Farm Bureau, American Farm Bureau Federation, Union Carbide Corporation, San Antonio Water System, CPS Energy and San Antonio River Authority to be filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the Fifth Circuit, which currently provides electronic service on the following counsel of record:

James B. Blackburn, Jr.: jbb@blackburncarter.com, velia@blackburncarter.com, zamerson@blackburncarter.com

Douglas G. Caroom: dcaroom@bickerstaff.com, ealbrech@bickerstaff.com, jwarren@bickerstaff.com, epeters@bickerstaff.com, smaxwell@bickerstaff.com

Sydney W. Falk, Jr.: sfalk@bickerstaff.com, dfregeolle-burk@bickerstaff.com

Carl R. Galant: cgalant@mcginnislaw.com

Russell S. Johnson: rjohnson@mcginnislaw.com

Case: 10-40610 Document: 44 Page: 24 Date Filed: 07/23/2010

David A. Kahne: davidkahne@earthlink.net

Joseph Michael Klise: jmklise@crowell.com

Cristina E. Rodriguez: cristina.rodriguez@bakerbotts.com, laura.natelson@bakerbotts.com

Stephen G. Tipps: stephen.tipps@bakerbotts.com

Edmond R. McCarthy, Jr., emccarthy@jacksonsjoberg.com

Jorge C. Rangel, jorge.c.rangel@rangellaw.com

*s/ Sydney W. Falk, Jr*
Sydney W. Falk, Jr.

**CERTIFICATIONS UNDER ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R.25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: July 23, 2010

*s/ Sydney W. Falk, Jr.*
Sydney W. Falk, Jr.

Case: 10-40610 Document: 44 Page: 25 Date Filed: 07/23/2010

## CERTIFICATE OF INTERESTED PARTIES

**No. 10-40610**, The Aransas Project, Plaintiffs v. Bryan Shaw, *et al*., Defendants v. Texas Farm Bureau, American Farm Bureau Federation, San Antonio Water System, Union Carbide Corporation, Movants – Appellants, and City Public Service, City of San Antonio by and through the City of San Antonio Public Service Board, Intervenor Defendant – Appellant.

**No. 10-40633**, The Aransas Project, Plaintiffs v. Bryan Shaw, *et al.*, Defendants v. San Antonio River Authority, Movant-Appellant.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Plaintiff-Appellee: | The Aransas Project, and all its members as stated in Plaintiff's Original Complaint at ¶ 7, ROA 22,[14] and at http://www.thearansasproject.org) |
| Counsel for Plaintiff-Appellee: | BLACKBURN CARTER PC<br>James B. Blackburn, Jr.<br>Charles William Irvine<br>Mary Carter<br><br>LAW OFFICES OF DAVID A. KAHNE<br>David Alfred Kahne |
| Movant-Appellant: | San Antonio Water System |
| Counsel for Movant-Appellant: | CROWELL & MORING LLP<br>Joseph Michael Klise<br>Steven P. Quarles |

[14] Citations to the Record on Appeal are to the pagination in three CDs provided by the district court to the parties in Case No. 10-40610. The CD containing the original record (July 6, 2010) is cited as "ROA." The CDs containing first and second supplemental records (July 8, 2010, and July 16, 2010) are cited as "ROA-1 xxx" and "ROA-2 xxx," respectively.

Case: 10-40610 Document: 44 Page: 26 Date Filed: 07/23/2010

| | |
|---|---|
| | MATHEWS & FREELAND, LLP<br>Jim Mathews |
| | SAN ANTONIO WATER SYSTEM<br>Phil Steven Kosub |
| Movant-Appellant: | Texas Farm Bureau<br>American Farm Bureau Federation |
| Counsel for Movant-Appellant: | BICKERSTAFF, HEALTH, DELGADO & ACOSTA, LLP<br>Sydney W. Falk, Jr.<br>Douglas G. Caroom |
| Movant-Appellant: | City of San Antonio by and through the City Public Service Board ("CPS Energy") |
| Counsel for Movant-Appellant: | MCGINNIS, LOCHRIDGE & KILGORE, LLP<br>Russell S. Johnson<br>Carl R. Galant |
| Movant-Appellant: | Union Carbide Corporation<br>The Dow Chemical Company |
| Counsel for Movant-Appellant: | BAKER BOTTS L.L.P.<br>Cristina Espinoza Rodriguez<br>Stephen G. Tipps |
| | THE RANGEL LAW FIRM, PC<br>Jorge C. Rangel<br>Jame S. Rangel |
| Movant-Appellant: | San Antonio River Authority |
| Counsel for Movant-Appellant: | JACKSON SJOBERG MCCARTHY & WILSON, LLP<br>Edmond R. McCarthy, Jr. |
| | BROWN & ROSS, PC<br>David W. Ross |

Case: 10-40610 Document: 44 Page: 27 Date Filed: 07/23/2010

| | |
|---|---|
| Intervenor-Defendant in district court: | Guadalupe-Blanco River Authority, and all its water customers as stated in its Certificate of Interested Parties, ROA 326-32 |
| Counsel for Intervenor-Defendant: | GUADALUPE-BLANCO RIVER AUTHORITY<br>Bruce Wasinger<br><br>HUNTON & WILLIAMS LLP<br>Edward F. Fernandes<br>Andrew J. Turner<br>Kathy Robb<br>Maida O. Lerner<br><br>LAW OFFICES OF MARK H. ZEPPA, PC<br>Mark H. Zeppa<br><br>CANALES SIMONSON PC<br>J.A. Tony Canales |
| Intervenor-Defendant in district court: | Texas Chemical Council, and all its members as stated in its Certificate of Interested Parties, ROA 1163-66 |
| Counsel for Intervenor-Defendant: | BROWN MCCARROLL LLP<br>Thomas H. Watkins<br>Kenneth R. Ramirez<br>Rachel L. Noffke |
| Defendants in district court: | Bryan Shaw, Buddy Garcia, Carlos Rubinstein, Mark Vickery, and Al Segovia |
| Counsel for Defendants: | TEXAS ATTORNEY GENERAL'S OFFICE<br>Environmental Protection & Administrative Law Division<br>Brian E. Berwick<br>Cynthia Woelk<br>John Hulm |

Case: 10-40610 Document: 44 Page: 28 Date Filed: 07/23/2010

*Amici* in district court:

The following parties have filed amicus briefs in the district court stating an interest in the proceedings (*see* ROA-2 6-10):

City of Kerrville
Represented by Martin C. Rochelle of Lloyd, Gosselink, Rochelle, and Townsend, PC, and Michael C. Hayes

CMC Steel Texas
Represented by Brad B. Castleberry, Kristen S. Olson, and Michael A. Gershon of Lloyd, Gosselink, Rochelle, and Townsend, PC

Guadalupe Valley Electric Cooperative, Inc.
Represented by Mark C. Davis of Brickfield, Bruchette, Ritts & Stone, PC

Caldwell County – *pro se*

City of Port Lavaca – *pro se*

City of Boerne – *pro se*

City of Bulverde – *pro se*

City of Cibolo – *pro se*

City of Lockhart – *pro se*

City of Luling – *pro se*

City of San Marcos
Represented by Michael John Cosentino, San Marcos City Attorney's Office

City of Victoria – *pro se*

City of Yoakum – *pro se*

Fair Oaks Ranch – *pro se*

Foresight Golf Partners, LTD – *pro se*

Golf Associates, LTD – *pro se*

Guadalupe Basin Coalition – *pro se*

Guadalupe-Blanco River Authority Customers
Represented by Will C. Jones, IV of the Jones Law Firm

Kendall County – *pro se*

Royal Marina Holdings, LLP – *pro se*

Royal Oaks Partners at Fulton Beach, LLP – *pro se*

SJWTX, Inc
Represented by Will C. Jones, IV of the Jones Law Firm

Texas Water Conservation Association – *pro se*

Victoria County – *pro se*

National Water Resources Association – *pro se*

Comal County – *pro se*

Calhoun County – *pro se*

Guadalupe County, Texas – *pro se*

City of Wimberley, Texas – *pro se*

City of New Braunfels
Represented by Alan C. Wayland, City Attorney

Case: 10-40610 Document: 00511184532 Page: 30 Date Filed: 07/23/2010

| | |
|---|---|
| | East Central Special Utility District<br>Represented by Louis T. Rosenberg |
| Surface water rights owners and water users in the Guadalupe and San Antonio River basins: | All other permitted and exempt surface water users within the Guadalupe and San Antonio River Basins are financially interested in this appeal and the underlying proceedings in the district court. According to a database maintained by the Texas Commission on Environmental Quality, available at http://www.tceq.state.tx.us/permitting/water_supply/water_rights/wr_databases.html, there are approximately 1,151 active permitted water rights holders on the Guadalupe and San Antonio River basins. The State Official Defendants filed a certificate of interested parties in the district court that lists a number of these water rights holders. ROA 102-20. |

Respectfully submitted,

*s/ Sydney W. Falk, Jr.*
Douglas G. Caroom
Lead Counsel
Texas Bar No. 03832700
Sydney W. Falk, Jr.
Texas State Bar No. 06795400
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638
dcaroom@bickerstaff.com
sfalk@bickerstaff.com

Attorneys for Appellants Texas Farm Bureau and American Farm Bureau Federation

*s/ J. Michael Klise*
(by consent 7/23/10)
J. Michael Klise
D.C. Bar No. 412420
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
jmklise@crowell.com

Attorneys for Appellant San Antonio Water System

Case: 10-40610 Document: 00511184532 Page: 31 Date Filed: 07/23/2010

*s/ Stephen G. Tipps*
(by consent 7/23/10)
Stephen G. Tipps
Texas Bar No. 20070500
Federal I.D. No. 00805
Cristina Espinosa Rodriguez
Texas Bar No. 00793701
Federal I.D. No. 20575
BAKER BOTTS L.L.P.
910 Louisiana
Houston, Texas 77002-4995
Telephone: (713) 229-1543
Facsimile: (713) 229-7943
stephen.tipps@bakerbotts.com
cristina.rodriguez@bakerbotts.com

Attorneys for Appellant Union Carbide Corporation

*s/ Russell S. Johnson*
(by consent 7/23/10)
Russell S. Johnson
Tex. Bar No. 10790550
Carl R. Galant
Tex. Bar No. 24050633
MCGINNIS, LOCHRIDGE & KILGORE, LLP
600 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 495-6000
Facsimile: (512) 505-6374
rjohnson@mcginnislaw.com
cgalant@mcginnislaw.com

Attorneys for Appellant City of San Antonio by and through the City Public Service Board ("CPS Energy")

*s/ Edmond R. McCarthy, Jr.*
(by consent 7/23/10)
Edmond R. McCarthy, Jr.
Texas Bar No. 13367200
JACKSON, SJOBERG, MCCARTHY & WILSON, LLP
711 West 7th Street
Austin, Texas 78701
Telephone: (512) 225-5606
Facsimile: (512) 480-8963
emccarthy@jacksonsjoberg.com

Attorneys for Appellant San Antonio River Authority

Case: 10-40610 Document: 00511184532 Page: 32 Date Filed: 07/23/2010

**INDEX TO EXHIBITS**

| Exhibit | Item |
| --- | --- |
| A | Complaint of The Aransas Project |
| B | Motion to Intervene by Union Carbide Corporation and Declaration of Kristan Soto. |
| C | Texas Farm Bureau and American Farm Bureau Federation's Motion to Intervene as Defendants and Memorandum in Support of Intervention Motion and Declaration of James D. Sartwelle, III. In Support. |
| D | Motion of San Antonio Water System for Leave to Intervene as Party Defendant, and Memorandum In Support, and Declaration of Steven Clouse. |
| E | CPS Energy's Motion to Intervene and Declaration of Michael Kotara In Support. |
| F | San Antonio River Authority's Motion to Intervene |
| G | June 17, 2010 Order (Denying Interventions of SAWS, TFB/AFBF, UCC and CPS) |
| H | Texas Farm Bureau and American Farm Bureau Federation's Motion for Stay of Proceedings Pending Appeal |
| I | Texas Chemical Council's Opposition to the Motion for Stay of Proceedings Pending Appeal |
| J | July 14, 2010 Order (Denying TFB/AFBF's Motion for Stay). |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT,<br><br>*Plaintiff*,<br><br>v.<br><br>BRYAN SHAW in his official capacity as CHAIRMAN OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, and<br><br>BUDDY GARCIA and CARLOS RUBINSTEIN, each in their official capacity as COMMISSIONERS OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, and<br><br>MARK VICKERY in his official capacity as EXECUTIVE DIRECTOR OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, and<br><br>AL SEGOVIA in his official capacity as SOUTH TEXAS WATERMASTER,<br><br>*Defendants*. | § § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. _______________ |

**ORIGINAL COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I. INTRODUCTION AND SUMMARY OF THE CASE

1. This litigation seeks declaratory and injunctive relief to eliminate, or at least to reduce significantly, immense threats to the very existence of Whooping Cranes. The Texas Commission on Environmental Quality ("TCEQ") and its officials cause these threats by agency actions, and refusals and failures to act, in managing freshwater uses and flows on the Guadalupe and San Antonio Rivers.

Case: 10-40610 Document: 00511184533 Page: 2 Date Filed: 07/23/2010

2. Whooping Cranes, magnificent birds, face extinction. More than half of all known adults and their young live in the flock that winters in Aransas National Wildlife Refuge (in Texas) and summers in Wood Buffalo National Park (in Canada). Only 263 birds remain. Last winter in Texas, 23 birds died, representing a loss of 8.5% of the wintering flock.

3. These deaths directly reflect the lack of sufficient freshwater flowing to San Antonio-Aransas Bay system. The Cranes need freshwater to drink, and to support two essential food sources – the wolfberry and, perhaps most importantly, for protein, the blue crab. Some Cranes literally face winter starvation, including the young whose own parents will push them away from feeding areas in a desperate effort to save their own lives.

4. This litigation alleges that Defendants – the three TCEQ Commissioners, the TCEQ Executive Director and the South Texas Watermaster of the TCEQ – in their roles to regulate water uses and flows, harmed and harassed the Whooping Cranes last winter in Aransas County, Texas, thereby violating Section 9 of the federal Endangered Species Act ("ESA") by causing a "take" of this already endangered species.

5. This litigation further alleges that, unless Defendants alter these practices, such harm and harassment in all likelihood will again occur, possibly leading to even more severe harm than occurred during the winter of 2008-2009, which is the worst on record. Indeed, with increasing water use in the Guadalupe basin, the Cranes face an existential threat – lack of freshwater could mean, literally, that they face extinction. Federal law forbids any such "take", actual or threatened, even if Defendants did not intend or even did not want their actions to cause harm. As far as Plaintiff is aware, none of the Defendants have taken any action to reduce this existential threat to Whooping Cranes well known to be caused by lack of freshwater.

Case: 10-40610 Document: 00511184533 Page: 3 Date Filed: 07/23/2010

6. Members of plaintiff – The Aransas Project – include numerous groups and businesses representing diverse interests and activities. They have a direct interest in the Whooping Crane and the ecological health of San Antonio, Carlos, Mesquite and Aransas Bays in their own right, as well as through their members.

7. Among these groups are the International Crane Foundation, Aransas County, the City of Rockport, the Town of Fulton, the Aransas County Navigation District, the Coastal Bend Guides Association, Rockport Birding and Kayak Adventures, Casterline Fishing Company, the Aransas Bird and Nature Club, the Aransas County Republican Party, the Aransas County Democratic Club, the American Bird Conservancy, the Coastal Bend Audubon Society, the Houston Audubon Society, the Travis Audubon Society, The Whooping Crane Conservation Alliance, the Texas Conservation Alliance, the Matagorda Bay Foundation, the Galveston Bay Conservation and Preservation Association, Environment Texas, Anthony's By the Sea, the Crane House, Durham and Associates, Hamilton A/C, Electric and Plumbing, Key Allegro Properties LLC, Pelican Rentals, MasterPlan Design, and James Fox Guide Service. These groups and over 200 individual members can be found at the web site of the Aransas Project at http://www.thearansasproject.org.

8. In this litigation, The Aransas Project is seeking injunctive relief to compel TCEQ officials to take appropriate steps to protect the wintering Whooping Crane from the negative impacts of water withdrawals from the Guadalupe and San Antonio River systems. Such steps could include, for example, creation of a Habitat Conservation Plan for the Whooping Crane pursuant to Section 10 of the ESA, compilation of a comprehensive and thorough inventory of all water withdrawals from the Guadalupe and San Antonio River systems, and identification of a process to reduce freshwater withdrawals during times of drought and low flow in order to

maintain flows into the San Antonio-Aransas Bay system, sufficient to prevent harm and harassment to the Whooping Cranes. It may also be appropriate to establish a special master to oversee this process.

## II. JURISDICTION AND VENUE

9. This Court has jurisdiction and the authority to grant the relief requested pursuant to 16 U.S.C. §§ 1540(c) & (g) (ESA), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 2201 *et seq*. (Declaratory Judgment Act).

10. Plaintiff has satisfied the jurisdictional requirements for bringing this suit. Under 16 U.S.C. § 1540(g)(2)(A)(i), Plaintiff notified all Defendants of their violations of the ESA and of Plaintiff's intent to sue for those violations by certified letter sent on December 7, 2009 ("Notice Letter"), attached as Exhibit 1. Defendants Shaw, Garcia, Rubinstein, Vickery, and Segovia and/or their authorized agents received the Notice Letter on December 9, 2009.

11. Plaintiff also gave notice of its intent to sue by sending the Notice Letter, on December 7, 2009, to Ken Salazar, Secretary of the Interior, and Sam Hamilton, Director of the United States Fish and Wildlife Service ("FWS"), which was received on December 14, 2009.

12. More than sixty days have passed since the Notice Letter was served and the violations complained of in the Notice Letter are continuing and reasonably likely to continue to occur. The named Defendants have not taken any actions to remedy or prevent continued violations of the Act. The Secretary of the Interior has not commenced an action to impose a penalty pursuant to 16 U.S.C. § 1540(a) and the United States has not taken any action to prevent continued violations of the Act.

13. Venue is appropriate in the Corpus Christi Division of the Southern District of Texas under the ESA, 16 U.S.C. § 1540(g)(3)(A), because alleged violations have occurred and will occur in this district. Venue is also appropriate in this district under 28 U.S.C. § 1391(b).

Case: 10-40610 Document: 00511184533 Page: 5 Date Filed: 07/23/2010

## III. PARTIES

14. Plaintiff, The Aransas Project ("TAP") is suing on behalf of itself and its members to protect one of the Nation's most unique and important ecological assets – the Whooping Crane. TAP is dedicated to the research, development and publication of proposals to protect the health of the streams and estuaries in and around the San Antonio-Aransas Bay system, including monitoring and taking legal action to protect the ecology of the region. Members include organizations, businesses and individuals dedicated to the protection and preservation of the Whooping Cranes and the natural resources of the region as well as commercial entities receiving all or part of their economic livelihood from Whooping Crane-related activities. TAP, as a non-profit corporation with principal place of business in Aransas County, Texas, has members who are injured by Defendants' violations of the ESA.

15. Defendant Bryan Shaw is sued in his official capacity as TCEQ Chairman. Defendant Shaw, through his actions at the TCEQ, regulates water diversion activities through the review and approval of water permits, and the rules, regulations and policies governing them. Defendant Shaw has a duty to ensure the water diversion activities authorized are consistent with applicable laws and regulations, including the ESA, and that authorization of such activities does not cause a "take" of species protected by the ESA.

16. Defendants Buddy Garcia and Carlos Rubinstein are sued in their official capacity as TCEQ Commissioners. Defendants Garcia and Rubinstein, through their actions at the TCEQ, regulate water diversion activities through the review and approval of water permits, and the rules, regulations and policies governing them. Defendants Garcia and Rubinstein have a duty to ensure the water diversion activities authorized are consistent with applicable laws and regulations, including the ESA, and that authorization of such activities does not cause a "take" of species protected by the ESA.

17. Defendant Mark Vickery is sued in his official capacity as TCEQ Executive Director. Defendant Vickery, through his actions at the TCEQ, regulates water diversion activities through the review and approval of water permits, and the rules, regulations and policies governing them. Defendant Vickery has a duty to ensure the water diversion activities authorized are consistent with applicable laws and regulations, including the ESA, and that authorization of such activities does not cause a "take" of species protected by the ESA.

18. Defendant Al Segovia is sued in his official capacity as the South Texas Watermaster, a TCEQ employee. Defendant Segovia, through his actions as the South Texas Water Master, regulates water diversion activities through the review and approval of each intended water diversion activity. Defendant Segovia has a duty to ensure the water diversion activities authorized are consistent with applicable laws and regulations, including the ESA, and that authorization of such activities does not cause a "take" of species protected by the ESA.

## IV. THE STATUTORY BACKGROUND

19. Congress enacted the Endangered Species Act, 16 U.S.C. § 1531 *et seq*., "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved... [and] to provide a program for the conservation of such endangered species and threatened species...." 16 U.S.C. § 1531(b).

20. Before a species receives critical protection under the ESA, FWS must list the species as either "threatened" or "endangered." 16 U.S.C. § 1533. An "endangered species" is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is one that is "likely to become an endangered species within the foreseeable future through all or a significant portion of its range." 16 U.S.C. § 1532(20).

Case: 10-40610 Document: 00511184533 Page: 7 Date Filed: 07/23/2010

21. Under the ESA, 16 U.S.C. § 1538(a)(1)(B), it is illegal to engage in any activity that "takes" an endangered species. The ESA's take prohibition applies to all listed species, including the Whooping Crane. 50 C.F.R. § 17.31; 55 Fed. Reg. 26114 (June 26, 1990).

22. Congress intended to define "take" in the "broadest possible manner to include every conceivable way" in which any person could harm or kill fish or wildlife. S. Rep. No. 307, 93rd Cong., 1st Sess. 1, reprinted in 1973 U.S. Code Cong. & Admin. News 2989, 2995.

23. The term "take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(18).

24. The term "harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

25. The term "harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

26. The U.S. Supreme Court has upheld the definitions of "harm" and "harass". *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995).

27. The ESA forbids "takes" by all "persons," including any "officer, employee, agent, department, or instrumentality of … any State." 16 U.S.C. § 1532(13).

28. In the ESA, Congress recognized that sometimes otherwise lawful activities can cause a take of a listed species. 16 U.S.C. § 1539. This is known as an 'incidental take.'

29. In some circumstances, Congress authorized those persons responsible for the take to seek an Incidental Take Permit. 16 U.S.C. § 1539(a). The Incidental Take Permit is

Case: 10-40610 Document: 00511184533 Page: 8 Date Filed: 07/23/2010

issued by FWS after development and submission of a Habitat Conservation Plan ("HCP") which must be approved by FWS. The HCP must include conservation measures designed to minimize and mitigate the impacts of taking species listed under the Act. 16 U.S.C. § 1539(a)(2)(A)(ii). In the absence of an Incidental Take Permit, the ESA forbids each and every take.

30. The ESA expressly authorizes citizens to sue and seek an injunction against any "person" alleged to be responsible for a take, or otherwise in violation of the ESA, including any governmental instrumentality or agency. 16 U.S.C. § 1540(g)(1).

31. As the U.S. Supreme Court has held, Congress has accorded the protection of endangered species the highest of priorities, so courts do not have the discretion to withhold injunctive relief where it is necessary to prevent an imminent and likely violation of the ESA. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

32. A Court must issue an injunction if a plaintiff establishes by a preponderance of the evidence that there is "a reasonably certain threat of imminent harm to a protected species." *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000).

## V. BACKGROUND FACTS

33. The Whooping Crane (*Grus americana*), a graceful and stately bird that can stand nearly six feet tall, captures the attention of all. While this species is limited in range to North America, other cranes exist abroad and, with migration routes crossing borders, they have been called international ambassadors of goodwill and symbols of peace. They are also referred to as ambassadors of water because their survival worldwide is so often intertwined with water issues and wetlands. In this sense the Whooping Crane faces threats common to other crane species, because without freshwater to maintain their already diminishing wetlands habitat, they will die.

Case: 10-40610 Document: 44 Page: 42 Date Filed: 07/23/2010

34. The flock of Whooping Cranes that is the subject of this litigation is the Aransas-Wood Buffalo flock, so-named because they winter at the Aransas National Wildlife Refuge ("ANWR" or "Refuge") in Aransas County, Texas and breed in Canada's Wood Buffalo National Park during the summer.

35. The Aransas-Wood Buffalo flock of Cranes is the only natural population that both migrates and survives on its own.

36. No more than approximately 500 Whooping Cranes exist worldwide, including those in zoos or otherwise in captivity.

37. After decades of federal protection in this country and Canada, the Aransas-Wood Buffalo flock stood at an all-time high of 270 in the spring of 2008, more than half of all birds worldwide.

38. A year later, fifty-seven birds had died, a staggering loss of 21.4% of the flock.

39. Twenty-three of these deaths occurred here in Texas (8.5% of the flock).

40. After this mortality, the following nesting season (2009) resulted in abnormally low productivity.

41. A critical reason the Cranes are dying is because not enough freshwater is flowing into the San Antonio Bay ecosystem and those habitats connected to it, including the Carlos, Mesquite and Aransas bay ecosystems and the adjacent marshes.

42. This reduction in freshwater inflow affects the Cranes in three crucial ways: it reduces the availability of blue crabs, their most important food source; it reduces the abundance of wolfberry fruit, another important food source; and it reduces the availability of drinkable water.

Case: 10-40610 Document: 00511184533 Page: 10 Date Filed: 07/23/2010

43. In good years, with sufficient water, most foraging occurs in the brackish bays, marshes, and salt flats on the edge of the mainland and on barrier islands. When necessary, Cranes fly to upland sites in search of freshwater to drink or to find foods such as acorns, snails, crayfish and insects, and then return to the marshes to roost.

44. When freshwater inflows fall too low, the Cranes have to fly further, forage longer, and expend more energy.

45. When critical food is scarce in their territory, Cranes often respond by abandoning their own juvenile and forcing it to try to fend for itself.

46. Malnutrition, emaciation and susceptibility to disease and predation, especially of the juveniles, all resulted in the mortality witnessed in 2008 - 2009.

47. The plight of the Cranes at Aransas has captured the attention of international, national and local groups, who have joined The Aransas Project to protect the Cranes.

48. The named Defendants are responsible for the management of the surface freshwater resource that the Cranes rely on.

49. Not enough freshwater flowed into the San Antonio bay ecosystem and the Aransas marshes during 2008-2009 because of Defendants' actions and inactions.

50. Defendants took no action to avoid harm, harassment and illegal takes of Cranes, and are unlikely to do so in the future.

51. This is actionable under the Endangered Species Act, even if there is no intent to cause the take.

**A. Whooping Crane Biology and Conservation Status**

52. The Whooping Crane is a flagship species for the North American wildlife conservation movement, symbolizing the struggle for survival that characterizes endangered species worldwide.

53. This Crane is a large white bird with black wing tips and a red crown and is the largest American bird, standing approximately six feet in height.

54. In their native habitat in the flat marsh adjacent to the San Antonio, Copano, Aransas, Espiritu Santo, Carlos and Mesquite Bays in Aransas County, Texas, these birds are simply magnificent. The pairs hunt crabs in the marsh ponds, and when successful in breeding are joined by a single orange-tinted juvenile that relies on its parents in its early journey through life.

55. Due to its charisma and aura, the Whooping Crane is often used as a cornerstone species in educational materials associated with endangered species.

56. In the United States, the Whooping Crane was listed as threatened with extinction in 1967, 32 Fed. Reg. 4001 (Mar. 11, 1967), and as endangered in 1970, 35 Fed. Reg. 16047 (Oct. 13, 1970). Both of these listings were "grandfathered" into the Endangered Species Act of 1973. 16 U.S.C. § 1531, *et seq*., 87 Stat. 884.

57. The Aransas National Wildlife Refuge originally comprising 47,261 acres was established on December 31, 1937 by Executive Order 7784.

58. Critical Habitat was designated in 1978 for the Crane's winter habitat at Aransas. Determination of Critical Habitat for the Whooping Crane, 43 Fed. Reg. 20938, 20942 (final notice, May 15, 1978).

59. This Designated Critical Habitat includes the Aransas National Wildlife Refuge and the Blackjack Peninsula, and extensive portions of San Antonio, Espiritu Santo Carlos, and Mesquite Bays, Matagorda Island, St. Charles Bay and Lamar Peninsula.

60. The Aransas-Wood Buffalo Population migrates during both spring and fall through a relatively narrow (80-300 km wide) corridor between Aransas and Wood Buffalo.

61. Historic population declines resulted from habitat destruction, shooting, and displacement by human activities.

**B. The 2008-2009 Whooping Crane Mortality Event is Unprecedented**

62. Aerial counts have provided an annual census starting in 1950 of how many Whooping Cranes arrive at Aransas in the fall and how many depart in the spring.

63. Between 1950 and 1986, a total of only 26 Whooping Cranes were lost on the wintering grounds in Texas.

64. That thirty-six year total is dwarfed by the catastrophe of 23 Cranes lost during the winter of 2008-2009 in Texas.

65. The flock size declined from a peak of 270 to 247 individuals (a loss of 23 birds) by the end of the 2008-2009 wintering season. Of the 38 juveniles, only 22 survived the 2008-2009 winter.

66. When added to the 34 birds that left Texas in spring 2008 and failed to return in the wintering season 2008-2009, 21.4% of the flock (57 birds) was lost during that year.

67. The 2009 breeding season in Canada was also bad, with a lower than average productivity rate of only 22 young fledged from 62 nests, roughly half the productivity of the previous summer season. This illustrates the difficulties Cranes experience in breeding.

68. The FWS census of February 2010 estimates the flock size at 244 adults and 19 juveniles, for a total of 263.

69. At least one juvenile already has died during the 2009-10 season in Texas.

70. In short, the past few years have been a very bad time for the Whooping Crane.

Case: 10-40610 Document: 00511184533 Page: 13 Date Filed: 07/23/2010

**C. Cause of Crane Mortality**

71. Food resources were very poor throughout the 2008-2009 winter. The fall wolfberry crop was far below average, and blue crabs were scarce from December through March.

72. The lack of food directly caused the high winter mortality.

73. When critical food is scarce in their territory, Cranes often respond by abandoning their own juvenile and leaving it to fend for itself.

74. Malnutrition, emaciation and susceptibility to disease and predation, especially of the juveniles, all result in the mortality that was witnessed.

75. Bay and marsh salinities were high throughout the season so that Cranes were forced to fly to freshwater to drink, with flight using an estimated 19 times more energy than a Crane at rest.

76. The much reduced birthrate and fledgling survival at Wood Buffalo may also be due to the birds arriving in Canada in an extremely weakened condition.

77. The FWS became so concerned about the food shortage for the Cranes that it began a program of supplemental feeding using game feeders dispersing whole kernel corn during the latter stages of the winter of 2008-2009.

78. The supplemental feeding appears to have been helpful to the Cranes by reducing the energy stress they were under from the shortage of natural foods.

79. In spite of these extraordinary efforts by FWS, unprecedented numbers of Cranes still died.

**D. TCEQ's Role**

80. The primary cause of this massive Crane mortality was the failure of the Defendants to ensure sufficient freshwater inflows into the San Antonio Bay estuary and the bay ecosystems and marshes adjacent to the Refuge.

81. For many decades the Defendant TCEQ Commissioners have issued permits to use water in the Guadalupe and San Antonio River basins and have overseen the diversion of water under those permits as well as from exemptions from permitting created under Texas law.

82. All Defendants have allowed these diversions to be maintained, and water used, without consideration of the need of the Whooping Crane for freshwater inflows to the San Antonio-Aransas Bay system, and without consideration of the overall health of the bay and estuary ecosystem upon which the Whooping Crane depends.

83. Defendants continue to allow the use of water from the San Antonio and Guadalupe River systems and ignore the issue of environmental flows and protection of the Whooping Crane during its oversight of these existing permitted and unpermitted diversions.

84. The water resources of the Guadalupe and San Antonio river basins are at the same time over-allocated and mismanaged by Defendants.

85. Although the drought during 2008-2009 would have caused naturally low freshwater inflows, these flows have been further and significantly reduced by the activities the Defendants authorize and oversee.

86. Defendants have acted, and failed to act, regarding water uses, with complete disregard to the requirements of the Whooping Crane in violation of the ESA.

Case: 10-40610 Document: 44 Page: 48 Date Filed: 07/23/2010

**E. Low Freshwater Inflows Cause High Bay Salinity**

87. Most freshwater inflows to San Antonio Bay come from the Guadalupe and San Antonio Rivers, which join approximately 10 miles before entering San Antonio Bay on the Texas coast.

88. Historically, the Guadalupe and San Antonio Rivers have supplied over 79% of the total freshwater inflows into this estuary. The gauged areas of the Guadalupe River alone accounted for 57% of the total freshwater inflows into the estuary.

89. Freshwater inflows play a vital role in sustaining the estuarine ecosystem, mixing with seawater to create brackish conditions, that is, water with salinity less than that in the Gulf of Mexico, which is about 32 parts per thousand (ppt).

90. Many commercially and recreationally important species rely on the lower salinity conditions of estuaries for at least some portion of their life cycle.

91. All estuarine organisms have a range of salinity concentrations that they can tolerate based on their ability to regulate concentrations of internal body salts relative to environmental salinity.

92. Excessive salinity, beyond an organism's zone of tolerance, can impair its ability to maintain osmotic balance and trigger metabolic stresses.

93. Freshwater inflows also transport beneficial sediments and nutrients into the bay.

94. As a result of these and many other interactions, the amount and timing of freshwater inflows have huge impacts on the productivity and overall health of the bay.

95. In addition to causing increased salinity, reduced freshwater inflows reduce mixing and stratification of the water column, and allow salt water to penetrate further into the bay, bringing marine predators, parasites and diseases.


USCA5 34

Case: 10-40610 Document: 44 Page: 49 Date Filed: 07/23/2010

96. During wet years, there generally is plenty of water for all water permits users and still adequate freshwater is left to flow into the bay.

97. It is during the drier years that the over-allocation and mismanagement by TCEQ officials becomes particularly harmful to Cranes.

98. During 2008-2009 freshwater flows into San Antonio Bay fell to record low levels.

99. These abnormally low flow rates were evident throughout 2008 and most of 2009, and flows only increased after the rains of October 2009.

100. As a result, measured salinity levels in the bay remained very high for well over a year, starting in July 2008, continuing through the 2008-2009 wintering season, and reaching a high of over 40 ppt near the Aransas National Wildlife Refuge in summer, 2009.

101. In non-drought years, bay salinity is much lower, with higher salinities limited to just a few months duration.

102. Lower bay salinity for the majority of the year is much more favorable to higher blue crab and wolfberry productivity.

103. Existing water diversion activities on the Guadalupe and San Antonio River Basins significantly alter the salinity of the San Antonio Bay system.

104. Potential future full use of existing permits will result in additional reductions in freshwater flows.

105. The salinity of San Antonio, Carlos, Mesquite and Espiritu Santo Bays where the Whooping Cranes spend the winter will continue to be significantly worsened from the natural conditions due to these water diversion activities.

Case: 10-40610 Document: 00511184533 Page: 17 Date Filed: 07/23/2010

106. During low inflow conditions, the current water diversions and Defendants' management practices have a significant adverse impact, increasing the salinity of the bay system generally as well as those portions of San Antonio, Espiritu Santo, Carlos and Mesquite Bays that are Designated Critical Habitat under the ESA.

107. The TCEQ does not maintain or possess an accounting of all withdrawals from the Guadalupe and San Antonio River systems due to the existence of an exemption from permitting for riparian domestic and livestock use.

108. Water withdrawals from the Guadalupe and San Antonio Rivers during the drought of 2008 and 2009 were much greater than is indicated in official records of such withdrawals maintained by the TCEQ.

**F. Low Inflows Reduce Abundance of Blue Crabs to the Detriment of the Whooping Crane**

109. The major source of food for the Whooping Cranes at Aransas is the blue crab.

110. Studies have shown a strong correlation between the blue crab population and freshwater inflows.

111. In a year of normal crab abundance, Cranes can consume 7-8 crabs per hour (80 crabs per day), totaling 80-90% of their diet.

112. In contrast, during years of low blue crab abundance, Cranes consume an average of only three crabs per hour (about 35 crabs per day).

113. Although the Cranes are somewhat versatile, and can and do switch to alternate food sources when blue crabs are scarce, the other food sources are inferior because blue crabs provide more protein and fat for far less foraging effort.

114. In the eight-year period from 1993-2001, the USFWS conducted surveys that roughly estimated the number of blue crabs available to Whooping Cranes.

Case: 10-40610 Document: 44 Page: 51 Date Filed: 07/23/2010

115. Two winters (1993-94 and 2000-01) had lower than normal numbers of crabs.

116. During those winters, seven and six Whooping Cranes died respectively.

117. In the six other winters with normal numbers of crabs, zero to one Crane died.

118. In 2009, FWS reported that "A blue crab count done on April 1st found zero crabs in the marsh.… Overall, these continue to be some of the worst conditions … ever observed for the Cranes at Aransas, with some birds looking thin and with disheveled plumage."

### G. Low Inflows Reduce Abundance of Wolfberries to the Detriment of Whooping Cranes

119. In addition to increasing salinity in the bays, reduced freshwater inflows result in an increased salinity in the marshes that provide habitat for the Cranes.

120. During low flows when bay salinity is high, marsh salinity is higher still.

121. Extended periods of increased salinity can result in negative effects on the estuarine marsh plants, particularly wolfberries. Increased salt marsh salinity is negatively correlated with abundance of wolfberries, because high salinities in late summer during the leafing period lead to reduced fruit production.

122. Wolfberries serve as an important food source for the Cranes, especially in November and December when the Cranes first arrive at Aransas.

123. With measured bay salinities remaining above 25 ppt from August 2008 through August 2009, the salinity of the Aransas marshes was also very high for this extended period.

124. The conditions of 2008 resulted in very low production of wolfberry fruit in the Refuge and surrounding marshes during the 2008-2009 winter.

125. The conditions of 2009 resulted in low production of wolfberry fruit in the Refuge and surrounding marshes during the 2009-2010 winter.

Case: 10-40610 Document: 44 Page: 52 Date Filed: 07/23/2010

**H. Low Inflows Reduce the Availability of Drinkable Water to the Detriment of Whooping Cranes**

126. For water to be drinkable by Cranes, it must be less than 23 ppt salinity.

127. Usually the Cranes drink the water in the marsh.

128. When the water in the bay or in the ponds of the coastal marsh rises above 23 ppt, the Cranes must fly to other sources of freshwater in order to drink.

129. These flights use up energy, reduce time available for foraging or resting, and potentially make the Cranes more vulnerable to predation in the uplands.

**I. The Health, Survival and Recovery of the Cranes is Directly Related to the Freshwater Inflows Regulated and Controlled by Defendants**

130. The health and welfare of the Whooping Crane is inextricably tied to freshwater inflows, bay salinity and the water management practices of the Defendants.

131. The federal government through the FWS and in cooperation with counterparts in Canada has published the Whooping Crane Recovery Plan (3d. Revision, March, 2007) which confirms the relationship between bay salinity levels and blue crab catch rates.

132. The Recovery Plan identifies impacts from low inflows and drought conditions including prolonged food shortage, lack of suitable nearby drinking water, drought-increased susceptibility to predation and disease, and possibly increased mortality during migration due to malnutrition.

133. In this Recovery Plan ensuring freshwater inflows is "priority 1" in the implementation schedule and vital to the recovery of the species.

134. Between 1988 and 2009, years in which higher Crane mortality was observed were always characterized by low inflows from the Guadalupe and San Antonio Rivers.

Case: 10-40610 Document: 44 Page: 53 Date Filed: 07/23/2010

135. A Crane response to low river flow (*i.e.* high salinity) is one of excess stress due to a number of ecological factors including food availability and the necessity to travel for freshwater.

136. Low freshwater inflows result in increased bay salinity, and reduced bay productivity.

137. The reduced availability of preferred and more nutritious food sources in the marshes (*i.e.* blue crabs) cause the Cranes to alter their feeding behavior and seek out less optimal foods.

138. Cranes expend more energy searching for other food sources and more frequently have to fly to upland areas in search of food and freshwater.

139. Cranes therefore must fly further, forage longer and end up with less nutritional food.

140. This situation results in the Cranes experiencing a negative energy balance, which if maintained over a longer period, results in malnutrition, weight loss and emaciation.

141. Malnutrition, weight loss and emaciation can lead to increased Crane mortality due to predation and disease.

142. Creating conditions that result in malnutrition, weight loss and emaciation of Cranes is harm and harassment.

143. The Cranes' stressed condition does not necessarily lead to death but may also be manifested as lack of sufficient body fat and protein that will be exhibited during the spring migration and subsequent poor reproductive behavior.

**J. State Regulatory Mechanisms Harm and Harass Whooping Cranes**

144. The Defendants regulate water diversion and use in Texas and control the appropriation, transfer and use of water by permits (including emergency curtailments).

Case: 10-40610 Document: 44 Page: 54 Date Filed: 07/23/2010

145. The Defendant TCEQ Commissioners formally authorize some water diversion and use by issuing to the holder a Certificate of Adjudication or a Water Right Permit, which contains the limits, a priority date, and any special or unique conditions associated with its use.

146. TCEQ also allows withdrawals for riparian domestic and livestock use, of up to 200 acre-feet per year without any permit, the so-called "exempt" withdrawal.

147. There is no record keeping associated with these so-called "exempt" water withdrawals.

148. Defendant Commissioners have the ability to set policies regarding the acceptance and processing of water permits and the oversight of both exempt and permitted withdrawals.

149. Defendant Vickery and his employees accept and process water permit applications, conduct administrative and technical reviews, issue the draft permit, propose regulations and have continuing oversight over all permits approved by the TCEQ.

150. Defendant Segovia is appointed by the TCEQ to administer the Guadalupe and San Antonio River (among others) water use. Although he has some authority to allocate the water among permit holders and exempt users to ensure that the use of water does not exceed certain limits, TCEQ does not ever take into account the needs of Whooping Cranes.

151. There is a causal relationship between the regulatory program administered by Defendants regarding water diversion and water use on the San Antonio and Guadalupe Rivers and the plight of the Whooping Crane.

152. Decisions by Defendants determine river flows and salinity, which affect the ability of the estuary ecosystems to produce the food required by the Cranes.

153. As a result food sources are directly and negatively impacted by the management and oversight of water permits by Defendants.

154. The actions of Defendants allow water to be taken during times of low flows when the impacts of these programs most directly affect the food and water sources of the Whooping Crane.

155. Defendants have not sought or obtained any Incidental Take Permits covering Whooping Cranes from USFWS.

156. Defendants have not proposed or promulgated regulations that would avoid prohibited takes.

157. Defendant TCEQ Commissioners have not instructed their employees, the Watermaster, the existing water permit holders or any other person to undertake steps to avoid prohibited takes of Cranes.

158. Defendants approve water diversions and uses that harm and harass Whooping Cranes.

159. Defendants are likely to continue approving water diversions and uses that harm and harass Whooping Cranes.

160. No existing state process, regarding existing permits or exempt uses, in which any Defendant is a participant in fact adequately or fully considers the freshwater inflows required by the San Antonio Bay to maintain resources important to prevent takes of the Whooping Crane.

161. TCEQ does participate in a process to evaluate future freshwater flows pursuant to state Senate Bill 3. The enabling legislation for Senate Bill 3 specifically prohibits TCEQ and anyone else from using this process to reduce or otherwise modify existing diversions and uses of water, whether permitted or exempt. *See* Section 1.27 of Acts 2007, 80th Leg., ch 1430. Thus the Senate Bill 3 process cannot protect Cranes from low freshwater flows such as already have occurred.

Case: 10-40610 Document: 00511184533 Page: 23 Date Filed: 07/23/2010

162. Although the South Central Texas Regional Water Planning Group ("Region L") engages in regional water planning activities pursuant to state Senate Bill 1, it has no authority to limit water diversion or use with respect to permitted or exempt withdrawals and no authority to ensure freshwater flows needed for the Whooping Cranes. Thus the Senate Bill 1 process cannot protect Cranes from low freshwater flows such as already have occurred.

163. The Edwards Aquifer Recovery Implementation Plan and its proposed Habitat Conservation Plan do not control or regulate surface water diversion activities whether permitted or exempt.

164. Whatever authority Defendants have, they have never exercised it to protect Whooping Cranes.

165. Defendants have systematically failed to protect, and failed to prevent takes of the Whooping Cranes.

166. No existing state process will remedy or avoid the harm, harassment and takes of Whooping Cranes described above, nor redress the injuries suffered by Plaintiff and its members.

**K. Commercial water suppliers and others seek to use TCEQ's deficient and flawed regulatory scheme to accelerate commitments for and overdraw freshwater in the Guadalupe River basin**

167. After the record Crane mortality of 2008-2009, the largest commercial water supplier in the Basin, the Guadalupe-Blanco River Authority ("GBRA"), submitted a new water permit application for 189,000 acre-feet of water per year to be diverted from the Guadalupe and sold to upper basin users.

168. After the Plaintiff's Notice of Intent to Sue letter was made public, the GBRA responded to the threatened litigation by renewing a long-term commitment to provide 75,000 acre-feet of water annually from an existing water permit to Exelon Corporation for a new nuclear power plant proposed in the lower basin.

Case: 10-40610 Document: 44 Page: 57 Date Filed: 07/23/2010

169. If the Exelon plant is eventually constructed, the additional 75,000 acre-feet of diverted water will significantly increase the likelihood of future takes of Cranes.

170. Defendants have done nothing and have no plans to do anything to prevent the takes that will result from the use of the water by Exelon.

171. The situation with Exelon water permit underscores the point that the TCEQ officials have taken no action and have no plan for preventing continued excessive use of water within the Guadalupe and San Antonio River systems to the detriment of the Whooping Crane.

172. Only the intervention of the Federal Court imposing the protections afforded by the Endangered Species Act will avoid a continuing "take" of the Whooping Crane.

## VI. CAUSES OF ACTION

173. Plaintiff incorporates by reference the foregoing pleadings in each count below.

### *Count I: Declaratory Relief*

174. Plaintiff and Defendants have an actual, substantial, legal controversy concerning the force of the Endangered Species Act, important aspects of which are detailed above.

175. Section 9 of the ESA prohibits the "taking" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). "'Take' is defined in ... the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 307, 93d Cong., 1st Sess. (1973), reprinted in 1973 U.S.C.A.A.N. 2989, 2995. Taking includes the concepts of "harm" and "harassment." 16 U.S.C. § 1532(19). Harm may occur through significant habitat modification that actually kills or injures a protected species by impairing essential behavior patterns, including breeding, feeding or sheltering. 50 C.F.R. § 17.3. Harassment may occur through an act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns such as breeding, feeding, or sheltering. 50 C.F.R. § 17.3.

Case: 10-40610 Document: 00511184533 Page: 25 Date Filed: 07/23/2010

176. All Defendants are persons subject to the ESA take provision, 16 U.S.C. § 1538(a), and subject to the ESA citizen suit provisions, 16 U.S.C. § 1540(g).

177. Defendants do not hold an incidental take permit or enjoy any other exemption authorizing take of Whooping Cranes.

178. Water diversion activities from rivers that flow into bays affecting Whooping Cranes cannot lawfully proceed without obtaining Defendants' review and approval and without complying with any restrictions imposed by Defendants as part of that review and approval.

179. Defendants' review and approval is a proximate cause of the water diversions activities from rivers that flow into bays affecting Whooping Cranes that, due to lack of needed restrictions, already have resulted in a take of the endangered Whooping Cranes, and are likely in the future to cause additional takes, all in violation of the ESA.

180. Defendants have promulgated regulations and authorized activities that enable the take of Whooping Cranes in violation of federal law.

181. TCEQ regulations or state laws that purport to authorize violations of Section 9 of the ESA, 16 U.S.C. § 1538, are preempted by federal law and are invalid under the Supremacy Clause of the United States Constitution.

182. To stop the on-going violation of federal law, Plaintiff seeks a judicial declaration of Defendants' obligations under the ESA pursuant to 28 U.S.C. § 2201 & 2202.

***Count II: Defendants Authorized Activities that Resulted in Crane Takes Without an Incidental Take Permit***

183. The Crane mortality of the 2008-2009 winter, due to actions and inactions of Defendants, constitutes a "take" of an endangered species and therefore a violation of Section 9 of the Endangered Species Act.


USCA5 44

Case: 10-40610 Document: 00511184533 Page: 26 Date Filed: 07/23/2010

184. During the same time period, the significant modification of suitable Crane habitat, including designated critical habitat, constitutes a 'harm' under the ESA because it significantly impaired essential Crane behavioral patterns.

185. These takes occurred as a proximate result of TCEQ officials' authorization and implementation of water permits, and is thus prohibited by the ESA unless the TCEQ officials have a permit allowing the take.

186. Throughout the drought period of 2008-2009 the Defendants continued to allow water permit holders and exempt users to divert and consume water from the Guadalupe and San Antonio River basins.

187. These diversions reduced the freshwater inflows into San Antonio Bay, which, during the drought period of 2008-2009, resulted in longer periods of very high salinities than would have been the case had these diversions not occurred.

188. There is a direct link of causation between the activities of the Defendants and the prohibited takes of Cranes.

189. Therefore the activities of the Defendants have violated and continue to violate Section 9 of the ESA.

190. No permit authorized an incidental take by any Defendant.

191. Unless enjoined by the Court, Defendants will continue taking Whooping Cranes in violation of Section 9 of the ESA, 16 U.S.C. § 1538, by approving water diversions that authorize other persons to harm or harass Whooping Cranes.

***Count III: Defendants Continue to Authorize Activities that are Reasonably Certain to Cause Significant Habitat Modification and Therefore Harm and Harass Cranes Without an Incidental Take Permit***

192. Water diversions authorized by the Defendants have a dramatic impact on salinity levels in the bay.

Case: 10-40610 Document: 44 Page: 60 Date Filed: 07/23/2010

193. During periods of drought or low flows, diversions of water from the river will result in increased salinity in the bay.

194. Significant alterations to the ecosystem of the bay and marshes are caused by extended periods of high salinity levels beyond that which would result under natural conditions.

195. High bay salinity causes reduced abundance and availability of blue crabs, potentially reduced availability of wolfberries and reduced availability of nearby suitable drinking water.

196. These impacts are significant modifications of the habitat used by Cranes, including designated critical habitat, and are therefore a 'take' because they harm and harass the protected species. 50 C.F.R. § 17.3.

197. No permit authorizes an incidental take by any Defendant.

198. Therefore the activities of the Defendants have violated and continue to violate Section 9 of the ESA.

199. Unless enjoined by the Court, Defendants will continue taking Whooping Cranes in violation of Section 9 of the ESA, 16 U.S.C. § 1538, by approving water diversions that authorize other persons to harm or harass Whooping Cranes in the manner described above.

***Count IV: Future Takes of Whooping Cranes are Reasonably Foreseeable and Must be Enjoined Under the ESA***

200. The Defendants' current water permit regulations and practices not only have failed to avoid prohibited takes of Cranes, they are highly likely to cause future takes.

201. The future use of existing water permits and exemptions, especially when drought occurs – as it inevitably will – likely will result in impacts much more severe than those exhibited during the 2008-2009 wintering season.

Case: 10-40610 Document: 00511184533 Page: 28 Date Filed: 07/23/2010

202. No existing state process will ensure sufficient freshwater flow to avoid takes of Cranes.

203. No existing state process will remedy or avoid the harm, harassment and takes of Whooping Cranes described above, nor redress the injuries suffered by Plaintiff and its members.

204. It is reasonably foreseeable that future use of existing water permits and exemptions authorized by Defendants will result in additional prohibited takes of Whooping Cranes unless and until such activities are enjoined.

205. Water use activities authorized by Defendants are so likely to result in prohibited takes of Whooping Cranes that they must be enjoined under the ESA.

## VII. STANDING

206. Plaintiff TAP has standing to bring this case. TAP's mission is the research, development and publication of proposals to protect the Whooping Cranes, other endangered and threatened species, and the health of streams and estuaries in the Aransas, Texas area, including but not limited to Aransas, St. Charles, Copano, Port, Mission, Carlos, Mesquite, San Antonio and Espiritu Santo Bays and the Guadalupe, San Antonio, Aransas and Mission Rivers. These activities include monitoring and protecting endangered and threatened species such as the endangered Whooping Crane; increasing public awareness and understanding of environmental issues in the Aransas, Texas area, such as the role and importance of freshwater inflows to the bays and estuaries, through media and other educational programs; participating in common law or statutory based litigation designed to further these activities; researching and publishing information about these issues to inform the public; and reviewing and commenting upon existing practices which impact these issues. This litigation is germane to TAP's mission.

207. Many TAP members are active birders and devote substantial time and effort to observing the Whooping Crane and other birds in their natural habitat. Organizations that are

Case: 10-40610 Document: 00511184533 Page: 29 Date Filed: 07/23/2010

members of TAP hold or sponsor field trips to the Aransas National Wildlife Refuge and adjacent areas of San Antonio estuary to accommodate their members and customers interests in observing and photographing Whooping Cranes and other wildlife in their natural habitat. TAP and its member organizations also sponsor educational and scientific research activities that involve the study of Whooping Cranes and other wildlife in their natural habitat. Members of TAP reside and work in the Aransas area, and for some their livelihood depends in large part upon the Cranes, and the livelihood of others depends upon healthy and productive estuaries and bays. TAP and its members intend to continue all of these activities in the future. Aesthetic, recreational, economic, professional, and other interests of TAP and its members in observing, photographing, studying, protecting and otherwise enjoying Whooping Cranes and other wildlife in their natural habitat are impaired by the destruction and alteration of Whooping Crane habitat, and the harm and harassment to Whooping Cranes resulting from Defendants' violations of the ESA. The relief sought in this lawsuit can redress the injuries to these interests.

208. TAP members include (among others):

a. Al and Diane Johnson, who own and operate the Crane House, St. Charles Bay, Aransas Co., Texas (http://www.cranehouseretreat.com). The Crane House borders the Lamar Unit of the Aransas National Wildlife Refuge and is a favored location for artists, writers, birders and photographers. Each year during Crane season (Nov-Apr) their business rents space to birdwatchers and others visiting Aransas specifically to see the Whooping Cranes. The Johnsons and their guests regularly see Cranes on the property itself, as well as on the adjacent Refuge lands. The Johnsons have placed 634 acres in a conservation easement, and actively manage their land for Cranes and other wildlife. The Johnsons provided supplemental sources of freshwater during the drought specifically for

Case: 10-40610 Document: 44 Page: 63 Date Filed: 07/23/2010

the Cranes. The Johnsons' economic future will be seriously harmed if the Crane population declines.

b. Mr. Tommy Moore captains the 'Skimmer', a tour boat that takes visitors to see the wildlife in and around the Refuge. Mr. Moore conducts bird watching boat tours throughout the year, but his busiest time is during the Whooping Crane season (http://www.whoopingcranetours.com). Mr. Moore's boat will take approximately 4000 paying visitors to see the Cranes each season. Each visitor will spend at least $125 each during their visit, including accommodation, boat trip, food and other expenses, all benefiting Mr. Moore, other businesses and the local economy. It is estimated that Mr. Moore's visitors contribute $500,000 to the local economy each year. Mr. Moore will suffer considerable loss of business and economic harm if the Crane population declines. Mr. Moore is himself a birdwatcher and will suffer additional harm if he is unable to view the Cranes during his trips.

c. Aransas County is a corporate and political body created pursuant to Art. IX, Section 1 of the Texas Constitution. In their Regular Meeting of October 12, 2009, the Commissioners Court of Aransas County voted unanimously to become a member of TAP. Aransas County is proud to be the home of the Aransas National Wildlife Refuge and the Whooping Cranes. The County has a significant economic interest in the welfare of the Cranes. Tourism brought in $97.2 million to the County's economy in 2008. The County and the local cities each recover 1% of the state sales tax which contributes significantly to the local budgets. The County estimates that for each $100 in tax revenue, $26 comes from tourists, many of whom visit specifically for the Cranes. It is estimated that the 70-80,000 visitors that come to the Refuge each year contribute some $5 million

Case: 10-40610 Document: 00511184533 Page: 31 Date Filed: 07/23/2010

to the local economy each year. Aransas County itself, and citizens residing there, whose interest the County represents, are injured by Defendants' violations of the ESA.

d. Aransas Bird & Nature Club ("ABNC") is a local, grass-roots organization dedicated to the effort of improving our stewardship of the natural world entrusted to our care, with a special interest in ornithology. The ABNC accomplishes this goal by increasing local awareness of the natural world with monthly meetings and field trips for its members and the public to observe birds and other wildlife including the highlight of Whooping Cranes, by fostering birding with the community, and providing a positive force to protect birds and preserve habitat. In addition, ABNC assists other local and national organizations in conservation efforts. The ABNC is a membership organization and has members who are injured by Defendants' violations of the ESA. Debra Corpora is president of the ABNC, has a house in Aransas County, and she has a strong recreational interest in the birds and other wildlife of the area. She has observed the Cranes at Aransas and has plans to visit the Refuge again.

e. International Crane Foundation ("ICF") is an organization that works worldwide to conserve Cranes and the wetland and grassland ecosystems on which they depend. ICF is dedicated to providing experience, knowledge, and inspiration to involve people in resolving threats to these ecosystems. ICF staff and members travel worldwide to see all species of Cranes, including Whooping Cranes, and to promote their conservation. ICF is a membership organization and has members who are injured by Defendants' violations of the ESA.

209. As described above, Plaintiff TAP and its members have suffered injury to their economic, environmental, and recreational interests uniquely entwined with the endangered

Whooping Crane, the San Antonio Bay and surrounding wetlands, as well as other birds and animals living in, travel through, and otherwise using this unique habitat.

## VIII. PRAYER

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

A. Declare that Defendants Shaw, Garcia, Rubinstein, Vickery and Segovia violated Section 9 of the ESA, 16 U.S.C. § 1538, between 2008 and 2009 by actions and inactions that allow persons to conduct water diversion activities that caused the death of many endangered Whooping Cranes;

B. Declare that Defendants Shaw, Garcia, Rubinstein, Vickery and Segovia are violating Section 9 of the ESA, 16 U.S.C. § 1538, by issuing water permits and authorizing water diversions that allow persons to conduct water diversion activities even when those activities (1) result in significant modification and destruction of Whooping Crane habitat which actually injures or kills Whooping Cranes by significantly impairing their essential behavioral and feeding patterns, and (2) harass Whooping Cranes to such an extent as to significantly disrupt their normal behavioral and feeding patterns;

C. Declare that water diversion regulations promulgated by Defendants Shaw, Garcia, Rubinstein and Vickery are preempted by federal law and are invalid under the Supremacy Clause of the United States Constitution when they purport to authorize water diversions even when those activities (1) result in significant modification and destruction of Whooping Crane habitat which actually injures or kills Whooping Cranes by significantly impairing their essential behavioral and feeding patterns, and (2) harass Whooping Cranes to such an extent as to significantly disrupt their normal behavioral and feeding patterns;

D. Enjoin Defendants and their employees and agents from approving or allowing water diversion activities that destroy or alter Whooping Crane habitat until the State provides

Case: 10-40610 Document: 00511184533 Page: 33 Date Filed: 07/23/2010

reasonable assurances that State-authorized water diversion activities will not take Whooping Cranes in violation of the ESA;

E. Enjoin Defendants and their employees and agents from approving or processing new or pending water permits absent sufficient assurances that future water diversion activities will not take Whooping Cranes in violation of the ESA;

F. Order Defendants to compile an inventory of all water withdrawals under the livestock and domestic use exemption and to develop a process for a complete accounting of all water withdrawals from the Guadalupe and San Antonio River systems;

G. Order Defendants to conduct a thorough analysis of all permitted and exempt withdrawals and develop a binding plan for water development and water use in the San Antonio and Guadalupe River basins sufficient to protect Whooping Cranes and their vital habitat, which may include reduction of existing water uses or addition of special conditions to existing permits;

H. Order Defendants to develop an approved Habitat Conservation Plan for the San Antonio and Guadalupe River basins and San Antonio Bay, including provisions to reduce all withdrawals during low flow conditions to such an extent necessary to prevent harm and harassment of the Aransas-Buffalo Wood Whooping Crane flock;

I. Appoint a Special Master to oversee the development of the plans, studies and activities necessary to implement this order;

J. Maintain jurisdiction and oversight over this matter until the Habitat Conservation Plan is approved and implemented and an Incidental Take Permit is issued by USFWS;

K. Award Plaintiff its costs and reasonable attorneys' fees, including expert witness fees, as authorized by the ESA, 16 U.S.C. § 1540(g)(4); and

L. Award such other relief as this Court deems just and appropriate.

Case: 10-40610 Document: 44 Page: 67 Date Filed: 07/23/2010

BLACKBURN CARTER, P.C.

by: */s/James B. Blackburn, Jr.*

JAMES B. BLACKBURN, JR.
Attorney in charge
TBN 02388500
Southern District of Texas Bar No. 7416
Charles Irvine
TBN 24055716
Southern District of Texas Bar No. 675029
Mary W. Carter
TBN 03926300
Southern District of Texas Bar No. 7811
4709 Austin Street
Houston, Texas 77004
713/524-1012
713/524-5165 (*fax*)

**OF COUNSEL:**
David A. Kahne
TBN 00790129
LAW OFFICE OF DAVID A. KAHNE
P.O. Box 66386
Houston, Texas 77266
713/652-3966
713/652-5773 (*fax*)

***Counsel for Plaintiff The Aransas Project***



USCA5 53

# EXHIBIT 1

Case: 10-40610 Document: 00511184533 Page: 38 Date Filed: 07/23/2010

**BLACKBURN CARTER**
**A Professional Corporation - Lawyers**

4709 Austin Street, Houston, Texas 77004
Telephone (713) 524-1012 ♦ Telefax (713) 524-5165

www.blackburncarter.com

JAMES B. BLACKBURN, JR
MARY W. CARTER
CHARLES W. IRVINE
ADAM M. FRIEDMAN
MCNAUGHTON A. DUSON

JAMES B. BLACKBURN, JR.
Sender's E-Mail: jbb@blackburncarter.com

December 7, 2009

*U.S. Certified Mail/RRR:*
Bryan W. Shaw, Ph.D., Chairman
Texas Commission on Environmental
Quality, MC 100
P.O. Box 13087
Austin, TX 78711-3087

*U.S. Certified Mail/RRR:*
Buddy Garcia, Commissioner
Texas Commission on Environmental
Quality, MC 100
P.O. Box 13087
Austin, TX 78711-3087

*U.S. Certified Mail/RRR:*
Carlos Rubinstein, Commissioner
Texas Commission on Environmental
Quality, MC 100
P.O. Box 13087
Austin, TX 78711-3087

*U.S. Certified Mail/RRR:*
Mark R. Vickery, P.G., Executive Director
Texas Commission on Environmental
Quality, MC 109
P.O. Box 13087
Austin, TX 78711-3087

*U.S. Certified Mail/RRR:*
Al Segovia, South Texas Watermaster
14250 Judson Road
San Antonio, TX 78233-4480

*U.S. Certified Mail/RRR:*
Sam D. Hamilton, Director
Fish and Wildlife Service
1849 C St., N.W.
Washington, D.C. 20240

*U.S. Certified Mail/RRR*:
Ken Salazar, Secretary of Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

*U.S. Certified Mail/RRR:*
Eric H. Holder Jr., Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

*U.S. Certified Mail/RRR:*
Greg Abbott, Texas Attorney General
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

***Re:*** **NOTICE OF INTENT TO SUE FOR VIOLATIONS OF SECTION 9 OF THE FEDERAL ENDANGERED SPECIES ACT FOR ILLEGAL TAKES OF WHOOPING CRANES AT ARANSAS NATIONAL WILDLIFE REFUGE, TEXAS**

Dear Chairman Shaw and other Public Officials:

This letter is written on behalf of The Aransas Project ("TAP") to inform you of violations of the Endangered Species Act, 16 U.S.C. § 1531, *et seq*. ("ESA") arising from the impact of surface water permits issued by the Texas Commission on Environmental Quality ("TCEQ") by and through its officials, and to request that you take immediate action to remedy these violations. This letter is provided to you pursuant to the 60-day notice requirement of the ESA's citizen suit

provision. 16 U.S.C. § 1540(g)(2). The activities described in this notice violate the take provisions of the ESA. If they are not curtailed, The Aransas Project intends to commence a civil action against Chairman Shaw, Commissioner Garcia, Commissioner Rubenstein, Director Vickery, and Mr. Segovia and other responsible state employees, acting in their official capacity, for violations of Section 9 of the ESA. 16 U.S.C. § 1538(a)(1)(B).

## I. NOTICING PARTY

The Aransas Project is a non-profit corporation with offices in Texas. TAP is dedicated to the research, development and publication of proposals to protect the health of the streams and estuaries in and around the San Antonio-Aransas Bay system, including monitoring and taking legal action to protect the ecology of the region, including endangered and threatened species such as the whooping crane. Members include organizations, businesses and individuals dedicated to the protection and preservation of the whooping cranes and the natural resources of the region as well as commercial entities receiving all or part of their economic livelihood from whooping crane-related activities.

The Aransas Project's mailing address is P.O Box 1839, Rockport, TX, 78381-1839. TAP can also be contacted through Jim Blackburn, Counsel, 4709 Austin Street, Houston, Texas 77004, phone number 713-524-1012 and fax number 713-524-5165.

## II. STATUTORY FRAMEWORK

Section 9 of the ESA specifically prohibits the "take" of an endangered species, 16 U.S.C. § 1538(a)(1)(B). "Take" is broadly defined to include harassing, harming, pursuing, wounding or killing such species, 16 U.S.C. § 1532(19). The term "harm" is further defined to include "significant habitat modification or degradation where it … injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 "Harass" includes any "act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id*. The ESA's legislative history supports "the broadest possible" reading of "take." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704-05 (1995). "Take" includes direct as well as indirect harm and need not be purposeful. *Id.* at 704; s*ee also National Wildlife Federation v. Burlington Northern Railroad,* 23 F.3d 1508, 1512 (9th Cir. 1994).

The take prohibition applies to any "person," 16 U.S.C. § 1538(a)(1), including state agencies and/or state officials in their official capacity, 16 U.S.C. § 1532(13). The ESA further makes it unlawful for any person, including state agencies and/or state officials, to "cause to be committed" the take of a species. 16 U.S.C. § 1538(g). Violations of Section 9 are enforceable under the ESA's citizen-suit provision. 16 U.S.C. § 1540(g).

Courts have repeatedly held that government actions authorizing third parties to engage in harmful actions can constitute an illegal taking under Section 9 of the ESA. *See Strahan v. Coxe*, 127 F.3d 155, 158, 163-64 (1st Cir. 1997), *cert. denied*, 525 U.S. 830 (1998) (state agency official caused taking of the endangered Right whale because it "licensed commercial fishing operations to use gillnets and lobster pots in specifically the manner that is likely to result in violation of [the ESA]"); *Animal Protection Institute v. Holsten*, 541 F. Supp. 2d 1073 (D. Minn, 2008) (finding that state agency official violated Section 9 by issuing trapping permits and

having a regulatory program that did not prevent incidental takes of Canadian lynx); *Defenders of Wildlife v. Administrator, Envtl. Protection Agency*, 882 F.2d 1294, 1300-01 (8th Cir. 1989) (federal agency caused takes of endangered Black-footed ferret through its "decision to register pesticides" even though other persons actually distributed or used the pesticides); *Loggerhead Turtle v. City Council of Volusia County*, 148 F.3d 1231, 1253 (11th Cir. 1998) (county's inadequate regulation of beachfront artificial light sources may constitute a taking of sea turtles in violation of the ESA).

The ESA authorizes private enforcement of the take prohibition through a broad citizen suit provision. "[A]ny person may commence a civil suit on his own behalf to enjoin any person, including … any … governmental instrumentality or agency … who is alleged to be in violation of any provision of [the ESA]." U.S.C. § 1540(g). A plaintiff may seek to enjoin both present activities that constitute an ongoing take and future activities that are reasonably likely to result in a take. *See National Wildlife Fed'n v. Burlington Northern Railroad,* 23 F.3d at 1511.

The ESA provides that the Secretary of the Interior ("Secretary") may permit the take of endangered and threatened species under some circumstances. Section 10(a)(1)(A) provides that the Secretary may issue permits "for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) [of the ESA]." 16 U.S.C. § 1539(a)(1)(A). Section 10(a)(1)(B) provides that the Secretary may permit "any taking otherwise prohibited by [Section 9(a)(1)(B) of the ESA] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

## III. SUMMARY OF THE CLAIM

In this 60-day Notice of Intent to Sue, TAP sets out the basis for the claim that the water rights permit program administered by TCEQ officials has reduced freshwater inflows to the San Antonio-Aransas Bay complex to the extent that significant habitat modification and/or degradation has occurred. The marsh-estuary habitats used by the whooping crane are made more saline and for longer periods. As a result, the marsh-estuary ecosystem is less productive and the natural food sources of the crane become scarce. This habitat modification and/or degradation injures wildlife by significantly impairing essential behavioral patterns of the whooping crane, including feeding and watering (*i.e.*, causing harm). 50 C.F.R. § 17.3. Similarly, TAP alleges that the actions of TCEQ officials reduced freshwater inflows to the extent that the likelihood of injury to the whooping cranes increased by disturbing them to such an extent as to significantly disrupt normal behavior patterns which include feeding and watering (*i.e.*, causing harassment). 50 C.F.R. § 17.3. <u>TAP is alleging in this Notice of Intent to Sue that the permit program and its oversight by TCEQ officials constituted harm and harassment during the 2008-2009 wintering season and is reasonably likely to continue to cause harm and harassment in the future, all in violation of the "take" provisions of the federal Endangered Species Act</u>. It is the goal of TAP to seek a court order (1) requiring a full accounting of all existing water uses on the Guadalupe and San Antonio River systems, (2) require the development of a Habitat Conservation Plan to identify the mechanism by which TCEQ will adjust existing permits on these two river systems in order to protect the whooping crane and (3) whatever other relief TAP requests or the federal court deems appropriate.

## IV. FACTUAL BACKGROUND

### A. The Whooping Crane

The whooping crane (*Grus americana*) is a flagship species for the North American wildlife conservation movement, symbolizing the struggle for survival that characterizes endangered species worldwide. It is a large, distinctive, and photogenic bird, popular with the public and the media, and it is often used as a cornerstone species in educational materials associated with endangered species.

In the United States, the whooping crane was listed as threatened with extinction in 1967 and endangered in 1970; both listings were "grandfathered" into the Endangered Species Act of 1973. Subsequently in 1978, Critical Habitat was designated for the crane's winter habitat at Aransas. *Determination of Critical Habitat for the Whooping Crane*, 43 Fed. Reg. 20938, 20942 (final notice, May 15, 1978). This Critical Habitat includes the Aransas National Wildlife Refuge and the Blackjack Peninsula, and extensive portions of San Antonio Bay, Espiritu Santo Bay, Matagorda Island, St Charles Bay and Lamar Peninsula.

Whooping cranes occur only in North America. They currently exist in the wild at 3 locations and in captivity at 9 sites. The August 2008 total wild population was estimated at 389. This includes: 266 individuals in the only self-sustaining population, the Aransas-Wood Buffalo National Park Population that nests in Wood Buffalo National Park and adjacent areas in Canada and winters in coastal marshes of the Aransas National Wildlife Refuge ("ANWR") and surroundings in Texas; 30 captive-raised individuals released in an effort to establish a non-migratory Florida Population in central Florida; and 93 individuals introduced between 2001 and 2008 that migrate between Wisconsin and Florida in an eastern migratory population.

The whooping crane breeds, migrates, winters, and forages in a variety of habitats, including coastal marshes and estuaries, inland marshes, lakes, ponds, wet meadows and rivers, and agricultural fields. The Aransas-Wood Buffalo Population migrates during both spring and fall through a relatively narrow (80-300 km wide) corridor between Aransas and Wood Buffalo.

The cranes' winter diet consists predominately of animal foods, especially blue crabs, along with the fruit of the wolfberry plant. Most foraging occurs in the brackish bays, marshes, and salt flats on the edge of the mainland and on barrier islands. Occasionally, cranes fly to upland sites in search of fresh water to drink or to find foods such as acorns, snails, crayfish and insects, and then return to the marshes to roost.

The Aransas-Wood Buffalo Population reached a low of only sixteen birds in the winter of 1941-1942, and numbered under 35 birds over the next two decades. Historic population declines resulted from habitat destruction, shooting, and displacement by human activities. Current threats include limited genetics of the population, loss and degradation of migration stopover habitat, construction of additional power lines, degradation of coastal ecosystems, threat of chemical spills in Texas, as well as the reduced inflows described herein.

A complete census of the Aransas-Wood Buffalo Population can only be done during the 5-6 months the flock is on the wintering grounds. Aerial counts have provided an annual census starting in 1950 of how many whooping cranes arrive at Aransas in the fall and how many depart

in the spring. Between 1950 and 1986, a total of 26 whooping cranes were lost on the wintering grounds. This thirty-six year total is rivaled by the 23 cranes lost during the winter of 2008-2009.

**B. The 2008-09 Whooping Crane Mortality Event is Unprecedented**

The Aransas-Wood Buffalo Population suffered unprecedented mortality while at Aransas this last winter. According to Tom Stehn, Whooping Crane Coordinator, USFWS, the flock size declined from a peak of 270 to 247 individuals (a loss of 23 birds) by the end of the 2008-2009 wintering season. Of the 38 juveniles, only 22 survived the 2008-09 winter. When added to the 34 birds that left Texas in spring 2008 and failed to return in the wintering season 2008-2009, 21.4% of the flock (57 birds) was lost during the last 12 months. Further, a below-average reproduction year in Canada resulted in only 22 fledged chicks from 62 nests, roughly half the productivity of the previous summer season. In short, the past 18 months has been a very bad time for the whooping crane.

According the USFWS's Tom Stehn:

> "Food resources were considered to be very poor throughout the 2008-09 winter. The fall wolfberry crop was way below average, and blue crabs were scarce from December through March. … The lack of food was believed to be directly related to the high winter mortality. Additionally, salinities were high throughout the season so that cranes were forced to fly to fresh water to drink, with flight using an estimated 19 times more energy than a crane at rest."

Tom Stehn, Whooping Crane Coordinator, USFWS, *Whooping Crane Recovery Activities, October, 2008 – October 2009*, at 4-5 (Oct. 2009). USFWS became so concerned about the food shortage at Aransas that it began a program of supplemental feeding using game feeders dispersing whole kernel corn. *Id.* at 5. "The supplemental feeding was not a cure-all, but we believe it helped some cranes reduce the energy stress they were under from the shortage of natural foods." *Id.* at 5-6. The USFWS has circulated a draft Environmental Assessment ("EA") for the supplemental feeding program. The EA states that the fall 2009 conditions at the refuge have not improved despite the recent rainfall, and surveys show that blue crabs and wolfberries are expected to be in short supply. USFWS staff intend to begin supplemental feeding again this winter.

Based upon our studies, we believe that the primary cause of this massive crane mortality is the failure of the TCEQ officials to ensure sufficient freshwater inflows into the San Antonio Bay estuary and the marshes of the Aransas NWR. For many decades the TCEQ's officials have issued water rights in the Guadalupe River basin. The TCEQ's officials have allowed those rights to be maintained and used without consideration of the need of the whooping crane for freshwater inflows to San Antonio Bay, and without consideration of the overall health of the bay ecosystem upon which the whooping crane is dependent. At the time of the writing of this letter, TCEQ officials continue to allow the use of water from the San Antonio and Guadalupe River systems and ignore the issue of environmental flows during its oversight of these existing permits. The water resources of the Guadalupe and San Antonio river basins are at the same time over-allocated and mismanaged.

Although the drought would have caused naturally low freshwater inflows, these flows have been further and significantly reduced by the activities the TCEQ officials authorize and oversee.

This regulatory program has been implemented with complete disregard to the requirements of the whooping crane in violation of the Endangered Species Act.

### C. Low Freshwater Inflows Cause High Bay Salinity

The majority of the freshwater inflows to San Antonio Bay come from the Guadalupe and San Antonio Rivers. Historically, the Guadalupe and San Antonio Rivers have supplied over 79.6% of the total freshwater inflows into this estuary. The gauged areas of the Guadalupe River alone accounted for 56.9% of the total freshwater inflows into the estuary.

The Guadalupe River originates in the southern edge of the Edwards Plateau. The Upper Guadalupe is shallow, with swift flows, receiving inputs from many minor tributaries that flow intermittently following rainfall events. The San Antonio River originates within the San Antonio city limits, on the northern edge of the South Texas Brushlands, and flows in a southeasterly direction. The San Antonio River joins the Guadalupe River approximately 10 miles before entering San Antonio Bay on the Texas coast. The Bay has fresher areas near the Guadalupe River mouth (Mission Lake, Guadalupe Bay, Hynes Bay), and high salinity areas in Espiritu Santo Bay near Pass Cavallo, one of the major bay-Gulf of Mexico passes.

Freshwater inflows play a vital role in sustaining the estuarine ecosystem. A primary role of freshwater inflows is the mixing with seawater to create brackish conditions typical of most bays and estuaries. Many commercially and recreationally important species rely on the lower salinity conditions of estuaries for at least some portion of their life cycle. To deal with the salinity variability, all estuarine organisms have a range of salinity concentrations that they can tolerate based on their ability to regulate concentrations of internal body salts relative to environmental salinity. Salinity regimes that extend beyond this zone of tolerance can impair an organism's ability to maintain osmotic balance triggering metabolic stresses. Freshwater inflows also transport beneficial sediments and nutrients into the bay. As a result of these and many other interactions, the amount and timing of freshwater inflows have huge impacts on the productivity and overall health of the bay. Reduced inflows cause increased salinity, reduced mixing and stratification of the water column, and allow salt water to penetrate further into the bay bringing marine predators, parasites and diseases

From 1941 to 1987, the bay received an average of 2.3 million acre-feet of inflow annually. During wet years, there generally is plenty of water for all users and still adequate freshwater is left to flow into the bay. It is during the dry years that the over-allocation and mismanagement by TCEQ officials becomes evident. The recent drought conditions in central Texas lasted over 18 months, and were nearly as bad as the so-called record drought of 1954–56. For example, in San Antonio, 2008 was the driest year on record since 1871, with only 42% of the average annual rainfall. Similarly, at Victoria, 2008 was the fifth driest year on record since 1900, with only 69% of the average annual rainfall. Summer 2009 freshwater flows into the bay fell to record low levels (*e.g.* 324 cfs at Tivoli on August 18). These abnormally low flow rates have been evident since the winter of 2008 and flows only increased after the rains of October 2009. As a result, measured salinity levels in the bay remained above 20 parts per thousand ("ppt") for well over a year, starting in July 2008 (Figure 1.) and reaching a high of over 35 ppt near the Aransas National Wildlife Refuge in summer, 2009. In non-drought years, bay salinity ranges from just above zero up to 30 ppt, with the high salinities limited to just a few months duration.

Case: 10-40610 Document: 00511184533 Page: 42 Date Filed: 07/23/2010





*Figure 1: Measured freshwater inflow and salinity data from 2007-2009.*

The Aransas Project has undertaken a study of the impacts of water use in the Guadalupe and San Antonio River Basins on salinity levels in the estuary. In this study, our consultant used water availability models (employing standard models and data) to determine available freshwater inflows under different scenarios, and then input the inflow data into a State of Texas-approved model to predict salinity gradients in the bay. The model was run with three scenarios: natural conditions, existing uses, and potential future use of all existing permitted rights. In other words, only the full use of existing water use permits was considered. The proposed or pending permit applications for surface water withdrawals for the Mid-Basin/Gonzales project and 189,000 acre feet at the Guadalupe River salt water barrier were not considered.

TAP's studies show that potential future use of existing permits will result in annual reductions on the order of 100,000 acre feet per year from current conditions or a total reduction from natural flows of almost half a million acre feet. As a result, the salinity of San Antonio, Carlos, Mesquite and Espiritu Santo Bays where the whooping cranes spend the winter will be significantly changed from the natural conditions. Table 1 sets out the changes in these bays associated with three different scenarios – natural conditions, existing use and full use of existing water rights. The impact of these scenarios is summarized for several target species based on their preferred salinities during certain key periods as set out by Texas Parks and Wildlife. Table 1 clearly shows a dramatic decline in the percentage of these bays with salinities suitable for a variety of species including the Blue crab which is a major part of the food chain of the whooping crane. Not only does this chart show a decline in the percentage of the bay that is suitable under existing uses, it also shows a significant decline as the full use of all existing permits is realized. In other words, the situation is bad and will get worse if all water rights currently issued are fully used.

| Target Species | Preferred Salinity (ppt) | Occurrence | % of Bay for Scenario | | |
|---|---|---|---|---|---|
| | | | Natural Conditions | Existing Use | Full Use of Existing Rights |
| White Shrimp | 5 - 10 | Jul - Dec | 7.0% | 2.0% | 0.6% |
| Blue Crab | 5 - 15 | Jan - Jun | 20.4% | 14.1% | 6.7% |
| Brown Shrimp | 10 - 20 | Apr - Sep | 11.3% | 3.8% | 1.4% |
| Gulf Menhaden | 5 - 10, 15 - 20 | Feb - Jul | 17.2% | 9.7% | 4.4% |
| Atlantic Croaker | 5 - 20 | Jan - Dec | 13.7% | 8.0% | 3.7% |
| Bay Anchovy | 20 - 25 | Jan - Dec | 13.7% | 8.0% | 3.7% |
| Pinfish | 25 - 30 | Jun - Nov | 7.2% | 2.0% | 0.8% |

*Table 1: Change in % area of San Antonio, Espiritu Santo, Mission and Carlos Bays suitable for various bay species under natural flows, existing usage and full future usage of all currently permitted water rights.*




*Figure 2.: Salinity changes in San Antonio, Espiritu Santo, Carlos and Mesquite Bays under natural conditions, existing uses and proposed full use of existing permits under 1989 flow conditions*

Case: 10-40610 Document: 44 Page: 77 Date Filed: 07/23/2010


Figure 2 shows a graphical representation of the salinity changes predicted by the model results for one of the monthly runs using the three scenarios (in this case February 1989, a period with similar low flow conditions to the 2008-2009 winter season and for which appropriate modeling data is available). The areas shown in color are various portions of the San Antonio-Aransas Bay complex and the colors correspond to predicted salinity levels for the three different scenarios – natural, existing use and full future use of all existing permits. The cross-hatched area is the Designated Critical Habitat of the whooping crane. As can be seen, there are significant differences in the salinity of the Designated Critical Habitat as well as in the entire bay system from scenario to scenario. These results (which are summarized in Table 1) show that during low inflow conditions, the current water diversions and TCEQ management practices have a significant impact upon the salinity of the bay system generally as well as upon the Designated Critical Habitat. TAP will continue to update these studies as better information becomes available.

**D. High Bay Salinity Reduces Abundance of Blue Crabs to the Detriment of the Whooping Crane**

It has long been understood that the major source of food for the whooping cranes at Aransas is the blue crab. In a year of high crab abundance, cranes can consume 7-8 crabs per hour (80 crabs per day), totaling 80-90% of their diet. In contrast, during years of low blue crab abundance, cranes consume an average of only three crabs per hour (about 35 crabs per day). Although the cranes are somewhat versatile, and can and do switch to alternate food sources when blue crabs are scarce, the other food sources are inferior because blue crabs provide more protein and fat for less foraging effort. It is also known that blue crabs are sensitive to salinity levels, and prefer salinities between 5 and 15 ppt. The crabs are known to migrate away from areas when the salinity surpasses these levels, creating a causal effect between higher salinity and a relative scarcity of crabs.

Studies have shown a strong correlation between the blue crab population and increased freshwater inflows. TPWD data suggests that water inflows greater than 1.3 million acre-feet annually results in low enough salinities in the estuary to produce high numbers of blue crabs. In San Antonio Bay, the years with the highest blue crab harvests all had inflows greater than 3 million acre-feet.

In the eight-year period from 1993-2001, the Fish and Wildlife Service ("USFWS") conducted surveys that roughly estimated the number of blue crabs available to whooping cranes. Two winters (1993-94 and 2000-01) had lower than normal numbers of crabs. During those winters, seven and six whooping cranes died respectively. In the six other winters with normal numbers of crabs, zero to one crane died.

This winter, Tom Stehn of the USFWS observed that "A blue crab count done on April 1st found zero crabs in the marsh.… Overall, these continue to be some of the worst conditions I have ever observed for the cranes at Aransas, with some birds looking thin and with disheveled plumage."

**E. High Salinity Reduces Abundance of Wolfberries to the Detriment of Whooping Cranes**

Extended periods of increased salinity can result in negative effects on the estuarine marsh plant community structure and composition. Wolfberries in the Aransas marshes can serve as an

Case: 10-40610 Document: 00511184533 Page: 45 Date Filed: 07/23/2010


important food source for the cranes, especially in the months of November and December when the cranes first arrive at Aransas. Increased salt marsh salinity is negatively correlated with abundance of wolfberries, because high salinities in late summer during the leafing period lead to reduced fruit production. In the absence of local rainfall, it is generally understood that when bay salinity is high, marsh salinity is somewhat higher still. With measured bay salinities remaining above 25 ppt from August 2008 through August 2009, and with practically no rainfall, the salinity of the Aransas salt marshes was very high for this extended period. The conditions of 2008 resulted in very low production of wolfberry fruit. Although there has been some rainfall in the fall of 2009, conditions in the marshes are similar to the previous year. Observer reports from Aransas indicate low to moderate abundance of wolfberry flowers and fruit in the fall of 2009 just as the cranes arrive for the winter.

**F. High Salinity Reduces the Availability of Drinkable Water, and Causes Takes of Whooping Cranes**

Yet another important relationship exists between the cranes and bay salinity. Cranes require that the water they drink be less than 23 ppt salinity. Usually the cranes drink the water in the marsh. However, when the water in the bay or in the ponds of the coastal marsh rises above 23 ppt, the cranes must fly to sources of freshwater in order to drink. These flights use up energy, reduce time available for foraging or resting, and could potentially make the cranes more vulnerable to predation in the uplands.

**G. The Health, Survival and Recovery of the Cranes is Directly Related to the Freshwater Inflows Regulated and Controlled by TCEQ Officials**

In the ways described above, among others, the health and welfare of the whooping crane is inextricably tied to bay salinity and the water management practices of TCEQ officials. The Whooping Crane Recovery Plan (3d. Revision, March, 2007) confirms the relationship between bay salinity levels and blue crab catch rates. The Recovery Plan identifies other impacts from low inflows and drought conditions including prolonged food shortage, lack of suitable nearby drinking water, drought-increased susceptibility to predation and disease, and possibly increased mortality during migration due to malnutrition. Therefore the Recovery Plan identifies that ensuring freshwater inflows is “priority 1” in the implementation schedule and vital to the recovery of the species.

Between 1988 and 2009, years in which higher crane mortality was observed were always characterized by low inflows from the Guadalupe River. (Figure 3). A crane response to low river flow (*i.e*. high salinity) is one of excess stress due to a number of ecological factors including food availability and the necessity to travel for fresh water. Weakened cranes may be more vulnerable to disease and predation. The cranes’ stressed condition does not necessarily lead to death but may also be manifested as lack of sufficient body fat and protein that will be exhibited during the spring migration and subsequent poor reproductive behavior. For example, following the poor blue crab winter of 1993-94, 37% of the known adult pairs (17 out of 46) failed to nest following their return to Canada. This was unusual since normally just about all pairs attempt to nest annually.




*Figure 3: Graph of Guadalupe-San Antonio River flows into the San Antonio Bay during the period July through December and whooping crane winter mortality from 1988-2009. Mortality data (% of flock) from Tom Stehn, USFWS.*

## H. State Regulatory Mechanisms Harm and Harass Whooping Cranes

The State of Texas owns the water in its public waterways. The right to divert and use water from a waterway is known as a "water right". The TCEQ officials named in this letter regulate water rights in Texas and control the appropriation, transfer and use of such rights (including emergency curtailments). The TCEQ Commissioners formally recognize a water right by issuing to the holder a Certificate of Adjudication or a Water Right Permit, which contains the limits of that right, its priority date, and any special or unique conditions associated with its use. The South Texas Watermaster is appointed by the TCEQ to administer the Guadalupe and San Antonio Rivers (among others), to enforce the regulatory scheme, and to apportion the water among the water rights holders to ensure that the more senior rights holders downstream obtain their water. Under State law, the Watermaster has the ability to curtail water rights in response to unique conditions.

The evidence is overwhelming that there is a causal relationship between the regulatory program administered by TCEQ officials regarding water rights and water use on the San Antonio and Guadalupe Rivers and the plight of the whooping crane. Decisions by the regulators determine river flows and salinity which affect the ability of the estuary ecosystems to produce the food required by the cranes. As a result food sources are directly and negatively impacted by the management and oversight of water rights by TCEQ officials. The actions of the Commissioners, the Executive Director and the Watermaster allow water to be taken during times of low flows when the impacts of these programs most directly affect the food and water sources of the whooping crane. The TCEQ officials have not sought or obtained any incidental take permits from USFWS that would allow takes of this protected species. The TCEQ officials have not

proposed or promulgated regulations that would avoid prohibited takes. The TCEQ officials have not instructed their employees, the Watermaster, the existing water rights permit holders or any other person to undertake steps to avoid prohibited takes of cranes.

## V. VIOLATIONS OF THE ESA SECTION 9

Section 9 of the ESA prohibits the "taking" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). "'Take' is defined in ... the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 307, 93d Cong., 1st Sess. (1973), reprinted in 1973 U.S.C.A.A.N. 2989, 2995. Taking includes the concepts of "harm" and "harassment." 16 U.S.C. § 1532(19). Harm may occur through significant habitat modification that actually kills or injures a protected species by impairing essential behavior patterns, including breeding, feeding or sheltering. 50 C.F.R. § 17.3; *Babbitt v. Sweet Home Chap. of Communities for a Greater Oregon*, 515 U.S. 687, 691 (1995). Harassment may occur through an act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns such as breeding, feeding, or sheltering. 50 C.F.R. § 17.3.

### A. TCEQ Officials Authorized Activities that Resulted in Crane Takes Without an Incidental Take Permit

The crane mortality of the 2008-09 winter described above constitutes a "take" of an endangered species and therefore a violation of Section 9 of the Endangered Species Act. Additionally, during the same time period, the significant modification of suitable crane habitat, including designated critical habitat, constitutes a 'harm' because it significantly impaired essential crane behavioral patterns. These takes occurred as a proximate result of TCEQ officials' authorization and implementation of their water rights permit scheme, and is thus prohibited by the ESA unless the TCEQ officials have a permit allowing the take. Throughout the drought period of 2008-09 the TCEQ officials continued to allow water rights holders to divert and consume water from the Guadalupe and San Antonio River basins. These diversions reduced the freshwater inflows into San Antonio Bay, which, during the drought period of 2008-09, resulted in longer periods of very high salinities than would have been the case had these diversions not occurred. As explained above, there is a direct link of causation between the activities of the TCEQ officials and the prohibited takes of cranes. Therefore the activities of the TCEQ Commissioners, the Executive Director and the Watermaster have violated and continue to violate Section 9 of the ESA.

### B. TCEQ Officials Continue to Authorize Activities that are Reasonably Certain to Cause Significant Habitat Modification and Therefore Harm and Harass Cranes Without an Incidental Take Permit

The Aransas Project has developed information, data and models to show that water diversions authorized by the TCEQ officials have a dramatic impact on salinity levels in the bay (*e.g*. Figure 2). During periods of drought or low flows, diversions of water from the river will result in increased salinity in the bay. As described above, significant alterations to the ecosystem of the bay and marshes are caused by extended periods of high salinity levels beyond that which would result under natural conditions. High bay salinity causes reduced abundance of blue crabs, potentially reduced availability of wolfberries and reduced availability of nearby suitable drinking water. These impacts are significant modifications of the habitat used by cranes,

including designated critical habitat, and are therefore a 'take' because they harm and harass the protected species. 50 C.F.R. § 17.3. No permit authorizes an incidental take by the TCEQ or the Watermaster. Therefore the activities of the TCEQ officials and the Watermaster have violated and continue to violate Section 9 of the ESA.

### C. Future Take of Whooping Cranes is Reasonably Foreseeable and May be Enjoined Under the ESA

The TCEQ officials' current water rights regulations and practices fail to avoid prohibited takes of cranes. It is the position of TAP that full use of existing water rights may result in impacts much more severe than those exhibited during the 2008-2009 wintering season. Water Conservation and Drought Contingency Plans that may be required of water rights permitees by TCEQ officials and which may be implemented during droughts are currently unrelated to the freshwater inflow requirements of the whooping cranes. These plans will therefore also do nothing to avoid prohibited takes. The SB3 environmental flows study for the San Antonio Bay cannot by law address existing water rights. Therefore, it is reasonably foreseeable that future use of existing water rights authorized by TCEQ officials will result in additional prohibited takes of whooping cranes unless and until such activities are enjoined.

Activities authorized by TCEQ officials that are reasonably likely to result in prohibited take of whooping cranes may be enjoined under the ESA. *See United States v. Town of Plymouth,* 6 F.Supp.2d 81, 91 (D. Mass. 1998) (preliminary injunction issued against township which authorized off-road vehicles on a beach that was habitat for threatened piping plovers); *Defenders of Wildlife v. Administrator, Envtl. Protection Agency*, 668 F.Supp. at 1356-1357, *aff'd* 882 F.3d 1294 (enjoining the EPA from continuing its registration of strychnine until it could do so without illegally taking protected species of wildlife).

## VI. CONCLUSION

TAP is claiming by this Notice of Intent that the TCEQ Commissioners, the TCEQ Executive Director and the South Texas Watermaster have violated and continue to violate Section 9 of the ESA. Pursuant to the citizen suit provision of the ESA, 16 U.S.C. §§ 1540(g)(1)(A) and (2)(A), TAP is providing you with sixty days notice of our intention to commence a civil action to challenge the foregoing violations of law and any violations that may occur after service of this notice letter, and to seek their remediation in a court of law.

In the litigation, The Aransas Project will seek an injunction barring TCEQ officials from approving new water rights permits involving the San Antonio and Guadalupe River basins until TCEQ officials and the Watermaster provide reasonable assurances that State-authorized activities will not harm or harass whooping cranes. The Aransas Project will also seek an injunction ordering TCEQ officials to develop a Habitat Conservation Plan for the San Antonio and Guadalupe River basins and San Antonio Bay, including provisions to control the allocation of already approved (*e.g.,* existing) water rights permits in the rivers so that a minimum of 1.3 million ac ft/year flow past the Guadalupe River gauge at Tivoli. The Aransas Project will ask the court to order TCEQ officials to conduct a thorough analysis of all permitted and exempt withdrawals and develop a binding plan for water development and water use in the San Antonio and Guadalupe River basins which may include reallocation of existing water use rights or addition of special conditions to existing permits. The Aransas Project will request that the court appoint a special master to oversee TCEQ's implementation and compliance with its orders.

Finally, The Aransas Project will seek a declaratory judgment that State water rights laws and regulations that cause harm to critical habitat or the take of cranes are inconsistent with the requirements of ESA, are preempted by federal law, and are invalid under the Supremacy Clause of the United States Constitution.

We are hopeful that the TCEQ officials and the Watermaster will take all necessary measures to avoid the unauthorized future taking of cranes, and that their representatives will contact us prior to the commencement of legal action to discuss obligations and alternatives under the ESA. If you have any questions about the issues raised in this letter, please feel free to contact me at any time.

Sincerely,

BLACKBURN CARTER, P.C.

by [signature]
James B. Blackburn, Jr.

c:

Governor Rick Perry
Office of the Governor
P.O. Box 12428
Austin, TX 78711-2428

Carter Smith, Executive Director
Texas Parks & Wildlife Department
4200 Smith School Road
Austin, TX 78744

The Honourable Jim Prentice
Minister of the Environment
Les Terrasses de la Chaudière
10 Wellington Street, 28th Floor
Gatineau, Quebec K1A 0H3
Canada

L'Oreal Stepney, Deputy Director
Office of Water
Texas Commission on Environmental Quality
P.O. Box 13087
Austin, TX 78711-3087

Benjamin Tuggle, Southwest Regional Director
Office of the Regional Director
U.S. Fish & Wildlife Service
P.O. Box 1306
Albuquerque, NM 87103-1306

Dan Alonso
Aransas National Wildlife Refuge
P.O. Box 100
Austwell, TX 77950-0100

Tom Stehn
Aransas National Wildlife Refuge
P.O. Box 100
Austwell, TX 77950-0100

Case: 10-40610 Document: 44 Page: 83 Date Filed: 07/23/2010

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bryan W. Shaw, Ph.D., Chairman
Texas Commission on Environmental
Quality, MC 100
P.O. Box 13087
Austin, TX 78711-3087

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (*Printed Name*) C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

TPASSICPA
DEC 09 2009

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number (*Transfer from service label*) 7007 3020 0001 2626 1627

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mark R. Vickery, P.G., Executive Director
Texas Commission on Environmental
Quality, MC 109
P.O. Box 13087
Austin, TX 78711-3087

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (*Printed Name*) C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

TPASSICPA
DEC 09 2009

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number (*Transfer from service label*) 7007 3020 0001 2626 1658

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Al Segovia, South Texas Watermaster
14250 Judson Road
San Antonio, TX 78233-4480

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X Evelyn Lopez ☒ Agent ☐ Addressee

B. Received by (*Printed Name*) Evelyn Lopez C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

2009 DEC -9
RECEIVED
SAN ANTONIO
REGION

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number (*Transfer from service label*) 7007 3020 0001 2626 1665

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

Case: 10-40610 Document: 00511184533 Page: 51 Date Filed: 07/23/2010

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Carlos Rubinstein, Commissioner
Texas Commission on Environmental
Quality, MC 100
P.O. Box 13087
Austin, TX 78711-3087

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X
☐ Agent
☐ Addressee

B. Received by ( Printed Name)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

TPASS/CPA
DEC 09 2009

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)
7007 3020 0001 2626 1641

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ken Salazar, Secretary of Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X [signature]
☐ Agent
☐ Addressee

B. Received by ( Printed Name)
S LONG

C. Date of Delivery
DEC 14 2009

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)
7004 0550 0000 0465 3696

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Eric H. Holder Jr., Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X
☐ Agent
☐ Addressee

B. Received by ( Printed Name)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

DEC 14 2009

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)
7004 0550 0000 0465 3689

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

Case: 10-40610 Document: 00511184533 Page: 52 Date Filed: 07/23/2010

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Sam D. Hamilton, Director
Fish and Wildlife Service
1849 C St., N.W.
Washington, D.C. 20240

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature X [signature] ☒ Agent ☐ Addressee

B. Received by (*Printed Name*) CCU

C. Date of Delivery 12/14/09

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number (*Transfer from service label*) 7004 0550 0000 0465 3702

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Greg Abbott, Texas Attorney General
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature X ☐ Agent ☐ Addressee

B. Received by (*Printed Name*)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

RECEIVED IN MAIL CENTER
DEC 0 9 2009
Attorney General of Texas

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number (*Transfer from service label*) 7007 3020 0001 2626 1672

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Buddy Garcia, Commissioner
Texas Commission on Environmental
Quality, MC 100
P.O. Box 13087
Austin, TX 78711-3087

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature X ☐ Agent ☐ Addressee

B. Received by (*Printed Name*)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

PASS/CFH
DEC 09 2009

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number (*Transfer from service label*) 7007 3020 0001 2626 1634

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

Case: 10-40610 Document: 00511184534 Page: 1 Date Filed: 07/23/2010

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT, Plaintiff, | § § § | |
| v. | § | Civil Action No. 2:10cv00075 |
| BRYAN SHAW, et al., Defendants. | § § § | |

**UNION CARBIDE CORPORATION'S MOTION TO INTERVENE**

Pursuant to Federal Rule of Civil Procedure 24(a)(2), or in the alternative Federal Rule of Civil Procedure 24(b)(1)(B), Union Carbide Corporation ("UCC") respectfully requests leave to intervene in the above-captioned action as a defendant.[1]

## I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

UCC operates an integrated chemical manufacturing complex located near Seadrift, Texas (the "Seadrift Plant"). As part of its commitment to contributing to the sustainability of the local community and environment, UCC participates in a number of initiatives that promote conservation on the Guadalupe River Basin. UCC employees are active representatives in local and regional water planning efforts. The Seadrift Plant hosts educators from Victoria and Calhoun Counties and surrounding areas in its annual Wonders of Water workshops discussing UCC's water usage, treatment, and conservation programs. It annually opens its site property to members of the Gulf Coast Bird Observatory for its annual Christmas Bird Count, which gives the local birding community and researchers the opportunity to view and study local bird populations. And the Seadrift Plant has been named the first ever Guadalupe River Conservation Partner for its assistance in enabling the Guadalupe-Blanco River

[1] UCC files its motion subject to Defendants' pending motion to dismiss pursuant to Rule 12(b)(6). (D.E. 40.) If the Court grants Defendants' motion to dismiss, UCC's motion to intervene will be rendered moot.

Case: 10-40610 Document: 00511184534 Page: 2 Date Filed: 07/23/2010

Trust to purchase 646 acres in the Guadalupe River Delta. The project is located in the Guadalupe River Basin and will add to a corridor of conserved lands in this critical area. It will be preserved and managed for key breeding areas as well as stop-over and wintering habitat for migratory birds in the Guadalupe River Delta.

UCC is actively involved in conservation efforts in part because the Seadrift Plant's existence depends on a reliable supply of suitable-quality fresh water. UCC's Seadrift Plant is one of the last diversion points on the Guadalupe River before the river enters the San Antonio and Guadalupe Bays. While UCC owns one of the most senior water rights in the lower portion of the Guadalupe Basin, its rights are considered "Run-of-the-River Rights," which are water rights that are dependent on the constant flow of the river rather than the release of stored water from a reservoir. The location of UCC's diversion point on the Guadalupe River, and its lack of authorization and facilities to store significant amounts of surface water during times of excess flow for future use, would cause UCC's water rights to be particularly affected by flow curtailments during extended period of drought. As a private, for-profit business entity dependent upon available water under its water rights authorizations for its ongoing manufacturing operations, UCC would be required to curtail its manufacturing processes with potentially devastating economic results if adequate water were not available.

Surface water rights in Texas are based on the prior appropriation doctrine. The central tenet of the doctrine is the principle of "first in time, first in right." This means that when the flow in the river is insufficient for all water right holders to divert their authorized amount, the most senior right holder is entitled to fully satisfy its right before the next most senior right holder is entitled to any water. Plaintiff's suit appears to be an attempt to dismantle the prior appropriation doctrine.

Case: 10-40610 Document: 00511184534 Page: 3 Date Filed: 07/23/2010

For all these reasons, and for the reasons discussed below, UCC has significant legally-protected interests in this litigation that are not adequately protected by the other parties to this proceeding. Accordingly, it should be admitted as an intervening party under Rules 24(a) and (b).

## II. Factual and Procedural Background

### A. UCC's significant interest in this case.

UCC's Seadrift Plant is located on 4,700 acres (about half of which is under production), with 11 manufacturing units conducting global business in basic plastics and chemicals and performance plastics and chemicals. The facility produces key building-block chemicals that serve as the precursors to many specialty chemical products critical to numerous industries. Some of the applications for UCC's products include plastics (polyethylene and polypropylene) for wire and cable applications, drip irrigation tubing, containers (food and beverage), automotive parts, toys and diapers, and roofing materials; glycols for antifreeze, polyester fabrics, and bottles; and oxide derivatives for health and beauty products such as medicines, shampoos, and soaps, as well as detergents, window cleaners, brake fluids, paints and carrying agents for herbicides. Fresh water is a critical and necessary component of UCC's products manufactured at the Seadrift Plant.

Some of the water rights upon which UCC depends predate the commencement of chemical production at the Seadrift Plant in 1954. UCC's most senior water rights are set out in Permit No. 1319, which has a priority date of February 3, 1941. This permit for 2,500 acre-feet of water was originally granted to the Port Lavaca Canal Company for irrigation purposes, and was amended in 1952 to include industrial uses (Permit No. 1319A). UCC's next most senior water rights originate from Permit No. 1375, which shows an application date of January 3, 1944, and an allotment of 42,615 acre-feet of water per year for irrigation purposes. The original

Case: 10-40610 Document: 00511184534 Page: 4 Date Filed: 07/23/2010

applicant was Charles G. Hooks. That permit was subsequently amended and transferred to the Calhoun County Canal Company in 1947 (Permit No. 1375A). The permit's use was modified in 1952 to include industrial uses (Permit No. 1375D). The permit was subsequently transferred to UCC's name. (Permit No. 1375B). UCC's sole ownership of 10,000 acre-feet of water originates from these senior permits.

Separately, under Permit No. 1614, UCC in 1952 acquired allowances for the beneficial use of 126,000 acre-feet of water per annum for industrial, municipal, and irrigation use. A diversion of 20,000 acre-feet of water for Central Power & Light Company was authorized in 1977 under Permit No. 1614E. That permit amendment also notes that Permit No. 1614 was amended, conveyed, and assigned such that UCC, West Side Calhoun County Navigation District, and the Guadalupe-Blanco River Authority ("GBRA")[2] each eventually possessed certain rights and interests in the permit. Additional permits held by UCC included Permit No. 1564, providing for 998 acre-feet of water per year, and Permit No. 1362 allotting 1,870 acre-feet of water per year for irrigation uses.

In 1984, a Final Decree of the 267th Judicial District Court of Victoria County determined rights between GBRA and UCC under their respective water rights permits. *See In Re: Adjudication of Water Rights in the Lower Guadalupe River Segment, Guadalupe River Basin, and a portion of the Lavaca-Guadalupe Coastal Basin*, Cause No. 84-2-32534C, dated May 25, 1984. Certificates of Adjudication 18-5173, 18-5174, 18-5175, 18-5176, 18-5177, and 18-5178 were issued in subsequent adjudication proceedings in 1988 to both GBRA and UCC as co-owners of water rights. As indicated in the Final Decree and these Certificates of Adjudication, which account for rights previously held by permit, UCC and GBRA together co-own 162,501 acre-feet of water in the Lower Guadalupe River Segment and UCC separately

[2] By Order dated April 23, 2010, this Court granted GBRA's Motion to Intervene. (D.E. 35.)

Case: 10-40610 Document: 00511184534 Page: 5 Date Filed: 07/23/2010

holds, as a sole owner, interest in 10,000 acre-feet of water for industrial use. *See Supplement to Each of the Applications of Guadalupe-Blanco River Authority to Amend Certificate of Adjudication Nos.* 18-5173, 18-5174, 18-5175, 18-5176, 18-5177, and 18-5178 (August 31, 2006).[3]

UCC and GBRA have entered into several agreements setting out their relative obligations and authorizations regarding their co-owned water rights. A recent agreement, made effective in September 2002 (the "2002 Agreement"), provides helpful details as to each party's respective water rights. Generally, the 2002 Agreement indicates that UCC has a significant interest in 172,501 acre-feet of water per year from the Guadalupe River Basin. More specifically, the 2002 Agreement notes that UCC has a "perpetual right to use for consumptive purposes up to 10,000 acre-feet of water per calendar year under the UCC 10,000 Acre-Foot-Right." (2002 Agreement § 3.2(a).) As the sole owner of this 10,000 acre-feet right, UCC has the express right to sell any portion of this allotment to third parties. In addition, UCC retains a perpetual right to use 20,000 acre-feet of water for consumptive purposes in the UCC Seadrift Plant and an additional 10,000 acre-feet of water if needed by UCC for consumptive use at the Seadrift Plant. (2002 Agreement §§ 3.2(c) & (e).) In addition, pursuant to a revenue sharing section in the 2002 Agreement, for any amount of co-owned water sold by GBRA, UCC receives a share of the Raw Water Revenues generated from the sale. UCC was to receive 28.4% of all revenues from GBRA's sale of co-owned Run-of-River-Rights under Section 3.6 of the 2002 Agreement.

Apart from its direct water rights interests in the Guadalupe River, UCC plays a substantial role in ongoing water planning related to the Guadalupe River Basin. One way it

---

[3] Numerous amendments to Certificate of Adjudication Nos. 18-5173, 18-5174, 18-5175, 18-5176, 18-5177, and 18-5178 addressing changes to diversion points and other changes have also been made but are not relevant here.

Case: 10-40610 Document: 00511184534 Page: 6 Date Filed: 07/23/2010

participates is through the State Environmental Flows Advisory Group ("EFAG") stakeholder process. The EFAG process was created by the Texas Legislature for the purpose of balancing the demands on the water resources of the state resulting from increased water demand and the fresh water requirements of riverine, bay, and estuary systems. UCC has participated in the EFAG process since its inception and its employees represent industry at basin and bay stakeholder meetings related to the Guadalupe, San Antonio, Mission, and Aransas Rivers and Mission, Copano, Aransas, and San Antonio Bays.

UCC employees also are involved in regional and local water planning and environmental stewardship. A UCC employee currently serves as a representative for industry interests and is a voting member of the South Central Texas Regional Water Planning Group (known as "Region L"). Region L is responsible for preparing and adopting a regional water plan encompassing more than 20 counties to conserve water supplies, meet future water supply needs, and respond to future droughts in the Region L area. Regional water plans are approved by the Texas Water Development Board and incorporated into a comprehensive state water plan. In addition, UCC employees serve on the Steering Committee for the Edwards Aquifer Recovery Implementation Program ("EARIP"). A goal of the EARIP is to work with the federal Fish & Wildlife Service to establish Habitat Conservation Plans for managing the Edwards Aquifer to preserve the species listed as endangered at the Comal and San Marcos Springs. As members of the Steering Committee, UCC employees represent industrial surface water rights in the Guadalupe River Basin.

UCC holds valuable water right interests in the Guadalupe River. Not only is UCC's use of water rights necessary to supply fresh water for industrial production of chemicals

Case: 10-40610 Document: 00511184534 Page: 7 Date Filed: 07/23/2010

at its Seadrift Plant, but UCC's interests in the relatively senior water rights are themselves significant assets that generate revenues for UCC.

**B. Status of TAP's suit.**

On March 10, 2010, The Aransas Project ("TAP") filed this suit against the Commissioners of the Texas Commission on Environmental Quality ("TCEQ"), the Executive Director of the TCEQ, and the South Texas Water Master (collectively the "TCEQ Defendants") alleging violations of Section 9 of the federal Endangered Species Act ("ESA"). (D.E. 1.)

TAP alleges that the TCEQ's permit program and its oversight of water rights on the Guadalupe and San Antonio Rivers resulted in a reduction of freshwater inflow to the San Antonio Bay ecosystem and connected habitats, constituting harm and harassment of whooping cranes during the 2008-2009 wintering season and causing a "take" of the endangered species under the ESA. (*E.g.*, D.E. 1.) TAP alleges that such harm and harassment is likely to continue in violation of the ESA unless the TCEQ alters its regulation of water uses and flows. TAP is seeking injunctive relief to compel TCEQ to (1) develop a Habitat Conservation Plan pursuant to Section 10 of the ESA, (2) compile a full accounting of all existing water uses on the Guadalupe and San Antonio River systems, and (3) identify a process to reduce freshwater withdrawals and maintain flows into the San Antonio-Aransas Bay system in order to protect the whooping crane. (*Id.* at 2-3.) The injunctive relief TAP seeks essentially would require that the TCEQ establish enforceable restrictions on otherwise authorized surface water withdrawals by existing water right holders to provide a specified "environmental flow" in the Guadalupe River.

The Texas Attorney General's Office has appeared in the case on behalf of the TCEQ Defendants. (D.E. 8-12.) The TCEQ Defendants were required to file an answer by May 17, 2010. On April 22, 2010, this Court held an Initial Pretrial and Scheduling Conference, during which it entered a Scheduling Order and General Order. (D.E. 32-33.)

By Order dated April 23, 2010, this Court granted GBRA intervenor status as of right. (D.E. 35.) The Court concluded that GBRA's motion was timely in part because it was filed before the defendant's answer was due. (*Id.* at 2-3.) The Court also concluded that GBRA had a significant interest in the litigation because disposition of the action would impede its interests and its interests were not adequately represented by the existing parties. (*Id.* at 3-4.)

On May 7, 2010, GBRA filed its List of Persons with Relevant Knowledge and a Certificate of Interested Parties. (D.E. 37-38.) The Certificate of Interested Parties specifically names UCC as an interested industrial user and "customer" of GBRA. (D.E. 37.) On May 14, 2010, on the business day before their deadline to answer the Complaint, the TCEQ Defendants filed a motion to dismiss pursuant to Rule 12(b)(6). (D.E. 40.) The TCEQ Defendants urge this Court to dismiss the Complaint because, among other things, TAP lacks standing to sue due to the TCEQ Defendants' lack of authority to redress the alleged injury.[4]

## III. ARGUMENT AND AUTHORITIES

### A. UCC should be allowed to intervene as a matter of right.

Rule 24(a)(2) requires proof of four elements to establish a right to intervention: (1) the application must be timely; (2) the applicant must have an interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect its interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit. *See* FED. R. CIV. P. 24(a)(2); *Sierra Club v. Glickman*, 82 F.3d 106, 108 (5th Cir. 1996); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994). UCC meets all four requirements for intervention as a matter of right.

[4] UCC supports the TCEQ Defendants' motion to dismiss.

Case: 10-40610 Document: 00511184534 Page: 9 Date Filed: 07/23/2010

**1. UCC's motion to intervene is timely.**

The timeliness of a motion to intervene is "to be determined from all the circumstances." *See Stallworth v. Monsanto Co.*, 558 F.2d 257, 263 (5th Cir. 1977) (internal quotation marks omitted). A court in the Fifth Circuit should specifically examine four factors to determine timeliness of a motion to intervene: (1) the length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case; (2) the prejudice that the existing parties would suffer because of any delay in the intervention (as opposed to the prejudice of allowing the intervention); (3) the extent of the prejudice that the would-be intervenor would suffer if denied intervention; and (4) the existence of any unusual circumstances militating either for or against a timely determination. *Id.* at 264 - 66.

This suit was filed in this Court March 10, 2010, and the Defendants' answer was to be due May 17, 2010. GBRA's Motion for Intervention, filed April 22, 2010 and granted April 23, 2010, was considered timely in part because it was filed before an answer was due in the case. (D.E. 35 at 2-3.) Similarly, this motion should be considered timely because it was submitted approximately nine weeks after the suit was filed and on the same day that the TCEQ Defendants' answer was due. Furthermore, because this suit is still in its initial stages, the timing of this motion will not delay the proceeding or prejudice any of the parties.[5]

By contrast, if UCC is denied a right to intervene, it will be substantially prejudiced and unable to protect substantial water right interests at risk of curtailment if TAP is successful in its case. There are no unusual circumstances that would militate against a timeliness determination. The fact that a co-owner of its water rights successfully intervened

[5] UCC is prepared to file all preliminary documents required by the Court of parties promptly after an Order granting UCC leave to intervene.

less than four weeks ago, however, is a significant factor for determining that the motion is timely. Under the existing circumstances, UCC's motion for intervention is timely.

**2. UCC has direct, substantial, and legally protected interests relating to the actions subject to the Complaint.**

The Fifth Circuit requires that an applicant have an interest in the proceeding that is "direct, substantial and legally protectable." *Espy*, 18 F.3d at 1207 (internal quotation marks omitted). The "'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.* UCC's interests in this proceeding meet this test.

As set forth above, UCC has a substantial, sole, and vested ownership interest in 10,000 acre-feet of water with senior priority rights dating back to 1941. *See Tex. Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 646 (Tex. 1971) (holding that a mature water appropriation right is a vested property right). In addition, it has co-ownership rights of 162,501 additional acre-feet per year. This makes UCC one of the largest water rights holders on the Guadalupe River Basin, and its significant water rights make its legally protectable interests a direct target of the TAP suit, which seeks to curtail water use in the Guadalupe River. *See, e.g.*, *Glickman*, 82 F.3d at 109.

Much of UCC's water rights are tied to its consumptive industrial use. Potential changes to the types and allowable quantities of consumptive uses will affect UCC's immediate business and manufacturing plans in addition to future plans. Because the Seadrift Plant has a legally protectable water right that may be altered or threatened by the potential reduction of water use sought by TAP, UCC has an interest sufficient to satisfy Rule 24(a).

Additionally, this suit threatens UCC's contracts with the GBRA. By agreement with GBRA, UCC is specifically allotted significant additional acre-feet of water in addition to

Case: 10-40610 Document: 44 Page: 96 Date Filed: 07/23/2010

the water it owns directly, and UCC directly benefits from water sold by GBRA pursuant to revenue sharing provisions within its contract with GBRA. "Contract rights are traditionally protectable interests." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001); *see also Espy*, 18 F.3d at 1207 (holding that companies have legally protectable property interests in existing timber contracts that were threatened by a suit addressing conservation practices). Because TAP's Complaint specifically cites GBRA contracts with large water purchasers, UCC's co-ownership interests with the GBRA are specifically targeted in TAP's Complaint. (*See* D.E. 1 at ¶¶ 167 - 69.) Because UCC's interests are direct, substantial and legally protectable, it meets the requirements under Rule 24(a).

**3. UCC's interests may be impaired by an unfavorable disposition of the case.**

The third requirement for intervention under Rule 24(a) is that the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect his interest. *See Espy*, 18 F.3d at 1207. Because the Complaint focuses on water rights upon which UCC relies, and because UCC's interests could be significantly affected by a ruling in TAP's favor, disposition of the action would impede UCC's ability to protect its interests. In particular, TAP specifically requests that diversions be reduced to allow more environmental flows to habitats of the whooping cranes. UCC is completely dependent on its water rights for production at its Seadrift Plant. If its water rights are curtailed, production capacity is similarly reduced and UCC and its shareholders could be irreparably harmed.

**4. UCC is not adequately represented by other parties to the suit.**

To ascertain the adequacy of representation of an existing party, the Court should consider:

> (1) whether the interest of a present party is such that it will undoubtedly make all of the intervenor's arguments; (2) whether

Case: 10-40610 Document: 00511184534 Page: 12 Date Filed: 07/23/2010

> the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect.

*Berg*, 268 F.3d at 822. While the applicant for intervention has the burden of demonstrating inadequate representation by existing parties to the suit, the burden is "minimal" and the applicant need only show that the representation "may be" inadequate. *Espy*, 18 F.3d at 1207 (*citing Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).

Because TAP seeks to reduce flows that would substantially impair UCC's water rights and consumptive uses, UCC is clearly not adequately represented by TAP. The Fifth Circuit has spoken directly to the distinct interests between TCEQ and a typical water user in a similar case under the ESA. In *Sierra Club v. City of San Antonio*, the court held that the state had met the requirements for intervention as of right because, as the legal representative of the TCEQ, the state had an interest in the regulation of various water rights that differed from and was not adequately represented by the state's existing role in the suit as a water user. 115 F.3d 311, 315 (5th Cir. 1997). The court explained, "It is axiomatic that the interests of the pumpers, who are local cities, businesses, and governmental entities that rely on the aquifer's water supply for their immediate subsistence, will diverge from those of the various state agencies who are charged with taking a state-wide view of the aquifer as it affects wildlife, water resources and quality, and the agricultural industry . . . ." *Id.* In the same way, the state's interest as representative of the TCEQ differs from UCC's interest as a water rights holder and industrial user in the case brought by TAP against the TCEQ. Accordingly, the state, as representative of the TCEQ parties, cannot adequately represent UCC in the suit.

UCC also has sufficiently distinct interests from intervenor-defendant GBRA and will not be adequately represented by GBRA. GBRA is a government entity with statutory authority to manage and contract for water over a ten-county region. In this way, its interests are

Case: 10-40610 Document: 44 Page: 98 Date Filed: 07/23/2010

similar to those of the TCEQ and are distinct from water users. *See City of San Antonio*, 115 F.3d at 315. GBRA also is not a consumer of water; it is a purveyor. As such, GBRA is not an industrial user that is completely dependent on water rights for manufacturing. As a government agency with potentially competing contracts for municipal, agricultural, and industrial uses, GBRA is unlikely to be willing to make all of UCC's arguments from the perspective of an industrial water user. *See Berg*, 268 F.3d at 822.

By contrast, UCC is a for-profit, industrial business with sole ownership over a 10,000 acre-foot "Run-of-the-River Right" with senior priority for industrial use pursuant to its own water rights permit. Continued rights under that permit are critical to the sustained economic operation of the Seadrift manufacturing facility that contributes significant resources to the local economy. UCC's status as a separate and for-profit industrial water rights user alone is likely sufficient to suggest that GBRA will not adequately represent UCC in this proceeding.

Even with respect to its co-owned shares of water, UCC and GBRA have distinct types of water rights that may create an issue as to the adequacy of GBRA's representation in this proceeding. While much of UCC's interests in water rights in the Guadalupe River Basin are tied to consumption, GBRA's interests are not so linked. In fact, if GBRA does not use or sell water, it has the specific ability under its permits to impound and store significant quantities of water in GBRA-controlled reservoirs. Similarly, while GBRA has the right to impound and release excess flows in a controlled manner, such as its ability to store water in large reservoirs it manages such as Canyon Lake, UCC's "Run-of-River Rights" are more limited and much more vulnerable to curtailed flows.[6] While UCC has some limited storage capacity, in general, its "Run-of-the-River Rights" are only available to UCC if sufficient flows exist to allow UCC's diversions. UCC's "Run-of-River Rights" in the lower Guadalupe River would thus be

[6] UCC may have some small impoundments that do not appreciably increase the reliability of its water supply.

Case: 10-40610 Document: 44 Page: 99 Date Filed: 07/23/2010

particularly affected by a decision that requires that specified amounts of natural flows must remain in the river for environmental flows such that the water would not be available for diversion. UCC's participation may thus offer necessary elements to the proceeding that GBRA would neglect. *See Berg*, 268 F.3d at 822.

As set forth above, UCC and GBRA also have entered into several agreements setting out relative obligations and authorizations between the two entities regarding their shared water rights. Besides being adverse parties in the negotiation of these agreements, GBRA and UCC's interests sufficiently diverge in their co-owned waters to warrant UCC's separate participation in this matter. For instance, while UCC is dependent on its downstream water rights for its production processes, GBRA holds excess water rights downstream that it cannot always sell. Thus, GBRA may be more willing than UCC to allow for reductions in flows downstream, and UCC and GBRA may have particularly different perspectives as to settlement of this matter. In addition, as a public agency, GBRA may have alternative competing motivations for uses of water that are not always the most beneficial to UCC as a for-profit, manufacturing business. All of these differences make GBRA an inadequate representative of UCC's interests in this suit.

**B. Alternatively, UCC should be allowed permission to intervene.**

UCC is entitled to intervene as a matter of right pursuant to Rule 24(a)(2). If, for any reason, this Court determines otherwise, UCC requests that it be permitted to intervene pursuant to Rule 24(b)(1)(B). Rule 24(b)(1)(B) provides: "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1)(B).

UCC's water rights are subject to the same questions of law and fact addressed in this suit and its claims and defenses would be similar to the defendants. Questions as to the

Case: 10-40610 Document: 00511184534 Page: 15 Date Filed: 07/23/2010

adequacy of existing flows, preparations for future droughts, and how TCEQ responds to such questions are issues that will affect UCC's substantial water rights in the Guadalupe River Basin. Despite significant common interests and defenses, UCC would also provide a unique perspective as a for-profit industrial user with "Run-of-the-River Rights."

UCC's motion is timely because the deadline for Defendants to file an answer has still not passed, and the proceeding is still in its initial stages. Because permissive intervention is primarily a practical tool to dispose of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process, allowing UCC to intervene would promote judicial economy and further due process. *See Espy*, 18 F.3d at 1207.

## IV. CONCLUSION

UCC meets all of the requirements for intervention as of right pursuant to Rule 24(a)(2). Accordingly, UCC respectfully requests that this Court grant UCC leave to intervene as of right. In the alternative, UCC respectfully requests that the Court grant UCC permissive intervention pursuant to Rule 24(b)(1)(B). UCC further respectfully requests that this Court grant it leave to file the original answer attached as Exhibit B.[7]

[7] Rule 24(c) states that a motion to intervene "must be accompanied by a pleading that sets out the claim or defense for which intervention is sought." FED. R. CIV. P. 24(c).

Case: 10-40610 Document: 44 Page: 101 Date Filed: 07/23/2010

Dated: May 17, 2010

Respectfully submitted,

/s/ Cristina Espinosa Rodriguez

Cristina Espinosa Rodriguez
State Bar No. 00793701
Federal I.D. No. 20575
Stephen G. Tipps
State Bar No. 20070500
Federal I.D. No. 00805
Matthew Kuryla
State Bar No. 24000312
Federal I.D. No. 21766
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana
Houston, Texas 77002-4995
Telephone: (713) 229-1188
Facsimile: (713) 229-7788
E-mail: stephen.tipps@bakerbotts.com
E-mail: cristina.rodriguez@bakerbotts.com
E-mail: matthew.kuryla@bakerbotts.com

ATTORNEYS FOR UNION CARBIDE CORPORATION

OF COUNSEL:

The Rangel Law Firm, P.C.
Jorge C. Rangel
Attorney-in-Charge
State Bar No. 16543500
Federal I.D. No. 5698
Jaime S. Rangel
State Bar No. 24033759
Federal I.D. No. 32226
615 Upper N. Broadway, Suite 2020
Corpus Christi, Texas 78477
Telephone: (361) 883-8500
Facsimile: (361) 883-2611
Email: jorge.c.rangel@rangellaw.com
Email: jaime.rangel@rangellaw.com

Case: 10-40610 Document: 005111845349 Page: 17 Date Filed: 07/23/2010

## CERTIFICATE OF CONFERENCE

I hereby certify that on May 13, 2010, I conferred with counsel for Plaintiff regarding the relief requested in Union Carbide Corporation's Motion to Intervene. Plaintiff is opposed to intervention by UCC. I further certify that on May 12, 2010, I conferred with Brian Berwick, counsel for Defendants. Defendants are not opposed to intervention by UCC. I further certify that on May 12, 2010, I conferred with counsel for Intervenor Guadalupe Blanco River Authority. Intervenor is not opposed to intervention by UCC.

/s/ Matthew Kuryla
Matthew Kuryla

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed pursuant to the electronic filing requirements of the United States District Court for the Southern District of Texas on this the 17th day of May 2010, which provides for service on counsel of record in accordance with the electronic filing protocols in place.

/s/ Cristina Espinosa Rodriguez
Cristina Espinosa Rodriguez

Case: 10-40610 Document: 00511184534 Page: 18 Date Filed: 07/23/2010

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT,<br>Plaintiff, | §<br>§<br>§ | |
| v. | § | Civil Action No. 2:10cv00075 |
| BRYAN SHAW, et al.,<br>Defendants. | §<br>§<br>§ | |

**DECLARATION OF KRISTAN SOTO**

My name is Kristan Soto. I am the Production Leader of UCC's Seadrift Plant in Seadrift, Texas. I am over the age of 18 and am otherwise competent to make this declaration.

I have reviewed UCC's Motion to Intervene. The factual statements contained therein are true and correct and within my personal knowledge.

I declare or certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 17, 2010.

Kristan Soto
Kristan Soto

# EXHIBIT B

Case: 10-40610 Document: 44 Page: 106 Date Filed: 07/23/2010

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT, Plaintiff, | § § § | |
| v. | § | Civil Action No. 2:10cv00075 |
| BRYAN SHAW, et al., Defendants. | § § § | |

**UNION CARBIDE CORPORATION'S ORIGINAL ANSWER**

Intervenor Union Carbide Corporation ("UCC") files its Answer to Plaintiff's Original Complaint for Declaratory and Injunctive Relief ("Complaint"):

**LIMITED GENERAL DENIAL**

Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, UCC asserts a general denial as to those allegations contained in the Plaintiff's Complaint that are not clearly and specifically admitted herein.

**ANSWERS TO PLAINTIFF'S ALLEGATIONS**

**"I. <u>Introduction and Summary of the Case"</u>**

1. UCC admits that Plaintiff seeks declaratory and injunctive relief, but denies that it is entitled to any such relief. UCC denies the remaining allegations contained in paragraph 1 of Plaintiff's Complaint.

2. UCC is without sufficient information to admit or deny the allegations contained in paragraph 2, and therefore denies the allegations contained in paragraph 2 of Plaintiff's Complaint.

3. UCC is without sufficient information to admit or deny the allegations contained in paragraph 3, and therefore denies the allegations contained in paragraph 3 of Plaintiff's Complaint.

Case: 10-40610 Document: 00511184534 Page: 22 Date Filed: 07/23/2010

4. UCC admits that Plaintiff alleges violations of the federal Endangered Species Act ("ESA") but denies that it is entitled to any relief under the ESA.

5. UCC is without sufficient information to admit or deny the allegations contained in paragraph 5, and therefore denies the allegations contained in paragraph 5 of Plaintiff's Complaint.

6. UCC is without sufficient information to admit or deny the allegations contained in paragraph 6, and therefore denies the allegations contained in paragraph 6 of Plaintiff's Complaint.

7. UCC is without sufficient information to admit or deny the allegations contained in paragraph 7, and therefore denies the allegations contained in paragraph 7 of Plaintiff's Complaint.

8. UCC admits that Plaintiff seeks declaratory and injunctive relief, but denies that it is entitled to any such relief.

**"II. Jurisdiction and Venue"**

9. UCC denies the allegations contained in paragraph 9 of the Complaint.

10. UCC admits that Plaintiff's Complaint Exhibit 1 includes a copy of notice provided to Defendants on December 7, 2009, but denies the remaining allegations contained in paragraph 10 of the Complaint.

11. UCC is without sufficient information to admit or deny the allegations contained in paragraph 11, and therefore denies the allegations contained in paragraph 11 of Plaintiff's Complaint.

12. UCC is without sufficient information to admit or deny the allegations contained in paragraph 12, and therefore denies the allegations contained in paragraph 12 of Plaintiff's Complaint.

Case: 10-40610 Document: 00511184534 Page: 23 Date Filed: 07/23/2010

13. On information and belief, UCC denies the allegations contained in paragraph 13 of the Complaint.

**"III. Parties"**

14. On information and belief, Defendant admits that Plaintiff The Aransas Project ("TAP") has its principal place of business in Aransas, County, Texas. UCC denies the remaining allegations contained in paragraph 14 of Plaintiff's Complaint.

15. UCC admits that Bryan Shaw is TCEQ Chairman, and that TCEQ regulates water diversion activities through the review and approval of water permits and the rules, regulations and policies governing them. UCC denies the remaining allegations contained in paragraph 15 of Plaintiff's Complaint.

16. UCC admits that Defendants Buddy Garcia and Carlos Rubinstein are TCEQ Commissioners. UCC denies the remaining allegations contained in paragraph 16 of Plaintiff's Complaint.

17. UCC admits that Defendant Mark Vickery is Executive Director of the TCEQ. UCC denies the remaining allegations contained in paragraph 17 of Plaintiff's Complaint.

18. UCC admits that Defendant Al Segovia is the South Texas Watermaster, and is an employee of the TCEQ. UCC denies the remaining allegations contained in paragraph 18 of Plaintiff's Complaint.

**"IV. The Statutory Background"**

19. UCC admits that Plaintiff cites a provision of the ESA in paragraph 19 of Plaintiff's Complaint. This paragraph requires no further responsive pleading.

20. UCC admits that Plaintiff cites a provision of the ESA in paragraph 20 of Plaintiff's Complaint. This paragraph requires no further responsive pleading.

Case: 10-40610 Document: 005111845349 Page: 24 Date Filed: 07/23/2010

21. UCC admits that Plaintiff cites a provision of the ESA in paragraph 21 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under that provision.

22. UCC admits that Plaintiff cites to legislative history of a provision of the ESA in paragraph 22 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under that provision.

23. UCC admits that Plaintiff cites a provision of the ESA in paragraph 23 of Plaintiff's Complaint. This paragraph requires no further responsive pleading.

24. UCC admits that Plaintiff cites a provision of the Code of Federal Regulations ("CFR") in paragraph 24 of Plaintiff's Complaint. This paragraph requires no further responsive pleading.

25. UCC admits that Plaintiff cites a provision of CFR in paragraph 25 of Plaintiff's Complaint. This paragraph requires no further responsive pleading.

26. UCC admits that Plaintiff cites to an opinion of the United States Supreme Court in paragraph 26 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief pursuant to that opinion.

27. UCC admits that Plaintiff cites to a provision of the ESA in paragraph 27 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under that provision.

28. UCC admits that Plaintiff cites to a provision of the ESA in paragraph 28 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under that provision.

29. UCC admits that Plaintiff cites to a provision of the ESA in paragraph 29 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under that provision.

30. UCC admits that Plaintiff cites to a provision of the ESA in paragraph 30 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under that provision.

31. UCC admits that Plaintiff cites to an opinion of the United States Supreme Court in paragraph 31 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief pursuant to that opinion.

32. UCC admits that Plaintiff cites to an opinion of the United States Court of Appeals for the Ninth Circuit in paragraph 32 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief pursuant to that opinion.

**"V. Background Facts"**

33. UCC denies the allegations contained in paragraph 33 of Plaintiff's Complaint.

34. UCC is without sufficient information to admit or deny the allegations contained in paragraph 34, and therefore denies the allegations contained in paragraph 34 of Plaintiff's Complaint.

35. UCC is without sufficient information to admit or deny the allegations contained in paragraph 35, and therefore denies the allegations contained in paragraph 35 of Plaintiff's Complaint.

36. UCC is without sufficient information to admit or deny the allegations contained in paragraph 36, and therefore denies the allegations contained in paragraph 36 of Plaintiff's Complaint.

37. UCC is without sufficient information to admit or deny the allegations contained in paragraph 37, and therefore denies the allegations contained in paragraph 37 of Plaintiff's Complaint.

38. UCC is without sufficient information to admit or deny the allegations contained in paragraph 38, and therefore denies the allegations contained in paragraph 38 of Plaintiff's Complaint.

39. UCC is without sufficient information to admit or deny the allegations contained in paragraph 39, and therefore denies the allegations contained in paragraph 39 of Plaintiff's Complaint.

40. UCC is without sufficient information to admit or deny the allegations contained in paragraph 40, and therefore denies the allegations contained in paragraph 40 of Plaintiff's Complaint.

41. UCC denies the allegations contained in paragraph 41 of Plaintiff's Complaint.

42. UCC denies the allegations contained in paragraph 42 of Plaintiff's Complaint.

43. UCC denies the allegations contained in paragraph 43 of Plaintiff's Complaint.

44. UCC denies the allegations contained in paragraph 44 of Plaintiff's Complaint.

45. UCC denies the allegations contained in paragraph 45 of Plaintiff's Complaint.

46. UCC denies the allegations contained in paragraph 46 of Plaintiff's Complaint.

47. UCC is without sufficient information to admit or deny the allegations contained in paragraph 47, and therefore denies the allegations contained in paragraph 47 of Plaintiff's Complaint.

48. UCC denies the allegations contained in paragraph 48 of Plaintiff's Complaint.

Case: 10-40610 Document: 44 Page: 112 Date Filed: 07/23/2010

49. UCC denies the allegations contained in paragraph 49 of Plaintiff's Complaint.

50. UCC denies the allegations contained in paragraph 50 of Plaintiff's Complaint.

51. UCC denies the allegations contained in paragraph 51 of Plaintiff's Complaint.

**"A. Whooping Crane Biology and Conservation Status"**

52. UCC denies the allegations contained in paragraph 52 of Plaintiff's Complaint.

53. UCC is without sufficient information to admit or deny the allegations contained in paragraph 53, and therefore denies the allegations contained in paragraph 53 of Plaintiff's Complaint.

54. UCC denies the allegations contained in paragraph 54 of Plaintiff's Complaint.

55. UCC is without sufficient information to admit or deny the allegations contained in paragraph 55, and therefore denies the allegations contained in paragraph 55 of Plaintiff's Complaint.

56. UCC admits that Plaintiff cites to Federal Register provisions in paragraph 56 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under those provisions.

57. UCC is without sufficient information to admit or deny the allegations contained in paragraph 57, and therefore denies the allegations contained in paragraph 57 of Plaintiff's Complaint.

58. UCC admits that Plaintiff cites to Federal Register provisions in paragraph 58 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under such provisions.

59. UCC is without sufficient information to admit or deny the allegations contained in paragraph 59, and therefore denies the allegations contained in paragraph 59 of Plaintiff's Complaint.

60. UCC is without sufficient information to admit or deny the allegations contained in paragraph 60, and therefore denies the allegations contained in paragraph 60 of Plaintiff's Complaint.

61. UCC denies the allegations contained in paragraph 61 of Plaintiff's Complaint.

**"B. The 2008-2009 Whooping Crane Mortality Event is Unprecedented"**

62. UCC is without sufficient information to admit or deny the allegations contained in paragraph 62, and therefore denies the allegations contained in paragraph 62 of Plaintiff's Complaint.

63. UCC is without sufficient information to admit or deny the allegations contained in paragraph 63, and therefore denies the allegations contained in paragraph 63 of Plaintiff's Complaint.

64. UCC denies the allegations contained in paragraph 64 of Plaintiff's Complaint.

65. UCC is without sufficient information to admit or deny the allegations contained in paragraph 65, and therefore denies the allegations contained in paragraph 65 of Plaintiff's Complaint.

Case: 10-40610 Document: 44 Page: 29 Date Filed: 07/23/2010

66. UCC is without sufficient information to admit or deny the allegations contained in paragraph 66, and therefore denies the allegations contained in paragraph 66 of Plaintiff's Complaint.

67. UCC is without sufficient information to admit or deny the allegations contained in paragraph 67, and therefore denies the allegations contained in paragraph 67 of Plaintiff's Complaint.

68. UCC admits that Plaintiff cites to a Fish & Wildlife Service ("FWS") census in paragraph 68 of Plaintiff's Complaint. This paragraph requires no further responsive pleading.

69. UCC is without sufficient information to admit or deny the allegations contained in paragraph 69, and therefore denies the allegations contained in paragraph 69 of Plaintiff's Complaint.

70. UCC denies the allegations contained in paragraph 70 of Plaintiff's Complaint.

**"C. Cause of Crane Mortality"**

71. UCC denies the allegations contained in paragraph 71 of Plaintiff's Complaint.

72. UCC denies the allegations contained in paragraph 72 of Plaintiff's Complaint.

73. UCC is without sufficient information to admit or deny the allegations contained in paragraph 73, and therefore denies the allegations contained in paragraph 73 of Plaintiff's Complaint.

74. UCC denies the allegations contained in paragraph 74 of Plaintiff's Complaint.

Case: 10-40610 Document: 00511184534 Page: 30 Date Filed: 07/23/2010

75. UCC denies the allegations contained in paragraph 75 of Plaintiff's Complaint.

76. UCC denies the allegations contained in paragraph 76 of Plaintiff's Complaint.

77. UCC is without sufficient information to admit or deny the allegations contained in paragraph 77, and therefore denies the allegations contained in paragraph 77 of Plaintiff's Complaint.

78. UCC is without sufficient information to admit or deny the allegations contained in paragraph 78, and therefore denies the allegations contained in paragraph 78 of Plaintiff's Complaint.

79. UCC is without sufficient information to admit or deny the allegations contained in paragraph 79, and therefore denies the allegations contained in paragraph 79 of Plaintiff's Complaint.

**"D. TCEQ's Role"**

80. UCC denies the allegations contained in paragraph 80 of Plaintiff's Complaint.

81. On information and belief, UCC admits that TCEQ Commissioners have issued permits to use water in the Guadalupe and San Antonio River basins. UCC denies the remaining allegations contained in paragraph 81 of Plaintiff's Complaint.

82. UCC denies the allegations contained in paragraph 82 of Plaintiff's Complaint.

83. UCC denies the allegations contained in paragraph 83 of Plaintiff's Complaint.

Case: 10-40610 Document: 00511184534 Page: 31 Date Filed: 07/23/2010

84. UCC denies the allegations contained in paragraph 84 of Plaintiff's Complaint.

85. UCC denies the allegations contained in paragraph 85 of Plaintiff's Complaint.

86. UCC denies the allegations contained in paragraph 86 of Plaintiff's Complaint.

**"E. Low Freshwater Inflows Cause High Bay Salinity"**

87. UCC is without sufficient information to admit or deny the allegations contained in paragraph 87, and therefore denies the allegations contained in paragraph 87 of Plaintiff's Complaint.

88. UCC is without sufficient information to admit or deny the allegations contained in paragraph 88, and therefore denies the allegations contained in paragraph 88 of Plaintiff's Complaint.

89. UCC is without sufficient information to admit or deny the allegations contained in paragraph 89, and therefore denies the allegations contained in paragraph 89 of Plaintiff's Complaint.

90. UCC is without sufficient information to admit or deny the allegations contained in paragraph 90, and therefore denies the allegations contained in paragraph 90 of Plaintiff's Complaint.

91. UCC is without sufficient information to admit or deny the allegations contained in paragraph 91, and therefore denies the allegations contained in paragraph 91 of Plaintiff's Complaint.

Case: 10-40610 Document: 44 Page: 117 Date Filed: 07/23/2010

92. UCC is without sufficient information to admit or deny the allegations contained in paragraph 92, and therefore denies the allegations contained in paragraph 92 of Plaintiff's Complaint.

93. UCC is without sufficient information to admit or deny the allegations contained in paragraph 93, and therefore denies the allegations contained in paragraph 93 of Plaintiff's Complaint.

94. UCC is without sufficient information to admit or deny the allegations contained in paragraph 94, and therefore denies the allegations contained in paragraph 94 of Plaintiff's Complaint.

95. UCC is without sufficient information to admit or deny the allegations contained in paragraph 95, and therefore denies the allegations contained in paragraph 95 of Plaintiff's Complaint.

96. UCC denies the allegations contained in paragraph 96 of Plaintiff's Complaint.

97. UCC denies the allegations contained in paragraph 97 of Plaintiff's Complaint.

98. UCC is without sufficient information to admit or deny the allegations contained in paragraph 98, and therefore denies the allegations contained in paragraph 98 of Plaintiff's Complaint.

99. UCC is without sufficient information to admit or deny the allegations contained in paragraph 99, and therefore denies the allegations contained in paragraph 99 of Plaintiff's Complaint.

Case: 10-40610 Document: 44 Page: 33 Date Filed: 07/23/2010

100. UCC is without sufficient information to admit or deny the allegations contained in paragraph 100, and therefore denies the allegations contained in paragraph 100 of Plaintiff's Complaint.

101. UCC is without sufficient information to admit or deny the allegations contained in paragraph 101, and therefore denies the allegations contained in paragraph 101 of Plaintiff's Complaint.

102. UCC is without sufficient information to admit or deny the allegations contained in paragraph 102, and therefore denies the allegations contained in paragraph 102 of Plaintiff's Complaint.

103. UCC is without sufficient information to admit or deny the allegations contained in paragraph 103, and therefore denies the allegations contained in paragraph 103 of Plaintiff's Complaint.

104. UCC denies the allegations contained in paragraph 104 of Plaintiff's Complaint.

105. UCC denies the allegations contained in paragraph 105 of Plaintiff's Complaint.

106. UCC denies the allegations contained in paragraph 106 of Plaintiff's Complaint.

107. UCC denies the allegations contained in paragraph 107 of Plaintiff's Complaint.

108. UCC denies the allegations contained in paragraph 108 of Plaintiff's Complaint.

Case: 10-40610 Document: 00511184534 Page: 34 Date Filed: 07/23/2010

**"F. Low Inflows Reduce Abundance of Blue Crabs to the Detriment of the Whooping Crane"**

109. UCC is without sufficient information to admit or deny the allegations contained in paragraph 109, and therefore denies the allegations contained in paragraph 109 of Plaintiff's Complaint.

110. UCC is without sufficient information to admit or deny the allegations contained in paragraph 110, and therefore denies the allegations contained in paragraph 110 of Plaintiff's Complaint.

111. UCC is without sufficient information to admit or deny the allegations contained in paragraph 111, and therefore denies the allegations contained in paragraph 111 of Plaintiff's Complaint.

112. UCC is without sufficient information to admit or deny the allegations contained in paragraph 112, and therefore denies the allegations contained in paragraph 112 of Plaintiff's Complaint.

113. UCC is without sufficient information to admit or deny the allegations contained in paragraph 113, and therefore denies the allegations contained in paragraph 113 of Plaintiff's Complaint.

114. UCC admits that Plaintiff cites to FWS surveys in paragraph 114 of Plaintiff's Complaint. This paragraph requires no further responsive pleading.

115. UCC is without sufficient information to admit or deny the allegations contained in paragraph 115, and therefore denies the allegations contained in paragraph 115 of Plaintiff's Complaint.

Case: 10-40610 Document: 44 Page: 35 Date Filed: 07/23/2010

116. UCC is without sufficient information to admit or deny the allegations contained in paragraph 116, and therefore denies the allegations contained in paragraph 116 of Plaintiff's Complaint.

117. UCC is without sufficient information to admit or deny the allegations contained in paragraph 117, and therefore denies the allegations contained in paragraph 117 of Plaintiff's Complaint.

118. UCC admits that Plaintiff cites to a FWS report in paragraph 118 of Plaintiff's Complaint. UCC denies the remaining allegations contained in paragraph 118 of Plaintiff's Complaint.

**"G. Low Inflows Reduce Abundance of Wolfberries to the Detriment of Whooping Cranes"**

119. UCC denies the allegations contained in paragraph 119 of Plaintiff's Complaint.

120. UCC denies the allegations contained in paragraph 120 of Plaintiff's Complaint.

121. UCC denies the allegations contained in paragraph 121 of Plaintiff's Complaint.

122. UCC denies the allegations contained in paragraph 122 of Plaintiff's Complaint.

123. UCC denies the allegations contained in paragraph 123 of Plaintiff's Complaint.

124. UCC denies the allegations contained in paragraph 124 of Plaintiff's Complaint.

Case: 10-40610 Document: 00511184534 Page: 36 Date Filed: 07/23/2010

125. UCC denies the allegations contained in paragraph 125 of Plaintiff's Complaint.

**"H. Low Inflows Reduce the Availability of Drinkable Water to the Detriment of Whooping Cranes"**

126. UCC denies the allegations contained in paragraph 126 of Plaintiff's Complaint.

127. UCC denies the allegations contained in paragraph 127 of Plaintiff's Complaint.

128. UCC denies the allegations contained in paragraph 128 of Plaintiff's Complaint.

129. UCC denies the allegations contained in paragraph 129 of Plaintiff's Complaint.

**"I. The Health, Survival and Recovery of the Cranes is Directly Related to the Freshwater Inflows Regulated and Controlled by Defendants"**

130. UCC denies the allegations contained in paragraph 130 of Plaintiff's Complaint.

131. UCC admits that Plaintiff cites to a federal government plan in paragraph 131 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under such plan.

132. UCC admits that Plaintiff cites to a federal government plan in paragraph 132 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under such plan.

133. UCC admits that Plaintiff cites to a federal government plan in paragraph 133 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under such plan.

134. UCC denies the allegations contained in Paragraph 134 of Plaintiff's Complaint.

Case: 10-40610 Document: 44 Page: 122 Date Filed: 07/23/2010

135. UCC denies the allegations contained in paragraph 135 of Plaintiff's Complaint.

136. UCC denies the allegations contained in paragraph 136 of Plaintiff's Complaint.

137. UCC denies the allegations contained in paragraph 137 of Plaintiff's Complaint.

138. UCC denies the allegations contained in paragraph 138 of Plaintiff's Complaint.

139. UCC denies the allegations contained in paragraph 139 of Plaintiff's Complaint.

140. UCC denies the allegations contained in paragraph 140 of Plaintiff's Complaint.

141. UCC denies the allegations contained in paragraph 141 of Plaintiff's Complaint.

142. UCC denies the allegations contained in paragraph 142 of Plaintiff's Complaint.

143. UCC denies the allegations contained in paragraph 143 of Plaintiff's Complaint.

**"J. State Regulatory Mechanisms Harm and Harass Whooping Cranes"**

144. On information and belief, UCC admits that Defendants regulate water diversion and use in Texas as alleged in paragraph 144 of Plaintiff's Complaint.

145. On information and belief, UCC admits that Defendants authorize some water diversion by issuing a Certificate of Adjudication or a Water Right Permit as alleged in paragraph 145 of Plaintiff's Complaint.

146. On information and belief, UCC admits that Defendants authorize some water withdrawals for riparian domestic and livestock use. UCC denies the remaining allegations contained in paragraph 146 of Plaintiff's Complaint.

147. UCC denies the allegations contained in paragraph 147 of Plaintiff's Complaint.

148. UCC admits that Defendant TCEQ Commissioners have the ability to set policies regarding the processing of water permits and permitted withdrawals. UCC denies the remaining allegations contained in paragraph 148 of Plaintiff's Complaint.

149. UCC admits that TCEQ Executive Director Vickery and TCEQ accept and process water permit applications, conduct administrative and technical reviews, issue the draft permit, propose regulations, and have oversight over all permits approved by TCEQ.

150. UCC admits that South Texas Watermaster Segovia is appointed by the TCEQ to manage water rights on the Guadalupe and San Antonio Rivers (among others). UCC denies the remaining allegations contained in paragraph 150 of Plaintiff's Complaint.

151. UCC denies the allegations contained in paragraph 150 of Plaintiff's Complaint.

152. UCC specifically denies the allegations contained in paragraph 151 of Plaintiff's Complaint. There is no causal relationship between the TCEQ's regulatory program regarding water diversion and use and the "plight of the Whooping Crane."

153. UCC denies the allegations contained in paragraph 152 of Plaintiff's Complaint.

154. UCC denies the allegations contained in paragraph 153 of Plaintiff's Complaint.

Case: 10-40610 Document: 00511118453 Page: 39 Date Filed: 07/23/2010

155. UCC denies the allegations contained in paragraph 154 of Plaintiff's Complaint.

156. UCC is without sufficient information to admit or deny the allegations contained in paragraph 155, and therefore denies the allegations contained in paragraph 155 of Plaintiff's Complaint.

157. UCC is without sufficient information to admit or deny the allegations contained in paragraph 156, and therefore denies the allegations contained in paragraph 156 of Plaintiff's Complaint.

158. UCC denies the allegations contained in paragraph 157 of Plaintiff's Complaint.

159. UCC specifically denies the allegations contained in paragraph 158 of Plaintiff's Complaint. There is no relationship between TCEQ's approval of water diversions and uses and harm to the whooping cranes.

160. UCC specifically denies the allegations contained in paragraph 159 of Plaintiff's Complaint. There is no relationship between TCEQ's approval of water diversions and uses and harm to the whooping cranes.

161. UCC specifically denies the allegations contained in paragraph 160 of Plaintiff's Complaint. UCC has participated in state processes addressing freshwater inflows required by the San Antonio Bay. UCC denies the remaining allegations contained in paragraph 160 of Plaintiff's Complaint.

162. UCC admits that Plaintiff cites to Senate Bill 3 in paragraph 161 of Plaintiff's Complaint, but denies the remaining allegations contained in paragraph 161 of Plaintiff's Complaint.

Case: 10-40610 Document: 00511184534 Page: 40 Date Filed: 07/23/2010

163. UCC admits that Plaintiff cites to activities by the South Central Texas Regional Water Planning Group in paragraph 162 of Plaintiff's Complaint, but denies the remaining allegations contained in paragraph 162 of Plaintiff's Complaint.

164. UCC admits that Plaintiff cites to the Edwards Aquifer Recovery Implementation Plan in paragraph 163 of Plaintiff's Complaint, but denies the remaining allegations contained in paragraph 163 of Plaintiff's Complaint.

165. UCC denies the allegations contained in paragraph 164 of Plaintiff's Complaint.

166. UCC denies the allegations contained in paragraph 165 of Plaintiff's Complaint.

167. UCC denies the allegations contained in paragraph 166 of Plaintiff's Complaint.

**"K. Commercial water suppliers and others seek to use TCEQ's deficient and flawed regulatory scheme to accelerate commitments for and overdraw freshwater in the Guadalupe River basin"**

168. UCC is without sufficient information to admit or deny the allegations contained in paragraph 167, and therefore denies the allegations contained in paragraph 167 of Plaintiff's Complaint.

169. UCC is without sufficient information to admit or deny the allegations contained in paragraph 168, and therefore denies the allegations contained in paragraph 168 of Plaintiff's Complaint.

170. UCC specifically denies the allegations contained in paragraph 169 of Plaintiff's Complaint. An additional water right will not have significant effect on the likelihood of future takes of whooping cranes.

Case: 10-40610 Document: 00511184534 Page: 41 Date Filed: 07/23/2010

171. UCC denies the allegations contained in paragraph 170 of Plaintiff's Complaint.

172. UCC denies the allegations contained in paragraph 171 of Plaintiff's Complaint.

173. UCC denies the allegations contained in paragraph 172 of Plaintiff's Complaint.

**"VI. Causes of Action"**

174. UCC admits that Plaintiff incorporates by reference previous pleadings in each count below. No further responsive pleading is required.

**"Count I: Declaratory Relief"**

175. UCC specifically denies the allegations contained in paragraph 174 of Plaintiff's Complaint. Defendants to not have an actual, substantial, legal controversy concerning the force of the ESA because Plaintiff claims harm that is wholly in the past and not ongoing.

176. UCC admits that Plaintiff cites to provisions of the ESA and CFR in paragraph 175 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under such provisions.

177. UCC denies the allegations contained in paragraph 176 of Plaintiff's Complaint.

178. UCC is without sufficient information to admit or deny the allegations contained in paragraph 177, and therefore denies the allegations contained in paragraph 177 of Plaintiff's Complaint.

179. UCC denies the allegations contained in paragraph 178 of Plaintiff's Complaint.

180. UCC denies the allegations contained in paragraph 179 of Plaintiff's Complaint.

181. UCC denies the allegations contained in paragraph 180 of Plaintiff's Complaint.

182. UCC denies the allegations contained in paragraph 181 of Plaintiff's Complaint.

183. UCC admits that Plaintiff cites to the U.S. Code provisions pertaining to declaratory judgments in paragraph 182 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any relief under these provisions.

**"Count II: Defendants Authorized Activities that Resulted in Crane Takes Without an Incidental Take Permit"**

184. UCC denies the allegations contained in paragraph 183 of Plaintiff's Complaint.

185. UCC denies the allegations contained in paragraph 184 of Plaintiff's Complaint.

186. UCC denies the allegations contained in paragraph 185 of Plaintiff's Complaint.

187. UCC denies the allegations contained in paragraph 186 of Plaintiff's Complaint.

188. UCC denies the allegations contained in paragraph 183 of Plaintiff's Complaint.

189. UCC specifically denies the allegations contained in paragraph 188 of Plaintiff's Complaint. There is no link between the activities of the Defendants and the alleged takes of whooping cranes.

Case: 10-40610 Document: 44 Page: 43 Date Filed: 07/23/2010

190. UCC denies the allegations contained in paragraph 189 of Plaintiff's Complaint.

191. UCC is without sufficient information to admit or deny the allegations contained in paragraph 190, and therefore denies the allegations contained in paragraph 190 of Plaintiff's Complaint.

192. UCC denies the allegations contained in paragraph 189 of Plaintiff's Complaint.

**"Count III: Defendants Continue to Authorize Activities that are Reasonably Certain to Cause Significant Habitat Modification and Therefore Harm and Harass Cranes Without an Incidental Take Permit"**

193. UCC denies the allegations contained in paragraph 192 of Plaintiff's Complaint.

194. UCC denies the allegations contained in paragraph 193 of Plaintiff's Complaint.

195. UCC denies the allegations contained in paragraph 194 of Plaintiff's Complaint.

196. UCC denies the allegations contained in paragraph 195 of Plaintiff's Complaint.

197. UCC denies the allegations contained in paragraph 196 of Plaintiff's Complaint.

198. UCC is without sufficient information to admit or deny the allegations contained in paragraph 197, and therefore denies the allegations contained in paragraph 197 of Plaintiff's Complaint.

199. UCC denies the allegations contained in paragraph 198 of Plaintiff's Complaint.

Case: 10-40610 Document: 44 Page: 129 Date Filed: 07/23/2010

200. UCC denies the allegations contained in paragraph 199 of Plaintiff's Complaint.

**"Count IV: Future Takes of Whooping Cranes and Reasonably Foreseeable and Must be Enjoined Under the ESA"**

201. UCC specifically denies the allegations contained in paragraph 200 of Plaintiff's Complaint. It is pure conjecture that Defendant's current activities are likely to cause future takes.

202. UCC specifically denies the allegations contained in paragraph 201 of Plaintiff's Complaint. It is pure conjecture to claim that existing water permits will result in more severe impacts in the future.

203. UCC specifically denies the allegations contained in paragraph 202 of Plaintiff's Complaint. The allegation does not account for existing state processes addressing environmental flows.

204. UCC specifically denies the allegations contained in paragraph 203 of Plaintiff's Complaint. The allegation does not account for existing state processes addressing environmental flows.

205. UCC specifically denies the allegations contained in paragraph 204 of Plaintiff's Complaint. It is pure conjecture to claim that existing water permits will result in more severe impacts in the future.

206. UCC specifically denies the allegations contained in paragraph 205 of Plaintiff's Complaint. It is pure conjecture to claim that existing water activities will result in prohibited takes in the future.

Case: 10-40610 Document: 00511184534 Page: 45 Date Filed: 07/23/2010

**"VII. Standing"**

207. On information and belief, UCC admits that Plaintiff's mission includes public education. UCC denies the remaining allegations contained in paragraph 206 of Plaintiff's Complaint.

208. UCC admits that Plaintiff alleges that relief sought in its complaint can redress injuries to the cranes, but UCC specifically denies the remaining allegations contained in paragraph 207 of Plaintiff's Complaint. The alleged harms affecting the cranes, are wholly based on past injuries not connected to Defendant's activities and not redressable through this suit.

209. UCC admits that Plaintiff cites individuals and organizations with an interest in whooping cranes. UCC denies the remaining allegations contained in paragraph 208 of Plaintiff's Complaint and its subparts.

210. UCC denies the allegations contained in paragraph 209 of Plaintiff's Complaint.

211. UCC denies each and every allegation not previously admitted or otherwise qualified.

**"VIII. Prayer"**

UCC admits that Plaintiff seeks various forms in relief in its "Prayer," but denies that Plaintiff is entitled to any of those forms of relief.

**DEFENSES AND AFFIRMATIVE DEFENSES**

1. UCC asserts that Plaintiff fails to state a claim on which relief may be granted.
2. UCC asserts that Plaintiff does not have standing to assert its claims.
3. UCC asserts that Plaintiff's claims are barred by a lack of ripeness.

Case: 10-40610 Document: 00511184534 Page: 46 Date Filed: 07/23/2010

4. UCC asserts that Plaintiff's claims are barred because the Plaintiff's alleged injuries are moot.

5. UCC asserts that Plaintiff has failed to exhaust its administrative remedies before bringing suit.

6. UCC asserts that Plaintiff has not met all conditions precedent to filing suit.

7. UCC asserts that Plaintiff' claims are barred because they are too speculative.

8. UCC asserts Plaintiff's claims are barred by the doctrine of laches.

9. UCC asserts that Plaintiff's claims are barred by the doctrine of abstention.

10. UCC asserts that Plaintiff' claims are barred by the doctrine of sovereign immunity.

11. UCC asserts that Plaintiff's claims are barred, in whole or in part, because the TCEQ Defendants lack the authority to address the Plaintiff's alleged injury.

12. UCC asserts that Plaintiff's claims are barred, in whole or in part, because the Plaintiff's proposed relief would be unconstitutional.

13. UCC asserts that Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered the injuries or damages alleged or any other injuries or damages resulting from Defendants' actions.

14. If Plaintiff has sustained any damages, which is expressly denied, Defendants' activities were not the proximate cause of the injury.

15. If Plaintiff has sustained any damages, which is expressly denied, the damages were the proximate result of some superseding or intervening cause.

Case: 10-40610 Document: 005111845349 Page: 47 Date Filed: 07/23/2010

16. UCC asserts that any injury, damage or loss sustained by Plaintiff in connection with the subject matter of this action, which is expressly denied, was not reasonably foreseeable.

17. UCC asserts that Plaintiff is not entitled to an award of attorneys' fees.

18. UCC asserts that Plaintiff's claims are barred because Defendants fully performed any and all statutory and other requirements under federal or state law.

19. UCC asserts that its practices and conduct were not unlawful in that it complied with all statutes and regulations applicable during the relevant period.

20. UCC asserts that Plaintiff' claims are barred, in whole or in part, because the activities alleged in the Complaint to be takings under the ESA were not takings.

21. UCC asserts that Plaintiff's claims for injunctive relief are barred, in whole or in part, because the equities of this case weigh against such relief, and Plaintiff's claims for equitable relief are contrary to the public interest.

22. UCC hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and trial or that may be asserted by another Defendant, and thus reserves the right to amend its defenses.

Case: 10-40610 Document: 44 Page: 48 Date Filed: 07/23/2010

Dated: May 17, 2010

Respectfully submitted,

/s/ Cristina Espinosa Rodriguez
Cristina Espinosa Rodriguez
State Bar No. 00793701
Federal I.D. No. 20575
Stephen G. Tipps
State Bar No. 20070500
Federal I.D. No. 00805
Matthew Kuryla
State Bar No. 24000312
Federal I.D. No. 21766
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana
Houston, Texas 77002-4995
Telephone: (713) 229-1188
Facsimile: (713) 229-7788
E-mail: stephen.tipps@bakerbotts.com
E-mail: cristina.rodriguez@bakerbotts.com
E-mail: matthew.kuryla@bakerbotts.com

ATTORNEYS FOR UNION CARBIDE CORPORATION

OF COUNSEL:

The Rangel Law Firm, P.C.
Jorge C. Rangel
Attorney-in-Charge
State Bar No. 16543500
Federal I.D. No. 5698
Jaime S. Rangel
State Bar No. 24033759
Federal I.D. No. 32226
615 Upper N. Broadway, Suite 2020
Corpus Christi, Texas 78477
Telephone: (361) 883-8500
Facsimile: (361) 883-2611
Email: jorge.c.rangel@rangellaw.com
Email: jaime.rangel@rangellaw.com

Case: 10-40610 Document: 44 Page: 134 Date Filed: 07/23/2010

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed pursuant to the electronic filing requirements of the United States District Court for the Southern District of Texas on this the 17th day of May 2010, which provides for service on counsel of record in accordance with the electronic filing protocols in place.

/s/ Cristina Espinosa Rodriguez
Cristina Espinosa Rodriguez

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT,<br>Plaintiff, | §<br>§<br>§ | |
| v. | § | Civil Action No. 2:10cv00075 |
| BRYAN SHAW, et al.,<br>Defendants. | §<br>§<br>§ | |

**ORDER GRANTING UNION CARBIDE CORPORATION'S MOTION TO INTERVENE**

On this day, the Court considered Union Carbide Corporation's Motion to Intervene. Having considered the motion, response, evidence, and applicable authorities, the Court finds that the motion should be granted.

IT IS THEREFORE ORDERED that Union Carbide Corporation's Motion to Intervene is GRANTED. Union Carbide Corporation is hereby permitted to intervene as a defendant in this action. The Clerk of the Court is directed to file the Answer attached as Exhibit B to the Motion.

SIGNED and ORDERED this ___ day of _____________, 2010.

_______________________________
HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

Case: 10-40610 Document: 44 Page: 136 Date Filed: 07/23/2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 2:10-cv-00075** |
| | § | |
| | § | |
| **BRIAN SHAW, et al.,** | § | |
| | § | |
| **Defendants** | § | |

**TEXAS FARM BUREAU**
**AND AMERICAN FARM BUREAU FEDERATION'S**
**MOTION TO INTERVENE AS DEFENDANTS AND**
**MEMORANDUM IN SUPPORT OF INTERVENTION**

*s/ Sydney W. Falk, Jr.*
Sydney W. Falk, Jr.
Texas State Bar No. 06795400
Southern District of Texas No. 16128
Email: sfalk@bickerstaff.com
Douglas G. Caroom
Attorney-in-Charge
Texas State Bar No. 03832700
*Application for admission pro hac vice pending*
Email: dcaroom@bickerstaff.com

BICKERSTAFF HEATH DELGADO ACOSTA LLP
3711 South MoPac Expressway, Building One, Suite 300
Austin, Texas 78746
Phone: (512) 472-8021
Facsimile: (512) 320-5638

**ATTORNEYS FOR TEXAS FARM BUREAU**
**and AMERICAN FARM BUREAU FEDERATION**

Case: 10-40610 Document: 44 Page: 137 Date Filed: 07/23/2010

**TABLE OF CONTENTS**

**BACKGROUND** ..... 1

**Plaintiff's Claims and Requests for Relief** ..... 1

**Texas Farm Bureau Members' Interests** ..... 3

**American Farm Bureau Federation's Interests** ..... 5

**INTERVENTION OF RIGHT** ..... 6

**Timeliness** ..... 7

**Direct, Substantial, Legally-Protected Interests** ..... 9

**Farm Bureau Members' Interests May Be Impaired or Impeded by the Disposition of This Lawsit** ..... 10

**Existing Parties Do Not Adequately Represent TFB and AFBF Member Interests** ..... 12

**All Factors for Rule 24(a)(2) Intervention of Right Have Been Established** ..... 15

**PERMISSIVE INTERVENTION IN THE ALTERNATIVE** ..... 15

**REQUIREMENTS OF FRCP 24(c) ARE SATISFIED** ..... 15

**CONCLUSION** ..... 16

Case: 10-40610 Document: 00511184535 Page: 3 Date Filed: 07/23/2010

# AUTHORITIES

## Cases

*Conservation Law Foundation of New England, Inc. v. Mosbacher*, 956 F.2d 39, 43 (1st Cir. 1992) ........ 11

*Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1126 (5th Cir. 1970)) ........ 8

*Edwards v. City of Houston*, 78 F.3d 983, 1003 (5th Cir. 1996) (en banc) ........ 9

*Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001)) ........ 11

*Heaton v. Monogram Credit Card Bank of Georgia*, 297 F.3d 416, 422 (5th Cir. 2002)) ........ 6, 7, 9, 12, 15

*John Doe No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001) ........ 7, 10, 11

*Ruiz v. Estelle*, 161 F.3d 814, 828 (5th Cir. 1998); *Espy*, 18 F.3d at 1205-06 ........ 8

*Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997) ........ 13

*Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994) ........ 7, 9, 10, 12

*Sierra Club v. FEMA*, 2008 WL 2414333 (S.D. Tex. June 11, 2010) at *5 ........ 7, 8, 11, 13

*Sierra Club v. Glickman*, 82 F.3d 106, 108 (5th Cir. 1996) (per curiam ........ 7, 9, 10, 12

*Texas Water Rights Comm'n v. L.A. Wright*, 464 S.W.2d 642, 647 (Tex.1971) ........ 9

*Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 647 (Tex. 1971) ........ 3

*Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 636 n.10 (1972)) ........ 14

## Rules

FRCP 24(a)(2) ........ 1, 6, 7, 15, 16

FRCP 24(b)(1)(B) ........ 1, 15, 17

FRCP 24(c) ........ 15

Case: 10-40610 Document: 00511184535 Page: 4 Date Filed: 07/23/2010

**TEXAS FARM BUREAU AND AMERICAN FARM BUREAU FEDERATION'S MOTION TO INTERVENE AS DEFENDANTS AND MEMORANDUM IN SUPPORT OF INTERVENTION**

Texas Farm Bureau ("TFB") and the American Farm Bureau Federation ("AFBF") request intervention as defendants in this cause, as of right under Federal Rule of Civil Procedure ("FRCP" or "Rule") 24(a)(2), or, in the alternative, permissively under FRCP 24(b)(1)(B).

## BACKGROUND

### Plaintiff's Claims and Requests for Relief

Plaintiff The Aransas Project ("Plaintiff" or "TAP") claims that the flock of whooping cranes that winter in South Texas have been adversely affected, rising to the level of a "take" under section 9 of the Endangered Species Act (the "Act"), 16 U.S.C. § 1538(a), by the failure of Texas authorities to have ensured adequate freshwater flows of the Guadalupe and San Antonio Rivers into the bays and estuary areas that comprise the wintering habitat of the birds during the 2008-09 winter season. According to Plaintiff, the state officials' failure to have prevented allegedly high salinity conditions stressed the birds by having compromised food and water supplies.

Plaintiff's theory is that the State of Texas, acting through the Texas Commission on Environmental Quality ("TCEQ") has the authority and a duty to ensure freshwater river flows sufficient to prevent "takes" of listed species – in this case, to prevent adverse salinity levels in the habitat bays and estuaries - by reducing upstream withdrawals and use of water from the rivers by, among others, holders of water rights granted by the State

Case: 10-40610 Document: 00511184535 Page: 5 Date Filed: 07/23/2010

of Texas; and that future takes will occur if TCEQ (and perhaps other state actors) continue to honor existing water rights and issue new water rights in these rivers.

Plaintiff seeks a declaration that TCEQ and the State generally have a duty under the Act to ensure freshwater flows, and ask for relief in the form of, among other things, mandatory reductions in upstream water use during any repetitions of drought or other periods of low freshwater inflow. Indeed, Plaintiff suggests that enjoining water rights holders' diversions will be required. *See, e.g.,* Docket Entry ("D.E.") 1, Plaintiff's Complaint ("Plaintiff's Complaint"), at ¶204 ("It is reasonably foreseeable that future use of existing water permits and exemptions authorized by Defendants [TCEQ] will result in additional prohibited takes of Whooping Cranes unless and until such activities are enjoined.").

Plaintiff also impliedly requests that restrictions be placed on water rights holders' diversions from the rivers (and presumably also on diversions by "exempt" users, *e.g.*, use for domestic and livestock purposes). *See, e.g.*, D.E. 1, Plaintiff's Complaint at ¶178 ("Water diversion activities from rivers that flow into bays affecting Whooping Cranes cannot lawfully proceed without obtaining Defendants' review and approval and without *complying with any restrictions imposed by Defendants* . . . ") (emphasis added); at ¶179 ("water diversions [sic] activities . . . , *due to lack of needed restrictions* . . . . ") (emphasis added); at ¶186-188 (defendants allowed "water permit holders and exempt users to divert and consume water" . . . when such diversions "reduced the freshwater inflows . . . resulting in longer periods of very high salinities" and there is a "direct link of causation" to the "prohibited takes of Cranes.").

Case: 10-40610 Document: 44 Page: 141 Date Filed: 07/23/2010

This theory of relief – that the existing rights of permitted water users and exempt domestic and livestock water users must be enjoined, conditioned, diminished or curtailed in some form - persists in all of Plaintiff's counts and requests for relief. Although Plaintiff has carefully couched this suit as one against the TCEQ, the state agency that grants permitted rights, it is as much a suit against each holder of permitted or exempted water rights in the rivers, since it is their rights to divert and use waters from the rivers that ultimately are being challenged and could be reduced or restricted, without their being named defendants.

Under Texas law, these various water rights are constitutionally protected vested property rights. *E.g.*, *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 647 (Tex. 1971).

**<u>Texas Farm Bureau Members' Interests</u>**

TFB is a non-profit membership association representing family farmers and ranchers in Texas. TFB is committed to the advancement of agriculture and prosperity for rural Texas. Texas Farm Bureau has over 422,159 members and is associated with independent county Farm Bureau corporations in 207 counties across the state. Texas Farm Bureau and its members – who are property owners and farmers – believe the protection of property rights is of critical importance to the State of Texas and all property owners in the State of Texas. Water rights are of particular interest to TFB and its members, as water is a resource that is of critical importance to agricultural life.

Among TFB's members are persons holding rights granted by the State of Texas to divert and use water from the Guadalupe River Basin and the San Antonio River Basin, which are the watercourses concerned in Plaintiff's complaint in this cause.

Case: 10-40610 Document: 00511184539 Page: 7 Date Filed: 07/23/2010

***Indeed, of the approximately 1150 water rights holders in the Guadalupe and San Antonio River Basins, of which 720 are irrigation rights,*[1] *at least 130 are TFB members owning water rights to irrigate –representing over 11% of the total permit holders and 18% of the irrigation permits holders.*** The relief requested by Plaintiff – "adjustment" of water rights in the rivers, including diminution of withdrawals of water for domestic and livestock uses – would directly and adversely affect the rights and the economic and personal well-being of TFB members who hold permits to divert water from the rivers for irrigation purposes.

TFB members also include numerous persons who divert water from the Guadalupe and San Antonio Rivers for domestic and livestock uses, for which no permit from the State of Texas is required under state law (referred to by Plaintiff as "exempt" uses). The relief requested by Plaintiff – "adjustment" of water rights in the rivers, including diminution of State-permitted withdrawals of water by permit holders – would directly and adversely affect the rights and the economic and personal well-being of TFB members who are entitled to divert water from the rivers for domestic and livestock uses.

TFB members also include persons who pump underground water from the Edwards Aquifer, which feeds the San Marcos Springs at San Marcos, Texas, and the Comal Springs at New Braunfels (Comal County), Texas. These springs provide substantial flows to the San Marcos and Comal Rivers, which are major tributaries of the Guadalupe River. In time of drought, these springs are the most significant source of water for the river, as noted by the Guadalupe-Blanco River Authority in its intervention papers. *See* Docket Entry ("D.E.") 31, GBRA's Motion to Intervene as Defendant and

[1] Based on a list of water rights holders identified by the Texas Commission on Environmental Quality ("TCEQ"). *See* http://www.tceq.state.tx.us/permitting/water_supply/water_rights/wr_databases.html . *See* Declaration of Jim Sartwelle III, Exhibit A hereto.

Memorandum in Support ("GBRA Motion") at 4; D.E. 31-1, Declaration of William E. West ("West Declaration"), at ¶¶ 17 - 24. The relief requested by Plaintiff – "adjustment" of water rights in the rivers, including diminution of State-permitted withdrawals of water by permit holders, and other actions as necessary to ensure what Plaintiff deems adequate estuarial and bay inflows from these rivers – could require regulatory actions to ensure minimum spring flows at these springs, including putting limits on pumping from the Edwards Aquifer more restrictive than limits required under the existing state (Edwards Aquifer Authority) regulatory regime. Such additional restrictive limits would directly and adversely affect the rights and the economic and personal well-being of TFB members who pump underground water from the Edwards Aquifer for agricultural irrigation uses or for domestic and livestock purposes.

TFB members whose rights to use waters of the Guadalupe and San Antonio River Basins, or the underground waters of the Edwards Aquifer would be directly affected by the relief requested by Plaintiff. As such, they are real parties in interest in this lawsuit.

**American Farm Bureau Federation's Interests**

Formed in 1919 and headquartered in Washington, D.C., American Farm Bureau Federation ("AFBF") is this nation's largest non-profit general farm organization. AFBF represents family farmer members who produce and raise every type of agricultural crop and commodity in the nation. AFBF is organized as a federation of fifty independent state Farm Bureaus and the Puerto Rico Farm Bureau, whose members include family farmers in their respective states and Puerto Rico. The Texas Farm Bureau is a member of AFBF.

Case: 10-40610 Document: 00511184539 Page: 9 Date Filed: 07/23/2010

AFBF's primary function is to advance and promote the interests and betterment of farming and ranching, the farming, ranching, and rural community and the individual families engaged in farming and ranching. The scope of this effort includes advancing, promoting, and protecting the economic, business, social and educational interests of farmers and ranchers across the United States and Puerto Rico. Through its advocacy function on behalf of the Nation's farmers and ranchers, AFBF represents its members in legal, regulatory and legislative matters relating to the Endangered Species Act.

The Texas Farm Bureau is a member of AFBF, and thus TFB's members are members of AFBF. The claims of the Plaintiff in this case, if recognized, have the potential to apply to virtually every water course or other body of water in the country from which farmers or ranchers have legally recognized rights to withdraw or divert, and use, water for irrigation, livestock or domestic purposes, if that water resource contributes in any way directly or indirectly to the habitat of any listed species. AFBF members in Texas and in other states as well have a direct interest in the issues asserted in this lawsuit.

## **INTERVENTION OF RIGHT**

As this Court has already stated, in courts in the Fifth Circuit a motion for intervention of right under FRCP 24(a)(2) is evaluated by considering four factors:

> (1) the applicant must file a timely application; (2) the applicant must claim an interest in the subject matter of the action; (3) the applicant must show that the disposition of the action may impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties to the litigation.

D.E. 35, Order of April 23, 2010 (admitting GBRA as intervenor under Rule 24(a)(2)) ("Order Granting GBRA Intervention") (citing *Heaton v. Monogram Credit Card Bank of*

Case: 10-40610 Document: 00511184539 Page: 10 Date Filed: 07/23/2010

*Georgia*, 297 F.3d 416, 422 (5th Cir. 2002)); *see also Sierra Club v. Glickman*, 82 F.3d 106, 108 (5th Cir. 1996) (per curiam (same); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994) (same). As the Court also noted, intervention should usually be allowed "when no one would be hurt and the greater justice could be attained." *See John Doe No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001); *Heaton*, 297 F.3d at 422.[2]

TFB and AFBF should be permitted to intervene as of right as defendants under Rule 24(a)(2) because they satisfy each of these four factors.

**<u>Timeliness</u>**

There is no absolute measure or rule determining timeliness. The Fifth Circuit standard for determining timeliness of an intervention request is based on a flexible four-factor analysis: (1) the length of time before the would-be intervenor sought intervention after it first learned of its interest in the case; (2) the extent of prejudice the existing parties may suffer by such delay; (3) the extent of prejudice the would-be intervenor might suffer were intervention denied; and (4) the existence of unusual circumstances favoring or disfavoring a determination the intervention request is timely. *E.g.*, *Heaton*, 297 F.3d at 422-23 (timeliness requirement "is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by the failure to apply sooner"); *Sierra Club v. Espy*, 18 F.3d at 1205 (purposes of the timeliness requirement is to avoid prejudice to other parties).

The mere length of time taken to seek intervention is not determinative; the question is whether existing parties would be prejudiced by intervention. *Sierra Club v.*

[2] GBRA has provided a thorough statement of the standards and caselaw regarding intervention as of right in its intervention motion and supporting memorandum (D.E. 31), and TFB and AFBF will not repeat that exercise here. To the extent that additional authority on these issues is desired, TBF and AFBF would refer the Court to D.E. 31.

Case: 10-40610 Document: 00511184533 Page: 11 Date Filed: 07/23/2010

*FEMA*, 2008 WL 2414333 (S.D. Tex. June 11, 2010) at *5. It is the prejudice caused by any delay in seeking intervention that is at issue, not the prejudice or inconvenience to the existing parties that might arise by permitting the intervention. *E.g.*, *Ruiz v. Estelle*, 161 F.3d 814, 828 (5th Cir. 1998); *Espy*, 18 F.3d at 1205-06. "'This consideration is to be evaluated against the liberal treatment that is to be accorded applications for intervention of right.'" *Sierra Club v. FEMA* at *5 (quoting *Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1126 (5th Cir. 1970)).

Both TFB and AFBF have acted promptly to request intervention. The case is still in its initial stages. Neither the state defendants nor intervenor-defendant GBRA has yet answered. The Court's own deadline for joinder of parties, June 15, 2010, has not been reached. No substantive actions have been taken by the Court; no discovery has commenced; no delay will result from TFB and AFBF's intervention. Granting TFB and AFBF intervention at this point would not prejudice any existing party.

TFB and AFBF and, more important, their members, would be significantly prejudiced were intervention not granted. What happens in this suit, should Plaintiff's requests for relief be granted, will clearly affect Farm Bureau members' water rights as well as the agricultural production dependent upon these rights. As discussed below, no one currently in the suit can adequately represent the interests of Farm Bureau members, which include property interests in water rights for irrigation or other agricultural uses, statutorily-based "exempt" rights to impoundments and diversions for domestic and livestock uses, and, should it come to the issue of conditioning, reducing or enjoining pumping from the Edwards Aquifer which feeds the springs that feed the Guadalupe River, the property rights of Farm Bureau members who are pumpers of that aquifer

Case: 10-40610 Document: 00511184535 Page: 12 Date Filed: 07/23/2010

water. Moreover, denying intervention would deprive TFB and AFBF an "opportunity to exercise 'the legal rights associated with formal intervention, namely the briefing of issues, presentation of evidence, and ability to appeal.'" *Heaton*, 297 F.3d at 424, *citing with approval and quoting Edwards v. City of Houston*, 78 F.3d 983, 1003 (5th Cir. 1996) (en banc) (quoting *Espy*, 18 F.3d at 1207).

There are no unusual circumstances that militate against TFB and AFBF being granted intervention as defendants.

The request for intervention by TFB and AFBF is timely.

**Direct, Substantial, Legally-Protected Interests**

The second requirement for intervention of right is that the would-be intervenor have direct, substantial and legally-protectable interests in the subject matter of the suit. *E.g.*, *Sierra Club v. Glickman*, 82 F.3d at 109; *Sierra Club v. Espy*, 18 F.3d at 1207.

TFB and AFBF members with potentially affected water rights clearly have the required direct, substantial and legally-protectable interest in the subject matter and issues of this suit. Under Texas law, the water rights challenged by Plaintiff are vested property rights. *See, e.g.*, *Texas Water Rights Comm'n v. L.A. Wright*, 464 S.W.2d 642, 647 (Tex.1971) ("a matured appropriation right to water is a vested right"; and riparian rights[3] are vested). The relief requested by Plaintiff – reduction of or conditioning of rights to divert and use waters from the rivers, whether under permitted use rights or exempt use rights, or even should Edwards Aquifer pumping be subjected to regulatory limits beyond those imposed lawfully by the state – would directly affect those Farm Bureau members' existing property rights, agricultural production, and water supplies.

---

[3] Following river adjudications in Texas, essentially the only remaining riparian rights are for domestic and livestock use.

Case: 10-40610 Document: 00511184535 Page: 13 Date Filed: 07/23/2010

The issues in this case threaten direct compromise of those rights. Water rights holders are real parties in interest in this suit, entitled to intervention of right. *See, e.g.*, *Sierra Club v. Glickman*, 82 F.3d at 109 (AFBF could intervene of right in challenge to federal agricultural subsidy program's funding to farmers who were Edwards Aquifer irrigation pumpers, because it was those farmers' pumping that was actual target of the suit; they were real parties in interest, justifying AFBF intervention to represent their interests). Here, just as in *Sierra Club v. Glickman*, the actual targets of the suit are the water rights holders, because the essence of the relief sought by Plaintiff is the reduction or conditioning of water rights in the Guadalupe and San Antonio River Basins. Just as the Fifth Circuit recognized AFBF's right to intervene of right in *Sierra Club v. Glickman* to protect the rights of its members targeted by Sierra Club's complaint, so too should this Court recognize TFB and AFBF's right to intervene of right in this suit to protect their members' water rights which are directly targeted by Plaintiff.

**Farm Bureau Members' Interests May Be Impaired or Impeded by the Disposition of This Lawsuit**

The third requirement for intervention of right is that, as a practical matter, the would-be intervenor's legally-protectable interests would be impaired or impeded by the disposition of the case. *E.g.*, *Sierra Club v. Espy*, 18 F.3d at 1204-05; *see also John Doe No. 1 v. Glickman*, 256 F.3d at 379 (denial of intervention may prejudice would-be intervenor, who would not be able to participate at trial or take appeal).

Plaintiff's claims clearly implicate the water rights of Farm Bureau members, as described previously. Those are, under Texas law, property rights. Water rights holders are, as recognized by the Fifth Circuit in *Sierra Club v. Glickman* in similar circumstances, real parties in interest in this suit. *See Sierra Club v. Glickman*, 82 F.3d at

Case: 10-40610 Document: 44 Page: 14 Date Filed: 07/23/2010

109 ("the … complaint targets the farmers' pumping" which it alleges "constitutes a 'substantial threat' to endangered species"). Denying intervention to TFB and AFBF to represent their members' interests in this case will impair or impede the ability of those members to protect their interests, including their vested property interests, or, indeed, of TFB and AFBF to urge on behalf of those members later. What happens in this suit, especially if Plaintiff's requested relief were granted or if a settlement were reached between Plaintiff and existing party defendants, would directly affect Farm Bureau members' water rights and other interests. *Sierra Club v. Glickman,* 82 F.3d at 109, *citing with approval and quoting Conservation Law Foundation of New England, Inc. v. Mosbacher*, 956 F.2d 39, 43 (1st Cir. 1992) ("the fishing groups seeking intervention are the real targets of the suit and are the subject of the regulatory plan. Changes in the rules will affect the proposed intervenors' business, both immediately and in the future.").

Similarly, were relief granted only to order TCEQ to seek a section 10(a) (16 U.S.C. § 1539(a)) "incidental take" permit under the Act from the United States Fish & Wildlife Service ("USFWS") and to fashion a habitat conservation plan acceptable to USFWS and Plaintiff, water rights holders' ability to raise their concerns and protect their existing water rights later would not be sufficient to ensure their rights were protected.

As a practical matter, the ability of a would-be intervenor to raise its concerns and protect its interests in later proceedings is inadequate.[4] *E.g.*, *Sierra Club v. FEMA*, 2008 WL 2414333 (S.D. Tex. June 11, 2008); *see also John Doe No. 1 v. Glickman*, 256 F.3d. at 379 (result might restrict remedy sought in separate suit by party denied intervention) (citing *Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001)).

---

[4] See GBRA discussion at notes 10 and 11 of D.E. 31, GBRA Motion.

Case: 10-40610 Document: 005111845339 Page: 15 Date Filed: 07/23/2010

Moreover, and akin to these concerns, "the *stare decisis* effect of an adverse judgment constitutes a sufficient impairment to compel intervention." *Sierra Club v. Glickman*, 82 F.3d at 109-10 (italics the court's), *citing Espy*, 18 F.3d at 1207; *see also Heaton*, 297 F.3d at 424 (citing *Sierra Club v. Glickman*).

**Existing Parties Do Not Adequately Represent TFB and AFBF Member Interests**

The interests of TFB and AFBF members in this litigation are not adequately represented by the existing parties. As this Court recognized in granting GBRA intervention, "[t]his litigation focuses on water rights upon which the GBRA relies." Order Granting GBRA Intervention, at 3. Similarly, this litigation focuses on water rights on which Farm Bureau members rely; however, there are some significant differences between GBRA's water rights and its interests, and those of TFB and AFBF.

As described above, Farm Bureau members' rights are vested property rights to divert and use water from the rivers in these basins. As this Court noted in granting GBRA's intervention, "Plaintiff clearly does not represent GBRA's interests, as it seeks relief that would impede GBRA's water rights." Order Granting GBRA Intervention, at 3. Similarly, the relief requested by Plaintiff would impede Farm Bureau members' water rights. Plaintiff's interests are diametrically opposed to those of TFB and AFBF members.

The state (TCEQ) defendants' interests are not congruent with those of TFB and AFBF members. TCEQ has statutory duties to grant appropriative permits such as those held by Farm Bureau members, but also duties that diverge from Farm Bureau members' interest in protecting their individual rights, such as "defending their [TCEQ's] policy determinations and protecting the State's resources on a larger level." *See* Order

Case: 10-40610 Document: 00511184539 Page: 16 Date Filed: 07/23/2010

Granting GBRA Intervention at 4. TCEQ must represent the general public interest, which distinguishes its interests in this case from those of TFB and AFBF members. *Cf. Sierra Club v. FEMA*, 20008 WL 2414333 at *7. Just as the TCEQ defendants would not be primarily interested in protecting GBRA's individual water rights concerns, so they would not be primarily interested to protect Farm Bureau members' water rights. *See, e.g., Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997) ("It is axiomatic that the interest of pumpers [of water] . . . that rely on the aquifer's water supply for their immediate subsistence, will diverge from those of the various state agencies who are charged with taking a state-wide view . . ..").

Nor are GBRA's interests congruent with those of TFB and AFBF in this case. Even though GBRA is a water-rights holder which seeks to protect its water rights, its interests diverge from those of Farm Bureau members. GBRA's interests as a water rights holder are as a supplier of water to its customers, that is, in honoring its water supply contracts, not as an ultimate user of the water. Moreover, GBRA's contractual obligations are not significantly to agricultural irrigators like TFB and AFBF members, but instead are to provide water to municipal and industrial users. D.E. 31, GBRA Motion at 3. GBRA is also concerned with meeting its various statutory duties, as this Court has recognized. *See* Order Granting GBRA Intervention at 4. Other of GBRA's activities include hydroelectric generation, water and wastewater treatment, and recreational operations. GBRA Motion at 3. GBRA also has extensive rights in a surface reservoir (Canyon Lake), *id.*, and duties to administer the conservation portion of that reservoir as well as rights in that portion of the reservoir, *see* D.E. 31-1, West Declaration at ¶¶25-29; interests in maintaining reliability of water supply in its 10-county statutory

Case: 10-40610 Document: 00511184539 Page: 17 Date Filed: 07/23/2010

service area, *see id.*; and interests in state and local water planning, including balancing various water use and supply concerns. *Id.* at ¶46. GBRA. has statutory duties to ensure conservation and efficient use of existing water supplies in the Guadalupe River Basin. GBRA Motion at 4. Farm Bureau member irrigators have distinctly different interests than GBRA. The irrigators' demand for water is primarily seasonal, some during the same time that Plaintiff seeks to obtain water for downstream salinity control and some during summer. Irrigators are dependent on run-of-the-river flows and lack GBRA's ability to utilize storage and manage the timing of delivery of water. Irrigators are also in a distinctly different position once their crops are planted, when a reduction or loss of needed water for irrigation could resulting in loss of the crop and the farmer's investment in it. Particularly if Plaintiff is able to persuade the Court to grant relief, GBRA's interests and those of TFB and AFBF member irrigators could diverge significantly; each would be competing, attempting to meet their needs from a limited resource.

Finally, Union Carbide Corporation has sought intervention. *See* D.E. 45 (filed May 17, 2010). While the Court has not yet acted on that request, even were intervention granted, Union Carbide would not adequately represent Farm Bureau members' interests in this case. Union Carbide's interests are to protect water rights which are primarily for "consumptive industrial use." *See* D.E. 45 at 10.

None of the existing parties, including would-be intervenor Union Carbide Corporation, adequately represent the interests of TFB and AFBF and their members. As the Court has already recognized, the showing required for this factor is "minimal." Order Granting GBRA Intervention at 3 (citing *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 636 n.10 (1972)). All would-be

Case: 10-40610 Document: 00511184539 Page: 18 Date Filed: 07/23/2010

intervenors need show is that representation of their interests by existing parties "may" be inadequate. *Heaton*, 297 F.3d at 425. This factor is clearly satisfied.

**All Factors for Rule 24(a)(2) Intervention of Right Have Been Established**

TFB and AFBF satisfy all four requirements for intervention under Rule 24(a)(2): timeliness, TFB and AFBF's member's real interests as water rights holders in the litigation, TFB and AFBF members' interests will as a practical matter be impeded or impaired by the disposition of the case, and existing parties will not adequately represent TFB and AFBF's members' interests. TFB and AFBF respectfully request the Court to grant them intervention of right.

**PERMISSIVE INTERVENTION IN THE ALTERNATIVE**

Alternatively, if the court denies leave to intervene as of right, TFB and AFBF should be granted permissive intervention under FRCP 24(b)(1)(B), because TFB and AFBF, representing their members' interests, have defenses similar to those of Defendants, and that share common questions of law and fact with the main action; and TFB and AFBF's motion to intervene is timely and will not unduly delay or prejudice the adjudication of the original parties' rights.

**REQUIREMENTS OF FRCP 24(c) ARE SATISFIED**

As GBRA has noted in its intervention motion (D.E. 31), it is not necessary to file a formal answer with a motion to intervene in order to satisfy FRCP 24(c), if the intervention papers sufficiently describe the claim or defense for which intervention is sought. *See* D.E. 31, GBRA Motion at 19-20, and cases cited there. TFB and AFBF's interests in this case are described above, and it should be clear from the discussion in this motion for which claims and defenses intervention is sought – in effect, as to all

Case: 10-40610 Document: 44 Page: 19 Date Filed: 07/23/2010

counts asserted by Plaintiff. TFB and AFBF do not believe that Plaintiff can show factually or as a matter of causation that ESA section 9 "takes" occurred or necessarily will occur because of diversions and use of water from the Guadalupe and San Antonio River Basins by water rights holders diverting and using water for irrigation, or exercising statutory or riparian rights to withdraw and use water for domestic and livestock purposes; nor that under fact or law Plaintiff is entitled to the relief it has requested.

If the Court grants this motion to intervene, TFB and AFBF proposes file their responsive pleadings within twenty (20) days after the Court grants intervention, or at the time the responsive pleadings of the state defendants and GBRA are due, or as otherwise directed by the Court. TFB and AFBF will work with the existing parties to avoid duplicative pleadings and so as not to delay any proceeding already scheduled.

## CONCLUSION

TFB and AFBF satisfy each of the four requirements for intervention of right: (1) the motion to intervene is timely; (2) TFB and AFBF claim an interest on behalf of their members in the subject matter of this case, because the relief sought by Plaintiff in this suit is to diminish or otherwise condition Farm Bureau members' – and others' – existing rights to divert and use waters in the Guadalupe River Basin and in the San Antonio River Basin; (3) TFB and AFBF have shown that the disposition of this case may impair or impede Farm Bureau members' ability to protect their water rights in the Guadalupe and San Antonio River Basins; and (4) TFB and AFBF's interests in protecting their members' water rights are not adequately represented by existing parties. TFB and AFBF respectfully ask the Court to grant them intervention of right under FRCP 24(a)(2).

Case: 10-40610 Document: 00511184539 Page: 20 Date Filed: 07/23/2010

Alternatively, if the Court does not grant intervention of right, it should grant permissive intervention under FRCP 24(b)(1)(B). TFB and AFBF have shown that they, acting on behalf of their members, have defenses that share common questions of law and fact with those of defendants in this case, their motion to intervene is timely, and their intervention will neither unduly delay the case nor prejudice the rights of existing parties.

Respectfully submitted,

*s/ Sydney W. Falk, Jr.*

Sydney W. Falk, Jr.
Texas State Bar No. 06795400
Southern District of Texas No. 16128
Email: sfalk@bickerstaff.com
Douglas G. Caroom
Attorney-in-Charge
Texas State Bar No. 03832700
*Application for admission pro hac vice pending*
Email: dcaroom@bickerstaff.com
BICKERSTAFF HEATH DELGADO ACOSTA LLP
3711 South MoPac Expressway, Building One, Suite 300
Austin, Texas 78746
Phone: (512) 472-8021
Facsimile: (512) 320-5638

**ATTORNEYS FOR TEXAS FARM BUREAU and AMERICAN FARM BUREAU FEDERATION**

Case: 10-40610 Document: 00511184535 Page: 21 Date Filed: 07/23/2010

## CERTIFICATE OF CONFERENCE

I hereby certify that on May 21, 2010, I conferred with counsel for Plaintiff regarding Texas Farm Bureau and American Farm Bureau Federation's motion to intervene as defendants in this case. Plaintiff is opposed to the intervention. I also certify that on May 20, 2010 and May 21, 2010, respectively, I conferred with counsel for the state defendants and counsel for GBRA, who are not opposed to the proposed intervention of TFB and AFBF.

s/ *Douglas G. Caroom*
Douglas G. Caroom

Case: 10-40610 Document: 44 Page: 157 Date Filed: 07/23/2010

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served through the Court's ECF electronic filing system to the known users of the Court's ECF filing system identified below on this 26th day of May 2010.

Attorneys for Plaintiff

James B. Blackburn, Jr.
Charles Irvine
Mary Carter
BLACKBURN CARTER, P.C.
4709 Austin Street
Houston, Texas 77004

David A Kahne
LAW OFFICE OF DAVID A. KAHNE
P.O. Box 66836
Houston, Texas 77266

Attorneys for State Defendants

Brian E. Berwick
Cynthia Woelk
John Hulm
TEXAS ATTORNEY GENERAL'S OFFICE
Environmental Protection and Administrative Law Division
P.O. Box 12458
Austin, Texas 78711-2548

Attorneys for Defendant-Intervenor
Guadalupe-Blanco River Authority

Edward F. Fernandes
Christopher H. Taylor
HUNTON & WILLIAMS LLP
111 Congress Avenue, Suite 1800
Austin, Texas 78701

Kathy Robb
HUNTON & WILLIAMS LLC
200 Park Avenue
New York, NY 10166

Bruce Wasinger
General Counsel
Guadalupe-Blanco River Authority
933 East Court Street
Sequin, Texas 78155

J.A. "Tony" Canales
Hector A. Canales
CANALES & SIMONTON, P.C.
2601 Morgan Avenue
P.O. Box 5624
Corpus Christi, Texas 78465

*s/ Sydney W. Falk, Jr.*
Sydney W. Falk, Jr.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 2:10-cv-00075** |
| | § | |
| | § | |
| **BRIAN SHAW, et al.,** | § | |
| | § | |
| **Defendants** | § | |

**DECLARATION OF JAMES D. SARTWELLE, III, IN SUPPORT OF TEXAS FARM BUREAU AND AMERICAN FARM BUREAU FEDERATION'S** **<u>MOTION TO INTERVENE</u>**

I, James D. Sartwelle III, a resident of McLennan County, Texas, declare as follows:

1. I am over the age of 18 years and am competent to make this declaration.

2. I am the Director of Public Policy for the Texas Farm Bureau. In this capacity, I direct the organization's Legislative; Commodity and Regulatory Activities; and Research, Education, and Policy Development departments. These departments coordinate member involvement and county Farm Bureau participation in public policy matters at all levels of government.

3. I, or employees of the Texas Farm Bureau under my supervision, reviewed the list of water rights holders in the Guadalupe and San Antonio River Basins, from the website of the Texas Commission on Environmental Quality ("TCEQ"). It is available at: http://www.tceq.state.tx.us/permitting/water_supply/water_rights/wr_databases.html. The TCEQ list indicates that there are 1150 total water rights holders in these river basins, of which 720 are holders of irrigation water rights.

Case: 10-40610 Document: 44 Page: 159 Date Filed: 07/23/2010

4. I, or employees of the Texas Farm Bureau under my supervision, compared the TCEQ list of water rights holders in these river basins to a list of members of the Texas Farm Bureau. That comparison revealed that at least 131 Texas Farm Bureau members hold irrigation rights permits.

5. I, or employees of the Texas Farm Bureau under my supervision, have also determined that there are at least ten (10) Texas Farm Bureau members residing or owning property in these river basins who exercise rights to divert water for domestic and livestock purposes.

6. I, or employees of the Texas Farm Bureau under my supervision, have also determined that there are at least 25 Texas Farm Bureau members residing on or owning property in Central Texas located above the Edwards Aquifer who have rights to pump and use water from that aquifer.

7. I declare or certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 25, 2010.

James D. Sartwelle, III

James D. Sartwelle III

Case: 10-40610 Document: 44 Page: 160 Date Filed: 07/23/2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 2:10-cv-00075** |
| | § | |
| | § | |
| **BRIAN SHAW, et al.,** | § | |
| | § | |
| **Defendants** | § | |

**ORDER**

On this day came on to be considered the Motion to Intervene as Defendants and Memorandum in Support of Intervention of the Texas Farm Bureau and the American Farm Bureau Federation ("the Motion to Intervene"). (D.E. ___.) Having considered the motion, response, evidence and applicable authority, the Court finds that the motion should be granted.

IT IS THEREFORE ORDERED that the Motion to Intervene of the Texas Farm Bureau and the American Farm Bureau Federation is GRANTED. Texas Farm Bureau and American Farm Bureau Federation shall be permitted to intervene in this action pursuant to Federal Rule of Civil Procedure 24(a)(2).

SIGNED and ORDERED this ____ day of _______________, 2010.

_______________________________________
Janis Graham Jack
United States District Judge

Case: 10-40610 Document: 00511184538 Page: 1 Date Filed: 07/23/2010

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BRYAN SHAW, *et al.*,** | § | |
| | § | **No. 2:10-cv-00075** |
| **Defendants,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **SAN ANTONIO WATER SYSTEM,** | § | |
| | § | |
| **Proposed Intervenor-** | § | |
| **Defendant.** | § | |

**MOTION OF SAN ANTONIO WATER SYSTEM FOR LEAVE TO INTERVENE AS PARTY DEFENDANT, AND MEMORANDUM IN SUPPORT**

Pursuant to Rule 24 of the Federal Rules of Civil Procedure and Rule 7 of this Court, San Antonio Water System ("SAWS") hereby moves to intervene in this action as a party defendant. SAWS seeks intervention as of right under Rule 24(a)(2) or, alternatively, permissive intervention under Rule 24(b)(2). A Proposed Order and Proposed Answer accompany this motion pursuant to Fed. R. Civ. P. 24(c) and LR 7.1.

**INTRODUCTION**

In this lawsuit, Plaintiff The Aransas Project ("TAP") seeks declaratory and injunctive relief under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.*, against five Texas State officials, including officials of the Texas Commission on Environmental Quality

Case: 10-40610 Document: 44 Page: 162 Date Filed: 07/23/2010

("TCEQ").[1] TAP alleges that the Defendants have violated ESA § 9, 16 U.S.C. § 1540(g), which prohibits the "take" of any species of wildlife listed as an "endangered species" under the ESA, in the course of performing their official duties to review and approve surface water diversion activities in the Guadalupe and San Antonio River basins.

TAP theorizes that the named Defendants and their predecessors have committed and will continue to commit ESA "take" of the whooping crane, an ESA-listed species, because the water diversion activities they authorize allegedly increase salinity levels in, and significantly modify, whooping crane habitat, and thereby "harm" and "harass" cranes within the meaning of the ESA's "take" prohibition; and because the regulations Defendants promulgate and the State laws they enforce allegedly authorize ESA "take" of whooping cranes and, thus, violate and are preempted by the Federal ESA. Compl. (D.E. 1) ¶¶ 174-205. TAP's allegations of "take" in 2008-2009 appear to focus primarily on Defendants' alleged inactions in regulating surface water diversions under permits issued by prior TCEQ commissioners "for many decades" (Compl. ¶ 81) and under domestic and livestock diversions and use that are statutorily exempt from regulation (*id.*, ¶ 146).

TAP seeks extensive declaratory and injunctive relief. TAP's twelve-paragraph Prayer for Relief asks the Court to declare that the State Officials have violated ESA § 9 by "taking" whooping cranes, significantly modifying and destroying crane habitat, and "harassing" cranes; and that the State's water diversion regulations are preempted by federal law to the extent they result in "takes" of cranes. *Id.* at 32-33 (Prayer for Relief). TAP also seeks injunctive relief that would, among other things:

---

[1]Defendants are TCEQ Chairman Bryan Shaw, TCEQ Commissioners Buddy Garcia and Carlos Rubenstein; TCEQ Executive Director Mark Vickery, and South Texas Watermaster Al (continued…)

Case: 10-40610 Document: 00511184538 Page: 3 Date Filed: 07/23/2010

- enjoin the State Officials from approving water diversion activities that would alter or destroy crane habitat;
- enjoin the State Officials from approving or processing new or pending water permits;
- enjoin the State Officials to compile an inventory of exempt water withdrawals for livestock and domestic use and develop a process for accounting for "all water withdrawals" from the San Antonio and Guadalupe River systems;
- enjoin the State Officials to compile inventories of all permitted and exempt withdrawals and develop a "binding plan" for water development and use that may include reduction of existing water uses or addition of special conditions to existing permits";
- enjoin the State Officials to develop a habitat conservation plan ("HCP") under ESA § 10, 16 U.S.C. § 1539, "for the San Antonio and Guadalupe River basins and San Antonio Bay," including provisions to "reduce all withdrawals" under certain circumstances; and
- appoint a Special Master to oversee development of the plans, studies, and activities necessary to implement the Court's order.

*Id.*

---

(…continued)

Segovia. Each is sued in his official capacity. Compl.(D.E. 1) ¶¶ 15-18.

**PROPOSED INTERVENOR SAN ANTONIO WATER SYSTEM AND ITS INTERESTS IN THIS LITIGATION**

The San Antonio Water System ("SAWS") is an agency of the City of San Antonio providing water, wastewater and/or reclaimed water services to approximately 1.3 million people. Management and control of the System has been transferred to a Board of Trustees pursuant to the authority of Texas Local Government Code Section 402.142 and City Ordinance number 75686 dated April 30, 1992. Declaration of Steven Clouse ¶ 2 (appended as Exhibit 1 to this Motion).

SAWS is a single utility responsible for water, wastewater, and water reuse. The System's water and wastewater service areas are established by the Texas Commission on Environmental Quality ("TCEQ"), acting through Defendants Brian Shaw, Buddy Garcia, and Carlos Rubenstein. The service area for water supply includes much of the City of San Antonio, several suburban municipalities, and adjacent parts of Bexar County. In addition to serving its own retail customers, SAWS also provides wholesale water supplies to several smaller utility systems within this area boundary. SAWS strives to provide responsible water services by delivering water services within its customers' terms and needs, consistent with being a good steward of water resources and the environment. Clouse Decl. ¶ 3.

TCEQ, acting through Defendants Shaw, Garcia, and Rubenstein, and Defendant Mark Vickery and his staff, also issue SAWS's permits to discharge treated wastewater into tributaries of the San Antonio River and regulate all aspects of SAWS's wastewater gathering and treatment system. In addition, SAWS's authority to collect and treat wastewater and redistribute that reclaimed water for reuse is also established by the TCEQ, acting through Defendants Shaw, Garcia, and Rubenstein, and Defendant Vickery and his staff. Clouse Decl. ¶ 4.

Case: 10-40610 Document: 00511184538 Page: 5 Date Filed: 07/23/2010

With per capita water consumption of 124 gallons per day in the drought year of 2009, SAWS is a state and national leader in water conservation efforts. Nonetheless, the population of the San Antonio metropolitan area is expected to almost double (from 1.3 million to over 2.15 million by SAWS's calculations) in the next 50 years. Even with continuing aggressive conservation efforts, SAWS anticipates that it must develop up to 141,000 acre-feet of new water supplies by 2060. Groundwater withdrawals by SAWS and others from the Edwards Aquifer have been limited by the State of Texas in order to protect springflow from the Comal Springs and San Marcos Springs, which provide critical habitat for endangered species and are an important source of supply for the Guadalupe River. Thus, in order to meet future water requirements for its customers, SAWS must develop the necessary new supplies from other surface water or groundwater supplies in the region. In the last ten years, SAWS has undertaken to develop surface water supplies from the Guadalupe and San Antonio Rivers and the Colorado River, as well as fresh groundwater from the Carrizo and Trinity Aquifers, and brackish groundwater from the Wilcox Aquifer. Clouse Decl. ¶ 5.

SAWS holds in excess of 23,000 acre-feet of surface-water rights in the San Antonio River Basin, under permits issued by TCEQ, that would be directly affected by the broad injunctive relief requested by TAP. In addition, in excess of 40,000 acre-feet of the treated wastewater that SAWS discharges from its water recycling plant into a tributary of the San Antonio River is subsequently withdrawn by CPS Energy, the City of San Antonio's municipally owned gas and electric utility, for cooling purposes pursuant to a TCEQ permit held by CPS but conditioned on CPS Energy's contract with SAWS. Clouse Decl. ¶ 6.

SAWS has invested over $140 million in one of the nation's largest "purple pipe" recycled water distribution and reuse systems. As noted above, this recycled water system is

Case: 10-40610 Document: 44 Page: 166 Date Filed: 07/23/2010

authorized and highly regulated by TCEQ acting through the Defendants Shaw, Garcia, Rubenstein, and Vickery. The availability of this system allows over 35,000 acre-feet per year of treated wastewater to be used for a variety of municipal purposes in lieu of potable water. The contract with CPS Energy is the cornerstone of this program. Clouse Decl. ¶ 7.

The foundation of SAWS's water supply continues to be groundwater withdrawn from the Edwards Aquifer pursuant to permits issued by another regulatory agency, the Edwards Aquifer Authority. The Defendant State Officials do not regulate groundwater. Thus, TAP's claims in this lawsuit, which are nominally directed only against those officials, pertain to surface water only. However, the sweeping relief TAP seeks, such as a "thorough analysis of all permitted and exempt withdrawals," the development of "a binding plan for water development and water use in the San Antonio and Guadalupe River basins," "reduction of existing water uses or addition of special conditions to existing permits," and the development of a broad Habitat Conservation plan "for the San Antonio and Guadalupe River basins and San Antonio Bay," D.E. 1 at 33, could, if construed broadly, wind up implicating groundwater use as well as surface-water rights and permits issued by Defendants. Moreover, the relief sought by TAP would diminish the availability of surface water supplies to governmental, industrial, commercial, and individual users throughout South Central Texas, thereby placing even greater pressure on the availability of all water supplies across the region. Clouse Decl. ¶ 8.

## ARGUMENT

## I. SAWS IS ENTITLED TO INTERVENE AS OF RIGHT

Under Rule 24 of the Federal Rules of Civil Procedure, intervention can be a matter of right, or permissive. For intervention of right, on a "timely" motion, a court "must" permit anyone to intervene who:

Case: 10-40610 Document: 00511184538 Page: 7 Date Filed: 07/23/2010

> . . . claims an interest relating to the property or transaction that is the subject matter of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(1).

To intervene as of right under Rule 24(a)(2), the Fifth Circuit requires a proposed intervenor to satisfy a four-part test:

> (1) the applicant must file a timely application; (2) the applicant must claim an interest in the subject matter of the action; (3) the applicant must show that disposition of the action may impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties to the litigation.

*Heaton v. Monogram Credit Card Bank of Georgia*, 297 F.3d 416, 422 (5th Cir. 2002). Rule 24(a)(2) is construed liberally in favor of intervention. Generally, "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained." *Id.*

SAWS readily satisfies the four factors for intervention of right.

**A. This Motion Is Timely.**

SAWS's motion is timely. The Fifth Circuit follows a "contextual" analysis that considers (1) the length of time the proposed intervenor knew of its interest in the case; (2) the extent of prejudice to the existing parties from the timing of intervention; (3) the extent of prejudice to the applicant if intervention is denied; and (4) any unusual circumstances militating for or against a finding of timeliness. *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994). Here, SAWS is moving to intervene shortly after suit was filed, following public notice and careful deliberation by its Board of Trustees, Clouse Decl ¶ 9, and before Defendants have filed their Answer. A motion to intervene prior to a defendant's answer is timely. 7C CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1916,

Case: 10-40610 Document: 44 Page: 168 Date Filed: 07/23/2010

at 557 (3d ed. 2007) (a motion to intervene "made before the existing parties have joined issue in the pleadings has been regarded as clearly timely").

Further, the Court's deadline for joinder of parties, June 15, 2010, has not been reached. Thus, this motion fits well within the Court's schedule for proceeding with the case, and the existing parties (particularly TAP, who endorsed the June 15 deadline as proposed by the Court, *see* D.E. 15 at 7) cannot claim prejudice from the timing of this motion. By comparison, SAWS would be significantly prejudiced if its motion were denied as untimely, because it then would be unable to protect its interests as contemplated by Rule 24(a).

**B. SAWS Has Cognizable Interests in the Subject Matter of this Litigation.**

The interest test is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Ceres Gulf v. Cooper*, 957 F.2d 1199, 1203 n.10 (5th Cir. 1992) (quoting *Neusse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1987)); *see also Sierra Club v. Espy*, 18 F.3d at 1207.

SAWS is clearly a "concerned person" with a significant interest in the subject matter of this litigation. SAWS is an agency of the City of San Antonio and provides water, wastewater and/or reclaimed water services to approximately 1.3 million people, pursuant to the authority of Texas Local Government Code Section 402.142 and City Ordinance number 75686 dated April 30, 1992. As the Court has found in granting the motion of the Guadalupe-Blanco River Authority ("GBRA") to intervene in this action, this case implicates the interests of holders of water rights and providers of water because of its "potential impact . . . upon the use of water in the region." D.E. 35 at 3. Surface-water use in this area, and its alleged ramifications for the whooping crane, are at the heart of TAP's complaint in this case. *See* D.E. 1 *passim*. TAP claims that more of this scarce resource should be reserved for whooping crane habitat, at the

Case: 10-40610 Document: 00511184538 Page: 9 Date Filed: 07/23/2010

expense of upstream holders of water rights and authorizations such as SAWS, and the end-users of that water, including SAWS's customers.

Further, SAWS has vested property rights at stake. SAWS holds surface-water interests by reason of permits issued by TCEQ. A permit or license is a property right that is protectable through intervention. This situation is analogous to *Sierra Club v. EPA*, 995 F.2d 1478 (9th Cir. 1993), in which the Ninth Circuit reversed a district court's denial of intervention by the City of Phoenix in litigation brought by advocacy groups that sought to change Phoenix's Clean Water Act permits for operating its two wastewater treatment plants. The court held that Phoenix had a "legally protectable interest" in the validity of its discharge permit and could intervene as of right because the relief sought would require the named defendant – the Environmental Protection Agency ("EPA") – to make the permits more restrictive. *Id.* at 1482. The court explained:

> The City of Phoenix . . . owns the wastewater treatment plants and the permits. These interests are rights connected with the City's ownership of real property and its status as an EPA permittee. Such rights are among those traditionally protected by law . . . .

*Id.*[2] Likewise, under Texas law, water premits are grants of vested rights: "a water right, when acquired and perfected, constitute[s] a vested right to the use of the water appropriated." *Texas Water Rights Comm'n v. Wright*, 464 SW 2d 642, 647 (Tex. 1971).[3]

---

[2] *See also Animal Protection Inst. v. Martin*, 241 F.R.D. 66 (D. Me. 2007) (licensed fur trappers granted intervention in ESA suit that would enjoin state agency from issuing licenses); *Animal Protection Inst. v. Merriam*, 242 F.R.D. 524 (D. Minn. 2006) (same); *Nader v. Ray*, 363 F. Supp. 946, 953 (D.D.C. 1973) (holders of Atomic Energy Commission-issued nuclear facility licenses had a sufficient property interest to intervene as of right in an action challenging the validity of certain AEC equipment acceptance criteria and seeking an injunction to terminate the use of certain nuclear reactors).

[3] SAWS also has property rights in *underground* water, which ostensibly is not a target of TAP's complaint (inasmuch as TAP's counts run only against State Officials who regulate *surface* water). TAP's request for relief, however, is worded broadly and vaguely, and if

(continued…)

Here, as in *Sierra Club v. EPA*, the plaintiff is suing government permit-issuing officials and is seeking declaratory and injunctive relief that would alter the terms of those permits – in this case, SAWS's permits for withdrawing water from the San Antonio River, and CPS Energy's permit conditioned on its contract with SAWS. And, under *Texas Water Rights Comm'n*, SAWS has a vested right to use the water it withdraws. SAWS thus has a legally protectable interest that entitles it to intervention under Rule 24(a)(2).

Moreover, SAWS is entitled to intervene because the ultimate targets of this lawsuit are water withdrawals themselves, just as they were in *Sierra Club v. Glickman*, 82 F.3d 108, 109 (5th Cir. 1996). There, advocacy groups sued the U.S. Department of Agriculture because its programs and activities allegedly had led to overpumping of the Edwards Aquifer. The affected farmers in central and western Texas were granted intervention because the plaintiffs' complaint, though nominally directed against a regulatory agency, in substance targeted the farmers' pumping, making the farmers "real parties in interest." *Id*. at 109. Here too, TAP's Complaint is formally directed against regulatory officials, but its Prayer for Relief ultimately seeks to restrict or eliminate water diversion activities. Here, as in *Glickman*, the suit "intends to have a direct impact" on those who divert the water, and the "proffered violations and remedy" confer on SAWS and other permittees "a sufficient interest to intervene." *Id.* at 109.

SAWS's contractually-based interest in the TCEQ-permitted withdrawals of SAWS's treated wastewater by CPS Energy provides an additional basis for intervention. Contractual interests in the subject matter of a case warrant intervention. *See Sierra Club v. Espy*, 18 F.3d at 1207 (timber companies' contracts with U.S. Forest Service warranted intervention of right in

---

(…continued)

construed to exceed the language of TAP's claims could impinge upon SAWS's groundwater

(continued…)

Case: 10-40610 Document: 00511184536 Page: 11 Date Filed: 07/23/2010

suit seeking to enjoin logging in national forests); *Kleissler v. U.S. Forest Service*, 157 F.3d 964, 973 (3d Cir. 1998) (timber companies' interest in existing and future U.S. Forest Service timber sales contracts is "substantial interest, directly related to and threatened by" lawsuit challenging timber sale projects, and "meets the requirements of Rule 24(a)").

Finally, TAP's peculiar theory of liability in this case highlights another SAWS interest supporting intervention – the interests of a regulated entity in lawsuits aimed at increasing regulatory burdens and constraints.[4] A regulated entity's interests are sufficient for intervention of right in suits against its regulators, as many courts have recognized. *E.g., Sierra Club v. Glickman*, 82 F.3d 106 (farming interests granted intervention in a case that could adversely affect them); *Conservation Law Foundation of New England v. Mosbacher*, 966 F.2d 39, 43-44 (1st Cir. 1992) (fishing industry granted intervention of right in a case seeking greater regulation of fishing); *Natural Resources Defense Council v. Costle*, 561 F.2d 904 (D.C. Cir. 1977) (chemical industry granted intervention is suit seeking greater regulation); *National Wildlife Fed'n v. Hodel*, 661 F. Supp. 473, 474-75 (E.D. Ky. 1987) (coal industry intervention in suit seeking greater regulation under SMCRA).

### C. Disposition of this Action May Impair or Impede SAWS's Ability to Protect Its Interests

As to impairment of SAWS's interests, Rule 24(a)(2) focuses on the *practical* impairment of SAWS's ability to protect its interests under the particular circumstances of the

---

(…continued)

rights. We address that contingency in section I.C of this argument.

[4] The Defendant State Officials have filed a Motion to Dismiss under Fed. R. Civ. P. 12(b) on grounds that there is no justiciable case or controversy against them, that this suit is barred by the Eleventh Amendment, and State regulatory officials acting in their official capacity cannot be held liable for alleged ESA "take" attributable to the conduct of persons or entities whose activities the State regulates. *See* D.E. 40. SAWS hereby joins in that motion.

Case: 10-40610 Document: 00511184536 Page: 12 Date Filed: 07/23/2010

case. The Rule itself expressly provides for intervention of right when "disposing of the action may *as a practical matter* impair or impede the movant's ability to protect its interest" (emphasis added).

The practical effect of granting TAP its requested relief would be to impede or impair SAWS's ability to protect its water interests. TAP seeks more than just a process. The overarching point of this lawsuit is to change, through multipronged declaratory and injunctive relief (Prayer for Relief, paragraphs A through L), the way the Defendant State Officials regulate water use. If TAP is successful in this litigation, permits issued to SAWS and others by the Defendant State Officials would be declared unlawful, and withdrawals of water under those permits would be enjoined pending the State Officials' compliance with Court orders to conduct inventories, develop "binding" plans, and develop and obtain U.S. Fish and Wildlife Service approval of an ESA Habitat Conservation Plan, covering water use throughout the San Antonio and Guadalupe River basins and San Antonio Bay. All of these measures would be designed to reduce, if not eliminate, water withdrawals by SAWS and other permittees, and leave more for what TAP alleges are the needs of the whooping crane.

This Court has held that, "If Plaintiffs are successful in this litigation, Defendants would be restricted in their approval of water use permits." D.E. 35 at 4. The restrictions TAP seeks would directly affect SAWS's permits and for that reason require intervention by SAWS. As the Ninth Circuit aptly observed when it granted intervention to the City of Phoenix to defend its permits in *Sierra Club v. EPA*:

> [T]he lawsuit would affect the use of real property owned by the intervenor by requiring the defendant to change the terms of permits it issues to the would-be intervenor, which permits regulate the use of that real property . . . .
>
> Our adversary process requires that we hear from both sides before the interests of one side are impaired by a judgment.

Case: 10-40610 Document: 00511184536 Page: 13 Date Filed: 07/23/2010

995 F.3d at 1483. That practical impairment of SAWS's interest by a ruling in TAP's favor is sufficient for intervention here.

In addition, depending on the breadth of relief granted, a ruling in TAP's favor reducing surface-water diversions could impinge upon SAWS's groundwater rights in ways that are impossible to foresee from TAP's claims (which run only against the regulators of surface water), but are not implausible given how broadly TAP words its Prayer for Relief. *See* D.E. 1 at 32-33. For example, TAP wants the Court to order Defendants to develop: "a process for a complete accounting of all water withdrawals from the Guadalupe and San Antonio River systems," including exempt "livestock and domestic use"; "a binding plan for water development and water use in the San Antonio and Guadalupe River basins sufficient to protect Whooping Cranes and their vital habitat which may include reduction of existing water uses or addition of special conditions to existing permits"; and "an approved Habitat Conservation Plan for the San Antonio and Guadalupe River basins and San Antonio Bay, including provisions to reduce all withdrawals during low flow conditions." D.E. 1 at 33. One reason SAWS seeks to intervene is to ensure that if relief is granted, it does not improperly exceed the scope of TAP's surface-water claims and impinge upon SAWS's groundwater holdings.

**D. SAWS's Interests Are Not Adequately Represented by Existing Parties.**

The final criterion for intervention of right is whether the representation of SAWS's interests by the existing parties "may be" inadequate. *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538-39 n.10 (1972); *Sierra Club v. Espy*, 18 F.3d at 1207. The "burden of that showing should be treated as minimal." *Id.*; D.E. 35 at 3 (quoting *Trbovich*). This element in particular is construed liberally in favor of intervention:

> [S]ince the rule is satisfied if there is a serious possibility that the representation may be inadequate, all reasonable doubts should be resolved in favor of allowing the absentee, who has an interest different from that of any existing party, to intervene so that he may

be heard on his own behalf.

7C WRIGHT § 1909 at 346 (footnote omitted).

SAWS's position in this case would be unique. Unlike the plaintiff, defendants, or any intervenor or proposed intervenor, SAWS's interests are precariously balanced between the San Antonio River Basin and the Guadalupe River Basin, and the environmental needs of both. This balance is exemplified by SAWS's prized reclaimed water program described above. Every acre-foot of treated wastewater placed in the purple pipe system reduces pumping from the Edwards Aquifer and contributes to spring flows that sustain endangered species and flows in the Guadalupe River. However, every acre-foot of wastewater that is reused is an acre-foot not immediately discharged into the San Antonio River. Because these rivers join a few miles above the Texas coast, the beneficial impact of this program on the whooping crane and its habitat is transparent. However, the far-reaching impact of the relief sought by TAP could negatively affect the program to the detriment of SAWS and other environmental interests, including the very species at issue in this lawsuit.

SAWS clearly is not adequately represented by TAP. TAP advocates an interpretation and application of the ESA to the detriment of SAWS's interests. *See United States v. Stringfellow*, 783 F.2d 821, 828 (9th Cir. 1986) (adverse party cannot adequately represent proposed intervenor's interests).

Nor can the Defendant State Officials adequately represent SAWS's interests. Regulatory officials "must represent the broad public interest, not just the economic concerns of [private] industry." *Sierra Club v. Espy*, 18 F.3d at 1208; *see Trbovich*, 404 U.S. at 539. Although Defendants do share some interests with SAWS in ensuring that water rights are not impeded, their respective interests diverge: the State is a permitting authority, and SAWS is its permittee. Further, the State Officials are primarily concerned with defending their policy

Case: 10-40610 Document: 00511184536 Page: 15 Date Filed: 07/23/2010

determinations and protecting the State's resources on a broad scale, and do not share SAWS's interests in specific commitments to its customers. *See Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997) ("[i]t is axiomatic that the interests of the pumpers, who are local cities, businesses, and governmental entities" that rely on water supplies "will diverge from those of the various state agencies who are charged with taking a state-wide view" of water supplies "as it affects wildlife, water resources and quality, and the agricultural industry"); *Sierra Club v. Glickman*, 82 F.3d at 110 (farmers' interests not adequately represented by U.S. Department of Agriculture, despite some common ground between them).

Lastly, neither Intervenor GBRA nor Proposed Intervenors Texas Farm Bureau, et al. ("TFB"), Texas Chemical Council ("TCC"), and Union Carbide Corporation ("UCC") adequately represent SAWS's interests. To begin with, only SAWS represents the interests of its extensive customer base – notably, the 1.3 million retail customers in the City of San Antonio, several suburban municipalities, and adjacent parts of Bexar County, who depend on SAWS for their water supply; other smaller utilities; and those dependent on SAWS's wastewater reuse systems. By contrast, the three Proposed Intervenors represent important but more narrowly focused and private commercial interests of agriculture, the chemical industry, or, in UCC's case, a single plant, as consumers of water for those respective uses. *See* D.E. 45 at 3-6 (UCC); D.E.. 51 at 6-9 (TFB); D.E. 53 at 1-3 (TCC). Unlike them, SAWS is a public agency with no commercial interests of its own, and a *purveyor* of water to a broad swath of residential, commercial, and industrial consumers. In formulating its positions in this litigation and in any settlement discussions, it must take all those interests into account. *See Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 823 (9th Cir. 2001) (city's interest differed from, and did not adequately represent, profit motives animating private parties).

As for GBRA, SAWS's interests here are distinctive and divergent for additional reasons. SAWS's immediate interest in this case stems from in its surface-water rights in, and other commitments concerning, surface water in the San Antonio River, whereas GBRA's interests lie in the Guadalupe River. *See* D.E. 31 at 3. This case seeks injunctive relief against water withdrawals from both of these bodies of water. *See* D.E. 1 ¶ 8. Because the two rivers are competing sources of water, the interests of SAWS and GBRA may diverge as the litigation proceeds, with SAWS uniquely concerned about, and positioned to address, withdrawals from the San Antonio River.

Further, one measure of adequacy of representation is whether an existing party "will undoubtedly make all" of the proposed intervenor's arguments and is capable of and willing to making such arguments. *Southwest Ctr.*, 268 F.3d at 822. As already noted, this case ostensibly concerns surface water, not groundwater. One reason SAWS seeks to intervene is to ensure that this limitation to surface water is honored not only in proceedings on the merits, but also in formulating any remedy. GBRA has argued, in contrast, that the case should be dismissed on grounds of *Burford* abstention because, *inter alia*, this case "will require substantial inquiry into state law governing the distribution of water rights in Texas, as well as the actual, local effectuation of this comprehensive regulatory scheme" – a scheme that GBRA says includes the management of withdrawals of groundwater from the Edwards Aquifer. D.E. 43 at 7, 23. SAWS's and GBRA's views on this point already appear to diverge, such that GBRA will not "undoubtedly make all" arguments SAWS would make – and may even make antithetical arguments – and thus cannot adequately represent SAWS's interests in this litigation.

## II. ALTERNATIVELY, PERMISSIVE INTERVENTION SHOULD BE GRANTED

If intervention of right is denied, the Court should grant SAWS permissive intervention under Rule 24(b)(2).

Case: 10-40610 Document: 00511184536 Page: 17 Date Filed: 07/23/2010

Under Rule 24(b)(2), an applicant may be permitted to intervene if its application is timely, and if it has a claim or defense that shares with the main action a common question of law or fact. This application is timely, as explained above. Moreover, there is a complete identity between TAP's claims and SAWS's defenses.

The Court should exercise its discretion by finding it is in the interests of justice to allow all affected interest groups (advocacy interests, the state regulator, the local water authorities, and affected public utilities and end-users) to participate as parties in this important and potentially wide-ranging litigation. *See Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 10-11 (D.D.C. 2007); *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002) (granting permissive intervention because "the magnitude of this case is such that both Applicants' intervention will contribute to the equitable resolution of the case").

Case: 10-40610 Document: 00511184536 Page: 18 Date Filed: 07/23/2010

## CONCLUSION

For the foregoing reasons, SAWS's motion to intervene should be granted.

Respectfully submitted,

Jim Mathews
Texas State Bar No. 13188700
Mathews & Freeland LLP
327 Congress Avenue, Suite 300
Austin, TX 78701
Telephone: (512) 404-7800
Facsimile: (512) 703-2785
E-mail: jmathews@mandf.com

*s/ J. Michael Klise*
J. Michael Klise (D.C. Bar No. 412420)
Attorney-in-Charge
*Pro hac vice* application pending
Steven P. Quarles (D.C. Bar No. 351668)
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
E-mail: jmklise@crowell.com

Phil Steven Kosub
Southern District of Texas No. 11983
Texas State Bar No. 11692500
San Antonio Water System
2800 U.S. Hwy. 281 North
San Antonio, TX 78212
Telephone: (210) 233-3872
Facsimile: (210) 233-4292
E-mail: skosub@saws.org

Attorneys for Proposed Intervenor-Defendant
San Antonio Water System

Dated: June 7, 2010

Case: 10-40610 Document: 00511184536 Page: 19 Date Filed: 07/23/2010

## CERTIFICATE OF CONFERENCE

I hereby certify that, pursuant to LR 7.1D, I have conferred with counsel for the other parties and proposed parties to determine whether the parties agree on the disposition of this motion. Counsel for Plaintiff The Aransas Project ("TAP") has advised that Plaintiff opposes intervention by SAWS. Therefore, SAWS and TAP cannot agree about the disposition of this motion. Counsel for Defendants Bryan Shaw, *et al.*, Intervenor-Defendant Guadalupe-Blanco River Authority, and Proposed Intervenor-Defendants Texas Chemical Council, Texas Farm Bureau, *et al.*, and Union Carbide Corporation have advised that their clients do not oppose intervention by SAWS.

*s/ J. Michael Klise*
J. Michael Klise

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 7th day of June, 2010, I caused a copy of the foregoing motion, supporting declaration, and accompanying proposed order and proposed answer to be filed pursuant to the electronic filing requirements of the U.S. District Court for the Southern District of Texas, which provides for service on counsel of record in accordance with the electronic filing protocols in place.

*s/ J. Michael Klise*
J. Michael Klise

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| **BRYAN SHAW, *et al.*,** | § | |
| **Defendants,** | § | **No. 2:10-cv-00075** |
| **and** | § | |
| **SAN ANTONIO WATER SYSTEM,** | § | |
| **Proposed Intervenor-Defendant.** | § | |

**DECLARATION OF STEVEN CLOUSE**

I, Steven Clouse, declare as follows:

1. I am the Senior Vice-President and Chief Operating Officer for the San Antonio Water System ("SAWS") and have held that position for three years. Prior to assuming responsibilities as Chief Operating Officer, I was Vice President of Production and Treatment of SAWS. I make this Declaration based upon personal knowledge, and in support of the SAWS's motion to intervene in this litigation.

2. SAWS is an agency of the City of San Antonio that provides water, wastewater and/or reclaimed water services to approximately 1.3 million people. Management and control of the System has been transferred to a Board of Trustees pursuant to the authority of Texas Local Government Code Section 402.142 and City Ordinance number 75686 dated April 30, 1992.

Case: 10-40610 Document: 00511184536 Page: 22 Date Filed: 07/23/2010

3. SAWS is a single utility responsible for water, wastewater, and water reuse. The System's water and wastewater service areas are established by the Texas Commission on Environmental Quality ("TCEQ"), acting through the Defendants in this litigation, Brian Shaw, Buddy Garcia, and Carlos Rubenstein. The service area for water supply includes much of the City of San Antonio, several suburban municipalities, and adjacent parts of Bexar County. In addition to serving its own retail customers, SAWS also provides wholesale water supplies to several smaller utility systems within this area boundary. SAWS strives to provide responsible water services by delivering water services within its customers' terms and needs, consistent with being a good steward of water resources and the environment.

4. TCEQ, acting through Defendants Shaw, Garcia, and Rubenstein, and Defendant Mark Vickery and his staff, also issue SAWS's permits to discharge treated wastewater into tributaries of the San Antonio River and regulate all aspects of SAWS's wastewater gathering and treatment system. In addition, SAWS's authority to collect and treat wastewater and redistribute that reclaimed water for reuse is also established by the TCEQ, acting through Defendants Shaw, Garcia, and Rubenstein, and Defendant Vickery and his staff.

5. With per capita water consumption of 124 gallons per day in the drought year of 2009, SAWS is a state and national leader in water conservation efforts. Nonetheless, the population of the San Antonio metropolitan area is expected to almost double (from 1,300,000 to 2,155,800 by SAWS's calculations) in the next 50 years. Even with continuing aggressive conservation efforts, SAWS anticipates that it must develop up to 141,000 acre-feet of new water supplies by 2060. Groundwater withdrawals by SAWS and others from the Edwards Aquifer have been limited by the State of Texas in order to protect springflow from the Comal Springs and San Marcos Springs, which provide critical habitat for endangered species and are an

important source of supply for the Guadalupe River. Thus, in order to meet future water requirements for its customers, SAWS must develop the necessary new supplies from other surface water or groundwater supplies in the region. In the last ten years, SAWS has undertaken to develop surface water supplies from the Guadalupe and San Antonio Rivers and the Colorado River, as well as fresh groundwater from the Carrizo and Trinity Aquifers, and brackish groundwater from the Wilcox Aquifer.

6. SAWS holds in excess of 23,000 acre-feet of surface-water rights in the San Antonio River Basin, under permits issued by TCEQ, that would be directly affected by the broad injunctive relief requested by Plaintiff The Aransas Project ("TAP") in this lawsuit. In addition, in excess of 40,000 acre-feet of the treated wastewater that SAWS discharges from its water recycling plant into a tributary of the San Antonio River is subsequently withdrawn by CPS Energy for cooling purposes pursuant to a TCEQ permit held by CPS but conditioned on CPS Energy's contract with SAWS. CPS Energy is the City of San Antonio's municipally owned gas and electric utility.

7. SAWS has invested over $140 million in one of the nation's largest "purple pipe" recycled water distribution and reuse systems. As noted above, this recycled water system is authorized and highly regulated by TCEQ acting through the Defendants Shaw, Garcia, Rubenstein and Vickery. The availability of this system allows over 35,000 acre-feet per year of treated wastewater to be used for a variety of municipal purposes in lieu of potable water. The contract with CPS Energy is the financial cornerstone of this program.

8. The foundation of SAWS's water supply continues to be groundwater withdrawn from the Edwards Aquifer pursuant to permits issued by another regulatory agency, the Edwards Aquifer Authority. The Defendant State Officials do not regulate groundwater. Thus, TAP's

Case: 10-40610 Document: 005111845369 Page: 24 Date Filed: 07/23/2010

claims in this lawsuit, which are directed only against those officials, pertain to surface water only. However, the sweeping relief TAP seeks, such as a "thorough analysis of all permitted and exempt withdrawals," the development of "a binding plan for water development and water use in the San Antonio and Guadalupe River Basins," "reduction of existing water uses or addition of special conditions to existing permits," and the development of a broad Habitat Conservation plan "for the San Antonio and Guadalupe River Basins and San Antonio Bay," could, if construed broadly, wind up implicating groundwater use as well as surface-water rights and permits issued by Defendants. Moreover, the relief sought by TAP would diminish the availability of surface water supplies to governmental, industrial, commercial, and individual users throughout South Central Texas, thereby placing even greater pressure on the availability of all water supplies across the region.

9. SAWS's decision to move to intervene in this action required advance public notice, followed by deliberation and resolution by the Board of Trustees. After giving public notice, the Board carefully deliberated intervention in this action in the course of three different meetings, concluded that intervention by SAWS was necessary to protect its interests and that the existing parties did not adequately represent those interests, and on May 17, 2010 issued a resolution authorizing the filing of the motion to intervene.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my knowledge and belief.

Executed this 7th day of June, 2010.

*<u>/s/ Steven Clouse</u>*
Steven Clouse

Case: 10-40610 Document: 00511184536 Page: 25 Date Filed: 07/23/2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BRYAN SHAW, *et al.*,** | § | |
| | § | |
| **Defendants,** | § | **No. 2:10-cv-00075** |
| | § | |
| **and** | § | |
| | § | |
| **SAN ANTONIO WATER SYSTEM,** | § | |
| | § | |
| **Intervenor-Defendant.** | § | |
| | § | |

**[PROPOSED] ANSWER OF INTERVENOR-DEFENDANT**
**SAN ANTONIO WATER SYSTEM**

Intervenor-Defendant San Antonio Water System ("SAWS") files this Answer pursuant to Rules 7-12 of the Federal Rules of Civil Procedure to the "Original Complaint for Declaratory and Injunctive Relief" filed on March 10, 2010, by Plaintiff The Aransas Project ("TAP") (D.E. 1). Any allegation not specifically admitted below is denied.

Answering specifically the numbered paragraphs of the Complaint, SAWS admits, denies, and avers as follows:

Case: 10-40610 Document: 00511184536 Page: 26 Date Filed: 07/23/2010

## I. "INTRODUCTION AND SUMMARY OF THE CASE"[1]

1. The first sentence of Paragraph 1 consists of TAP's characterization of this lawsuit, to which no response is required. The second sentence states a legal conclusion, to which no response is required. Insofar as this Paragraph is deemed to contain allegations of fact, the allegations are denied.

2. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 2, and therefore denies same.

3. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 3, and therefore denies same.

4. Paragraph 4 consists of TAP's characterization of this lawsuit, to which no response is required.

5. The first sentence of Paragraph 5 consists of TAP's characterization of this lawsuit, to which no response is required. The second sentence purports to summarize and characterize federal law, which speaks for itself and is the best evidence of its content. Any allegations inconsistent with that best evidence are denied. SAWS lacks sufficient information to form a belief as to the truth of the allegations of the third sentence, and therefore denies same.

6. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 6, and therefore denies same.

7. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 7, and therefore denies same.

---

1 SAWS quotes the headings of TAP's Complaint in this Answer purely for ease of reference. Insofar as those headings are deemed to contain allegations of fact, those allegations are denied.

Case: 10-40610 Document: 44 Page: 187 Date Filed: 07/23/2010

8. Paragraph 8 consists of TAP's characterization of this lawsuit and the relief being sought, to which no response is required.

**II. "JURISDICTION AND VENUE"**

9. Paragraph 9 states a conclusion of law, to which no response is required.

10. The first sentence of Paragraph 10 states a conclusion of law, to which no response is required. SAWS lacks sufficient information to form a belief as to the truth of the remaining allegations of Paragraph 10, and therefore denies same.

11. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 11, and therefore denies same.

12. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 12, and therefore denies same.

13. Paragraph 13 states conclusions of law, to which no response is required.

**III. "PARTIES"**

14. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 14, and therefore denies same.

15. SAWS admits that Defendant Shaw is sued in his official capacity as TCEQ Chairman. As to the allegations concerning Chairman Shaw's duties and authorities under state and federal law, the provisions of those laws speak for themselves and are the best evidence of their contents. Any allegations to the contrary of that best evidence are denied.

16. SAWS admits that Defendants Garcia and Rubenstein are sued in their official capacities as TCEQ Commissioners. As to the allegations concerning their duties and authorities under state and federal law, the provisions of those laws speak for themselves and are the best evidence of their contents. Any allegations to the contrary of that best evidence are denied.

Case: 10-40610 Document: 00511118453699 Page: 28 Date Filed: 07/23/2010

17. SAWS admits that Defendant Vickery is sued in his official capacity as TCEQ Executive Director. As to the allegations concerning his duties and authorities under state and federal law, the provisions of those laws speak for themselves and are the best evidence of their contents. Any allegations to the contrary of that best evidence are denied.

18. SAWS admits that Defendant Segovia is sued in his official capacity as South Texas Watermaster. As to the allegations concerning his duties and authorities under state and federal law, the provisions of those laws speak for themselves and are the best evidence of their contents. Any allegations to the contrary of that best evidence are denied.

## IV. "STATUTORY BACKGROUND"

19. Paragraph 19 purports to quote from and characterize provisions of the Endangered Species Act ("ESA"), which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

20. Paragraph 20 purports to quote from and characterize provisions of the ESA, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

21. Paragraph 21 purports to quote from and characterize provisions of the ESA and related regulations, which speak for themselves and are the best evidence of their content. Any allegation to the contrary of that best evidence is denied.

22. Paragraph 22 purports to quote from and characterize a legislative report, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

23. Paragraph 23 purports to quote from and characterize provisions of the ESA, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

Case: 10-40610 Document: 44 Page: 189 Date Filed: 07/23/2010

24. Paragraph 24 purports to quote from and characterize a regulation, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

25. Paragraph 25 purports to quote from and characterize a regulation, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

26. Paragraph 26 purports to quote from and characterize a U.S. Supreme Court opinion, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

27. Paragraph 27 purports to quote from and characterize a regulation, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

28. Paragraph 28 purports to quote from and characterize a regulation, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

29. Paragraph 29 purports to quote from and characterize a regulation, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

30. Paragraph 30 purports to quote from and characterize a regulation, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

Case: 10-40610 Document: 44 Page: 190 Date Filed: 07/23/2010

31. Paragraph 31 purports to quote from and characterize a U.S. Supreme Court opinion, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

32. Paragraph 32 purports to quote from and characterize a U.S. Supreme Court opinion, which speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

## V. "BACKGROUND FACTS"

33. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 33, and therefore denies same.

34. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 34, and therefore denies same.

35. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 35, and therefore denies same.

36. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 36, and therefore denies same.

37. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 37, and therefore denies same.

38. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 38, and therefore denies same.

39. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 39, and therefore denies same.

40. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 40, and therefore denies same.

Case: 10-40610 Document: 00511184536 Page: 31 Date Filed: 07/23/2010

41. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 41, and therefore denies same.

42. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 42, and therefore denies same.

43. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 43, and therefore denies same.

44. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 44, and therefore denies same.

45. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 45, and therefore denies same.

46. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 46, and therefore denies same.

47. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 47, and therefore denies same.

48. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 48, and therefore denies same.

49. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 49, and therefore denies same.

50. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 50, and therefore denies same.

51. Paragraph 51 states conclusions of law, to which no response is required.

**A. "Whooping Crane Biology and Conservation Status"**

52. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 52, and therefore denies same.

Case: 10-40610 Document: 44 Page: 192 Date Filed: 07/23/2010

53. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 53, and therefore denies same.

54. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 54, and therefore denies same.

55. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 55, and therefore denies same.

56. SAWS admits that the whooping crane is listed as an "endangered" species under the ESA. In further response to Paragraph 56, SAWS respectfully refers the Court to the referenced documents and statutory provisions for a complete and accurate statement of their content. Any allegation or characterization of fact to the contrary of that best evidence is denied.

57. Paragraph 57 is admitted.

58. SAWS admits that a determination of critical habitat for the whooping crane was made on May 15, 1978. In further response to Paragraph 58, SAWS respectfully refers the Court to the referenced document for a complete and accurate statement of its content. Any allegation or characterization of fact to the contrary of that best evidence is denied.

59. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 59, and therefore denies same.

60. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 60, and therefore denies same.

61. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 61, and therefore denies same.

**B. "The 2008-2009 Whooping Crane Mortality Event is Unprecedented"**

62. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 62, and therefore denies same.

Case: 10-40610 Document: 00511184536 Page: 33 Date Filed: 07/23/2010

63. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 63, and therefore denies same.

64. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 64, and therefore denies same.

65. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 65, and therefore denies same.

66. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 66, and therefore denies same.

67. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 67, and therefore denies same.

68. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 68, and therefore denies same.

69. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 69, and therefore denies same.

70. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 70, and therefore denies same.

**C. "Cause of Crane Mortality"**

71. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 71, and therefore denies same.

72. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 72, and therefore denies same.

73. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 73, and therefore denies same.

Case: 10-40610 Document: 44 Page: 194 Date Filed: 07/23/2010

74. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 74, and therefore denies same.

75. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 75, and therefore denies same.

76. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 76, and therefore denies same.

77. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 77, and therefore denies same.

78. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 78, and therefore denies same.

79. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 79, and therefore denies same.

**D. "TCEQ's Role"**

80. SAWS denies the allegations of Paragraph 80.

81. SAWS admits that TCEQ Commissioners have issued permits for water use in the Guadalupe and San Antonio River basins, but denies the remaining allegations of Paragraph 81.

82. SAWS denies the allegations of Paragraph 82.

83. SAWS denies the allegations of Paragraph 83.

84. SAWS denies the allegations of Paragraph 84.

85. SAWS denies the allegations of Paragraph 85.

86. Paragraph 86 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

Case: 10-40610 Document: 44 Page: 195 Date Filed: 07/23/2010

E. "Low Freshwater Inflows Cause High Bay Salinity"

87. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 87, and therefore denies same.

88. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 88, and therefore denies same.

89. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 89, and therefore denies same.

90. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 90, and therefore denies same.

91. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 91, and therefore denies same.

92. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 92, and therefore denies same.

93. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 93, and therefore denies same.

94. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 94, and therefore denies same.

95. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 95, and therefore denies same.

96. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 96, and therefore denies same.

97. SAWS denies the allegations of Paragraph 97.

98. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 98, and therefore denies same.

Case: 10-40610 Document: 00511184536 Page: 36 Date Filed: 07/23/2010

99. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 99, and therefore denies same.

100. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 100, and therefore denies same.

101. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 101, and therefore denies same.

102. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 102, and therefore denies same.

103. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 103, and therefore denies same.

104. SAWS denies allegations of Paragraph 104.

105. SAWS denies allegations of Paragraph 105.

106. SAWS denies allegations of Paragraph 106.

107. SAWS denies allegations of Paragraph 107.

108. SAWS denies allegations of Paragraph 108.

**F. "Low Inflows Reduce Abundance of Blue Crabs to the Detriment of the Whooping Crane"**

109. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 109, and therefore denies same.

110. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 110, and therefore denies same.

111. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 111, and therefore denies same.

Case: 10-40610 Document: 00511184536 Page: 37 Date Filed: 07/23/2010

112. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 112, and therefore denies same.

113. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 113, and therefore denies same.

114. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 114, and therefore denies same.

115. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 115, and therefore denies same.

116. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 116, and therefore denies same.

117. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 117, and therefore denies same.

118. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 118, and therefore denies same; in further response, SAWS avers that the quoted but unidentified report speaks for itself and is the best evidence of its content. Any allegation to the contrary of that best evidence is denied.

**G. "Low Inflows Reduce Abundance of Wolfberries to the Detriment of Whooping Cranes"**

119. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 119, and therefore denies same.

120. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 120, and therefore denies same.

121. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 121, and therefore denies same.

Case: 10-40610 Document: 00511184536 Page: 38 Date Filed: 07/23/2010

122. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 122, and therefore denies same.

123. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 123, and therefore denies same.

124. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 124, and therefore denies same.

125. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 125, and therefore denies same.

### H. "Low Inflows Reduce the Availability of Drinkable Water to the Detriment of Whooping Cranes"

126. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 126, and therefore denies same.

127. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 127, and therefore denies same.

128. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 128, and therefore denies same.

129. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 129, and therefore denies same.

### I. "The Health, Survival and Recovery of the Cranes is Directly Related to the Freshwater Inflows Regulated and Controlled by Defendants"

130. SAWS denies the allegations of Paragraph 130.

131. SAWS admits that the federal government has issued a whooping crane recovery plan, which speaks for itself and is the best evidence of its content. SAWS respectfully refers the Court to the referenced document for a complete and accurate statement of its content. Any allegation or characterization of fact to the contrary of that best evidence is denied.

Case: 10-40610 Document: 44 Page: 199 Date Filed: 07/23/2010

132. Paragraph 132 selectively quotes from and characterizes the Recovery Plan, which speaks for itself and is the best evidence of its content. SAWS respectfully refers the Court to the referenced document for a complete and accurate statement of its content. Any allegation or characterization of fact to the contrary of that best evidence is denied.

133. Paragraph 133 selectively quotes from and characterizes the Recovery Plan, which speaks for itself and is the best evidence of its content. SAWS respectfully refers the Court to the referenced document for a complete and accurate statement of its content. Any allegation or characterization of fact to the contrary of that best evidence is denied.

134. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 134, and therefore denies same.

135. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 135, and therefore denies same.

136. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 136, and therefore denies same.

137. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 137, and therefore denies same.

138. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 138, and therefore denies same.

139. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 139, and therefore denies same.

140. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 140, and therefore denies same.

Case: 10-40610 Document: 00511184536 Page: 40 Date Filed: 07/23/2010

141. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 141, and therefore denies same.

142. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 142, and therefore denies same.

143. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 143, and therefore denies same.

**J. "State Regulatory Mechanisms Harm and Harass Whooping Cranes"**

144. SAWS admits that Defendants, among others, regulate water diversion and use in Texas. In further response to Paragraph 144, SAWS avers that the scope of Defendants' regulatory duties and authorities are set forth in State law and regulations, whose provisions speak for themselves and are the best evidence of their contents. Any allegations to the contrary of that best evidence are denied.

145. SAWS admits that Defendants authorize some water diversion and use by issuing the referenced certificates or permits. In further response to Paragraph 145, SAWS avers that the certificates and permits speak for themselves and are the best evidence of their contents. Any allegations to the contrary of that best evidence are denied.

146. SAWS admits that Defendants authorize some water withdrawals for riparian domestic and livestock use, but denies the remaining allegations of Paragraph 146.

147. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 147, and therefore denies same.

148. In response to Paragraph 148, SAWS avers that the scope of the Commissioners' regulatory duties and authorities are set forth in State law and regulations, whose provisions speak for themselves and are the best evidence of their contents. Any allegations to the contrary of that best evidence are denied.

Case: 10-40610 Document: 00511184536 Page: 41 Date Filed: 07/23/2010

149. In response to Paragraph 149, SAWS avers that the regulatory duties and authorities of Defendant Vickery and his employees are as set forth in State law and regulations, whose provisions speak for themselves and are the best evidence of their contents. Any allegations to the contrary of that best evidence are denied.

150. SAWS admits that Defendant Segovia is appointed by the TCEQ. In further response to Paragraph 150, SAWS avers that the regulatory duties and authorities of Defendant Segovia are as set forth in State law and regulations, whose provisions speak for themselves and are the best evidence of their contents. Any allegations to the contrary of that best evidence are denied.

151. Paragraph 151 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

152. SAWS denies allegations of Paragraph 152.

153. SAWS denies allegations of Paragraph 153.

154. SAWS denies allegations of Paragraph 154.

155. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 155, and therefore denies same.

156. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 156, and therefore denies same.

157. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 157, and therefore denies same.

158. Paragraph 158 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

Case: 10-40610 Document: 00511184536 Page: 42 Date Filed: 07/23/2010

159. Paragraph 159 consists of Plaintiff's speculation, to which no response is possible, let alone required. Further, Paragraph 159 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

160. SAWS denies allegations of Paragraph 160.

161. Paragraph 161 purports to summarize and characterize Senate Bill 3, which speaks for itself and is the best evidence of its content. SAWS respectfully refers the Court to the referenced document for a complete and accurate statement of its content. Any allegation or characterization of fact to the contrary of that best evidence is denied.

162. Paragraph 162 purports to summarize and characterize Senate Bill 1, which speaks for itself and is the best evidence of its content. SAWS respectfully refers the Court to the referenced document for a complete and accurate statement of its content. Any allegation or characterization of fact to the contrary of that best evidence is denied.

163. Paragraph 163 purports to summarize and characterize the Edwards Aquifer Recovery Implementation Plan, which speaks for itself and is the best evidence of its content. SAWS respectfully refers the Court to the referenced document for a complete and accurate statement of its content. Any allegation or characterization of fact to the contrary of that best evidence is denied.

164. SAWS denies allegations of Paragraph 164.

165. Paragraph 165 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

166. Paragraph 166 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

Case: 10-40610 Document: 00511184536 Page: 43 Date Filed: 07/23/2010

**K. "Commercial water suppliers and others seek to use TCEQ's deficient and flawed regulatory scheme to accelerate commitments for and overdraw freshwater in the Guadalupe River basin"**

167. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 167, and therefore denies same. Further, the referenced application speaks for itself and is the best evidence of its content. SAWS respectfully refers the Court to the referenced application for a complete and accurate statement of its content. Any allegation or characterization of fact to the contrary of that best evidence is denied.

168. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 168, and therefore denies same.

169. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 169, and therefore denies same.

170. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 170, and therefore denies same.

171. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 171, and therefore denies same.

172. Paragraph 172 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

## VI. "CAUSES OF ACTION"

173. SAWS incorporates by reference the foregoing responses in each count below.

***"Count I: Declaratory Relief"***

174. Paragraph 174 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

Case: 10-40610 Document: 44 Page: 204 Date Filed: 07/23/2010

175. Paragraph 175 selectively quotes from and purports to characterize provisions of the ESA and related regulations, which speak for themselves and are the best evidence of their content. Any allegation to the contrary of that best evidence is denied.

176. Paragraph 176 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

177. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 177, and therefore denies same.

178. Paragraph 178 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

179. Paragraph 179 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

180. Paragraph 180 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

181. Paragraph 181 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

182. Paragraph 182 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

***"Count 2: Defendants Authorized Activities that Resulted in Crane Takes Without an Incidental Take Permit"***

183. Paragraph 183 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

184. Paragraph 184 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

Case: 10-40610 Document: 44 Page: 205 Date Filed: 07/23/2010

185. Paragraph 185 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

186. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 186, and therefore denies same.

187. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 187, and therefore denies same.

188. Paragraph 188 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

189. Paragraph 189 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

190. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 190, and therefore denies same.

191. Paragraph 191 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

***"Count 3: Defendants Continue to Authorize Activities that are Reasonably Certain to Cause Significant Habitat Modification and Therefore Harm and Harass Cranes Without an Incidental Take Permit"***

192. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 192, and therefore denies same.

193. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 193, and therefore denies same.

194. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 194, and therefore denies same.

195. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 195, and therefore denies same.

Case: 10-40610 Document: 00511184536 Page: 46 Date Filed: 07/23/2010

196. Paragraph 196 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

197. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 197, and therefore denies same.

198. Paragraph 198 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

199. Paragraph 199 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

***Count IV: Future Takes of Whooping Cranes are Reasonably Foreseeable and Must be enjoined Under the ESA***

200. Paragraph 200 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

201. Paragraph 201 consists of Plaintiff's speculation, to which no response is possible, let alone required. Further, Paragraph 201 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

202. Paragraph 202 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

203. Paragraph 203 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

204. Paragraph 204 consists of Plaintiff's speculation, to which no response is possible, let alone required. Further, Paragraph 204 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.



USCA5 787

Case: 10-40610 Document: 00511184536 Page: 47 Date Filed: 07/23/2010

205. Paragraph 205 consists of Plaintiff's speculation, to which no response is possible, let alone required. Further, Paragraph 205 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

## VI. "STANDING"

206. Paragraph 206 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

207. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 207, and therefore denies same.

208. SAWS lacks sufficient information to form a belief as to the truth of the allegations of Paragraph 208, and therefore denies same.

209. Paragraph 209 states legal conclusions and therefore requires no response; insofar as it is deemed to contain allegations of fact, those allegations are denied.

The remainder of the Complaint consists of Plaintiff's Prayer for Relief, to which no response is required. To the extent a response is deemed required, SAWS denies that Plaintiff is entitled to the relief requested or to any relief whatsoever.

## GENERAL DENIAL

Defendants deny each and every allegation in Plaintiff's Complaint not specifically admitted herein.

## AFFIRMATIVE DEFENSES

1. The Court lacks subject-matter jurisdiction over this action.
2. Plaintiff lacks standing.
3. Plaintiff fails to state a claim upon which relief can be granted.
4. Plaintiff's claims are barred by the Eleventh Amendment.

* * *

WHEREFORE, SAWS respectfully requests that this Court deny all relief sought by Plaintiff, grant judgment to Defendants and SAWS, and grant Defendants and SAWS such additional relief as the Court may deem just and proper.

Respectfully submitted,

Jim Mathews
Texas State Bar No. 13188700
Mathews & Freeland LLP
327 Congress Avenue, Suite 300
Austin, TX 78701
Telephone: (512) 404-7800
Facsimile: (512) 703-2785
E-mail: jmathews@mandf.com

*s/ J. Michael Klise*
J. Michael Klise (D.C. Bar No. 412420)
Attorney-in-Charge
*Pro hac vice* application pending
Steven P. Quarles (D.C. Bar No. 351668)
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
E-mail: jmklise@crowell.com

Phil Steven Kosub
Southern District of Texas No. 11983
Texas State Bar No. 11692500
San Antonio Water System
2800 U.S. Hwy. 281 North
San Antonio, TX 78212
Telephone: (210) 233-3872
Facsimile: (210) 233-4292
E-mail: skosub@saws.org

Attorneys for Intervenor-Defendant San Antonio Water System

Dated: June 7, 2010

Case: 10-40610 Document: 44 Page: 209 Date Filed: 07/23/2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BRYAN SHAW, *et al.*,** | § | |
| | § | **No. 2:10-cv-00075** |
| **Defendants,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **SAN ANTONIO WATER SYSTEM,** | § | |
| | § | |
| **Intervenor-Defendant.** | § | |

**[PROPOSED] ORDER**

This matter came before the Court on the Motion of San Antonio Water System for Leave to Intervene on the side of the Defendants (D.E. __).

The Court having considered such motion, the arguments of the parties, and the record herein, the Court finds that the motion should be granted.

IT IS THEREFORE ORDERED that the Motion for Leave to Intervene of San Antonio Water System is GRANTED. San Antonio Water System shall be granted intervention in this action pursuant to Federal Rule of Civil Procedure 24(a)(2).

SIGNED and ORDERED this ____ day of _______________, 2010.

___________________________________
Janis Graham Jack
United States District Judge

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT,<br>Plaintiff, | §<br>§ | |
| | § | CIVIL ACTION NO. 2:10-cv-00075 |
| v. | § | |
| | § | |
| BRYAN SHAW, et al,<br>Defendants. | §<br>§ | |

**CPS ENERGY'S MOTION TO INTERVENE**

Pursuant to Federal Rule of Civil Procedure 24(a)(2), or in the alternative Federal Rule of Civil Procedure 24(b)(1)(B), the City of San Antonio, Texas, acting by and through the City Public Service Board, a Texas municipal utility ("CPS Energy"), respectfully requests leave to intervene in this action as a defendant.[1]

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

CPS Energy is the exclusive provider of electrical service to over 1.7 million people in the greater San Antonio area. To provide electrical service, CPS Energy owns and operates two power plant complexes in southeast Bexar County, each complex containing several electrical generating units located next to large water reservoirs. The power plant complexes are a critical part of the state power grid managed by the Electric Reliability Council of Texas ("ERCOT"). To operate the complexes, and provide electricity to the citizens of greater San Antonio, CPS Energy must have an adequate and reliable water supply to maintain precise water levels in the reservoirs. CPS Energy owns permitted water rights that authorize diversions from the San Antonio River basin sufficient to meet CPS Energy's water needs. Plaintiff The Aransas Project

[1] CPS Energy files its motion to intervene subject to the TCEQ Defendants' and GBRA's pending motions to dismiss pursuant to Rule 12(b)(6), (D.E. 40 & 43), and subject to the TCEQ Defendants' pending motion to dismiss or abate under the *Burford* abstention doctrine (D.E. 57). Dismissing this suit pursuant to one of these motions will render moot CPS Energy's motion to intervene.

Case: 10-40610 Document: 00511184537 Page: 2 Date Filed: 07/23/2010

("TAP") seeks relief that would modify, undermine, or reduce CPS Energy's water rights. Without an adequate water supply, several electrical generating units would cease to operate, impairing CPS Energy's ability to provide electrical service to the greater San Antonio population. CPS Energy seeks to intervene as defendant in this suit as a matter of right, or alternatively by permission, to protect its significant interests.

CPS Energy should be granted intervention because (1) it has timely sought intervention in the initial stages of this suit, before any answers have been filed and before any substantive determinations were made; (2) it has a vested ownership interest in a substantial amount of surface water rights dating to 1961, the use of which TAP seeks to enjoin or reduce; (3) its interests will be impaired by an unfavorable decision that enjoins future use or establishes a process to curtail or reduce water rights in certain situations; and (4) as the nation's largest municipally owned energy utility providing both natural gas and electrical service, which critically relies on rights to impound and divert water from the San Antonio River basin to generate electricity vital to the health and well being of over 1.7 million people, no other party can adequately represent CPS Energy's interests.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. CPS Energy's interests in this case.

CPS Energy is the nation's largest municipally owned energy utility providing both natural gas and electrical service. (Declaration of Michael Kotara ¶ 2, attached as Exhibit 1). Acquired by the City of San Antonio in 1942, and managed independently by a Board of Trustees, CPS Energy serves approximately 707,000 metered electrical customers and 322,000 natural gas customers in and around the seventh-largest city in the nation. (Exhibit 1 ¶ 2). Among its electrical customers are single family residences, large commercial and industrial

Case: 10-40610 Document: 00511184537 Page: 3 Date Filed: 07/23/2010

facilities, and numerous cities within and outside the greater San Antonio area. (Exhibit 1 ¶ 2). The metered customer numbers do not reflect the even larger population that CPS Energy serves, which CPS Energy estimates at over 1.7 million people. (Exhibit 1 ¶ 2). CPS Energy's 1,566-square-mile service area includes Bexar County and portions of Atascosa, Bandera, Comal, Guadalupe, Medina, Wilson and Kendall Counties. (Exhibit 1 ¶ 2). CPS Energy is the exclusive provider of electricity within this service area. (Exhibit 1 ¶ 2).

CPS Energy owns and operates electric generating power plant complexes at two locations in southeast Bexar County. (Exhibit 1 ¶ 3). Each power plant complex contains several electrical generating units. (Exhibit 1 ¶ 3). The power plant complexes are critical to providing electricity to CPS Energy's large customer base, and are a significant part of the regional electrical system known as ERCOT. (Exhibit 1 ¶ 3). Over 60% of CPS Energy's generation capacity is located at these two complexes. (Exhibit 1 ¶ 3).

Operating the closed-loop steam cycle plants requires substantial amounts of water for condenser cooling. (Exhibit 1 ¶ 4). Cooling water is supplied pursuant to permitted and adjudicated surface water rights authorizing impoundments and diversions from the San Antonio River basin to Braunig Lake and Calaveras Lake, located near the power plant complexes. (Exhibit 1 ¶ 4). The lakes are specifically designed for use of water during the steam cycle condensing process. (Exhibit 1 ¶ 4). CPS Energy must maintain constant and specific lake levels at these reservoirs for its condenser pumps. (Exhibit 1 ¶ 4). If the lakes fluctuate even by a few inches during peak demand periods, CPS Energy must act to maintain appropriate water levels for the pumps. (Exhibit 1 ¶ 4). The lakes are also designed, with specific depths and flow currents, to cool water that has been heated through the condensing cycle, so the water can be reused for condensing. (Exhibit 1 ¶ 4). If the lake levels change or cannot be maintained at

Case: 10-40610 Document: 00511184537 Page: 4 Date Filed: 07/23/2010

precise levels, for instance due to a reduction in permitted diversion amounts during a drought, the plants cannot operate and must be shut down. (Exhibit 1 ¶ 4). Water is a critical and necessary component for the generation of electricity at the power plant complexes. (Exhibit 1 ¶ 4).

CPS Energy has continuously owned and exercised surface water rights for its electrical generation operations for over 40 years. (Exhibit 1 ¶ 5). CPS Energy initially obtained surface water rights in 1961, when the Texas Board of Water Engineers (predecessor to the Texas Commission on Environment Quality ("TCEQ")) granted Permit No. 1990 to CPS Energy, authorizing construction, impoundment, and diversions of state water to Braunig Lake. (Exhibit 1 ¶ 5). Permit No. 1990 was confirmed in the adjudication of water rights of the San Antonio River basin, resulting in Certificate of Adjudication ("CA") 19-2161, as amended by CA 19-2161(a) (collectively "CA 19-2161(a)"). (Exhibit 1 ¶ 5). CA 19-2161(a) authorizes CPS Energy to construct and maintain a dam and reservoir on the Arroyo Seco Watershed (Braunig Lake), with an impoundment capacity of 26,500 acre-feet of water. (Exhibit 1 ¶ 5). CA 19-2161(a) also authorizes CPS Energy to divert into Braunig Lake (or Calaveras Lake) 12,000 acre-feet of water per year from the San Antonio River, and use it consumptively for industrial cooling, condensing, and other purposes associated with generating electricity at the power plant complexes located nearby. (Exhibit 1 ¶ 5).

CPS Energy obtained additional surface water rights in 1967, when the Texas Water Rights Commission (also predecessor to TCEQ) granted Permit No. 2325 to CPS Energy, authorizing the construction, impoundment, and diversions of state water to Calaveras Lake. (Exhibit 1 ¶ 6). Permit No. 2325 was confirmed by CA 19-2162 in the adjudication of water rights of the San Antonio River basin, as later amended by CA 19-2162(a) (collectively "CA 19-

2162(a)"). (Exhibit 1 ¶ 6). CA 19-2162(a) authorizes CPS Energy to construct a dam and reservoir on Calaveras Creek (Calaveras Lake), with an impoundment capacity of 63,200 acre-feet of water. (Exhibit 1 ¶ 6). CA 19-2162(a) also authorizes CPS Energy to divert and impound 27,000 acre-feet of storm and flood waters of Calaveras Creek, supplemented with up to 60,000 acre-feet of water per year of unappropriated public waters of the San Antonio River. (Exhibit 1 ¶ 6). CPS Energy supplements its water from the San Antonio River through a contract with the San Antonio Water System ("SAWS"), whereby CPS Energy diverts wastewater effluent released upstream by SAWS. (Exhibit 1 ¶ 7; *see also* D.E. 59-1, Clouse Decl. ¶ 6). CA 19-2162(a) authorizes CPS Energy to divert from and consumptively use up to 37,000 acre-feet of water per year from Calaveras Lake. (Exhibit 1 ¶ 6).

Given its critical reliance on water to generate substantial amounts of electricity for the area, and its ownership of surface water rights in the San Antonio River basin, CPS Energy participates in various aspects of the state's water planning process. (Exhibit 1 ¶ 8). For instance, CPS Energy is a participating member in a working group that is part of the S.B. 3 process for evaluating and establishing the state's environmental flows sufficient to address bay and estuary needs. (Exhibit 1 ¶ 8). CPS Energy represents the interests of the electrical generation industry as a member of the local Basin and Bay Area Stakeholders Committee for the Guadalupe, San Antonio, and Aransas Rivers and Mission, Copano, Aransas, and San Antonio Bays. (Exhibit 1 ¶ 8). This committee must develop, and submit to TCEQ and the statewide Environmental Flows Advisory Group, recommendations regarding environmental flow standards and strategies to meet them. Tex. Water Code § 11.02362(o).

CPS Energy participates in the South Central Texas Regional Water Planning Group, which develops five-year plans to protect and allocate water resources in the region. (Exhibit 1 ¶

Case: 10-40610 Document: 00511184537 Page: 6 Date Filed: 07/23/2010

9). CPS Energy also participates as a stakeholder in the Edwards Aquifer Recovery Implementation Program, a collaborative, consensus-based stakeholder process seeking to develop a plan to protect federally-listed endangered species potentially affected by management of the Edwards Aquifer. (Exhibit 1 ¶ 9). CPS Energy participates in these planning groups representing the unique perspective of the electrical generation industry. (Exhibit 1 ¶ 9).

**B. TAP's claims.**

On March 10, 2010, TAP sued the TCEQ Defendants,[2] alleging that the state officials failed to adequately manage the uses and flows of freshwater on the Guadalupe and San Antonio Rivers. (D.E. 1 at 1). TAP alleges this failure reduced the freshwater flow into the Aransas-San Antonio Bay ecosystem to amounts insufficient to maintain appropriate salinity conditions for the food and water supplies of Whooping Cranes during the 2008-09 winter season, resulting in a "take" of Whooping Cranes in violation of section 9 of the Endangered Species Act ("ESA"). (D.E. 1 at 2-3, 9-10). TAP alleges that the TCEQ Defendants have "a duty to ensure the water diversion activities authorized" do not cause a "take" of endangered species. (D.E. 1 at 5, 25).

TAP has specifically pointed to existing permitted water uses and withdrawals from the San Antonio and Guadalupe River systems as a cause of the ESA violations. For instance, TAP alleges the TCEQ Defendants, in their oversight of "permitted and unpermitted diversions" from the San Antonio and Guadalupe Rivers, continue to "ignore the issue of environmental flows" and have "over-allocated and mismanaged" the water resources. (D.E. 1 at 14). TAP alleges "[p]otential future full use of existing permits will result in additional reductions in freshwater flows," and that these "water diversion activities" will continue to worsen the salinity conditions of the bay ecosystem where the Whooping Crane winters. (D.E. 1 at 16). TAP specifically

[2] The TCEQ Defendants are TCEQ Chairman Bryan Shaw, TCEQ Commissioners Buddy Garcia and Carlos Rubinstein, TCEQ Executive Director Mark Vickery, and TCEQ South Texas Watermaster Al Segovia.

Case: 10-40610 Document: 00511184537 Page: 7 Date Filed: 07/23/2010

identifies the State's surface water appropriation system, including TCEQ's issuance of certificates of adjudication and water rights permits. (D.E. 1 at 21). TAP alleges that "food sources are directly and negatively impacted by the management and oversight of water permits by Defendants," including allowing "water to be taken during times of low flows." (D.E. 1 at 21-22). TAP has even specifically identified two large water permits that it believes illustrate the problem. (D.E. 1 at 23). TAP has clearly alleged facts that implicate CPS Energy's permitted water rights. This is even clearer given the relief TAP seeks.

TAP seeks to enjoin the TCEQ Defendants' alleged violations of the ESA. (D.E. 1 at 25-27, Counts II, III, and IV). This relief necessarily requires a determination that certain activities violate and will continue to violate the ESA, including what TAP identifies as review and approval of water diversions, "authorization and implementation of water permits," and "future use of existing water permits." (*See* D.E. 1 at 24-27). TAP's direct attack on existing water rights holders, like CPS Energy, is no clearer than in the following two statements:

> 204. It is reasonable foreseeable that future use of existing water permits and exemptions authorized by Defendants will result in additional prohibited takes of Whooping Cranes unless and until such activities are enjoined.
>
> 205. Water use activities authorized by Defendants are so likely to result in prohibited takes of Whooping Cranes that they must be enjoined under the ESA.

(D.E. 1 at 28, ¶¶ 204-05).

In its response to Union Carbide Corporation's ("UCC") motion to intervene, TAP disingenuously characterizes its claims as merely seeking to establish a "planning process" to prevent "takes" of Whooping Cranes. (D.E. 58 at 1). But TAP has not so amended its Complaint. TAP's Complaint plainly seeks to enjoin use of existing water rights permits. (D.E. 1 at 32-33). Even with respect to the planning process that TAP urges, TAP states the plan "may

include reduction of existing water uses or addition of special conditions to existing permits." (D.E. 1 at 33). Although TAP has attempted to couch its suit as one against the state officials that grant and administer permitted water rights, this suit directly affects the holders of permitted water rights in the Guadalupe and San Antonio Rivers, as it is their vested rights to divert and use water that TAP attacks and seeks to restrict, without the water rights owners being present.

**C. Status of Lawsuit**

This suit is still in its initial stages. On April 22, 2010, after an initial pretrial and scheduling conference, the Court entered a scheduling order and general order. (D.E. 32, 33). The scheduling order establishes June 15, 2010 as the deadline for joinder of parties. (D.E. 32).

Also on April 22, 2010, the Guadalupe-Blanco River Authority ("GBRA") moved to intervene in the suit. (D.E. 31). On the next day the Court entered an order granting GBRA's motion to intervene. (D.E. 35). Among the reasons given for granting intervention, the Court noted that (1) the motion was timely in part because it was filed before the submission of any answers (*id.* at 2-3), (2) GBRA had a significant interest in the litigation because it holds water rights from TCEQ that it uses to contract with municipal, industrial, and agricultural users; and (3) the disposition of this action may impair or impeded GBRA's ability to protect its interests because the "litigation focuses on water rights upon which GBRA relies, as well as the administration of water resources that GBRA manages," and that GBRA could be restricted in approval of water use permits." (*Id.* at 3).

Although answers to the Complaint were due May 17, 2010, the TCEQ Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) on May 14, 2010. (D.E. 40). GBRA filed a similar motion on May 17, 2010. (D.E. 43). On May 26, 2010, the Court entered an order granting TAP an extension of time until June 17, 2010 to file a consolidated response to the

Case: 10-40610 Document: 00511184537 Page: 9 Date Filed: 07/23/2010

motions to dismiss. (D.E. 52). To date, the existing defendants have not filed an answer and the Court has not ruled on the motions to dismiss.

On May 17, 2010, UCC sought to intervene in the suit. (D.E. 45). On May 26, 2010, the Texas Chemical Council ("TCC") also filed a motion to intervene, (D.E. 53), as did the Texas Farm Bureau and American Farm Bureau Federation (collectively, the "Farm Bureau Intervenors") (D.E. 51). On June 1, 2010, TAP filed a response in opposition to UCC's motion to intervene. (D.E. 58). On June 7, 2010, SAWS filed a motion to intervene. (D.E. 59). The Court has not yet ruled on these motions to intervene.

On May 28, 2010, the TCEQ Defendants filed a *Burford* Abstention Motion. (D.E. 57). The Court has not yet ruled on this motion to dismiss or abate.

When the Court granted GBRA's motion to intervene it had not yet made any substantive or dispositive decisions in this suit. That remains true today.

## III. ARGUMENT AND AUTHORITIES

### A. CPS Energy should be allowed to intervene as a matter of right.

As stated in the Court's order granting GBRA intervention, courts in the Fifth Circuit evaluate motions to intervene of right under Rule 24(a)(2) by considering four factors:

> (1) the applicant must file a timely application; (2) the applicant must claim an interest in the subject matter of the action; (3) the applicant must show that disposition of the action may impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties to the litigation.

(D.E. 35 at 2, citing *Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 422 (5th Cir. 2002)); *see also Sierra Club v. Glickman*, 82 F.3d 106, 108 (5th Cir. 1996) (per curium); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994). As the Court also noted, "[g]enerally '[f]ederal courts should allow intervention where no one would be hurt and the greater justice

Case: 10-40610 Document: 00511184537 9 Page: 10 Date Filed: 07/23/2010

could be attained.'" (D.E. 35 at 2, quoting *Heaton*, 297 F.3d at 422). CPS Energy satisfies the four factors, and allowing its intervention would attain greater justice while hurting no one.

**1. CPS Energy's motion is timely.**

"There are no absolute measures of timeliness; it is determined from all the circumstances." *Heaton*, 297 F.3d at 423. The Fifth Circuit uses a four-factor analysis: (1) the length of time before the would-be intervenor sought intervention after it learned of its interest in the case; (2) the prejudice that existing parties may suffer as a result of any delay by the would-be intervenor in applying to intervene; (3) the prejudice the would-be intervenor may suffer if intervention is denied; and (4) whether unusual circumstances favor or disfavor a determination that intervention is timely. *Id.* at 422-23. The key question is whether the original parties would be prejudiced by the intervention. *Espy*, 18 F.3d at 1205 ("requirement of timeliness is not a tool of retribution to punish the tardy . . . but rather a guard against prejudicing the original parties by the failure to apply sooner"). CPS Energy's motion to intervene is timely.

CPS Energy has acted promptly to seek intervention, waiting until this week to file its motion only so it could thoroughly brief its Board of Trustees. The case is still in its initial stages. It has only been three months since the action was filed on March 10, 2010. Neither the TCEQ Defendants nor GBRA has answered. The Court's deadline for joinder of parties (June 15, 2010) has not yet passed. No substantive actions have been taken by the Court, nor has the Court ruled on any dispositive motions. No discovery has commenced, except for initial disclosures. Although mere length of time is not dispositive, courts in the Fifth Circuit have allowed intervention following significantly longer delays than in this case. *See, e.g.*, *Edwards v. City of Houston*, 78 F.3d 983, 1001 (5th Cir. 1996) (seven months after suit began); *Espy*, 18 F.3d at 1205-06 (eight years after suit began); *Ass'n of Prof'l Flight Attendants v. Gibbs*, 804

Case: 10-40610 Document: 44 Page: 220 Date Filed: 07/23/2010

F.2d 318, 320-21 (5th Cir. 1986) (two years after suit began). Moreover, if granted intervention, CPS Energy intends to join all or portions of the motions to dismiss filed by the TCEQ Defendants and GBRA (*see* D.E. 40, 43, & 57), rather than file its own duplicative pleadings on those topics, unless to reply to a response by TAP. Ultimately, no delay in the case or prejudice to the original parties will result from granting intervention to CPS Energy.

On the other hand, CPS Energy would be significantly prejudiced if intervention is not granted. As the Court noted with respect to GBRA, if TAP obtains the relief it seeks, CPS Energy's water rights in the San Antonio River basin will be affected. (*See* D.E. 35 at 3). This alone is a sufficient interest to grant intervention. But, more importantly, the water rights are critical for CPS Energy's electrical generation operations. Several electrical generating units will cease to operate without an adequate water supply to maintain precise water levels in Braunig and Calaveras Lakes. (Exhibit 1 ¶10). A limitation or injunction on use of water rights would affect CPS Energy's significant obligation to provide electrical service to a massive population in greater San Antonio, as well as the reliability of the state's electrical grid, if CPS Energy is unable to maintain sufficient electrical generation. (Exhibit 1 ¶ 10). No other party, existing or otherwise, has a similar obligation and interest in this suit. The considerable prejudice to CPS Energy, particularly considering its unusual circumstances as the nation's largest municipally owned energy utility providing both natural gas and electrical service, militate in favor of granting intervention to CPS Energy; no unusual circumstances militate against it.

Intervention by CPS Energy will not delay the case or prejudice the original parties. On the other hand, CPS Energy will be considerably prejudiced if it is not able to defend its unique interests under attack by TAP. Accordingly, CPS Energy's motion to intervene is timely.

Case: 10-40610 Document: 00511184537 Page: 12 Date Filed: 07/23/2010

**2. CPS Energy has direct, substantial, and legally protected interests in the water rights and uses targeted by the Complaint.**

A proposed intervenor must demonstrate "a direct, substantial and legally protectable" interest in the subject matter of the litigation. *Espy*, 18 F.3d at 1207. Here that legally protectable interest is surface water rights. TAP expressly attacks and seeks to enjoin the use of existing water rights in the Guadalupe and San Antonio Rivers. For instance, TAP seeks a determination that the review and approval of water diversions, "authorization and implementation of water permits," and "future use of existing water permits," violate and will continue to violate the ESA. (*See* D.E. 1 at 24-27). TAP seeks to enjoin "future use of existing water permits" and the "water use activities authorized by Defendants." (D.E. 1 at 28, ¶¶ 204-05). TAP also seeks to establish a planning process that "may include reduction of existing water uses or addition of special conditions to existing permits." (D.E. 1 at 33). Thus, this suit directly affects each holder of permitted water rights in the Guadalupe and San Antonio River basins. CPS Energy is the owner of such permitted water rights in the San Antonio River basin. (Exhibit 1 ¶¶ 5-6). Given CPS Energy's absolute reliance on these water rights for its electrical generation operations, CPS Energy's interest in these water rights is substantial.

CPS Energy's permitted water rights are vested, protectable property rights. In its response to UCC's motion to intervene, TAP mischaracterizes the nature of the property right owned by a permittee of surface water rights like CPS Energy. (D.E. 58 at 4-5). Generally, surface water, including that in the Guadalupe and San Antonio River basins, is owned by the state. *See* TEX. WATER CODE § 11.021(a). However, the state permits use of surface water through the statutory appropriation process set out in chapter 11 of the Texas Water Code. Water rights obtained through the appropriation process, confirmed through adjudication, and put to beneficial use, are vested and protectable property rights. *Tex. Water Rights Comm'n v.*

Case: 10-40610 Document: 44 Page: 222 Date Filed: 07/23/2010

*Wright*, 464 S.W.2d 642, 649 (Tex. 1971); *see also In re Adjudication of the Water Rights of Upper Guadalupe Segment of Guadalupe River*, 642 S.W.2d 438, 445 (Tex. 1982) ("Appropriated water rights, like riparian rights, are vested.").

While usufructuary, these vested water rights are legally protectable from both action by another water user and action by the state. The very case relied upon by TAP, (D.E. 58 at 15), confirms the vested and protectable nature of an appropriated surface water right:

> The holder is presumably free at any time to increase the quantity of water which he diverts and uses beneficially, up to the maximum quantity allowed by his permit, and the increased quantity becomes the measure of his right, good as against the State under § 11.026 and good as against competing claimants under § 11.029.

*Lower Colo. River Auth. v. Tex. Dep't of Water Res.*, 638 S.W.2d 557, 563 & n.5 (Tex. App.—Austin 1982), *overruled on other grounds*, 689 S.W.2d 873 (Tex. 1984). Even in the subsequent overruling opinion, the Texas Supreme Court held that "second grants that overlay uncancelled water permits are not authorized, and except as provided by Subchapter E of the Water Code, existing rights may not be impaired or forfeited until cancelled in whole or in part." *Lower Colo. River Auth. v. Tex. Dep't of Water Res.*, 689 S.W.2d 873, 876 (Tex. 1984). The Court further stated, in reference to possible overappropriations, particularly during drought, that "[n]o matter how many permits the Commission issues, the action is purely administrative, and it cannot divest or impair prior rights." *Id*. at 882.[3] The fact that a surface water right is usufructuary in nature does not change its protected status, and TAP has not cited any support for a contrary proposition. (D.E. 58 at 5).

[3] Like all vested property rights, a vested water right may be reasonably regulated. *In re Adjudication*, 642 S.W.2d at 445-46. For instance, the surface water "permittee's vested right is the right to use the resource beneficially—not waste it." *Id*. at 445. Thus, a surface water right may be cancelled for nonuse, because the right carries with it an implied condition subsequent of continued beneficial use. *Wright*, 464 S.W.2d at 647-48; *see also* TEX. WATER CODE § 11.172. When put to beneficial use, however, the property right owned by the water permittee remains vested and protectable. *See Lower Colo. River Auth.*, 689 S.W.2d at 876, 882.

Case: 10-40610 Document: 44 Page: 223 Date Filed: 07/23/2010

As explained above, the main case relied upon by TAP confirms the vested nature of the surface water right, and that it may not be impaired or forfeited until cancelled in whole or in part. *Lower Colo. River Auth.*, 689 S.W.2d at 876, 882; *Lower Colo. River Auth.*, 638 S.W.2d at 563 & n.5. The other case cited by TAP is also inapposite. (D.E. 58 at 5). *City of San Marcos* dealt with ownership of particular molecules of wastewater effluent that were initially produced from a groundwater well then later discharged (or abandoned) into the San Marcos River. *City of San Marcos v. Tex. Comm'n on Env't Quality*, 128 S.W.3d 264, 266 (Tex. App.—Austin 2004, pet. denied). After years of discharge into the river, the City of San Marcos claimed the discharges were groundwater still owned by the City. *Id.* TAP has merely quoted a parenthetical that the *City of San Marcos* court used to describe another abandonment case that addresses the effect of abandoning possession of water into a state watercourse. *Id.* at 274 (summarizing and quoting *South Tex. Water Co. v. Bieri*, 247 S.W.2d 268, 272-73 (Tex. Civ. App.—Galveston 1952, writ ref'd n.r.e.)). Neither *City of San Marcos* nor *Bieri* address the vested, legally protectable nature of a surface water right that is put to beneficial use.

Adjudicated surface water rights that have been put to beneficial use are perfected and vested property rights, legally protectable against other users and the state. *Wright*, 464 S.W.2d at 649; *Lower Colo. River Auth.*, 689 S.W.2d at 876, 882; *In re Adjudication*, 642 S.W.2d at 445; *Lower Colo. River Auth.*, 638 S.W.2d at 563 & n.5. Because CPS Energy holds such water rights, and because TAP seeks to enjoin and establish a plan for use of the rights, CPS Energy has a direct, substantial, and legally protectable interest that is the target of this suit. *See Sierra Club v. Glickman*, 82 F.3d 106, 109 (5th Cir. 1996) (granting intervention to water users that were target of suit in which plaintiff attempted to sue only the USDA to enjoin it from funding groundwater pumping and to establish "land conservation and water utilization programs").

Case: 10-40610 Document: 00511184537 Page: 15 Date Filed: 07/23/2010

**3. CPS Energy's water rights interests may be impaired by an unfavorable disposition of the case.**

The third requirement for intervention of right is that disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interests. *Espy*, 18 F.3d at 1207. The ability of an applicant to raise its concerns in future litigation or administrative proceedings is not sufficient to ensure the applicant is able to protect its interests, because reestablishing the status quo can be "difficult and burdensome." *Sierra Club v. FEMA*, Civil Action No. H-07-0608, 2008 WL 2414333, *6 (S.D. Tex. June 11, 2008) (citing *Funds for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003)) (subsequent administrative appeal insufficient to protect interests); *see also John Doe No. 1 v. Glickman*, 256 F.3d 371, 379 (5th Cir. 2001) (inability to be heard in first lawsuit justified intervention due to collateral estoppel effect of judgment); *Sierra Club v. Glickman*, 82 F.3d at 109-10 ("the *stare decisis* effect of an adverse judgment constitutes a sufficient impairment to compel intervention").

TAP contends that it seeks merely to establish a process, a process that will have "an entirely speculative impact on an individual water permit holder," and that this suit will not "predetermine a result for the planning process." (D.E. 58 at 9). Not only is this contrary to TAP's express requests for injunctive relief, a Fifth Circuit case with similar facts establishes that even a planning process justifies intervention for CPS Energy.

In *Sierra Club v. Glickman*, Sierra Club sued the United States Department of Agriculture ("USDA") seeking to enjoin USDA from funding activities that supported pumping from the Edwards Aquifer by farmers, and to order USDA to "establish land conservation and water utilization programs." 82 F.3d at 109. The complaint alleged that the farmers' pumping constituted a "'substantial threat' to endangered species" in violation of federal laws. *Id.* In response to the farmers' application for intervention, Sierra Club argued the farmers would not

Case: 10-40610 Document: 00511184537 Page: 16 Date Filed: 07/23/2010

be impaired by non-intervention because they would not be bound by the outcome of the suit. *Id.* at 109-110. The Court rejected Sierra Club's contention and granted intervention, stating "a ruling in the Sierra Club's favor could be relied upon as a precedent in suits against individual farmers over their pumping from the Aquifer." *Id.* at 110.

Similarly here TAP seeks to enjoin the use of water rights in light of an alleged threat to endangered species. Whether by court order or through a planning process, TAP seeks to enjoin or reduce the use of vested real property rights in the Guadalupe and San Antonio River basins to increase environmental flows. (*See* D.E. 1 at 24-28, 33). CPS Energy critically relies on its San Antonio River basin water rights to maintain its electrical generation operations and provide electricity to over 1.7 million people in the greater San Antonio area. (Exhibit 1 ¶ 10). If CPS Energy's permitted water use is curtailed or enjoined, there is a serious threat CPS Energy will not be able to cool its generating plants and the plants will have to be shut down. (Exhibit 1 ¶ 10). Such a shutdown would severely diminish CPS Energy's generation capacity, undermining its obligation to provide electricity to residents and businesses and impacting the reliability of the ERCOT grid. (Exhibit 1 ¶ 10). If TAP obtains the relief it seeks, CPS Energy's vested real property rights, as well as over a million and a half people, could be irreparably harmed.

Reliable electricity is a societal necessity. As a significant provider of such a necessity, CPS Energy should be afforded the opportunity to defend its interests. If CPS Energy is not granted intervention in this suit, it will have no ability to defend and represent its unique interests through mediation, settlement, trial, or appeal. Any decision that enjoins, curtails, establishes a process for revising, or otherwise relates to surface water rights and uses will bind CPS Energy as a user and owner of those water rights. In the very least, it could be used as a precedent in a subsequent suit against CPS Energy over its water use from the San Antonio River basin. *See*

Case: 10-40610 Document: 00511184537 Page: 17 Date Filed: 07/23/2010

*Sierra Club v. Glickman*, 82 F.3d at 110. As a practical matter, CPS Energy's ability to reestablish the status quo and raise its concerns in a later proceeding will be difficult and burdensome, whether in litigation or some administrative agency planning process.

**4. No other party can adequately represent CPS Energy's interests.**

To satisfy the fourth factor for intervention of right, the applicant has only a "minimal" burden to show that representation by another party "may be" inadequate. *Espy*, 18 F.3d at 1207 (citing and quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)); (D.E. 35 at 3). As described above, CPS Energy's interests in this suit are vested property rights to impound, divert, and use water from the San Antonio River basin for the purpose of electrical generation and service to over 700,000 metered customers and 1.7 million people in greater San Antonio. No party in the suit or seeking to intervene adequately represents these interests.

As this Court noted with respect to GBRA in granting its intervention, (D.E. 35 at 3), TAP clearly does not represent CPS Energy's interests. Rather, TAP seeks to enjoin, reduce, or otherwise impede use of water rights on the San Antonio River basin, which would include those held by CPS Energy. TAP is adverse to CPS Energy.

The TCEQ Defendants do not adequately represent CPS Energy's interests. In its response to UCC's motion to intervene, TAP contends that the government (here the TCEQ Defendants) can adequately represent the interests of all citizens in the state, because the government is presumed to do so and has the same ultimate objective as water users in this case. (D.E. 58 at 10). But the Fifth Circuit has consistently rejected this position in similar regulatory cases, because "the government must represent the broad public interest," not just the concerns of a particular party or industry. *Espy*, 18 F.3d at 1208; *see also John Doe #1 v. Glickman*, 256

F.3d at 381; *Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997); *Sierra Club v. Glickman*, 82 F.3d at 110.

In *Sierra Club v. Glickman*, the Fifth Circuit granted intervention to the association representing water users and the state, rejecting the district court's conclusion that the USDA would adequately represent their interests. 82 F.3d at 110. The court stated that, because the government must represent the broad public interest, the water users' interests will not necessarily coincide with the government's, "even though, at this point, they share common ground." *Id.* The court also stated that, while the "USDA is legally obliged to represent the interests of all U.S. citizens," the "State of Texas has a narrower but independently vital interest in representing its residents, maintaining its agricultural industry, and allocating its natural resources." *Id.* Similarly here, the interests of the government (TCEQ Defendants) and water users (CPS Energy) do not coincide, though the parties may appear to share common ground in defense of water permits. The TCEQ Defendants' interests are much broader, and may in fact conflict with the particularized interests of CPS Energy, when it comes to exercising vested rights to use state water.

In *Sierra Club v. City of San Antonio*, the Fifth Circuit similarly rejected Sierra Club's contention that the state's interests coincided with groundwater users. 115 F.3d 311, 315 (5th Cir. 1997). Like TAP in this case, Sierra Club sued under the ESA, alleging that existing water withdrawals were reducing the flow of water into habitat of endangered species, and seeking to enjoin pumping activities. *Id.* at 313. The state sought to intervene in various capacities, including on behalf of various agencies and the citizens in general. *Id.* The court vehemently rejected Sierra Club's adequacy of representation argument, stating:

> It is axiomatic that the interests of the pumpers, who are local cities, businesses, and governmental entities that rely on the aquifer's water supply for their

Case: 10-40610 Document: 00511184537 Page: 19 Date Filed: 07/23/2010

> immediate subsistence, will diverge from those of the various state agencies who are charged with taking a state-wide view of the aquifer as it affects wildlife, water resources and quality, and the agricultural industry, as well as those of the state *qua* state and as *parens patriae*.

*Id.*[4]

As in the *Sierra Club* water-use cases discussed above, the state cannot and does not adequately represent the interests of water users like CPS Energy. CPS Energy is a regional municipal utility that relies on its surface water rights for immediate subsistence and the provision of electricity to its customers. (Exhibit 1 ¶¶ 2, 10). The TCEQ Defendants' interests are much broader and must consider, from a state-wide rather than regional perspective, issues such as wildlife, water resources, water quality, multiple industries, and many more citizens. The TCEQ Defendants make decisions among and between the various interests and water users affected by this suit, and cannot possibly look out for the particular and critical interests of CPS Energy. Nor should CPS Energy be required to sit idly by in hopes that the TCEQ Defendants will represent its interests. Because their interests diverge, there can be no presumption that the TCEQ Defendants will adequately represent CPS Energy in this suit. *See Haspel & Davis Milling & Planting Co. v. Brd. of Levee Comm'ns*, 493 F.3d 570, 578 (5th Cir. 2007).

GBRA does not adequately represent CPS Energy's interests. While GBRA is a water-rights holder, GBRA's statutory existence as a river authority and water supplier makes it very different from CPS Energy. GBRA's statutory jurisdiction does not extend into the San Antonio River basin, which is the basin from which CPS Energy diverts water. (Exhibit 1 ¶¶ 5-7).

[4] TAP attempts to distinguish *Sierra Club v. City of San Antonio* as addressing whether the state was adequately represented by water users (such as the City of San Antonio), rather than the issue here of whether the water users are adequately represented by the state. (D.E. 58 at 11). But this is a distinction without a difference. Whether the state's interests are different from the water users', or the water users' interests are different from the state's, there is still a difference, and it's the same difference no matter how you say it.

Case: 10-40610 Document: 00511184537 Page: 20 Date Filed: 07/23/2010

GBRA is not an ultimate consumer of water like CPS Energy. GBRA supplies water through water supply contracts with various types of parties, including municipal, agricultural, and industrial users. (D.E. 31 at 3). GBRA also must meet various statutory duties, including conservation and efficient use of existing water supplies in the Guadalupe River basin. (D.E. 31 at 4; D.E. 35 at 4). CPS Energy has no similar statutory obligations. Unlike CPS Energy, GBRA engages in hydroelectric generation, water and wastewater treatment, and recreational operations. (D.E. 31 at 3). GBRA has extensive rights and duties associated with the Canyon Reservoir, including flood control and reliability of water supply in its 10-county statutory service area. (*Id.*; D.E. 31-1, West Declaration at ¶¶ 25-29). CPS Energy has interests in Braunig Lake and Calaveras Lake primarily for consumptive use for cooling its numerous power plants at the lakes. (Exhibit 1 ¶¶ 5-6). While GBRA and CPS Energy may have the same general purpose for seeking intervention—defense of water rights and obligations associated with them—GBRA and CPS Energy have divergent interests, particularly given the injunctions against use that TAP seeks, which could place GBRA and CPS Energy at odds. For instance, if existing surface water rights must be curtailed or their exercise limited, each type of user will seek to preserve its own use and have use by others reduced first.

UCC does not adequately represent CPS Energy's interests. While UCC is a large water consumer, it consumes water to create industrial products and make a profit for shareholders. (D.E. 45 at 2-3, ). UCC's diversions occur significantly downstream of CPS Energy. (D.E. 45 at 2). Similarly, TCC seeks to intervene on behalf of five chemical manufacturing facility members, including UCC. (D.E. 53 at 2-3). TCC specifically seeks to "represent and protect the statewide chemical industry's common interest" and the "broader public policy of how the State

allocates water," (D.E. 53 at 2, 10), not the municipal electrical generation interests of CPS Energy. Only CPS Energy represents the interest of its large electrical customer base.

The Farm Bureau Intervenors do not adequately represent CPS Energy's interests. The Farm Bureau Intervenors represent agricultural irrigators that use water for agricultural use. (D.E. 51 at 12-14). As stated in their motion to intervene, the irrigators' demand for water is primarily seasonal and based on run-of-the-river flows for which they do not have the ability to store and manage. (D.E. 51 at 14). The harm to agricultural irrigators if water rights are impeded is an inability to plant crops, or if crops are already planted, a loss of investment for crops that cannot be watered. (*See* D.E. 51 at 14). While CPS Energy's water needs can fluctuate with the demand for power or weather conditions, (Exhibit 1 ¶ 4), it is not seasonal like that of irrigators. CPS Energy has over 700,000 metered customers and 1.7 million people to whom it must provide electricity every day and every night. (Exhibit 1 ¶ 10). If the generating plants cannot run, someone is at risk of losing power. (Exhibit 1 ¶ 10). Reliable electricity is a societal commodity critical to the welfare of the community. CPS Energy thus has a very different purpose and need for its water rights.

SAWS does not adequately represent CPS Energy's interests. Similar to CPS Energy, SAWS is a public entity with no commercial interests of its own. (D.E. 59 at 15, *see also* Exhibit 1 ¶ 2). However, unlike CPS Energy, SAWS is a purveyor of water (and other water related utilities) to a "broad swath of residential, commercial, and industrial customers." (D.E. 59 at 15). SAWS provides water, wastewater, and water reuse to approximately 1.3 million people. (D.E. 59 at 4). SAWS also provides wholesale water supplies to smaller utility systems, and is permitted to discharge treated wastewater into tributaries of the San Antonio River. (D.E. 59 at 4). No aspect of SAWS responsibilities involves supplying electrical service, or the

Case: 10-40610 Document: 00511184537 Page: 22 Date Filed: 07/23/2010

reliance on water for operation of electrical generation. SAWS' interests therefore diverge from those of CPS Energy. In fact, CPS Energy and SAWS are parties to a contract under which SAWS provides and discharges treated wastewater effluent that CPS Energy diverts from the San Antonio River, which could be complicated by TAP's attempt to enjoin or implement a plan to restrict exercise of water rights. (Exhibit 1 ¶ 7).

No other party can adequately represent CPS Energy's interests in this suit, or bring the unique perspectives and elements that it can bring as the nation's largest municipally owned energy utility providing both natural gas and electrical service. The parties to this suit and those seeking intervention represent varying interests, from the scope of view they must consider; their role in groundwater regulation and permitting; or the quantity, location, and purpose of water use. The relief TAP seeks, particularly the planning process and habitat conservation plans, pits the state, GBRA, and every water rights holder against one another as they seek to meet their obligations and preserve their interests. No other party is a public electric utility, much less the largest municipally owned energy utility providing both natural gas and electrical service. No other party maintains two large reservoirs and uses water to supply electricity to the population of the greater San Antonio area. CPS Energy seeks to protect interests affected by this litigation that other parties would neglect. Accordingly, no party can adequately represent CPS Energy's unique interests in this case.

CPS Energy is entitled to intervene of right pursuant to Rule 24(a)(2).

**B. Alternatively, CPS Energy should be allowed to intervene by permission.**

CPS Energy alternatively requests that it be permitted to intervene pursuant to Rule 24(b)(1)(B). Permissive intervention is appropriate when: "(1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or

Case: 10-40610 Document: 44 Page: 232 Date Filed: 07/23/2010

fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 n.2 (5th Cir. 1989); *see* FED. R. CIV. P. 24(b)(1)(B). Courts should also consider whether existing parties adequately represent the proposed intervenor's interests and whether the proposed intervenor is likely to contribute significantly to the development of underlying factual issues. *Id.* at 189.

CPS Energy previously addressed in this brief the issues of timeliness, prejudice to other parties, and adequate representation. As to the other elements of permissive intervention, CPS Energy's water rights are subject to the same questions of law and fact raised by TAP's Complaint, and CPS Energy's defenses would be similar to those likely to be proffered in the main action. For instance, CPS Energy's water rights will be affected by the issues of whether a "take" under the ESA has occurred or will occur under the current water permitting system, whether current water uses should be enjoined, and how to maintain environmental flows during future droughts. CPS Energy seeks to defend and protect its water rights with respect to these issues. However, CPS Energy will also bring a unique perspective as the nation's largest municipally owned energy utility providing both natural gas and electrical service, operating several power plants on two reservoirs in the San Antonio River basin. CPS Energy will therefore contribute significantly to the development of factual issues that other parties would neglect or have no reason to develop. Judicial economy favors having a representative of every major water rights stakeholder in the Guadalupe and San Antonio River basins as a party to this case, so the issues placed in question by TAP may be fully considered from the various and important perspectives that exist. CPS Energy is greater San Antonio's electrical generator and supplier. No other party can or will represent those interests.

Case: 10-40610 Document: 00511184537 Page: 24 Date Filed: 07/23/2010

### C. This pleading satisfies FED. R. CIV. P. 24(c).

A motion to intervene "must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." FED. R. CIV. P. 24(c). As explained by GBRA, Rule 24(c) may be satisfied by a motion to intervene that clearly spells out the intervenor's position on the subject matter of the litigation. (*See* D.E. 31 at 19-20, citing cases for this proposition). This motion describes with sufficient specificity CPS Energy's substantial and legally-protected interests in the subject matter of the litigation, and its positions regarding defense of those interests. CPS Energy seeks to defend its vested property rights in water for which it critically relies to generate and supply electricity to the greater San Antonio area. CPS Energy contests TAP's ability to show that a "take" of Whooping Cranes has occurred or is likely to occur due to use of water from the Guadalupe and San Antonio River basins, particularly by water rights holders impounding, diverting, and using water for electrical generation operations. Nor does CPS Energy believe that under fact or law TAP is entitled to the relief its requests. A duplicative "pleading" should not be required.

CPS Energy is prepared to file responsive pleadings within 20 days after the Court grants intervention, or as otherwise directed by the Court. CPS Energy also intends to work with existing parties to avoid duplicative pleadings and delay.

## IV. CONCLUSION

CPS Energy respectfully requests that the Court grant CPS Energy leave to intervene of right pursuant to Rule 24(a)(2). Alternatively, CPS Energy requests that the Court grant CPS Energy permissive intervention pursuant to Rule 24(b)(1)(B).

Case: 10-40610 Document: 00511184537 Page: 25 Date Filed: 07/23/2010

Dated: June 14, 2010

Respectfully submitted,

By: *s/ Russell S. Johnson*

Russell S. Johnson
Attorney-In-Charge
State Bar No. 10790550
Motion for admission *pro hac vice* pending
rjohnson@mcginnislaw.com

Carl R. Galant
Of Counsel
State Bar No. 24050633
Motion for admission *pro hac vice* pending
cgalant@mcginnislaw.com

McGinnis, Lochridge & Kilgore, LLP
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000
(512) 505-6374 – FAX

**Attorneys for CPS Energy**

## CERTIFICATE OF CONFERENCE

I certify I have conferred or attempted to confer with counsel for the other parties and proposed parties to determine whether the parties agree on the disposition of CPS Energy's motion to intervene as a defendant in this case. Counsel for Plaintiff The Aransas Project has advised that Plaintiff opposes the intervention by CPS Energy. Counsel for the TCEQ Defendants Bryan Shaw, et al., Intervenor-Defendant Guadalupe-Blanco River Authority, and proposed Intervenor-Defendants Texas Farm Bureau, et al., Union Carbide Corporation, and San Antonio Water System, have advised that their clients do not oppose intervention by CPS Energy. I attempted but was not able to reach counsel for Texas Chemical Council before the time of filing.

*s/ Russell S. Johnson*
Russell S. Johnson

**CERTIFICATE OF SERVICE**

I certify that on June14, 2010, I served the foregoing motion, supporting declaration, and accompanying proposed order through the Court's ECF electronic filing system consistent with the procedures established by the Court, which provide for service through the electronic filing system on counsel of record that are known to be registered users of the system.

*s/ Russell S. Johnson*
Russell S. Johnson

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT,<br>Plaintiff, | §<br>§ | |
| | § | CIVIL ACTION NO. 2:10-cv-00075 |
| v. | § | |
| | § | |
| BRYAN SHAW, et al,<br>Defendants. | §<br>§ | |

**CPS ENERGY'S MOTION TO INTERVENE**

# EXHIBIT 1

## DECLARATION OF MICHAEL KOTARA IN SUPPORT OF CPS ENERGY'S MOTION TO INTERVENE

Case: 10-40610 Document: 44 Page: 237 Date Filed: 07/23/2010

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT,<br>Plaintiff,<br><br>v.<br><br>BRYAN SHAW, et al,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 2:10-cv-00075 |

**DECLARATION OF MICHAEL KOTARA**
**IN SUPPORT OF CPS ENERGY'S MOTION TO INTERVENE**

THE STATE OF TEXAS §
§
COUNTY OF BEXAR §

I, Michael Kotara, declare as follows:

1. I am the Senior Vice President for Fossil Generation at the City Public Service Board of San Antonio, Texas, a Texas municipal utility ("CPS Energy"). I am over the age of 18 years and am otherwise competent to make this declaration. I make this declaration based upon personal knowledge, and in support of CPS Energy's motion to intervene in this suit. CPS Energy has acted promptly to seek intervention after thoroughly briefing its Board of Trustees.

2. CPS Energy is the nation's largest municipally owned energy utility providing both natural gas and electrical service. Acquired by the City of San Antonio in 1942, and managed independently by a Board of Trustees, CPS Energy is a public entity that serves approximately 707,000 metered electrical customers and 322,000 natural gas customers in and around the seventh-largest city in the nation. Among its electrical customers are single family residences, large commercial and industrial facilities, and numerous cities within and outside the greater San Antonio area. The metered customer numbers do not reflect the even larger

Case: 10-40610 Document: 44 Page: 238 Date Filed: 07/23/2010

population that CPS Energy serves, which CPS Energy estimates at over 1.7 million people. CPS Energy's 1,566-square-mile service area includes Bexar County and portions of Atascosa, Bandera, Comal, Guadalupe, Medina, Wilson and Kendall Counties. CPS Energy is the exclusive provider of electricity within this service area.

3. CPS Energy owns and operates electric generating power plant complexes at two locations in southeast Bexar County. Each power plant complex contains several electrical generating units. The power plant complexes are critical to providing electricity to CPS Energy's large customer base, and are a significant part of the generation capacity for the regional electrical system known as the Electric Reliability Council of Texas ("ERCOT"). Over 60% of CPS Energy's generation capacity is located at these two complexes.

4. Operating the closed-loop steam cycle plants requires substantial amounts of water for condenser cooling. Cooling water is supplied pursuant to permitted and adjudicated surface water rights authorizing impoundments and diversions from the San Antonio River basin to Braunig Lake and Calaveras Lake, located near the power plant complexes. The lakes are specifically designed for use of water during the steam cycle condensing process. CPS Energy must maintain constant and specific lake levels at these reservoirs for its condenser pumps. Water demand can fluctuate with the demand for power or weather conditions. If the lakes fluctuate even by a few inches during peak demand periods, CPS Energy must act to maintain appropriate water levels for the pumps. The lakes are also designed, with specific depths and flow currents, to cool water that has been heated through the condensing cycle, so the water can be reused for condensing. If the lake levels change or cannot be maintained at precise levels, for instance due to a reduction in permitted diversion amounts during a drought, the plants cannot

Case: 10-40610 Document: 00511184537 Page: 30 Date Filed: 07/23/2010

operate and must be shut down. Water is a critical and necessary component for the generation of electricity at the power plant complexes.

5. CPS Energy has continuously owned and exercised surface water rights for its electrical generation operations for over 40 years. CPS Energy initially obtained surface water rights in 1961, when the Texas Board of Water Engineers granted Permit No. 1990 to CPS Energy, authorizing construction, impoundment, and diversions of state water to Braunig Lake. Permit No. 1990 was confirmed in the adjudication of water rights of the San Antonio River basin, resulting in Certificate of Adjudication ("CA") 19-2161, as amended by CA 19-2161(a) (collectively "CA 19-2161(a)"). CA 19-2161(a) authorizes CPS Energy to construct and maintain a dam and reservoir on the Arroyo Seco Watershed (Braunig Lake), with an impoundment capacity of 26,500 acre-feet of water. CA 19-2161(a) also authorizes CPS Energy to divert into Braunig Lake (or Calaveras Lake) 12,000 acre-feet of water per year from the San Antonio River, and use it consumptively for industrial cooling, condensing, and other purposes associated with generating electricity at the power plant complexes located nearby.

6. CPS Energy obtained additional surface water rights in 1967, when the Texas Water Rights Commission granted Permit No. 2325 to CPS Energy, authorizing the construction, impoundment, and diversions of state water to Calaveras Lake. Permit No. 2325 was confirmed by CA 19-2162 in the adjudication of water rights of the San Antonio River basin, as later amended by CA 19-2162(a) (collectively "CA 19-2162(a)"). CA 19-2162(a) authorizes CPS Energy to construct a dam and reservoir on Calaveras Creek (Calaveras Lake), with an impoundment capacity of 63,200 acre-feet of water. CA 19-2162(a) also authorizes CPS Energy to divert and impound 27,000 acre-feet of storm and flood waters of Calaveras Creek, supplemented with up to 60,000 acre-feet of water per year of unappropriated public waters of

Case: 10-40610 Document: 44 Page: 240 Date Filed: 07/23/2010

the San Antonio River. CA 19-2162(a) authorizes CPS Energy to divert and consumptively use up to 37,000 acre-feet of water per year from Calaveras Lake.

7. CPS Energy supplements its water use from the San Antonio River under CA 19-2162(a) pursuant to a contract with the San Antonio Water System ("SAWS"), whereby CPS Energy diverts wastewater effluent released upstream by SAWS. Under the contract, SAWS provides and discharges specific amounts of treated wastewater effluent that CPS Energy diverts from the San Antonio River. Restrictions on the exercise of these water rights could complicate the contract between SAWS and CPS Energy.

8. Given its critical reliance on water to generate substantial amounts of electricity for the area, and its ownership of surface water rights in the San Antonio River basin, CPS Energy participates in various aspects of the state's water planning process. For instance, CPS Energy is a participating member in a working group that is part of the S.B. 3 process for evaluating and establishing the state's environmental flows sufficient to address bay and estuary needs. CPS Energy represents the interests of the electrical generation industry as a member of the local Basin and Bay Area Stakeholders Committee for the Guadalupe, San Antonio, and Aransas Rivers and Mission, Copano, Aransas, and San Antonio Bays.

9. CPS Energy participates in the South Central Texas Regional Water Planning Group, which develops five-year plans to protect and allocate water resources in the region. CPS Energy also participates as a stakeholder in the Edwards Aquifer Recovery Implementation Program, a collaborative, consensus-based stakeholder process seeking to develop a plan to protect federally-listed endangered species potentially affected by management of the Edwards Aquifer. CPS Energy participates in these planning groups representing the unique perspective of the electrical generation industry.

Case: 10-40610 Document: 44 Page: 241 Date Filed: 07/23/2010

10. CPS Energy's San Antonio River basin water rights are critical and necessary to maintain its electrical generation operations. CPS Energy relies on these surface water rights for immediate subsistence and the provision of electricity to the population of greater San Antonio. CPS Energy's electrical generating units cannot operate without an adequate water supply to maintain precise water levels in Braunig and Calaveras Lakes. If CPS Energy's permitted water use is curtailed or enjoined, there is a serious threat CPS Energy will not be able to cool its generating plants and the plants will have to be shut down. Such a shutdown would severely diminish CPS Energy's generation capacity, undermining its obligation to provide electricity to residents and businesses and impacting the reliability of the ERCOT grid. CPS Energy has over 700,000 metered customers and 1.7 million people to whom it must provide electricity every day and every night. If the generating plants cannot run, someone is at risk of losing power.

11. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct to the best of my knowledge and belief.

Executed on June 11, 2010.

Michael Kotara

Michael Kotara

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT, | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 2:10-cv-00075 |
| v. | § | |
| | § | |
| BRYAN SHAW, et al, | § | |
| Defendants. | § | |

**[PROPOSED]**
**ORDER GRANTING CPS ENERGY'S MOTION TO INTERVENE**

On this day, the Court considered the Motion to Intervene of the City of San Antonio, Texas, acting by and through its City Public Service Board, a Texas municipal utility ("CPS Energy"). Having considered the motion, arguments of the parties, evidence, and applicable authorities, the Court finds that the motion should be granted.

IT IS THEREFORE ORDERED that CPS Energy's Motion to Intervene is GRANTED. Pursuant to Federal Rule of Civil Procedure 24(a)(2), CPS Energy is granted intervention as a defendant in this action for all purposes.

SIGNED and ORDERED this _____ day of _______________, 2010.

_______________________________________
HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 2:10-CV-00075** |
| **v.** | § | |
| **BRYAN SHAW, et al.** | § | |
| **Defendants.** | § | |

**SAN ANTONIO RIVER AUTHORITY'S**
**MOTION TO INTERVENE**

Pursuant to Federal Rule of Civil Procedure 24(a)(2), or in the alternative Federal Rule of Civil Procedure 24(b)(1)(B) or 24(b)(2), the San Antonio River Authority ("SARA"), by and through its undersigned counsel, moves this Court for leave to intervene in the above-captioned action, and in support thereof would show the Court the following:

## I.
## SARA'S INTERVENTION

1.0 SARA should be granted intervention as of right under Fed. R. Civ. P. 24(a)(2) because (1) its application is timely; (2) SARA has significant legally protected interests in the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede SARA's ability to protect those interests; and (4) neither Plaintiff nor Defendants nor any other Intervenor to the proceedings have the ability to protect adequately SARA's interests.

1.1 In the alternative, if the Court denies leave to intervene as of right, SARA should be granted permissive intervention under Fed. R. Civ. P. 24(b)(1)(B) or (2) because (1) SARA's defenses and the claims raised in this action have questions of law or fact in common; (2) SARA's motion to intervene is timely and will not result in delay or prejudice of the original parties' rights; and (3) SARA's intervention is premised upon its enabling statute as well as

Case: 10-40610 Document: 00511184538 Page: 2 Date Filed: 07/23/2010

orders issued by the Texas Commission on Environmental Quality ("TCEQ"), granting water rights; and (4) SARA's intervention will promote judicial economy.

## II. FACTUAL BACKGROUND EVIDENCING SARA'S PECULIAR AND INDIVIDUALIZED INTERESTS

2.0 SARA is a conservation and reclamation district created by special act of the Legislature, formerly codified as Article 8280-119, TEX. CIV. STAT. ANN., pursuant to Article XVI, Section 59 of the Constitution, and operating pursuant to its enabling legislation and other applicable general statutes of Texas. A copy SARA's enabling legislation is appended hereto as **Attachment 1.** Pursuant to its enabling legislation, SARA's boundaries include Bexar, Wilson, Karnes and Goliad Counties. SARA's four-county area includes areas within the Guadalupe, San Antonio, Medina, and San Antonio-Nueces Coastal River Basins. SARA is governed by a 12 member elected Board of Directors. Six Directors are elected from Bexar County and two each are elected from Wilson, Karnes and Goliad Counties.

2.1 SARA's enabling legislation expressly provides in pertinent part as follows:

> Section 2. District Created. [SARA is] declared to be a governmental agency, a municipality, body politic and corporate, vested with all the authority and full sovereignty of the State, in behalf of the State, insofar as intended by this Act, and with authority to exercise the powers, rights, privileges and functions hereinafter specified. The creation of such District is hereby determined to be essential to the accomplishment of the purposes of Section 59 of Article 16 of the Constitution of the State of Texas, including but not limited to . . . the control of the waters of those parts of all rivers, streams and tributaries thereof which are within the boundaries of the District . . .

*See* TEX. CIV. STAT. ART. 8280-119 § 2 (emphasis added).

2.2 SARA's powers, rights, privileges, and functions include the authority to construct, maintain and operate navigable canals or waterways; effectuate flood control and flood plain management; conserve and use for all beneficial purposes the ground, storm, flood

Case: 10-40610 Document: 00511184538 Page: 3 Date Filed: 07/23/2010

and unappropriated flow waters within SARA's four county statutory area; and to effectuate irrigation, soil conservation, sewage treatment and solid waste disposal, pollution prevention, the development of parks and recreational facilities, the preservation of fish, forestation and reforestation. In furtherance of this grant of authority, SARA's Board of Directors has adopted the goals of exemplifying environmental leadership, stewardship and expertise; enhancing community appreciation for the environmental resources of the San Antonio River and its tributaries; and advancing a sustainable environment. By statute, the Texas Legislature has conferred title in and to the natural bed and banks of the San Antonio River for its entire length to the confluence with the Guadalupe River, and to the tributaries and contributing water courses of the San Antonio River Basin within SARA's four county statutory area.

2.3 Pursuant to its statutory powers, rights, privileges, and functions, SARA has participated in the Senate Bill 1 Regional Planning Process and specifically as member of the Region L (South Central Texas) Regional Planning Group, and as the Administrator of the Region L Regional Planning Group. "Senate Bill 1," otherwise known as the "Omnibus Water Bill" was enacted by the State Legislature to be effective September 1, 1997. *See* 75th Leg. R.S., Ch. 1010, 1997 Tex. Gen. Laws 3610.

2.4 Pursuant to its statutory powers, rights, privileges and functions, SARA has applied for water appropriation permits for potential water supply projects and to support the environmental flow needs of the San Antonio River Basin. For example, SARA owns the following water rights issued by the Defendant TCEQ (and its predecessor agencies):

Certificate of Adjudication No. 19-2164
Certificate of Adjudication No. 19-2198
Certificate of Adjudication No. 19-4195
Permit No. 3863
Permit No. 5917
Permit No. 12054


USCA5 1073

Case: 10-40610 Document: 00511184538 Page: 4 Date Filed: 07/23/2010

Additionally, SARA is negotiating the acquisition of additional water rights within the San Antonio River Basin, including an Option to acquire a portion of the water rights authorized by Permit No. 5611.

2.5 Also pursuant to its statutory powers, rights, privileges and functions, SARA is vitally interested in protecting the environment within Region L, and SARA's four-county district, including protection of instream and estuarine habitat. As an example, SARA has been, and continues to be, a leading proponent of (i) adequate regulation of pumping from the Edwards Aquifer to ensure maintenance of adequate, continuous spring flows from the Comal and San Marcos Springs, including throughout the most severe droughts, to provide flows needed for instream and estuarine habitat, (ii) the development of alternative water supplies, and (iii) the completion of studies regarding instream flow and bay and estuary inflow.

Pursuant to Section 59, Article 16 of the Constitution of Texas, SARA was created as a water conservation and reclamation district and a public corporation of the State of Texas by an act of the Texas legislature (TEX. CIV. STAT. ART. 8280-119). SARA holds such title as was conveyed by the State of Texas to the entire length of the bed and banks of the San Antonio River and all of the tributaries of the San Antonio River within its statutory boundaries of Bexar, Karnes, Wilson and Goliad Counties, and is empowered by statute to construct canals and other navigation facilities, acquire surface-water rights, construct dams and reservoirs, and sell water, including the water that is the subject of dispute in this litigation.

2.6 A map showing the San Antonio River Basin reflecting SARA's four (4) county statutory district is appended hereto as **Attachment 2**.

2.7 SARA's stewardship of the San Antonio River Basin includes careful coordination of its planning and resource development efforts within the broader consideration of

Case: 10-40610 Document: 00511184538 Page: 5 Date Filed: 07/23/2010

regional and statewide water needs. To fulfill its statutory responsibilities, SARA provides a variety of services in the San Antonio River Basin, including water quality and environmental studies; wastewater treatment; municipal water supply; flood control, watershed management and recreational operations.

2.8 SARA also is authorized to develop programs and policies to insure that existing water supplies are used efficiently and wisely. SARA actively works with water users and local governments within the San Antonio River Basin through the Regional Water Alliance, a group of nineteen water purveyors brought together by SARA, to educate them on water conservation efforts. SARA also works closely with the Edwards Aquifer Authority, Guadalupe Basin Coalition, and the Edwards Aquifer Recovery Implementation Program ("EARIP") to insure the Edwards Aquifer is managed effectively and in accordance with state law, thereby insuring adequate springflow into the Guadalupe and San Marcos Rivers, which incidentally could increase intermittent springflow into the San Antonio River.

## III.
## SARA'S INTEREST IN THE EDWARDS AQUIFER AND EDWARDS AQUIFER RECOVERY IMPLEMENTATION PROGRAM

3.0 The Edwards Aquifer underlies approximately 180 miles within six counties from the City of Brackettville in Kinney County in Southwest Texas to the City of Kyle in Hays County in Central Texas. Communities outside of San Antonio from the Hill Country to the Texas Gulf Coast have competing interests in the water that flows from the Aquifer's s[rng outlets and the river systems it feeds. Nearly two million people depend on the Edwards Aquifer as the primary source of 95% of their drinking water, and for other domestic, agricultural, industrial, and recreational uses.

3.1 The Edwards Aquifer contains water in its vast underground limestone formations, the Aquifer's water level rises and falls for a variety of reasons, and the flow from its

springs has an impact on rivers in the region. The amount of water discharged from those springs is heavily influenced by the Aquifer level. During the Aquifer's drought of record, which lasted from 1947 to 1957, Comal Springs near New Braunfels, Texas, stopped flowing for 144 days in 1956.

3.2 In 1991, a lawsuit filed by the Sierra Club and others under the federal Endangered Species Act led to the creation of the Edwards Aquifer Authority ("EAA"). In 1993, the Texas Legislature directed the EAA to regulate pumping from the Aquifer, implement critical period management restrictions, and pursue other measures designed to ensure minimum continuous springflows from the Aquifer at Comal and San Marcos Springs to protect endangered and threatened species.

3.3 SARA has participated in the EARIP, a collaborative, consensus-based stakeholder process in Texas convened by U.S. Fish and Wildlife Service ("FWS"), since 2006. SARA is a Member of the EARIP Steering Committee, Chair of the Recharge Facility Feasibility Subcommittee and a Member of the Science Subcommittee. The purpose of the EARIP is to develop a plan to contribute to the recovery of the federally-listed species dependent upon the Edwards Aquifer. In May 2007, the Texas Legislature directed the EAA and certain other state and municipal water agencies to participate in the EARIP and to prepare a FWS-approved Plan by 2012 for managing the Aquifer to preserve the listed species at Comal and San Marcos Springs. The Legislature directed that the Plan must include recommendations regarding adjustments in the withdrawals of water from the Aquifer during critical periods that ensure that federally-listed species associated with the Edwards Aquifer will be protected. The EARIP process is ongoing.

Case: 10-40610 Document: 00511184538 Page: 7 Date Filed: 07/23/2010

**IV.**
**SARA'S INTERESTS IN THE REGION L**
**STATE WATER PLANNING ACTIVITIES**

4.0 Pursuant to the legislative directive, sixteen planning groups were established state-wide by the Texas Water Development Board ("TWDB") to develop "Regional Water Plans" as required by Senate Bill 1 ("SB 1"), 75th Legislative Session (Tex. S.B. 1, 75th Leg., R.S. (1997), now codified in Texas Water Code §16.053-.056). SARA is located in the South Central Texas Region, designated as "Region L."

4.1 The goal of the SB 1 water planning process is to "develop regional and state water plans that will provide for the orderly development, management, and conservation of water resources, and preparation for and response to drought conditions in order that sufficient water will be available at a reasonable cost to ensure public health, safety, and welfare, further economic development, and protect the agricultural and natural resources of the particular region." TEX. WATER CODE §16.053(a).

Pursuant to SB 1, Regional Water Plans approved by the TWDB are incorporated by the TWDB into a comprehensive State Water Plan. Both the regional and state-wide water plans are updated every five years. Region L is responsible for the development of five year plans to protect water resources now and in the future within the 22-1/2 counties included within the Region. The Region L territory includes both the San Antonio and Guadalupe River Basins, except for Bandera and Kerr Counties. SARA is a Member of, and serves as the Administrator for, the Region L planning group.

4.2 In evaluating new water supply projects, Region L applies the Consensus Criteria for Environmental Flow Needs or site-specific information in the calculation of water potentially available for diversion and/or impoundment as part of a proposed water management strategy. Region L also performs a cumulative effects analysis of all the proposed water management

Case: 10-40610 Document: 00511184538 Page: 8 Date Filed: 07/23/2010

strategies in the regional plan on the rivers and bays in the Region L planning region. This process specifically includes an ecologically-based streamflow and bay and estuary inflow assessment that significantly exceeds the minimum requirements set forth by the TWDB for such analyses.

## V.
## SARA'S INTERESTS IN ENVIRONMENTAL FLOWS & WATER QUALITY

5.0 The term "environmental flows" describes the flows needed to maintain ecologically healthy streams and rivers and the bays and estuaries that they feed. This is a complex, multidisciplinary subject that has been studied for many years. With the population of the State projected to double over the next 50 years, which will create a shortfall in the volume of available water supplies to meet the associated increase in demand, the purpose of the Environmental Flows process is to ascertain how much water will be needed to be set aside for the protection and maintenance of the environment. In addition to SARA's own programs, SARA participates in state-wide and regional programs designed to understand, protect and promote the availability of adequate river flows to protect the environment, including the legislatively mandated Senate Bill 2 and Senate Bill 3 programs.

5.1 In 2001, the 77th Legislative Session of the Texas Legislature enacted Senate Bill 2 (Tex. S.B. 2, 77th Leg., R.S. (2001)), establishing an instream flow data collection and evaluation program (the "Program"). The Program is being cooperatively developed and jointly administered by the TCEQ, Texas Parks and Wildlife Department, and TWDB. Its purpose is to perform scientific and engineering studies and analyses to determine appropriate methodologies for determining flow conditions necessary to support a sound ecological environment in the river basins of Texas. The Program will conduct sub-basin studies, including the San Antonio and



USCA5 1078

Case: 10-40610 Document: 00511184538 Page: 9 Date Filed: 07/23/2010

Guadalupe River Basins, that focus on the entire ecosystems. Priority studies must be completed by December 31, 2016. SARA participates in this Program with the state agencies by contributing both funding and its experience and knowledge of the San Antonio River Basin.. SARA has contributed approximately $1,000,000 to fund biological field studies, including engineering and biological analyses, that has leveraged available state funding through the Texas Instream Flow Program Lower San Antonio River and Cibolo Creek Study. SARA also funded a preliminary instream flow assessment of the lower San Antonio River, Martinez and Salatrillo Creeks in advance of the initiation of the Texas Instream Flow Program. The results of these studies will be available this year for use by the Senate Bill 3 bay and basin expert science team that is charged with developing instream flow recommendations for the San Antonio River and its tributaries pursuant to SB 3.

5.2 In 2007, the 80th Legislative Session of the Texas Legislature passed Senate Bill 3 (Tex. S.B. 3, 80th Leg., R.S. (2007)), creating a stakeholder-driven process for determining environmental flow set-asides for all the major river basins of the state. The process involves an Environmental Flows Advisory Group, a Science Advisory Committee, basin and bay area stakeholder committees, basin and bay expert science teams, and the TCEQ. The deadline for the environmental flow recommendation prepared by the Guadalupe and San Antonio River bay and basin expert science team is March 1, 2011. The Guadalupe and San Antonio bay and basin area stakeholder committee must provide its comments to the environmental flow recommendation by October 1, 2011. SARA is participating in this process by its membership on and chairmanship of the bay and basin area stakeholder committee, as well as and its membership on the bay and basin expert science team. SARA is further assisting the SB3 environmental flows process with administrative support of these groups.

Case: 10-40610 Document: 44 Page: 252 Date Filed: 07/23/2010

5.3 SARA has a long history of conducting its own biological and water quality monitoring of the San Antonio River and has accumulated a significant amount of technical data. SARA monitors 56 sites within the San Antonio River Basin as part of the State Clean Rivers Program and the SARA Stream Monitoring program. SARA, working in cooperation with TCEQ and the State Soil and Water Conservation Board, has developed water quality based watershed protection plans, total maximum daily loads and, implementation plans for many sub-watersheds within the San Antonio River Basin.

5.4 SARA has entered into an agreement with Coastal Bend Bays & Estuaries Program, Inc. to provide funding in support of the San Antonio Bay Partnership. The purpose of the agreement is to compile all available technical data regarding San Antonio Bay, conduct a two day forum to share information on current scientific and technical studies being conducted in the San Antonio Bay system, and to develop a prioritized list of data needs and proposed studies to support the development of an estuary management plan. The purpose of the San Antonio Bay Partnership is to create and sustain a working partnership of committed stakeholders in order to protect, restore and enhance the natural resources of the San Antonio Bay System for the benefit of the ecosystem and its human uses. SARA is a Member of both the Partnership's steering committee and the science-technical subcommittee.

5.5 SARA has previously initiated litigation to protect the environment and water quality in the San Antonio River Basin, including litigation against the City of San Antonio to enforce compliance in their wastewater treatment operations. The water quality of the San Antonio River is much improved as a result of SARA's activities, as evidenced by the fact that sensitive species of fish are now present in the San Antonio River immediately downstream of the discharge of San Antonio Water Systems ("SAWS") Dos Rios Wastewater Treatment Plant.


USCA5 1080

Case: 10-40610 Document: 44 Page: 253 Date Filed: 07/23/2010

**VI.**
**SARA'S INTERESTS IN THE "SAGES" STUDY**

6.0 SARA is a co-sponsor of an extensive multi-year, $2 million study known as the "San Antonio Guadalupe Estuarine System" ("SAGES"). The SAGES study is designed to provide scientific analysis of the existing in-flows and needs of the bay and estuary systems below the confluence of the San Antonio and Guadalupe Rivers. SARA's participation included providing funding and other resource support.

6.1 A report based on the SAGES study entitled, "Linking Freshwater Inflows and Marsh Community Dynamics in San Antonio Bay to Whooping Cranes," was published in August 2009. The SAGES research team included academics from Texas A&M University, and was co-funded by FWS, the U.S. Geological Survey, TWDB, Guadalupe-Blanco River Authority ("GBRA"), SAWS, as well as SARA.

6.2 The SAGES study began in 2002 to assess impacts from the former Lower Guadalupe Water Supply Project ("LGWSP"). The SAGES study was initiated to consider whether the water diversion near the GBRA's saltwater barrier below the confluence of the San Antonio and Guadalupe Rivers would affect the bay. The LGWSP was cancelled in 2006, and SAWS discontinued its funding of the SAGES study at that time. SARA and GBRA continued to fund the SAGES study to enlarge the relatively small body of research on the whooping cranes and their wintering grounds below the confluence of the San Antonio and Guadalupe Rivers.

**VII.**
**SARA'S INTERESTS SUPPORTING INTERVENTION**

7.0 On March 10, 2010, The Aransas Project ("TAP") filed its complaint in U.S. District Court in Corpus Christi (the "TAP Complaint"), alleging that TCEQ is violating the Endangered Species Act ("ESA") in managing freshwater uses and flows on the Guadalupe and San Antonio Rivers into the San Antonio Bay estuary. The TAP complaint contains multiple

Case: 10-40610 Document: 005111845389 Page: 12 Date Filed: 07/23/2010

claims for relief. The first claim alleges that TCEQ's regulations governing review and approval of water diversions on the Guadalupe and San Antonio Rivers enable a "take" of the whooping crane without an incidental take permit, in violation of Section 9 of the Endangered Species Act, and the TAP seeks a judicial declaration of TCEQ's obligations under the ESA. TAP Complaint §§ 174-182. The second claim alleges that TCEQ's authorization and implementation of water permits caused the take of whooping cranes, and seeks to enjoin TCEQ from allowing water permit holders and exempt users to divert and consume water from the Guadalupe and San Antonio River Basins. TAP Complaint §§ 183-191. The third claim alleges that TCEQ's approval of water diversions resulted in significant habitat modification in violation of the Endangered Species Act, and seeks to enjoin TCEQ from approving water diversions. TAP Complaint §§ 192-199. The fourth claim alleges that TCEQ's current water permit regulations and practices are likely to cause future takes of the whooping crane in violation of the Endangered Species Act, and seeks to enjoin future use of existing TCEQ water permits and exemptions. TAP Complaint §§ 200-205.

7.1 SARA has a substantial interest (1) in protecting its rights in the San Antonio River Basin as granted by the Texas Legislature, (2) in protecting its ability as Steward of the San Antonio River to manage and implement its ongoing projects, programs and studies designed to exemplify environmental leadership, stewardship and expertise and promote, protect, conserve and enhance the resources of the San Antonio River entrusted to it by the Texas Legislature; (3) in protecting its ability to pursue innovative solutions throughout the development and implementation of future projects, programs, and studies designed to further promote, protect, conserve and enhance those same resources to advance a sustainable environment and serve generations to come; (4) in protecting its existing water entitlements

Case: 10-40610 Document: 00511145389 Page: 13 Date Filed: 07/23/2010

granted by TCEQ for the diversion and use of water in the San Antonio River Basin and the future use of those rights; (5) in maintaining the reliability, quality, and predictability of water sources from the San Antonio River and its tributaries within its statutory service area; and (6) in the orderly implementation of state water planning, taking into account the complex needs of all stakeholders, including current water rights holders, and balancing water use and supply while maintaining natural resources that are critical to the environment and endangered species. Plaintiff's action threatens all of these interests of SARA. Neither the Plaintiff, nor Defendant TCEQ or any of the other Intervenors in this case either share the unique interests and obligations of SARA as they relate to the San Antonio River Basin or have the capability to represent and protect those interests in these proceedings. As creatures of statute, GBRA and SARA are limited to exercising those powers that have been expressly granted by the Legislature, or powers necessarily implied pursuant to the express powers granted. *See Tri-city Freshwater Supply District No. 2 v. Mann, 142 S.W.2d 945-948 (Tex. 1940).* GBRA cannot exercise its powers and duties in the San Antonio River Basin because the Legislature did not confer such authority or duty; therefore GBRA cannot adequately represent the interests of SARA in this case. Accordingly, SARA seeks leave to intervene to protect its interests.

## VIII.
## CONCLUSION & PRAYER

SARA has the requisite standing and interests to intervene in these proceedings either as a matter of right pursuant to Rule 24(a)(2) and, in the alternative, permissively pursuant to Rule 24(b)(1)(b), (2). Accordingly, SARA respectfully requests the Court grant its Motion to Intervene. Should the Court grant this motion, SARA will work cooperatively with the Parties and any other Intervenors in this action so that the Court will not be burdened with duplicative pleadings.


USCA5 1083

Respectfully submitted,

Edmond R. McCarthy, Jr.
Attorney-in-charge
Application for admission *pro hac vice* pending
Texas State Bar No. 13367200
JACKSON, SJOBERG, MCCARTHY & WILSON, LLP
711 West 7th Street
Austin, Texas 78701
Telephone (512) 225-5606
Telecopier (512) 480-8963

s/ David W. Ross
David W. Ross
General Counsel, SARA
Southern District of Texas No. 20294
Texas State Bar No. 17205700
Brown & Ross, P.C.
2008 NW Military Hwy
San Antonio, Texas 78213-2184
Telephone (210) 341-6642
Telecopier (210) 341-6939

**ATTORNEYS FOR THE SAN ANTONIO RIVER AUTHORITY**



USCA5 1084

**VERIFICATION**

STATE OF TEXAS

COUNTY OF BEXAR

Before me, the undersigned notary, on this day personally appeared Suzanne B. Scott, acting in her capacity as General Manager of the San Antonio River Authority, a person whose identity is known to me. After I administered an oath, upon her oath she said "I am the General Manager of the San Antonio River Authority. In my capacity as General Manager, I have read the foregoing San Antonio River Authority's Motion to Intervene and the facts stated therein are within my personal knowledge and are true and correct."

Suzanne B. Scott
General Manager
San Antonio River Authority

SWORN TO AND SUBSCRIBED before me by Suzanne B. Scott, acting in her capacity as General Manager of the San Antonio River Authority, on June 18, 2010.

LUPE SANCHEZ
Notary Public, State of Texas
My Commission Expires
November 14, 2012

Notary Public in and for
the State of Texas



USCA5 1085

Case: 10-40610 Document: 00511184538 Page: 16 Date Filed: 07/23/2010

## CERTIFICATE OF CONFERENCE

I hereby certify that pursuant to L.R. 7.1D, I conferred with counsel for Plaintiff, counsel for Defendants Bryan Shaw, *et al* and Defendant-Intervenors Guadalupe-Blanco River Authority ("GBRA") and Texas Chemical Counsel ("TCC") regarding the relief requested in the San Antonio River Authority's ("SARA") Motion to Intervene on June 18, 2010, and the State Defendants and Defendant-Intervenors GBRA and TCC support intervention by SARA. The Plaintiff opposes this motion. As a result, counsel for SARA and counsel for Plaintiff cannot agree about the disposition of this motion.

Edmond R. McCarthy, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served through the Court's ECF electronic filing system to the known users of the Court's ECF filing system below on this the 18th day of June 2010:

BRIAN E. BERWICK
Assistant Attorney General Office of the Attorney General Environmental Protection Administrative Law Division P.O. Box 12548
Austin, TX 78711-2548

EDWARD F. FERNANDES
Hunton & Williams LLP
111 Congress Avenue, Suite 1800
Austin, TX 78701

KATHY ROBB
Hunton & Williams LLP 200 Park Avenue
New York, NY 10166

THOMAS H. WATKINS
Kenneth Ramirez
Rachel L. Noffke
Brown McCarroll LLP
111 Congress Ave, Suite 1400
Austin, TX 78701

J. MICHAEL KLISE
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004-2595

J.A. "TONY" CANALES 2601 Morgan Avenue P.O. Box 5624
Corpus Christi, TX 78465

JAMES B. BLACKBURN, JR.
Charles Irvine
Mary Carter
Blackburn Carter, P.C.
4709 Austin Street
Houston, TX 77004

DAVID A. KAHNE
Law office of David A. Kahne
P.O. Box 66386
Houston, TX *77266*

CHRISTINA ESPINOSA RODRIGUEZ
Stephan Tipps
Matthew Kurlya
Baker Botts LLP One Shell Plaza 910 Louisiana
Houston, TX 77002

BRUCE WASINGER Guadalupe-Blanco River Authority 933 East Court Street
Seguin, TX 78155

Edmond R. McCarthy, Jr.

Case: 10-40610 Document: 00511184538 Page: 18 Date Filed: 07/23/2010

# SAN ANTONIO RIVER AUTHORITY

**CHAPTER 276, PAGE 556,**

**ACTS OF THE 45TH LEGISLATURE, 1937,**

**AND AS SUBSEQUENTLY AMENDED**

Case: 10-40610 Document: 00511184538 Page: 19 Date Filed: 07/23/2010

# FOREWORD

The organic act of the SAN ANTONIO RIVER AUTHORITY was enacted in 1937 by the 45th Legislature, H. B. No. 726, Chapter 276, Page 556. This Act has been subsequently added to and amended by the following laws: Spec. L., Page 1083, 46th Legislature (1939); Chapter 60, Page 82, 53rd Legislature (1953); Chapter 37, Page 1469, 55th Legislature (1957); Chapter 37, Page 78, 56th Legislature (1959); Chapter 233, Page 466, 57th Legislature (1961); Chapter 836, Page 2488, 61st Legislature (1969); Chapter 301, Page 776; Chapter 604, Page 1893, 64th Legislature (1975); S. B. 741, 67th Legislature (1981) and Chapter 701, Page 5139, 70th Legislature (1987).

The statute has been before the appellate courts in San Antonio River Authority v. Sheppard, 157 Tex. 63, 299, S. W. 2d 920 (1957); City of San Antonio v. Trease, 243 S. W. 2d 187, err. ref. (1951); San Antonio River Authority v. Lewis, 343 S. W. 2d 475; aff. 363 S. W. 2d 444 (1962); and San Antonio River Authority v. Hunt, 405 S. W. 2d 700, ref. n.r.e. (1966).

Revised: February 1, 1990

Reprinted: January 5, 2001

Case: 10-40610 Document: 00511145389 Page: 20 Date Filed: 07/23/2010

**INDEX**


| | | |
|---|---|---|
| Section 1 | Definitions | 2 |
| Section 2 | District Created | 3 |
| Section 2-a | Boundaries of the District | 3 |
| Section 3 | Powers of the District | 3 |
| Section 4-a | Master Plan | 15 |
| Section 6 | District Constabulary | 16 |
| Section 8 | Duties of Certain State Officers | 16 |
| Section 9 | Governing Body of the District; Qualifications of Members of the Board; Vacancies; Term of Office | 16 |
| Section 10 | Election of Directors | 17 |
| Section 11 | Compensation and Expenses of Directors | 18 |
| Section 12 | Removal of Directors and Officers | 18 |
| Section 13 | Organization and Meetings of the Board; Officers; Quorum | 18 |
| Section 14 | Powers of the Board and Executive Committee; Bonds Required | 19 |
| Section 14-a | Audit | 19 |
| Section 15 | Payment of Debts | 20 |
| Section 15-a | Taxation | 20 |
| Section 15-b | Rendition, Assessment, Levying and Collection of Taxes | 22 |
| Section 16 | Issuance of Bonds | 22 |
| Section 17 | Purchase of Bonds by District | 25 |
| Section 17-a | Bonds Legal for Investment and Security | 25 |
| Section 18 | Property of the District | 25 |
| Section 19 | Bonds, Tax Free | 26 |
| Section 20 | Appeal Bond Not Required | 26 |
| Section 21 | Full Authority to Issue Bonds | 26 |
| Section 21-a | Contract with Bexar County | 27 |
| Section 21-b | Pollution Control Districts | 27 |
| Section 22 | Liberal Construction; Conflicts | 31 |
| Section 23 | Domicile | 32 |
| Section 24 | Constitutional Conformity | 32 |
| Section 25 | Severability Clause | 32 |

# SAN ANTONIO RIVER AUTHORITY

Section 1. Definitions. The words and phrases used in this Act shall, unless the same be inconsistent with the context, be construed as follows:

(a) "District" shall mean the San Antonio River Authority.

(b) "Section 59" shall mean Section 59 of Article 16 of the Constitution of Texas, as the same now provides.

(c) "Chapter 25" shall be understood to mean Chapter 25 of the General Laws passed by the Thirty-ninth Legislature of Texas at the Regular Session, which adjourned on March 19, 1925, and where not otherwise provided therein, to include any present or future amendment thereof.

(d) "Board" or "Directors" shall be understood to mean the Board of Directors of this District, or the members thereof in their official capacity.

(e) "Federal" shall mean or relate to the Government of the United States of America, and/or its functions or subsidiary agencies.

(f) "State" shall mean or relate to the Government of the State of Texas, and/or such of its functions and agencies as are appropriate to accomplish the objects of this Act.

(g) "Persons" means and includes an individual, partnership, association, corporation, business trust, legal representative, or receiver or any organized group of persons.

(h) "Professional services" shall mean those services rendered, either individually or by firms, by accountants, attorneys, engineers, surveyors, geologists, physicians, surgeons, laboratory technicians, bond brokers, fiscal advisers, appraisers, statisticians, researchers and by such other vocations, callings, occupations or employments involving labor, skill, education, special knowledge and compensation or profit, but the labor and skill involved therein being predominantly mental or intellectual rather than physical or manual. Amended, H. B. 83, 57th Legislature.

(i) "Flood Plain" shall mean the area of the channel of a river or stream and those portions of land abutting and adjacent to such channel which are reasonably required to carry floodwaters. Added, S. B. 704, 61st Legislature.

(j) "San Antonio River Basin" shall mean all of the area except Bandera, Real and Kerr Counties which has topographic characteristics causing surface

Case: 10-40610 Document: 00511184538 Page: 22 Date Filed: 07/23/2010

waters to flow into the San Antonio River and its tributaries. Added, S. B. 704, 61st Legislature.

Section 2. District Created. Under the authority of, and in pursuance with the policy of, Section 59 of Article 16, of the Constitution of Texas, there is hereby created within the State of Texas, in addition to the Districts into which the State has heretofore been divided, a Conservation and Reclamation District to be known as "SAN ANTONIO RIVER AUTHORITY" (hereinafter called the "District"), which is hereby declared to be a governmental agency, a municipality, body politic and corporate, vested with all the authority and full sovereignty of the State, in behalf of the State, insofar as intended by this Act, and with the authority to exercise the powers, rights, privileges and functions hereinafter specified. The creation of such District is hereby determined to be essential to the accomplishment of the purposes of Section 59 of Article 16 of the Constitution of the State of Texas, including but not limited to the construction, maintenance and operation of navigable canals or waterways, hereinafter authorized, and the control of the waters of those parts of all rivers, streams and tributaries thereof which are within the boundaries of the District as hereinafter defined. Amended, H. B. 83, 57th Legislature.

Section 2-a. Boundaries of the District. The District shall include all of that part of the State of Texas within the boundaries of the Counties of Bexar, Wilson, Karnes and Goliad.

It is hereby found and determined that all of the land included in the District will be benefited by the exercise of the power conferred by this Act. Added, H. B. 83, 57th Legislature.

Section 3. Powers of the District. The District is hereby invested with all of the powers of the State of Texas under Article 16, Section 59, of the Constitution of the State of Texas to effectuate the construction, maintenance and operation of navigable canals or waterways, to effectuate flood control, to effectuate the conservation and use, for all beneficial purposes, of ground, storm, flood and unappropriated flow waters in the District, to effectuate irrigation, to effectuate soil conservation, to effectuate sewage treatment, to effectuate pollution prevention, encourage and develop parks, recreational facilities and to preserve fish, to effectuate forestation and reforestation, and to do all things as are required therefor, subject only to: (i) declarations of policy by the Legislature of the State of Texas as to the use of water; (ii) continuing supervision and control by the State Board of Water Engineers and any board or agency which may thereafter succeed to its duties; (iii) the provisions of Section 4, page 212, Acts of the Thirty-fifth Legislature, 1917, as subsequently amended describing the priorities of uses for water; and (iv) the rights heretofore or hereafter legally acquired in water by municipalities and other users. Subject to the foregoing, it shall be the duty of the District to exercise for the greatest practicable measure of the conservation and beneficial utilization of all ground, storm, flood and unappropriated flow waters of the District, in the manner and for the particular purposes specified hereinafter in this Section 3 and elsewhere in this Act the following powers, rights, privileges and functions, to wit:

(a) Navigation:

(1) To promote, construct, maintain and operate, and/or to make

Case: 10-40610 Document: 005111845389 Page: 23 Date Filed: 07/23/2010

practicable, promote, aid and encourage, the construction, maintenance and operation of navigable canals or waterways and all navigational systems or facilities auxiliary thereto using the natural bed and banks of the San Antonio River to its junction with the Guadalupe River where practicable and thence traversing such route as may be found by the District to be most feasible and practicable to connect with the Intracoastal Canal and/or with any new canal to be constructed and/or with any harbor at or near San Antonio Bay or the Gulf of Mexico, and also using such new correlated artificial waterways, together with all locks and other works, structures and artificial facilities as may be necessary and convenient for the construction, maintenance and operation of said navigable canals or waterways and all navigational systems or facilities auxiliary thereto. The District is empowered to construct, or cause to be constructed, said system of artificial waterways, canals, locks, works and other facilities so as to connect the watershed area of the San Antonio River, including navigation to or at the point near the City of San Antonio, with the Intracoastal Canal and/or with any new canal to be constructed and/or with any harbor at or near San Antonio Bay or the Gulf of Mexico;

(2) To control, develop, store and use the natural flow and floodwaters of the San Antonio River and its tributaries for the purpose of operating and maintaining said navigable canals or waterways and all navigational systems or facilities auxiliary thereto, provided, however, that such navigational use shall be subordinate to consumptive use of water, and navigation shall be incidental thereto;

(3) In the case of the construction of said navigable canals or waterways and all navigational systems or facilities auxiliary thereto by the Federal Government or otherwise, the District shall have the power to construct, maintain and operate lateral connecting canals and turning basins to serve local needs, and shall also have the power to provide, construct, acquire, purchase, take over, lease from others, lease to others, and to maintain and operate, develop, regulate and/or by franchise control wharves, docks, warehouses, grain elevators, bunkering facilities, belt or terminal railroads, floating plants, lighterage, towing facilities, and all other facilities incident to or in aid of the efficient operation and development of said canals or waterways and all navigational systems or facilities auxiliary thereto, and any ports incident thereto, whether the same be upon land or upon water;

(4) In the event the construction and/or maintenance and operation of said navigable canals or waterways and all navigational systems or facilities auxiliary thereto is taken over by the Federal Government or any agency of the Federal Government, then and in such event the District shall be fully authorized to make and enter into any such contracts as may be lawfully required by the Federal Government, including such assignments and transfers of property and rights of property and easements

Case: 10-40610 Document: 005111845389 Page: 24 Date Filed: 07/23/2010

and privileges and any and all other lawful things and acts may be necessary and required in order to meet the requirements of the Federal Government or any agency of the Federal Government in taking over the construction and/or maintenance and operation of said navigable canals or waterways and all navigational systems or facilities auxiliary thereto;

(5) The District may grant a franchise or right to any person or body politic or corporate for the use of said navigable canals or waterways and all navigational systems or facilities auxiliary thereto or any facility thereof in aiding navigation and no person or body politic or corporate may provide, maintain or operate any facility of aid of navigation in any way connected with said navigable canals or waterways and all navigational systems or facilities auxiliary thereto and intended for use by the public within the meaning and intent of this Act, except by and under the franchise granted by this District, in the form of an ordinance as provided by this Act, which franchise may be for any term not to exceed fifty (50) years. Such ordinance granting franchise may contain provisions for the payment of reasonable fees, and/or other charges to be paid to the District, and shall contain provisions adequate to regulate the fees, tolls, rates or exactions to be demanded for the use of, or service to be rendered by any means or facility to be provided or operated under any such franchise, to the end that the same will be uniform, reasonable, and without discrimination against any person, both as to charges and the conditions of use or service, and such ordinance shall contain all provisions reasonably required to procure service adequate to serve the public necessity and convenience. The District may grant a franchise for the design, construction, repair, enlargement, alteration, maintenance, operation of, and service from, or use of any facility to be provided for use in aid of navigation on said navigable canals or water ways and all navigational systems or facilities auxiliary thereto, whether upon land, or in or upon water. The right hereby granted shall include the right to require uniform and adequate analytic accounting systems and forms, periodic verified reports based thereon, and the right of audit by the District, and other reasonable regulations designed to protect the public. In order to procure observance of the conditions of the franchise granted hereunder, and/or compliance with the rules and regulations established by ordinance of the District (to be adopted and promulgated as elsewhere is provided in this Act) hereunder, such ordinance may provide reasonable and commensurate penalties fixed by General Law in Texas, and not to exceed the limit for penalties as fixed elsewhere in this Act. The forfeiture or suspension of a franchise granted under this Act, where not otherwise provided in any such franchise, may be only because of discrimination in rendering service, affording use, or in taking or demanding a toll, rate or charge. Forfeiture or suspension of a franchise granted hereunder, unless otherwise provided therein, shall be upon a decree of a District Court within the County in which this District may maintain its general office.



USCA5 1094

Case: 10-40610 Document: 005111845389 Page: 25 Date Filed: 07/23/2010

The District may likewise by ordinance establish rules necessary or designed to protect the physical property owned by it, or physical property owned or operated by another under a franchise hereunder granted, and/or to effect the safety or efficient use of the same, and in such ordinance may provide reasonable and commensurate penalties for the violation thereof, which penalties shall be cumulative of other penalties provided by the General Law of Texas, and not to exceed the limit for penalties as fixed elsewhere in this Act;

(b) Flood Control and Flood Plain Management:

To prevent and aid in the prevention of damage to persons and property by the overflow of any and all rivers, streams or tributaries thereof within the District including the study and designation of flood plains and the regulation thereof;

(c) Water Conservation, Storage, Procurement, Distribution and Supply:

(1) To store and conserve to the greatest beneficial use the storm, flood and unappropriated flow waters of any and all rivers, streams or the tributaries thereof within the District, so as to prevent the escape of any water without maximum beneficial use either within or without the District;

(2) For the conservation of water for uses either within or without the District, including providing water supply for cities and towns, and the right to sell water and stand-by service to any person, firm, or corporation, including cities and towns and other public agencies within or without the District; provided that it is the intent of this Act to establish a District that is concerned primarily with the conservation, control, storage, distribution and sale of water in bulk quantities in the public interest and only incidentally with the retail sale of water insofar as it does not compete with municipal water distributors and then only when necessary or convenient as a service to the public;

(3) To acquire water appropriation permits either within or without the District directly from the State Board of Water Engineers or to purchase or otherwise acquire such permits or certified filings either within or without the District from the owners thereof;

(4) To purchase water, water supply facilities on conservation storage capacity either within or without the District from any person, firm, corporation, State agency or other public agency, or from the United States or its agencies;

(5) To execute water supply contracts with users of water within or without the District. Included in the services for which the District may

Case: 10-40610 Document: 00511184538 Page: 26 Date Filed: 07/23/2010

(6) To provide water for the development of commercial and industrial enterprises within or without the District;

(7) To bring water into the boundaries of the District;

(8) To construct, acquire, equip, to acquire storage rights at, and operate and maintain dams and reservoirs, either within or without the District, and in carrying out the powers conferred upon the District, or to exercise such powers in conjunction with others;

(9) To construct, operate and maintain or otherwise provide water supply lines, water purification and water pumping systems and facilities either within or without the District;

(10) Power to execute contracts with municipalities and others involving the construction of reservoirs, dams, water supply lines, water purification and pumping facilities, and the furnishing of water supply service substantially in the manner prescribed by Chapter 342, Acts of the Regular Session of the Fifty-first Legislature, for Districts organized and created pursuant to Article 16, Section 59, of the Constitution, extended so as to permit such contracts with individuals, partnerships, and all classes of corporations, and to permit the inclusion of provisions for the operation, maintenance and ownership of such properties, but the powers granted the District in this Subsection are not to be considered a limitation on the powers, rights, privileges and functions otherwise granted herein;

(11) To acquire from the United States Government, through the Secretary of the Army or the Secretary of the Interior or any other of its officials authorized to make such contracts, or from the State of Texas, or any agency thereof, or from any privately financed reservoirs, unsold conservation storage capacity at any dam within or without the District now constructed or to be constructed either by or with the assistance of the United States Government or the State of Texas, or by both. It may acquire additional conservation storage capacity which may be provided at any such dam;

(d) Irrigation:

To provide water for irrigation of lands within and without the District, and incident thereto, to construct, operate and maintain supply lines and pumping systems and facilities either within or without the District;

(e) Soil Conservation:

Case: 10-40610 Document: 00511184538 Page: 27 Date Filed: 07/23/2010

For the conservation of soils and other surface resources within the District against destructive erosion, thereby preventing the increased flood menace incident thereto, and for the prevention of sedimentation and siltation of lands, channels and reservoirs, including the right either to act as local sponsoring agent of upstream soil and water conservation and flood prevention projects authorized by State or Federal Agencies in conjunction with Soil Conservation Districts or to aid and supplement the work of such upstream soil and water conservation and flood prevention projects, all in furtherance of the "Master Plan" as defined in Section 4-1. In connection therewith, the District is authorized to make arrangements satisfactory to the Secretary of Agriculture of the United States for defraying costs of operating and maintaining such projects, in accordance with regulations presented by the Secretary of Agriculture; provided, however, that any portion of the total construction cost of any such project which is allocable to flood control and/or soil conservation shall be paid for or financed by funds which have their source in the county in which each particular project is situated and which funds may be of any kind or character, except taxes collected in accordance with the provisions of Sections 15-a and 15-b of this Act;

(f) Sewage Treatment and Solid Waste Disposal:

As a necessary aid to the conservation, control, preservation, purification and distribution of surface and ground waters within the District, the District shall have the power to construct, own, operate, maintain or otherwise provide, within the San Antonio River Basin, sewage gathering, treatment and/or disposal services, including solid waste disposal services, to charge for such services, and to make contracts in reference thereto with counties, municipalities and others. Provided, however, that the District shall not exercise the powers hereinabove granted by this Section 3(f) within the boundaries of Kerr, Real, or Bandera Counties unless the Commissioners Court of such county or counties shall first have consented by a majority vote thereof to the exercise of such power within such county or counties;

(g) Pollution Prevention:

To provide for the study, correcting and control of both artificial and natural pollution including organic, inorganic and thermal, of all ground or surface water within the San Antonio River Basin. In this connection, the District is given the power by ordinance to promulgate rules and regulations with regard to such pollution, both artificial and natural, with the right of policing by said District to enforce such rules and regulations and of providing reasonable and commensurate penalties for the violation of any rules and regulations, which penalties shall be cumulative of any penalties fixed by General Law in Texas, and not to exceed the limit for penalties as fixed elsewhere in this Act. Provided, however, that no ordinance enacted pursuant to the powers hereinabove given the District by this Section 3(g) shall be promulgated in any county or counties outside the existing

Case: 10-40610 Document: 00511184538 Page: 28 Date Filed: 07/23/2010

boundaries of the District;

(h) Parks, Recreational Facilities and Preservation of Fish:

For the encouragement and development of parks, recreational facilities and the preservation of fish, the District shall have the power to acquire additional land adjoining any permanent work of improvement constructed within the District for the purpose of developing parks, or recreational facilities. The District may negotiate contracts with any county, municipality, municipal corporation, person, firm, corporation, non-profit organization, or State or Federal agency for the operation and/or maintenance of any such park, or recreational facility. The preservation of fish shall be in accordance with rules and regulations, if any, prescribed by the Game and Fish Commission of the State of Texas;

(i) Forestation and Reforestation:

To forest and reforest and to aid in foresting and reforesting of all areas within the District;

(j) Contractual:

To make contracts and to execute instruments necessary or convenient to the exercise of the powers, rights, privileges and functions conferred upon it by this Act, with the United States, its agencies, counties, cities, all municipal corporations, political subdivisions and districts, and with private persons, partnerships, associations and corporations. The District shall make and execute such contracts and instruments in accordance with the following procedures:

(1) Concerning any wholesale contract for the sale, purchase, procurement, distribution and/or supply of water or conservation storage capacity, or for the construction of a navigable canal or waterway, or any contract authorized by Section 1, Chapter 84, Page 140, Acts of the 52nd Legislature, 1951, as subsequently amended, (now codified as Article 6702-1, Vernon's Civil Statutes of Texas), the Manager shall cause a notice describing the general nature of such contract to be published once each week for three (3) consecutive weeks in a newspaper of general circulation in each county in the District within which such contract is to have effect. Such contract may be considered and acted upon at the regular meeting of the Board next following the last date of publication or, without further notice, at any meeting thereafter. The affirmative vote of at least seven (7) members of the Board shall be required for the approval of confirmation or ratification of any such contract. Of those seven (7) affirmative votes, at least three (3) affirmative votes shall be cast by Board members from Bexar County, at least one (1) affirmative vote shall be cast by a Board member from Wilson County, at least one (1) affirmative vote shall be cast by a Board member from Karnes County, and at least one (1)

Case: 10-40610 Document: 00511184538 Page: 29 Date Filed: 07/23/2010

affirmative vote shall be cast by a Board member from Goliad County. The District may use any such contract as the sole basis, or as a supplement to the basis, for securing its bonds;

(2) Concerning any construction, maintenance, operation or repair contract, contract for the purchase of material, equipment or supplies or any contract for services other than professional services, if the contract will require an estimated expenditure of more than the maximum amount for which competitive bidding is required by statute for any political subdivision of the state or if the contract is for a term of two (2) years or more, the Board, upon the affirmative vote of a majority of a quorum present at any regular or special meeting, shall award such contract to the lowest and best bidder after publication of a notice to bidders once each week for three (3) consecutive weeks. The Board by bylaw shall promulgate the procedures for the publication of notice to bidders and related procedures and may, within the limitations set forth in this section, from time to time prescribe the amount of estimated expenditures to be subjected to competitive bidding. In the event of an emergency, the Authority may let such contracts as are necessary to protect and preserve the public health and welfare or the properties of the authority, without such bidding procedures. Members of the Board of Directors shall be ineligible to submit such bids. Any provision of this Subsection to the contrary notwithstanding, the District may purchase surplus property from the United States by negotiated contract and without the necessity of advertising for bids.

(k) General:

(1) This District hereby is vested with such title and right of control as the State has, or may have, in, to and concerning the natural bed and banks of the San Antonio River in its entire length, and all of its tributaries as are within the District, as said District is defined in Section 2-a of this Act, and the District hereby is further vested with such title and right of control as the State has, or may have, in, to and concerning the natural bed and banks of any other navigable stream or tributary thereof as may be situated within the District, as said District is defined in Section 2-a of this Act; which investment, however, shall be in trust, and to authorize said District to make such uses, and/or disposition of such lands and rights (and the proceeds, income, revenues, or trading values thereof) as in actual experience may prove to be reasonably required for, or in aid of, the accomplishment of the purposes of this Act;

(2) To make preliminary investigations and surveys in the manner and for the purposes specified in said Chapter 25 (either independently at its own cost, or jointly with others, or to contribute to the cost thereof when done by another), whereby to procure cooperation by the Government of

Case: 10-40610 Document: 00511184538 Page: 30 Date Filed: 07/23/2010

the United States of America, to the end that any project lawfully within the purposes of this Act may be approved for construction as a Federal project under such contractual terms and conditions as may be demanded by the Federal Congress;

(3) To expend all sums reasonably deemed to be necessary or expedient for seeking cooperation in accomplishing the objects of this Act from the Federal Government, and/or any and all other persons, creatures, or entities, whether natural, or creatures of law or contract;

(4) Subject to the provisions of this Act from time to time to sell or otherwise dispose of any property of any kind, real, personal, or mixed, or any interest therein, which shall not be necessary to the carrying on of the business of the District;

(5) To overflow and inundate any public lands and public property and to require the relocation of roads and highways in manner and to the extent permitted to districts organized under General Laws pursuant to Section 59 of Article 16 of the Constitution of the State of Texas. In the event that the District, in the exercise of the power of eminent domain or power of relocation, or any other power granted hereunder, makes necessary the relocation, raising, rerouting or changing the grade of, or altering the construction of any railroad, or street railway, all such necessary relocation, raising, rerouting, changing of grade or alteration of construction shall be accomplished at the sole expense of the District;

(6) To construct, extend, improve, maintain and reconstruct, to cause to be constructed, extended, improved, maintained, and reconstructed, and to use and operate, any and all facilities of any kind necessary or convenient to the exercise of such powers, rights, privileges, and functions;

(7) To sue and to be sued in its corporate name;

(8) To adopt, use, and alter a corporate seal;

(9) To adopt and to amend its bylaws for the management of its affairs;

(10) To appoint officers, agents, employees and professional consultants, none of whom shall have any interest, direct or indirect, in any contracts awarded by the District;

(11) To prescribe the duties and fix the compensation of all officers, agents, employees and professional consultants;

(12) To acquire by purchase, lease, gift, or in any other lawful manner and to maintain, use, and operate any and all property of any kind, real,

Case: 10-40610 Document: 00511845389 Page: 31 Date Filed: 07/23/2010

personal or mixed, or any interest therein, within and without the boundaries of the District, necessary or convenient to the exercise of the powers, rights, privileges and functions conferred upon it by this Act, in the manner provided by general law with respect to condemnation or, at the option of the District, in the manner provided by the statutes relative to condemnation by Districts organized under general law pursuant to Section 59 of Article 16 of the Constitution of the State of Texas;

(13) To condemn lands used or dedicated for cemetery purposes in the manner provided by the General Law of Texas where reasonably necessary to effectuate the powers, rights, privileges and functions of the District, provided, however, that, when such power of condemnation is sought to be exercised with respect to any Perpetual Care cemetery, as defined in Article 912a, Vernon's Civil Statutes of the State of Texas, as to the condemnation of any such Perpetual Care cemetery or portion thereof, jurisdiction is hereby conferred for such purpose on the District Court or Courts of the county in which such cemetery land or any part thereof may be located, and such condemnation action shall likewise involve the issue of the removal of the dedication thereof as such Perpetual Care cemetery and the issue of the necessity for such taking;

(14) To borrow money for its corporate purposes and to execute proper notes or other evidences of indebtedness, and without limitation of the generality of the foregoing, to borrow money and accept grants from the United States of America, and in connection with any such loan or grant, to enter into such agreements as the United States of America or such corporation or agency may require; and to make and issue its negotiable bonds for moneys borrowed in this manner and to the extent provided in Section 16. Nothing in this Act shall authorize the issuance of any bonds, notes, or other evidences of indebtedness of the District, except as specifically provided in this Act, and no issuance of bonds, notes, or other evidences of indebtedness, except as specifically provided in this Act, shall ever be authorized except by an Act of the Legislature;

(15) To obtain loans from and accept grants from the United States and its agencies, and from the State of Texas, and its agencies, and it shall have the right to participate in and be the beneficiary of any plan which may be evolved by the State or Federal Government for guaranteeing or otherwise subsidizing the obligations of the District;

(16) The District shall have the power to adopt and promulgate by ordinance all reasonable rules and regulations for purposes elsewhere provided in this Act and generally to secure and protect any and all of its property and any and all of its works of improvement, and to regulate residence, hunting, fishing, boating and camping, and all recreational and business privileges on any navigable river of the District, or any reservoir



USCA5 1101

Case: 10-40610 Document: 44 Page: 274 Date Filed: 07/23/2010

of the District, or upon any land owned by the District. The District may prescribe reasonable and commensurate penalties for the violation of any and all such rules and regulations of the District, which penalties shall be cumulative of any penalties fixed by the General Law in Texas and shall not exceed fines of more than Two Hundred Dollars ($200), or imprisonment for not more than one hundred eighty (180) days, or may provide for both such fine and imprisonment. No rule or regulation which provides a penalty for the violation thereof shall be in effect, as to enforcement of the penalty, until five (5) days next after the District may have caused a substantive statement of the particular rule or regulation and the penalty for the violation thereof to be published once a week for three (3) consecutive weeks in a newspaper of general circulation in each county in which it is to be effective. The substantive statement so to be published shall be as condensed as is possible to afford an intelligent direction of the mind to the act forbidden by the rule or regulation; one (1) notice may embrace any number of regulations; there must be embraced in the notice advice that breach of the particular regulation, or regulations, will subject the violator to the infliction of a penalty and there also shall be included in the notice advice that the full text of the regulations sought to be enforced is on file in the principal office of the District, where the same may be read by any interested person. Five (5) days after the third publication of the notice hereby required, the advertised regulation shall be in effect, and ignorance of any such regulation shall not constitute a defense to a prosecution for the enforcement of a penalty and, the rules and regulations authorized hereby, after the required publication, shall judicially be known to the courts and shall be considered of a nature like unto that of valid penal ordinance of a city of the State. The District shall be primarily liable for any court costs incurred hereunder, and the cost to maintain any offender committed for imprisonment hereunder. Any fine imposed in any such proceeding and paid in money shall be payable to this District and applied as its Board may direct;

(17) To designate an official newspaper of the District in each county in the District, each of which newspapers shall be a newspaper having general circulation in the county in which it is situated;

(18) To acquire such rights-of-way as are necessary to construct, operate and maintain such roads as are necessary for ingress and egress to any work of improvement or to any park, recreational facility, or fish or wildlife preserve or reserve;

(19) To grant concessions and franchises upon the premises of any works of improvement or any park, recreational facility or fish or wildlife preserve or reserve to any person or corporation;

Case: 10-40610 Document: 005111845389 Page: 33 Date Filed: 07/23/2010

(20) When germane to the accomplishment and the purposes of this Act, and not otherwise adequately provided by Chapter 25, or provided elsewhere in this Act, the Directors of the District shall have the power to adopt and promulgate ordinances, which may be done by a majority (except as specifically provided elsewhere in this Act) of those Directors present at any meeting held in compliance with the provisions of the bylaws at which there must be present a majority of the Board, constituting a quorum. No notice shall be required before the passage of such ordinance, except such notices of special or regular meetings of the Board as may be provided elsewhere in this Act. After having adopted such ordinances, the Directors shall cause the same to be filed and recorded in the official records of the Authority. The Directors may, if they deem necessary and proper, in addition to filing and recording same in the official records of the Authority, either cause certified copies of same to be forthwith filed of record in the Office of the County Clerk of each county situated in whole or in part within the District within which such ordinance is intended to have application and/or to be published once or more each week for three (3) or more consecutive weeks in a newspaper or newspapers of general circulation in each county within the District within which such ordinance is intended to have application, following either or all of which methods of recording and/or publication the ordinance shall be in full force and effect; and thereafter all courts and persons shall be held to have knowledge thereof, just as though the same had been embraced in the body of this Act and the County Clerk in any county is authorized and directed to file and record all certified copies of such county and to charge therefore the same fees as is provided for recording deeds of conveyance. And the powers of said District to adopt ordinances shall include, among other things as follows: in any case in which said Chapter 25 does not provide a specific power or right germane to, or appropriate, or adequate to accomplish an object of this Act, and such specific power has been, or hereafter may, conferred by law on Counties, Cities, Water Improvement Districts, Water Control and Improvement Districts, Drainage Districts, Navigation Districts, Canal Corporations, Channel or Dock Corporations, Deep Water Corporations, Railway Corporations, Terminal Railway Corporations, Telegraph and Telephone Corporations, or other like creatures of the law, then to the intent required to make adequate hereto the powers and rights of this District, it may by ordinance adopt and have as part of the law for its being so much of the power and right of any of the herein designated creatures of the law as will enable it effectively to accomplish that purpose of this Act. The adoption of a power or mode of procedure hereunder shall not be held to include any incidental limitation which would impede the lawful accomplishment of the purposes of this Act. As to this, there shall be no limit hereof save such as would violate the provisions of the Constitution of the United States of the State of Texas concerning the rights of others;

Case: 10-40610 Document: 00511184538 Page: 34 Date Filed: 07/23/2010

(21) This District shall have all such powers and rights, and regulations for government and procedure, as are contained in said Chapter 25, which shall be cumulative of those provided by this Act, and those rules for procedures which may be provided by ordinances adopted by the District under other provisions of this Act. Amended and added to, H. B. 83, 57th Legislature; S. B. 704, 61st Legislature, and S. B. 741, 67th Legislature.

Section 4. Repealed, H. B. 83, 57th Legislature.

Section 4-a. Master Plan. It shall be the duty of the District to prepare a master plan for the maximum development of the soil and water resources of the entire District, including plans for the complete utilization, for all economically beneficial purposes, of the water resources of the District. The master plan shall be filed with and approved by the State Board of Water Engineers. The master plan may be amended or supplemented from time to time by the District, provided that a copy of such amendment or supplement to the master plan shall be filed with and approved by the State Board of Water Engineers. The first master plan, as amended or supplemented, shall be effective for a period of ten (10) years, as computed from the date of its approval by the State Board of Water Engineers. Upon the expiration of each ten (10) year period, the District shall revise its master plan and a copy of said revised master plan shall be filed with and approved by the State Board of Water Engineers. Prior to the adoption of the master plan, or any amendment or supplement thereto or revision thereof, the Board of Directors shall give notice to the public that it proposes to adopt such master plan, or any amendment or supplement thereto or revision thereof, by causing a notice describing its general nature to be published once each week for three (3) consecutive weeks in a newspaper of general circulation in each county in the District. In addition to such publication, a copy of such notice shall be transmitted by the Manager of the District, by registered or certified mail, to the County Judge of each county within the District, to the Mayor of each incorporated municipality within the District, to the Manager or presiding Director of every water district within the District which has registered with the State Board of Water Engineers under Chapter 62, p. 237, Act of the 54th Legislature, Regular Session, 1955, as subsequently amended, such notice to be mailed not less than twenty (20) days before the regular meeting at which the master plan, or any amendment or supplement thereto or revision thereof, is to be considered for the first time. Such master plan, or any amendment or supplement thereto or revision thereof, may be considered and approved at the regular meeting of the Board next following the last date of publication or, without further notice, at any regular meeting thereafter. The affirmative vote of at least seven (7) members of the Board shall be required for the approval of said master plan, or any amendment or supplement thereto or revision thereof. Of those seven (7) affirmative votes, at least four (4) affirmative votes shall be cast by Board members from Bexar County, at least one (1) affirmative vote shall be cast by a Board member from Wilson County, at least one (1) affirmative vote shall be cast by a Board member from Karnes County, and at least one (1) affirmative vote shall be cast by a Board member from Goliad County. After the master plan shall have been filed with the State Board of Water Engineers, the plan of any water development proposal within the entire District not now or hereafter exempted by law from the requirement for procuring a permit shall be submitted to the State Board of Water Engineers, and a copy thereof shall be furnished to the District at its principal office by the party proposing the development, who shall notify the

Board of Water Engineers of compliance with this provision. The District shall make its recommendations in reference to the proposed development to the State Board of Water Engineers within sixty days (60) after receipt of a copy of such water development plan. The State Board of Water Engineers shall hold a hearing at which the proponents of the proposed water development plan and the District shall have an opportunity to present their evidence and recommendations to the State Board of Water Engineers. The State Board of Water Engineers shall approve or disapprove such proposed water development plan notwithstanding any provision of the District's master plan in accordance with the provisions of Chapter 1, Title 128, Revised Civil Statutes of Texas, as amended. Said master plan, and all amendments or supplements thereto or revisions thereof, shall be prepared so as to effectuate Chapter 128, Sections 4 and 5, p. 21, Acts of the 42nd Legislature, 1931, and Chapter 11, p. 23, Acts of the 55th Legislature, First Called Session, 1957, and the rules and regulations of the State Board of Water Engineers. Added, H. B. 83, 57th Legislature.

Section 5. Repealed, H. B. 83, 57th Legislature.

Section 6. District Constabulary. In order to accomplish the objects of this Act, this District may constitute and maintain its own independent constabulary under oath and bond, insofar as is applicable, conditioned as is provided for a sheriff of a county, who shall be charged with the duty to police the District's property and its controlled facilities, with power to make arrests to prevent injury to such properties or other such offense or violation of any penal ordinance of the District, and, upon complaint or indictment lawfully had thereon, to make arrests either within or beyond the boundaries of the District.

Section 7. Repealed, H. B. 83, 57th Legislature.

Section 8. Duties of Certain State Officers. The State Board of Water Engineers and the Reclamation Engineer of Texas shall be under duty to cooperate with this District in the making of investigations and plans and the approval of plans for improvements to be provided by this District. Such plans, however, shall be subject to approval by them when appropriate under the General Laws of Texas; provided, only, that where the Federal Government shall have adopted a plan for improvements, the same, as to all matters save the use of water already under permit from the State, shall control.

Section 9. Governing Body of the District; Qualifications of Members of the Board; Vacancies; Term of Office. The government and control of the District shall be vested in a Board of Directors consisting of twelve (12) members, six (6) of whom shall be elected from Bexar County, two (2) of whom shall be elected from Wilson County, two (2) of whom shall be elected from Karnes County, and two (2) of whom shall be elected from Goliad County. Each director shall serve for a term of six (6) years, and shall hold office until his successor has been elected and has qualified by taking the oath of office. Before entering upon the duties of his office, each member of the Board shall take the Constitutional Oath of Office and the same shall be filed in written form with the Secretary of the Board. Vacancies occurring on the Board from any county shall be filled by appointment by the Governor of the State, with the advice and consent of the Senate, for such unexpired term. Any person over the age of twenty-one (21) years, residing within the District and within the county from which he is elected or appointed

Case: 10-40610 Document: 00511184538 Page: 36 Date Filed: 07/23/2010

and possessing the qualifications of a juror shall be eligible to be elected or appointed and to serve as a director. Amended, H. B. 83, 57th Legislature; and S. B. 741, 67th Legislature.

Sec. 10. Election of Directors. All elections within the District shall be carried out in accordance with rules set forth in the bylaws and the Election Code, and the results of all elections shall be canvassed by the Board of Directors of the District at the regular meeting next following each biennial election. All elections shall be held on the third Saturday in January of each odd-numbered year and at the polling places designated by the Board of Directors of the District. The terms of office of Directors elected at each election after the said first election shall commence on the first day of February following their election. In all elections the following rules shall apply:

(a) Those persons seeking to have their names placed on the official ballot shall make application to the Secretary of the Board in accordance with rules prescribed by the Board either in the ordinance calling the election or in the bylaws.

(b) The Secretary of the Board shall make the official ballot for each county from the names of candidates who have filed applications, and the placing of the names of the candidates on the ballots shall be determined by lot. The drawing of lots for the placing of the names of the candidates on the ballots shall be by the Secretary of the Board, and all candidates, or their designated representatives, may be present at such drawing.

(c) The Directors from Wilson, Karnes and Goliad Counties shall be elected at large from each county. Four (4) Directors from Bexar County shall be elected from single-member districts and two (2) Directors shall be elected at large. The four (4) single-member districts shall be coterminous with and bear the same number as the Bexar County Commissioners Precincts. A candidate for a single-member district position must live in the district the candidate seeks to represent.

(d) The candidates receiving the greatest number of votes, that is a plurality, shall be declared elected. Should there be a tie in the votes received, the winner of the election shall be determined by the majority of the Board. The two (2) at-large Directors of Bexar County shall be elected simultaneously by plurality, and the two (2) candidates receiving the greatest number of votes shall be declared elected.

(e) Directors of the District serving from single-member districts at the time new single-member districts are adopted shall serve for the remainder of the terms to which they were elected regardless of the redistricting.

The residency requirements of Subsection (c), Section 10, Chapter 276, Acts of the 45th Legislature, Regular Session, 1937, as amended by this Act, do not apply to persons serving as directors when this Act takes effect or to candidates for District 2 at the 1989 election or to candidates for District 4 at the 1991 election.

The directors for Bexar County elected in l989, l991, and l993 shall be elected as follows:

(a) Election of directors for District l and 2 in January, l989;

(b) Election of directors by District 3 and 4 in January, l99l; and

(c) Election of directors for the two at-large positions in January l993. Amended, H. B. 83, 57th Legislature; S. B. 704, 61st Legislature; S. B. 741, 67th Legislature; and S.B. 1437, 70th Legislature.

Section 11. Compensation and Expenses of Directors. The Directors of the District shall be entitled to the compensation and allowances established by general law for each day of official service, whether sitting as a Board or serving on a committee of the Board, and in addition thereto shall be entitled to reimbursement for all expenses necessarily incurred by reason of such service. A meeting shall be deemed a day of service, provided that no charge shall be made for more than one meeting held on any one day, and no Director shall be paid per diem in excess of one hundred and fifty (150) days in any one fiscal year, exclusive of reimbursement for expenses, as compensation for service rendered as a Director and as a member of a committee. Amended, H. B. 83, 57th Legislature S. B. 741, 67th Legislature; and S.B. 1437, 70th Legislature.

Section 12. Removal of Directors and Officers. Any Director or Officer shall be subject to removal or suspension from office by the affirmative vote of eight (8) Directors for incompetency, official misconduct, official gross negligence, habitual drunkenness or for inattendance at six (6) consecutive regular meetings of the Board; provided, that no Director or Officer shall be removed or suspended from office until charges in writing are filed against him and he is given the opportunity of a fair hearing before the Board of Directors. Amended, H. B. 83, 57th Legislature.

Section 13. Organization and Meetings of the Board; Officers; Quorum. At the first regular meeting of the Board held in the month of February of each odd-numbered year, there shall be appointed by a majority vote of the Board of Directors from its membership a Chairman, a Vice-Chairman, a Secretary and a Treasurer, and, if deemed proper, an Assistant Secretary and an Assistant Treasurer, who need not be members of the Board of Directors and who may be granted limited powers in the bylaws. The officers so appointed shall serve for a term of two (2) years and until their successors have been appointed, except that the Assistant Secretary and the Assistant Treasurer, if such officers are appointed, shall hold office at the pleasure of the Board. A quorum at all meetings of the Board of Directors shall consist of not less than seven (7) members. A quorum at all meetings of the Executive Committee shall consist of not less than three (3) members. Regular and special meetings of the Board of Directors shall be held as provided by the bylaws and notice of such meetings shall be given as required by the bylaws. The Board shall meet periodically with the Texas Water Commission. All meetings of the Board shall be open to the public. Amended, H. B. 83, 57th Legislature and S.B. 1437, 70th Legislature.

Case: 10-40610 Document: 00511184538 Page: 38 Date Filed: 07/23/2010

<u>Section 14.</u> <u>Powers of the Board and Executive Committee; Bonds Required.</u> The Board of Directors shall be responsible for the management and control of all affairs of the District. In connection therewith, the Board of Directors shall have the power:

(a) To exercise all the powers, rights, privileges and functions conferred by law upon the District.

(b) To adopt all such bylaws as are not inconsistent with the law. The bylaws may provide for the designation by the Board of an Executive Committee of five (5) members upon whom the District's Manager may call for policy decisions and advice concerning matters which arise between meetings of the Board and which may authorize, on behalf of the District, the execution of any contract involving the expenditure of an amount no greater than Twenty Thousand Dollars ($20,000).

(c) To appoint and fix the salary of a Manager, who shall be the chief executive officer of the District. The Manager shall employ and supervise, subject to policies promulgated by the Board, all employees, agents, accountants, attorneys, engineers and others rendering professional services necessary and required to accomplish the purposes of this Act. The Manager may execute, on behalf of the District, without specific authorization of the Board, any contract not subject to competitive bidding. The Manager may execute on behalf of the District and with specific authorization of the Board, any other contract.

Except as specifically provided elsewhere in this Act, all the powers, rights, privileges and functions of the District may be exercised by a majority of those Directors present at any meeting of the Board (or of the Executive Committee if the sum involved is no greater than Twenty Thousand Dollars [$20,000]) held in compliance with the provisions of the bylaws at which meeting there must be present a majority of the Board (or of the Executive Committee), constituting a quorum.

Said Board of Directors shall have all such additional powers as may be conferred on this District by the other provisions of this Act and said Chapter 25, and of said Article 16, Section 59, of the Constitution of the State of Texas; provided, however, that members of the Board shall be ineligible to engage in any transaction for gain or profit with the District.

The Directors and all Officers of the District who are not Directors shall, within fifteen (15) days after their election or appointment, file a good and sufficient bond with the Secretary of the Board; the official bond of each Director and Officer shall be in the sum of Five Thousand Dollars ($5,000), shall be payable to the District, shall be conditioned upon the faithful performance of their duties as such Directors or Officers, and shall be subject to approval by the Secretary of the Board. Amended, H. B. 83, 57th Legislature and H. B. 741, 67th Legislature.

<u>Section 14-a.</u> <u>Audit.</u> A complete system of accounts shall be kept by the District in accordance with generally accepted principles of accounting. The State Auditor shall annually audit the books and accounts of the District in such manner as to enable him to report to the

Case: 10-40610 Document: 44 Page: 281 Date Filed: 07/23/2010

Legislature as to the manner and purpose of the expenditure of all funds of the District. Such audit shall cover the fiscal year from July the first to June the thirtieth, and a report thereof shall be made before the first day of January each year, a copy of which shall be filed with the Governor of Texas, the Lieutenant Governor of Texas, the Attorney General of Texas, the Speaker of the House of Representatives, the County Judge of each county included in the District and with each State Senator and Member of the House of Representatives of each county within the District. The State Auditor, after completing such report, shall prepare a detailed statement showing the actual cost of such audit and shall certify such statement to the Governor of the State of Texas for his approval; and such statement, when approved by the Governor, shall be delivered to the Manager of the District, and the District shall forthwith deposit such sum of money with the State Treasurer, which sum shall be placed in the General Fund of the State of Texas. Nothing herein shall prohibit the District from employing the professional services of an independent Certified Public Accountant or firm of Certified Public Accountants for any purpose. All books, accounts, contracts, records, papers and archives of the District shall be kept and maintained at the District's general office and shall be open to public inspection at all reasonable times. Amended, H. B. 83, 57th Legislature.

Section 15. Payment of Debts. Any and every indebtedness, liability, or obligation of the District, for the payment of money, however entered into or incurred, and whether arising from express contracts or implied contracts, or otherwise, shall be payable solely out of revenue received by the District in respect of its properties, and from out of any other moneys or income from any source whatsoever coming into possession of said District including proceeds of sale of bonds.

Section 15-a. Taxation. Subject to the limitation as to the maximum rate of tax as prescribed in this Section, the District may levy and collect throughout the territory of the District such ad valorem taxes as are voted at an election or elections called by the Board for that purpose and conducted throughout the territory of the District. The maximum rate of tax which can be levied and collected for any year shall be Two Cents ($.02) on the One Hundred Dollars ($100.00) of taxable property based on its assessed valuation, in accordance with the following conditions and procedures:

(a) The Board of Directors of the District may, by ordinance, call an election to submit to the voters for approval such taxation; provided that a public hearing to discuss the proposed tax issue shall be held in each county in the District, said public hearing to be held not less than ten (10) days nor more than twenty-five (25) days prior to the scheduled date of any such election, and said hearings shall be called by the Board of Directors of the District and notice of the time, day, date, place and purpose of said meeting shall be given by publishing said notice in at least one (1) newspaper of general circulation in each county where the meeting is to be held at least ten (10) days prior to such hearing.

(b) Only qualified electors, owning taxable property within the boundaries of the District and who have duly rendered their property for taxation shall be entitled to vote in any such election. An elector otherwise qualified must vote in the county of his residence and at the polling place designated for the precinct of his

Case: 10-40610 Document: 00511184538 Page: 40 Date Filed: 07/23/2010

residence. The ordinance calling the election shall specify the polling place or places in each of the several counties. The notice of election will be sufficient as to any county within the District if it states that the election is to be held throughout the territory comprising the District and if it specifies the polling place or places in such county, but it shall not be necessary to publish such details except in the county to which they are applicable.

(c) Returns of the election shall be made to the Board, and the Board shall canvass the returns of the election and adopt an ordinance declaring the results thereof. The Board may levy taxes within the maximum rate thus voted if a majority of the votes cast throughout the District are in favor of the levy of the tax and if a majority of the votes cast in any three (3) counties in the District are in favor of the levy of the tax.

(d) The rate of tax shall be uniform throughout the territory comprising the District, and shall be certified by the Chairman and the Secretary of the Board of Directors of the District to the Tax Assessor and the Tax Collector of each included county.

(e) After an election has resulted favorably to the levy of a tax, the Board of Directors may borrow money payable therefrom and may evidence such loan by a negotiable note given in the name of the District.

(f) Any taxes thus collected shall be used for the purpose of general administration, preparation of the Master Plan provided for in Section 4-a, and for other planning and services with respect to any of the purposes, rights, privileges and functions of the District; provided, however, that none of the taxes thus collected shall be used to pay for or finance the construction of any dams, reservoirs, levees, channels, pipelines or other major physical works of the District, or pay for the cost of any right-of-way acquisition, or damages awarded by any Court under Article 1, Section 17, of the Constitution of the State of Texas. It is the intent of this Act that any taxes thus collected will enable the District to develop a Master Plan for the maximum development of the soil and water resources of the District, it being hereby found and determined that the benefits to be realized from such maximum development can be obtained only through area-wide participation and planning. It is the intent of this Act that the construction of any dams, reservoirs, levees, channels, pipelines or other major physical works of the District shall be paid for or financed by revenue bonds of the District to be redeemed either by the sale of services or by taxes to be levied by a county or municipality and paid over to the District as an independent contractor of said county or municipality. It is likewise the intent of this Act that any taxes thus collected may be used to pay for the operation, repair and/or maintenance of any flood control, soil-conservation, watershed protection and/or erosion structures or works of improvement constructed in cooperation with the Federal Government; provided, however, that any such operation, repair and/or maintenance costs shall be paid for out of taxes thus collected in the county in which the particular structure or work of improvement is situated. It is further the intent of this Act that the taxes

Case: 10-40610 Document: 00511184538 Page: 41 Date Filed: 07/23/2010

authorized by this Section 15-a thus collected shall not be pledged to the redemption of any bonds of the District. Added, H. B. 83, 57th Legislature.

Section 15-b. Rendition, Assessment, Levying and Collection of Taxes. The rendition and assessment of property for taxation and the collection of taxes for the benefit of the District shall be in accordance with the law applicable to counties, insofar as such law is applicable. Renditions shall be to the County Tax Assessor of the county in which the property is taxable for State and County purposes. It shall be the duty of the Assessor and Collector in each county to cause to be placed on the county tax rolls such additional column or columns as are needed to show the tax levied by the District and the amount thereof, based on the value of such property as approved finally for State and County purposes by the Board of Equalization of such county. The fee for assessing and collecting taxes shall be two percent (2%) of the taxes collected, such fee to be paid over and disbursed in each county, as are other fees of office. All of the laws for the enforcement of State and County taxes shall be available to the District. The District has the right to cause the officers of each county to enforce the taxes due to the District in that county, as provided in the law for the enforcement of State and County taxes. Taxes assessed and levied for the benefit of the District shall be payable and shall become delinquent at the same time, in the same manner and subject to the same discount for advance payment as taxes levied by and for the benefit of the County in which the property is taxable. The fee for collecting delinquent taxes through prosecution of suit shall be fifteen percent (15%) of the taxes collected by such suit, such fee to be paid over and disbursed in each county as are other fees of office. Added, H. B. 83, 57th Legislature.

Section 16. Issuance of Bonds. For the purpose of constructing improvements related to the exercise of any power or powers conferred on it by law, the District shall have the power and is hereby authorized to issue negotiable bonds, either as a single issue or in separate issues, from time to time, to be secured by a pledge of revenues, income and funds of the District without reference to their source and having such priority of liens thereon as may be prescribed in the proceedings authorizing the issuance of such bonds; provided, however, that no ad valorem taxes collected in accordance with the provisions of Sections 15-a and 15-b shall be pledged to any issue or issues of bonds. The District shall have the power to issue the bonds provided for in this section by action of its Board of Directors and without the necessity of an election. Said bonds may either be (1) sold for cash, at public sale, at such price or prices as the Board shall determine, provided that the interest cost of the money received therefore, computed to maturity in accordance with standard bond tables in general use by banks and insurance companies, shall not exceed six percent (6%) per annum, or (2) may be issued on such terms as the Board shall determine in exchange for property of any kind, real, personal, or mixed, or any interest therein which the Board shall deem necessary or convenient for any such corporate purpose, or (3) may be issued in exchange for principal amounts or other obligations of the District, matured or unmatured. The proceeds of sale of such bonds may be deposited in such banks or trust company or trust companies, and may be paid out pursuant to such terms and conditions, as may be agreed upon between the District and the purchasers of such bonds. All such bonds shall be authorized by resolution of the Board concurred in by at least eight (8) of the members thereof, and shall bear such date or dates, mature at such time or times, bear interest at such rate or rates (not exceeding six percent [6%] per annum), payable annually or semi-annually, be in such denominations, be in such form, either coupon or registered, carry such registration privileges as

Case: 10-40610 Document: 44 Page: 284 Date Filed: 07/23/2010

to principal only or as to both principal and interest, and as to exchange of coupon bonds for registered bonds or vice versa, and exchange of bonds of one denomination for bonds of other denomination, be executed in such manner and be payable at such place or places within or without the State of Texas, as such resolution or resolutions may provide. Any resolution or resolutions authorizing any bonds may contain provisions, which shall be part of the contract between the District and the holders thereof, from time to time: (a) reserving the right to redeem such bonds at such time or times, in such amounts and at such prices, not exceeding one hundred five percent (105%) of the principal amount thereof, plus accrued interest, as may be provided; (b) providing for the setting aside of sinking funds or reserve funds and the regulation and disposition thereof; (c) pledging to secure the payment of the principal of and interest on such bonds and of the sinking fund or reserve fund payments agreed to be made in respect of such bonds, any part or all of the revenue and income of every kind and character from any source whatsoever thereafter received by the District; (d) prescribing the purpose to which such bonds or any bonds thereafter to be issued, or the proceeds thereof, may be applied; (e) agreeing to fix and collect rates, charges, and assessments sufficient to produce net revenues adequate to pay the items specified above in subdivisions (a), (b) and (c) of this Section 16, and prescribing the use and disposition of all revenues; (f) prescribing limitations upon the issuance of additional bonds and upon the agreements which may be made with the purchasers and successive holders thereof; (g) with regard to the construction, extension, improvement, reconstruction, operation, maintenance, and repair of the properties of the District and carrying of insurance upon all or any part of said properties covering loss or damage or loss of use and reconstruction, operation, maintenance and repair of the properties of the District and carrying of insurance upon all or any part of said properties covering loss or damage or loss of use and occupancy resulting from specified risks; (h) fixing the procedure, if any, by which, if the District shall so desire, the terms of any contract with the holders of such bonds may be amended or abrogated, the amount of bonds the holders of which must consent thereto, and the manner in which such consent may be given; (i) for the execution and delivery by the District to a bank or trust company authorized by law to accept trusts, or to the United States of America or any officer or agency thereof, of indentures and agreements for the benefit of the holders of such bonds, setting forth any or all of the agreements herein authorized to be made with or for the benefit of the holders of such bonds and such other provisions as may be customary in such indentures or agreements; and (j) such other provisions not inconsistent with the provisions of this Act, as the Board may approve.

Any such resolution and any indenture or agreement entered into pursuant thereto may provide that in the event that:

(a) Default shall be made in the payment of the interest of any or all bonds when and as the same shall become due and payable.

(b) Default shall be made in the payment of the principal of any or all bonds when and as the same shall become due and payable, whether at the maturity thereof by call for redemption or otherwise.

(c) Default shall be made in the performance of any agreement made with the purchasers or successive holders of any bonds.

Case: 10-40610 Document: 44 Page: 285 Date Filed: 07/23/2010

And such default shall have continued such period, if any, as may be prescribed by said resolution in respect thereof, the trustee under the indenture or indentures entered into in respect of the bonds, authorized thereby, or if there shall be no such indenture, a trustee appointed in the manner provided in such resolution or provisions by the holders of twenty-five percent (25%) in aggregate principal amount of the bonds authorized thereby and at the time outstanding, may, and upon the written request of the holders of twenty-five percent (25%) in aggregate principal amount of the bonds authorized by such resolutions at the time outstanding, shall, in his or its own name, but for the equal proportionate benefit of the holders of all such bonds, and with or without having possession thereof:

(a) By mandamus or other suit, action or proceeding at law or in equity, enforce all rights of the holders of such bonds.

(b) Bring suit upon such bonds and/or the appurtenant coupons.

(c) By action or suit in equity, require the District to account as if it were the trustee or an express trust for the bondholders.

(d) By action or suit in equity, enjoin any acts or things which may be unlawful or in violation of the rights of the holders of such bonds

(e) After such notice to the District as such resolution may provide, declare the principal of all such bonds due and payable, and if all defaults shall have been made good, then with the written consent of the holders of twenty-five percent (25%) in aggregate principal amount of such bonds at the time outstanding annul such declaration and its consequences; provided, however, that the holders of more than a majority in principal amount of the bonds authorized thereby and at the time outstanding shall by instrument or instruments in writing delivered to such trustee have the right to direct and control any and all action taken or to be taken by such trustee under this paragraph. Any such resolution, indenture, or agreement may provide that in any such suit, action, or proceeding any such trustee, whether or not all of such bonds shall have been declared due and payable and with or without possession of any thereof, shall be entitled as of right to the appointment of a receiver who may enter and take possession of all or any part of the properties of the District and operate and maintain the same, and fix, collect and receive rates and charges sufficient to provide revenues adequate to apply the item set forth in subparagraphs (a), (b) and (c) of Section 16 hereof and costs and disbursements of such suit, action or proceeding and to apply such revenues in conformity with the provisions of this Act and the resolution or resolutions authorizing such bonds. In any suit, action, or proceeding by any such trustee, the reasonable fees, counsel fees and expenses of such trustee and of the receiver or receivers, if any, shall constitute taxable disbursements, and all costs and disbursements allowed by the Court shall be a first charge upon any revenues pledged to secure the payment of such bonds. Subject to the provisions of the Constitution of the State of Texas, the Courts of the County of Bexar shall have jurisdiction of any such suit, action, or proceeding by any such trustee on behalf

Case: 10-40610 Document: 00511184538 Page: 44 Date Filed: 07/23/2010

of the bondholders and of all property involved therein. In addition to the powers hereinabove specifically provided for, each such trustee shall have and possess all powers necessary or appropriate for the exercise of any thereof, or incident to the general representation of the bondholders in the enforcement of their rights.

Before any bonds shall be sold by the District, a certified copy of the proceedings for the issuance thereof, including the form of such bonds, together with any other information which the Attorney General of the State of Texas may require, shall be submitted to the Attorney General, and if he shall find that such bonds have been issued in accordance with law, and if he shall approve such bonds, he shall execute a certificate to that effect which shall be filed in the office of the Comptroller of the State of Texas and be recorded in a record kept for that purpose. In lieu of the approval by the Attorney General, the District may institute proceedings as authorized by Chapter 316, Acts of the Regular Session of the 56th Legislature, 1959. No bonds shall be issued until the same shall have been registered by the Comptroller, who shall so register the same if the Attorney General shall have filed with the Comptroller his certificate approving the bonds and the proceedings for the issuance thereof as hereinabove provided.

All bonds approved by the Attorney General as aforesaid, and registered by the Comptroller as aforesaid, and issued in accordance with the proceedings as approved, shall be valid and binding obligations of the District and shall be incontestable for any cause from and after the time of such registration.

Nothing herein shall prevent the District from making a private sale of its bonds to the Texas Water Development Board under such terms and conditions as District's Board of Directors shall in their discretion deem advisable, and such private sale is specifically authorized by this Act. Amended, H. B. 83, 57th Legislature.

Section 17. Purchase of Bonds by District. The District shall have power out of any funds available therefore to purchase any bonds issued by it at a price not exceeding the redemption price applicable at the time of such purchase, or if such bonds shall not be redeemable, at a price not exceeding the principal amount thereof plus accrued interest. All bonds so purchased shall be cancelled and no bonds shall ever be issued in lieu thereof.

Section 17-a. Bonds Legal for Investment and Security. The bonds of the District shall be and are hereby declared to be legal and authorized investments for banks, savings banks, trust companies, building and loan associations, savings and loan associations, insurance companies, fiduciaries, trustees, guardians, and for the sinking funds of cities, towns, villages, counties, school districts, or other political corporations or subdivisions of the State of Texas. Such bonds shall be eligible to secure the deposit of any and all public funds of the State of Texas, and any and all public funds of cities, towns, villages, counties, school districts or other political corporations or subdivisions of the State of Texas; and such bonds shall be lawful and sufficient security for said deposits to the extent of their value, when accompanied by all unmatured coupons appurtenant thereto. Added Acts 1959, 56th Legislature, p. 78, ch. 39, Sec. 1.

Section 18. Property of the District.

(a) Prohibition Against Encumbering Property.
Nothing in this Act shall be construed as authorizing the District, and it shall not be authorized, to mortgage or otherwise encumber any of its property of any kind, real, personal or mixed, or any interest herein, or to acquire any such property or interest subject to the mortgage or conditional sale; provided, however, that this subsection shall not be construed as preventing the pledging of any and all revenues and income of the District of every kind and character and from any source whatever, except ad valorem taxes collected by the District in accordance with Sections 15-a and 15-b of this Act.

(b) Disposition of Property.
Nothing in this Act shall be construed as authorizing the District, or any receiver of its properties, or any court, to sell, lease or otherwise dispose of any of its property of any kind, real, personal or mixed, or any interest therein, unless such sale, lease or other disposition has been generally authorized by this Act; provided, however, that the District may sell or otherwise dispose of any property of any kind or any interest in property that is not necessary to carry on the business of the Authority provided that the Board, by a majority vote of a quorum present at any regular or special meeting, determines that the property is not convenient to the business of the Authority and is surplus. The Board shall cause a notice of such proposed sale to be published once each week for three (3) consecutive weeks in a newspaper of general circulation in the county or counties in which said property or interest therein is situated if the appraised value of said property or interest therein is in excess of Five Thousand Dollars ($5,000) and if the said property or interest therein is not partial or total consideration in a transaction for the exchange of properties.

(b) Property Exempt from Forced Sale.
All property of the District shall be at all times exempt from forced sale, and nothing in this act shall authorize the sale of any of the property of the District under any judgment rendered in any suit, and such sales are hereby prohibited and forbidden. Amended H. B. 83, 57th Legislature and S. B. 741, 67th Legislature.

Section 19. Bonds, Tax Free. All bonds and the interest thereon issued pursuant to the provisions of this Act shall be exempt from taxation (except inheritance taxes) by the State of Texas or by any municipal corporation, county, or other political subdivision or taxing district of the State.

Section 20. Appeal Bond Not Required. This District shall not be required to give bond on any appeal from judgment in any Court.

Section 21. Full Authority to Issue Bonds. This Act without reference to other Statutes of the State of Texas shall constitute full authority for the authorization and issuance of bonds hereunder and no other Act or law with regard to the authorization or issuance of obligation or the deposit of the proceeds thereof, or in any way impeding or restricting the carrying out of the

Case: 10-40610 Document: 00511184538 Page: 46 Date Filed: 07/23/2010

acts herein authorized to be done, shall be construed as applying to any proceedings taken hereunder or acts done pursuant hereto.

Section 21-a. Contract with Bexar County. Recognizing the fact that the District has heretofore entered into a contract with the Commissioners' Court of Bexar County, Texas, for the purpose of financing the construction of certain flood control and soil conservation works of improvement in Bexar County, the District is hereby prohibited from spending any income or revenue derived from said contract, and all amendments thereto or reformations thereof, for any purpose other than those which are specifically provided for therein; provided, however, that a reasonable amount of said income or revenue may be allocated by the Board for the payment of the District's overhead, operational costs and the fees of the Directors who reside in Bexar County. Added, H. B. 83, 57th Legislature.

Section 21-b. Pollution Control Districts.

(a) Authority to establish; purpose. The Authority may establish one or more pollution control district for the purpose of accomplishing any of the powers, purposes, rights, privileges or authority vested in the Authority regarding waste treatment.

(b) Procedure for establishing districts; resolution; public hearing; election. Pollution control districts may be established by the procedures contained in this Section.

(1) The Board may adopt a resolution calling for the creation of a pollution control district, defining the boundaries thereof, estimating the principal amount of and stating the purpose of bonds proposed to be issued by the Authority on behalf of the proposed pollution control district, declaring that taxes for the payment of the proposed bonded indebtedness shall be levied exclusively on the taxable property within the proposed pollution control district, and fixing a time and place for a public hearing on the matters set out in the resolution.

(2) The Board may adopt a resolution calling for the creation of a pollution control district, defining the boundaries thereof, declaring that taxes for the maintenance of the Authority and its improvements shall be levied on the taxable property within the proposed pollution control district, and fixing a time and place for a public hearing on the matters set out in the resolution.

(A) The resolutions hereby authorized may be adopted simultaneously, and simultaneous hearings on proposed bond and maintenance taxes may be held.

(B) The public hearing may be conducted by a quorum of the Board of Directors, or one or more directors, or one or more employees who may be designated by the Board. If someone other

Case: 10-40610 Document: 00511145389 Page: 47 Date Filed: 07/23/2010

than a quorum of the Board conducts the hearing, he shall have power to accept evidence and make recommendations upon which the Board may act. The Board may alter, modify or change any provision of the resolution calling for the creation of the proposed pollution control district subsequent to the public hearing; provided, however, that the boundaries of the pollution control district may not be enlarged or expanded without further notice as hereinafter provided.

(C) Notice of the public hearing shall be published in a newspaper of general circulation within the proposed pollution control district once not less than fifteen (15) or more than thirty (30) days prior to the public hearing. To the extent not inconsistent with the provisions hereof, notice of the public hearing shall also comply with Chapter 271, Acts of the 60th Legislature, Regular Session, 1967, as amended (Article 6252-17, Vernon's Texas Civil Statutes).

(D) All public hearings on creation of a pollution control district shall be held within the boundaries of the proposed pollution control district, and may be held concurrently or in connection with any other public hearing, meeting or proceeding conducted by the Board.

(E) Any interested person, including persons residing or owning property within the Authority, may appear at the public hearing and present evidence relevant to the matter set forth in the resolution calling forth the creation of the proposed pollution control district. All persons residing within or owning property within the proposed pollution control district shall have the right to appear at the public hearing and present evidence with regard to whether they will receive benefits from the proposed improvements or taxation. Failure to appear at the public hearing shall constitute a waiver of all objections which the absent party might have had to all matters set forth in the resolution calling for the creation of the proposed pollution control district.

(F) The Board shall review the findings and recommendations resulting from the public hearing, and may adopt a resolution creating the pollution control district, stating the purposes for which the pollution control district has been created, designating the boundaries of the pollution control district, declaring that the indebtedness to be incurred or the cost of services to be rendered by the Authority for the benefit of the pollution control district shall be payable from taxes levied on property within the district, finding that the property within the pollution control district will

Case: 10-40610 Document: 00511184538 Page: 48 Date Filed: 07/23/2010

benefit from the indebtedness proposed to be incurred or the services proposed to be rendered by the Authority on its behalf, and calling for an election within the pollution control district to authorize said indebtedness and/or said maintenance tax. Said resolution shall further state the date of the election, the proposition or propositions to be voted on, the location of the polling places, and the names of the officers of the election. Said election may be held in conjunction with general election or any special election other than a primary election. The provisions of the Texas Election Code, as amended, shall govern the election unless contrary to any provision of this Act.

(G) The resolution of the Board creating a pollution control district shall be final and conclusive, and shall not be subject to review by any court except on the basis of whether the resolution is supported by substantial evidence. Said resolution shall be filed in the deed records of the county or counties wherein the territory within the pollution control district is situated. Any action or proceeding wherein the validity of the Board's resolution creating a pollution control district or of the proceedings relative thereto is contested, questioned or denied, shall be commenced within thirty (30) days from the effective date of the resolution; otherwise, said resolution and all proceedings relative thereto, including the creation of the pollution control district, shall be held to be valid and in every respect legal and incontestable.

(c) Boundaries; annexation proceedings.

(1) The boundaries of a pollution control district may include any territory within the Authority, whether or not the territory contains noncontiguous parcels of land; and whether or not the territory is located within the boundaries of any incorporated city, town, village, or any other governmental entity or political subdivision of the State of Texas. If any portion of the territory of a proposed pollution control district falls within the boundaries or within the exclusive extraterritorial jurisdiction of an incorporated city, town, or village, the Board shall not create said pollution control district until it has obtained the consent of said city, town, or village. Said consent may contain such conditions as may be mutually agreed on by the Authority and said city, town, or village, and shall be evidenced by a duly enacted ordinance of the governing body of said city, town, or village.

(2) Proceedings for the annexation of territory to an existing pollution control district may be initiated by a resolution of the Board or by a petition signed by the owners of 50 percent or more of the value of the land subject to the proceedings, or by a petition signed by a majority of the

Case: 10-40610 Document: 00511184538 Page: 49 Date Filed: 07/23/2010

residents of the land to be annexed. The petition shall, insofar as is practicable, set forth substantially those matters set forth in a resolution calling for the creation of a pollution control district, and shall request a public hearing by the Board on the matters set out in the petition. The public hearing shall be held in substantial compliance with the provisions set forth herein for a public hearing on creation of a pollution control district. If the Board determines that the annexation should be accomplished, it may adopt a resolution calling separate elections on the matter of annexation to be held within the existing pollution control district and within the land to be annexed. The annexation shall not become final until approved by a majority of the qualified voters within the existing pollution control district, and until a majority of the qualified voters within the boundaries of the land to be annexed approve said annexation and elect to allow the land to be annexed to be taxed for maintenance purposes and/or to assume its pro rata share of indebtedness theretofore authorized and/or taxes necessary to support the voted but unissued tax or tax-revenue bonds of the Authority which are to be issued on behalf of the existing pollution control district, and authorize the Board to levy a tax on the property therein for payment for such unissued bonds, when issued. Said elections shall conform to the Texas Election Code, as amended, insofar as said Code is not inconsistent with the provisions of this Act. The Board's resolution canvassing the returns of such elections shall redefine the boundaries of the pollution control district and shall be recorded in the deed records of the county within which the annexed territory lies.

(3) Proceedings for the addition of territory to an existing pollution control district on which less than three (3) qualified voters reside may be initiated by a petition signed by the owner or owners thereof praying that the land described therein be added thereto and become a part thereof. The petition shall, insofar as applicable set forth substantially those matters set forth in a resolution calling for the creation of a pollution control district and shall request a public hearing by the Board on the matters set out in the petition. The public hearing shall be held in substantial compliance with provisions set forth herein for a public hearing on creation of a pollution control district. If the Board determines that the addition should be accomplished, it may adopt a resolution adding such land. If taxes or bonds have been authorized within the pollution control district prior to the addition of said land, said resolution adding the land shall be temporary and the addition shall not become final until approved by a majority of the qualified voters with the pollution control district as it exists after said addition. Such election shall be held as soon as practicable after said addition on the proposition of approving said addition, ratifying the unissued tax or tax-revenue bonds of the authority which are to be issued on behalf of the pollution control district, and to authorize the Board to levy a tax on the property within the pollution

Case: 10-40610 Document: 005111845389 Page: 50 Date Filed: 07/23/2010

control district as enlarged for payment of said unissued bonds when issued and/or for the maintenance of the authority. Such election shall conform to the Texas Election Code, as amended, so far as such Code is not inconsistent with the provisions of this Act. The Board's resolution canvassing the returns of such election or adding the territory shall redefine the boundaries of the pollution control district and shall be recorded in the deed records of the county within which the added territory lies.

(d) Bonds; maintenance tax.

(1) If the qualified voters in the elections called pursuant hereto authorize the Authority to incur indebtedness for the benefit of a pollution control district, the Board shall have authority to issue bonds as provided in this Act; provided, however, that taxes levied for the purpose of making payments of the interest on or principal of said bonds shall be levied only on taxable property within the pollution control district.

(2) Notwithstanding any provision of this Act to the contrary, if the qualified voters in the elections called pursuant hereto authorize the Authority to levy and collect ad valorem taxes for the maintenance of the Authority and its improvements, the Board shall have authority to levy, assess, and collect said maintenance tax; provided, however, that said maintenance tax shall be levied only on taxable property within the pollution control district.

(e) Indebtedness authorized; taxes.

The Board may incur all such indebtedness as may be necessary to provide all improvements, and the maintenance thereof, requisite to the achievement of the purposes for which any pollution control district is organized, and the Authority is authorized to levy and collect all such taxes as may be necessary for the payment of the interest thereon and the creation of a sinking fund for the payment thereof, and such taxes shall be a lien on the property assessed for the payment thereof.

<u>Section 22.</u> <u>Liberal Construction; Conflicts.</u> This Act and all of the terms and provisions hereof shall be liberally construed to effectuate the purposes set forth herein.

It is especially provided, however, that in the event any authority or power granted in this Act overlaps or conflicts with any authority or power heretofore vested in the Guadalupe-Blanco River Authority as created by H. B. No. 138, Chapter 410, Act of the Forty-Fourth Legislature at its First Called Session, that the power and authority granted by said Act creating said Guadalupe-Blanco River Authority shall supersede and control over any power or authority granted by this Act, unless said Guadalupe-Blanco River Authority consents to the exercise of such power or authority by the San Antonio River Authority.



USCA5 1120

Case: 10-40610 Document: 00511184538 Page: 51 Date Filed: 07/23/2010

It is further especially provided that no provision of this Act shall have the effect of divesting any person, firm or corporation of any vested riparian rights heretofore vested, or any vested rights derived under existing permits for the appropriation and use of public waters heretofore issued by the State Board of Water Engineers, or any vested rights derived under any certified filings heretofore filed with said Board.

It is further especially provided that nothing in this Act shall impair or supersede the authority and supervision granted to the State Board of Water Engineers under the general laws of the State of Texas or under the rules formulated by said State Board in accordance with said general laws, any provision of this Act to the contrary notwithstanding. Amended, H. B. 83, 57th Legislature; S. B. 704, 61st Legislature.

Section 23. Domicile. The general office and place of domicile of this District shall be in the City of San Antonio, Bexar County, Texas.

Section 24. Constitutional Conformity. Nothing in this Act contained shall be construed to violate any provision of the Federal or State Constitutions, and all Acts done under this Act shall be done in such a manner as will conform thereto, whether herein expressly provided or not. Where any procedure hereunder may, by the Board, be deemed to be violative thereof, this District shall have the power by ordinance to provide a procedure conformable therewith. If any provision of this Act shall be invalid, such holding shall not affect the instant creation of this District, or the validity of any other provision of this Act. Acts 1937, 45th Legislature, p. 556, ch. 276; Acts 1939, 46th Legislature, Spec. L., p. 1083, paragraph 1.

Section 25. Severability Clause. The provisions of this Act are severable. If any section, subsection, provision or part whatsoever of this Act should be held to be void as in violation of the Constitution, it shall not affect the validity of the remaining portions thereof, and it is hereby declared to be the legislative intent that this Act would have been passed as to the remaining portions hereof, regardless of the invalidity of any part. Added, H. B. 83, 57th Legislature.


Calhoun
San Antonio Bay
Aransas
San Patricio
Refugio
Victoria
Goliad
Bee
Dewitt
Karnes
Live Oak
Gonzales
Wilson
Guadalupe
Atascosa
Bexar
Comal
Medina
Blanco
Kendall
SAN ANTONIO RIVER AUTHORITY

USCA5 1122

Case: 10-40610 Document: 00511184538 Page: 53 Date Filed: 07/23/2010

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **THE ARANSAS PROJECT, Plaintiff,** | § § § | **Civil Action No. 2:10-CV-00075** |
| **v.** | § | |
| **BRYAN SHAW, et al. Defendants.** | § § | |

**[PROPOSED]**
**ORDER GRANTING SAN ANTONIO RIVER AUTHORITY'S MOTION TO INTERVENE**

On this day, the Court considered the Motion to Intervene of the San Antonio River Authority ("SARA"). Having considered the motion, arguments of the parties, evidence, and applicable authorities, the Court finds that the motion should be granted.

IT IS THEREFORE ORDERED that SARA's Motion to Intervene is GRANTED. Pursuant to Federal Rule of Civil Procedure 24 ___, SARA is granted intervention as a party in this action for all purposes.

SIGNED and ORDERED this _____ day of ______________________, 2010.

___________________________________
HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT — SOUTHERN DISTRICT OF TEXAS

Motion and Order for Admission *Pro Hac Vice*

| Division | Corpus Christi | Case Number | 2:10-cv-00075 |
|---|---|---|---|
| The Aransas Project | | | |
| *versus* | | | |
| Bryan Shawn, et al | | | |

| | |
|---|---|
| Lawyer's Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number<br>Federal Bar & Number | Edmond R. McCarthy, Jr.<br>Jackson Sjoberg McCarthy & Wilson, LLP<br>711 W. 7th Street<br>Austin, TX 78701<br>(512) 225-5606<br>Licensed: Texas, Bar No. 13367200 |
| Seeks to appear for this party: | San Antonio River Authority ("SARA") |
| Dated: 6/16/2010 | Signed: |

I aver I have familiarized myself with the Local Rules of the Southern District of Texas and the procedures outlined in the Court's Standing Order dated April 23, 2010.

| The state bar reports that the applicant's status is: | |
|---|---|
| Dated: | Clerk's signature: |

**Order**

This lawyer is admitted *pro hac vice*.

Dated: ____________________

______________________________
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-10-75 |
| | § | |
| BRYAN SHAW, *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

On this day came on to be considered: (1) Union Carbide Corporation's Motion to Intervene (D.E. 45); (2) Texas Farm Bureau and American Farm Bureau Federation's Motion to Intervene (D.E. 51); (3) Texas Chemical Council's Motion to Intervene (D.E. 53); (4) Motion of San Antonio Water System for Leave to Intervene as Party Defendant, and Memorandum in Support (D.E. 59); and (5) CPS Energy's Motion to Intervene (D.E. 70).

For the reasons stated herein, the Court GRANTS Texas Chemical Council's Motion to Intervene (D.E. 53), but DENIES Union Carbide Corporation's Motion to Intervene (D.E. 45), Texas Farm Bureau and American Farm Bureau Federation's Motion to Intervene (D.E. 51), San Antonio Water System's Motion to Intervene (D.E. 59), and CPS Energy's Motion to Intervene (D.E. 70).

## I. Jurisdiction

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 16 U.S.C. §§ 1540(c) & (g) (the Endangered Species Act),[1] and 28 U.S.C. § 2201 (Declaratory Judgment Act).

[1] 16 U.S.C. § 1540(c) provides, "[t]he several district courts of the United States, including the courts enumerated in section 460 of title 28, shall have jurisdiction over any actions arising under this chapter," and Section 1540(g) provides for civil lawsuits under the Endangered Species Act.

Case: 10-40610 Document: 00511184539 Page: 2 Date Filed: 07/23/2010

**II. Factual and Procedural Background**

The Aransas Project (a non-profit corporation) brought this action on March 10, 2010 pursuant to the Endangered Species Act, 16 U.S.C. §§ 1540(c) & (g), against several Texas Commission on Environmental Quality ("TCEQ") officials (Bryan Shaw, Buddy Garcia, Carlos Rubinstein, and Mark Vickery) and the South Texas Watermaster (Al Segovia). In essence, Plaintiff alleges that Defendants' failure to adequately manage the flow of fresh water into the San Antonio Bay ecosystem during the 2008-2009 winter resulted in a "tak[ing]" of Whooping Cranes, an endangered species, in violation of Section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1)(B). Plaintiff argues that the reduced flow of fresh water into the ecosystem increased salinity, reducing the food and water supply for the Whooping Cranes, thus weakening and ultimately resulting in the death of twenty-three Whooping Cranes. (D.E. 1 at 2, 8-24.)

Plaintiff requests declaratory and injunctive relief to ensure that the Whooping Cranes have sufficient water resources to prevent future "takings." (D.E. 1 at 32-33.) In essence, Plaintiff seeks a declaration that Defendants' actions resulted in a "taking" of Whooping Cranes in violation of Section 9 of the ESA, an injunction impacting current and future water diversions that result in takings of Whooping Cranes, and a court order requiring Defendants to develop a process to ensure that Whooping Cranes are protected. (D.E. 1 at 32-33.)[2]

[2] More specifically, Plaintiff seeks, among other relief: (1) a declaration that Defendants have violated Section 9 of the ESA and continue to do so; (2) a declaration that water diversion regulations promulgated by Defendants are preempted by federal law when they purport to authorize water diversions that result in a taking of Whooping Cranes; (3) an injunction preventing Defendants from approving or allowing water diversions that destroy or alter the Whooping Crane habitat until the State provides reasonable assurances that such diversions will not take Whooping Cranes in violation of the ESA; (4) an injunction preventing Defendants from approving new water permits absent assurances that future water diversions will not take Whooping Cranes; (5) an order directing Defendants to develop a process for a complete accounting of all withdrawals from the Guadalupe and San Antonio River systems; (6) an order directing Defendants to conduct a through analysis of all permitted and exempted withdrawals and develop a water development and use plan sufficient to protect Whooping Cranes, "which may include reduction of existing water uses or addition of special conditions to existing permits."; and (7) an order

Union Carbide Corporation ("UCC") filed its Motion to Intervene on May 17, 2010. UCC seeks to intervene pursuant to Federal Rule of Civil Procedure 24(a)(2) or in the alternative Rule 24(b)(1)(B). (D.E. 45.)[3] On May 26, 2010 the Texas Farm Bureau ("TFB") and American Farm Bureau Federation ("AFBF") (collectively "TFB/AFBF") filed their Motion to Intervene (D.E. 51), as did the Texas Chemical Council ("TCC") (D.E. 53), also seeking intervention under Rule 24(a)(2) or Rule 24(b)(1)(B). The San Antonio Water System ("SAWS") filed its Motion to Intervene on June 7, 2010. (D.E. 59.) The City of San Antonio, acting by and through the City Public Service Board, a Texas municipal utility ("CPS Energy") filed its Motion to Intervene on June 14, 2010. (D.E. 70.) Plaintiff is opposed to each intervention. (D.E. 45 at 17; D.E. 51 at 21; D.E. 53 at 13; D.E. 59 at 19; D.E. 70 at 25.) Plaintiff filed its Response to UCC's Motion to Intervene on June 1, 2010 (D.E. 58), and its Response to TCC's and TFB/AFBF's Motions to Intervene on June 16, 2010. (D.E. 74.) The Court previously granted state agency Guadalupe-Blanco River Authority's ("GBRA") Motion to Intervene on April 23, 2010. (D.E. 35.)

## III. Discussion

### A. Intervention under Rule 24(a)(2)

Federal Rule of Civil Procedure 24(a)(2), which governs intervention as of right, provides:

> On timely motion, the court must permit anyone to intervene who: (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

---

directing plans to develop an approved Habitat Conservation Plan for the San Antonio and Guadalupe River basins and San Antonio Bay, "including provisions to reduce all withdrawals during low flow conditions to such an extent necessary to prevent" the taking of Whooping Cranes. (D.E. 1 at 32-33.)

[3] On June 10, 2010, Movant UCC filed an Unopposed Motion for Leave to File Reply Brief in Further Support of its Motion to Intervene. (D.E. 62.) The Court GRANTS this Motion.

Case: 10-40610 Document: 44 Page: 300 Date Filed: 07/23/2010

Fed. R. Civ. P. 24(a)(2). Based upon this Rule, the Fifth Circuit has developed the following four factor test in evaluating a motion to intervene under Rule 24(a)(2):

> (1) the applicant must file a timely application; (2) the applicant must claim an interest in the subject matter of the action; (3) the applicant must show that disposition of the action may impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties to the litigation.

Heaton v. Monogram Credit Card Bank of Georgia, 297 F.3d 416, 422 (5th Cir. 2002). Generally, "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained." Id.

**B. TCC Motion to Intervene (D.E. 53)**

**1. Background**

According to its Motion, TCC is a statewide trade association of chemical manufacturing facilities in Texas, many of which could be negatively affected by this lawsuit. TCC seeks to represent and protect the statewide chemical industry's common interest, and has a total of 68 member companies statewide, many of which rely upon fresh water for their daily operations. (D.E. 53 at 1-3.)[4] TCC member facilities acquire water rights either through their own state-issued water rights permits that allow the facilities to divert water in specific amounts, or alternatively they purchase water from another party who, in turn, possesses its own state-issued water rights. TCC states that the potential disruption of water supplies that could result from this litigation would "virtually incapacitate [member] facilities." (D.E. 53 at 2.) The facilities most directly affected include INVISTA S.a r.l. LLC ("INVISTA") (Victoria, Texas site), E.I. du Pont de Nemours and Company ("du Pont") (Victoria, Texas site), INEOS (formerly BP Chemicals) (Green Lake Plant), LyondellBasell Industries ("LyondellBasell") (Victoria, Texas site), and

[4] For a full list of TCC members, see http://www.txchemcouncil.org/categories/About-Us/Current-Members/.

Case: 10-40610 Document: 44 Page: 301 Date Filed: 07/23/2010

UCC, as a wholly-owned subsidiary of Dow Chemical Company (Seadrift, Texas site). TCC states that these facilities draw water from the Guadalupe River, and this litigation would affect 55,000 acre-feet of water per year for INVISTA, 5,000 acre-feet/year for du Pont (water supplied by INVISTA), 3,226 acre-feet/year for INEOS (water supplied by GBRA), 8,597 acre-feet/year for LyondellBasell, and 10,000 acre-feet/year for UCC. Together, these facilities hold the rights to approximately 68,226 acre-feet of water per year. (D.E. 53 at 2-3.) TCC argues that if the lawsuit were to succeed, it could result in significant reductions of water diversions for TCC member facilities, and possibly cause these facilities to reduce or discontinue operations altogether. (D.E. 53 at 3-4.)

TCC argues that it should be allowed to intervene as a matter of right under Rule 24(a)(2) because its motion is timely, as it has known about its interest in this litigation only since this lawsuit was filed. (D.E. 53 at 6-7.) Second, TCC states that it has a strong interest in the subject matter of this litigation, as TCC member facilities have significant water rights, upon which they rely to conduct their operations. (D.E. 53 at 7-8.) Third, TCC claims that the relief Plaintiff seeks in this lawsuit, if granted, could result in serious and wide-ranging consequences for TCC members' water rights. (D.E. 53 at 8.) Finally, TCC states that its interests are not adequately represented by existing parties, as TCEQ officials are primarily concerned with their policy determinations and preservation of state-wide resources and GBRA is a governmental entity concerned with contractual commitments and the exercise of its own statutory authority. Potential intervenor UCC, even though a member of TCC, represents only its own interests and not the overarching interests of TCC members as a whole. (D.E. 58 at 9.)

The Court considers each of the Rule 24(a)(2) factors separately.

**2. Application of Rule 24(a)(2) Factors**

**a. Timeliness**

As an initial matter, the Court concludes that TCC's Motion to Intervene is timely, in light of all the factors outlined in Stallworth v. Monsanto Co., 558 F.2d 257, 263 (5th Cir. 1977).[5] This action was filed on March 10, 2010, and the Motion to Intervene was filed on May 26, 2010, approximately two and a half months later. The deadline for joinder of parties was June 15, 2010 (D.E. 32 at 2), and no other essential deadlines have yet passed in this case. Intervenor GBRA was granted permission to intervene on April 23, 2010, approximately one month before TCC filed its Motion. (D.E. 35.) Given the early stage of the proceedings, existing parties would not be unduly prejudiced by TCC's intervention, especially in light of the fact that the parties were aware of TCC's potential intervention as early as April 12, 2010, as stated in the Join Discovery / Case Management Plan. (D.E. 15 at 2 ("The state official defendants have heard that . . . the Texas Chemical Council may seek to intervene on the defense side.").) In contrast, TCC would be significantly prejudiced by not being allowed to intervene in a lawsuit that would have a direct impact on the water rights of its members. Finally, no unusual circumstances are present in this case that weigh for or against a determination of timeliness. TCC's Motion to Intervene is timely.[6]

**b. Interest**

The second factor under Rule 24(a)(2) requires that the movant "claim an interest in the subject matter of the action." Heaton, 297 F.3d at 422. To support intervention as of right, a

---

[5] The Stallworth factors are: (1) "[t]he length of time during which the would-be intervenor actually know[s] or reasonably should have known of his interest in the case before he petitioned for leave to intervene," (2) "[t]he extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case," (3) "[t]he extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied," and (4) "[t]he existence of unusual circumstances militating either for or against a determination that the application is timely." Stallworth, 558 F.2d at 264-66.

[6] Plaintiff does not dispute timeliness. (D.E. 74 at 3.)

movant must show that it has "a direct, substantial, legally protectable interest in the action, meaning that the interest be one which the substantive law recognizes as belonging to or being owned by the applicant." In re Lease Oil Antitrust Litig., 570 F.3d 244, 250 (5th Cir. 2009) (internal citations and quotation marks omitted). "[I]t is plain that something more than an economic interest is necessary." New Orleans Public Service, Inc. v. United Gas Pipe Line Co., 732 F.2d 452, 464 (5th Cir. 1984). The "'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." Sierra Club v. Espy, 18 F.3d 1202, 1207 (5th Cir. 1994).

As described above, TCC is a trade association composed of chemical manufacturing facilities in Texas. TCC has identified five such facilities, INVISTA, du Pont, INEOS, LyondellBasell, and UCC, which together hold the rights to approximately 68,226 acre-feet of water per year along waterways at issue in this litigation. (D.E. 53 at 3.)[7] TCC states that fresh water is "integral to the facilities' operations – that is, the facilities cannot operate without it." (D.E. 53 at 7.) This lawsuit directly impacts the water rights of these member facilities, and would likely impact their ability to operate, possibly resulting in the loss of jobs. (D.E. 53 at 7.) The Certificates of Interested Parties submitted by the TCEQ Defendants and Intervenor GBRA specifically identify certain TCC members as having a financial interest in the outcome of this litigation. (D.E. 14-1 (TCEQ Certificate identifying du Pont as financially interested)); D.E. 37 at 1-2, 4 (GBRA Certificate identifying BP Chemical (now INEOS), Dow Chemical Company, and UCC as financially interested).)

Plaintiff argues that neither TCC nor any of the other proposed intervenors have a direct, substantial, or legally protectable interest in this litigation. (D.E. 58 at 10, D.E. 74 at 3-5.)

[7] As detailed below, the interests of UCC even apart from other TCC members are far greater. Specifically, UCC together with GBRA co-owns an additional 162,501 acre-feet of water in the Lower Guadalupe River Segment. (D.E. 45 at 4-5.)

Plaintiffs essentially argue that as water is the property of the State of Texas, and water permit holders have only "usufructuary" rights (the right to use the property of another), water permit holders are not guaranteed use of the water. (D.E. 58 at 10, D.E. 74 at 4-5.) Under the Texas regulatory scheme, Plaintiff argues, the water use of permit holders is regulated by TCEQ Defendants. This lawsuit is about the TCEQ Defendants' water management, not the water rights of any permit holders, Plaintiff contends. (D.E. 58 at 11, D.E. 74 at 5.) Plaintiff further argues that Movants lack an interest in this lawsuit because the lawsuit does not seek to take away water permits, but rather to have Defendants develop a "planning process . . . to fulfill their duties under the ESA." Water permit holders can then participate in the development of procedures to protect the Cranes and ensure their own access to water. (D.E. 58 at 11-12, D.E. 74 at 2.)

The Court concludes that TCC's members have a legally protectable interest in this litigation. While Texas law provides that water "is the property of the state," Tex. Water Code § 11.021(a), it recognizes the property rights of users, even if subject to the State's ownership. Section 11.022 of the Texas Water Code provides, "[t]he right to the use of state water may be acquired by appropriation in the manner and for the purposes provided in this chapter. When the right to use state water is lawfully acquired, it may be taken or diverted from its natural channel." Id. § 11.022. State water may be appropriated many different reasons, including for any "beneficial use." Id. § 11.023(a), (b). State law also provides that the "right to use state water under a permit or certified filing is limited not only to the amount specifically appropriated but also to the amount which is being or can be beneficially used for the purposes specified in the appropriation, and all water not so used is considered not appropriated." Id. § 11.025. Water rights are not "perfected unless the water has been beneficially used for a purpose stated in the

Case: 10-40610 Document: 00511184539 Page: 9 Date Filed: 07/23/2010

original declaration of intention to appropriate water or stated in a permit issued by the commission or one of its predecessors." Id. § 11.026. "As between appropriators, the first in time is the first in right." Id. § 11.027. Notably, Texas law provides that "[w]hen an appropriator from a source of water supply has used water under the terms of a certified filing or a permit for a period of three years, he acquires title to his appropriation by limitation against any other claimant of water from the same source of water supply and against any riparian owner on the same source of water supply." Id. § 11.029. Conversely, "[i]f any lawful appropriation or use of state water is wilfully abandoned during any three successive years, the right to use the water is forfeited and the water is again subject to appropriation." Id. § 11.030. Texas water law also recognizes that state and local governments "have the power of eminent domain." Id. § 11.033.

Texas courts have recognized that perfected water rights are vested property rights under Texas law. See Texas Water Rights Comm. v. Wright, 464 S.W.2d 642, 647 (Tex. 1971) ("[A] matured appropriation right to water is a vested right. However, the right which one obtains by a water permit for appropriated waters is a right which is limited to beneficial and non-wasteful uses."); In re Contests of City of Eagle Pass, to Adjudication of Water Rights in Middle Rio Grande Basin and Contributing Texas Tributaries, 680 S.W.2d 853, 858 (Tex. App. – Austin 1984) ("The owner of a certified filing has the right to all of the water appropriated which may be used in a beneficial and nonwasteful manner."). The relevant provisions of the Texas Water Code and case law demonstrate that water users do have important legal rights, which are directly at issue in this litigation. Even if those water rights are subject to control by the state, or may be lost over time, this does not alter the conclusion that water rights holders, such as TCC members, have legally protectable rights in the water at issue in this litigation.

Case: 10-40610 Document: 00511184539 Page: 10 Date Filed: 07/23/2010

As a related issue, although Plaintiff argues that it only seek a "process" to protect the Whooping Cranes during water shortages, and do not seek to directly affect water rights, the Complaint demonstrates that far more is at stake. For example, Plaintiff requests that this Court (1) "[e]njoin Defendants . . . from **approving or allowing water diversion activities** that destroy or alter Whooping Crane habitat until the State provides reasonable assurances that State-authorized water diversion activities will not take Whooping Cranes in violation of the ESA," (2) "[o]rder Defendants to conduct a thorough analysis of all permitted and exempt withdrawals and develop a binding plan for water development and water use in the San Antonio and Guadalupe River basins sufficient to protect Whooping Cranes and their vital habitat, **which may include reduction of existing water uses or addition of special conditions to existing permits**," and (3) "[o]rder Defendants to develop an approved Habitat Conservation Plan for the San Antonio and Guadalupe River basins and San Antonio Bay, **including provisions to reduce all withdrawals during low flow conditions** to such an extent necessary to prevent harm and harassment of the Aransas-Buffalo Wood Whooping Crane flock." (D.E. 1 at 33 (emphasis added).) As the requested relief demonstrates, the interests of water users are directly at issue in this litigation. A natural consequence of increased water flows to the Whooping Crane habitat will be a decrease in water for other users. Plaintiff in fact acknowledges that it "ultimately seek[s] water for the Cranes when they face a crisis . . ., and the process TAP seeks could ultimately lead to reductions in available water to other users . . . ." (D.E. 74 at 2.)

Thus, water rights holders, including TCC members, have direct, substantial, and legally protectable interests in the action. In light of the significant impact this lawsuit may have upon TCC member companies' operation, the Court concludes that TCC has sufficient interest in the subject matter of this litigation. See Sierra Club v. Espy, 18 F.3d 1202, 1207 (5th Cir. 1994)

Case: 10-40610 Document: 00511184539 Page: 11 Date Filed: 07/23/2010

(ruling that forest products industry representatives could intervene in environmental lawsuit against the U.S. Forest Service, as they had a "legally protectable property interests in existing timber contracts that are threatened by the potential bar on even-aged [logging] management.").

**c. Impairment**

The third factor for intervention under Rule 24(a)(2) requires that the movant "show that disposition of the action may impair or impede the applicant's ability to protect [its] interest" in the subject matter of the litigation. Heaton, 297 F.3d at 422. Rule 24(a)(2) does not require "a showing by the applicant for intervention that he will be bound by the disposition of the action. The current practical impairment standard represents a liberalization of the prerequisites to intervention. . . . [T]his more generous measure of impairment favors would-be intervenors." Edwards v. City of Houston, 78 F.3d 983, 1004-05 (5th Cir. 1996) (internal citations omitted). Plaintiff here argues that the lawsuit will not invalidate existing water permits held by TCC members, as it seeks only a process to ensure compliance with the ESA, not a reallocation of TCC members' water rights. (D.E. 74 at 5-6.)

As the Court has discussed above, disposition of this action may impair or impede TCC members' water rights. Plaintiff seeks both declaratory and injunctive relief that could considerably alter water rights in Texas, and would impact a basic resource upon which TCC members and others rely for their central operations. The third factor is easily satisfied.

**d. Adequate Representation**

The final factor under Rule 24(a)(2) is that the movant's "interest must not be adequately represented by existing parties to the litigation." Heaton, 297 F.3d at 422. The showing for this final factor is "treated as minimal." Trbovich v. United Mine Workers of Am., 404 U.S. 528,

Case: 10-40610 Document: 005111845399 Page: 12 Date Filed: 07/23/2010

538 n.10 (1972). "The burden of establishing inadequate representation is on the applicant for intervention." Edwards, 78 F.3d at 1005.

Plaintiff argues that any interest TCC has, as a collection of water permit holders, is adequately represented by the existing parties to this litigation. Specifically, it argues that the TCEQ Defendants are presumed to adequately represent the interests of their regulated community, as they want to protect the current regime. Further, GBRA provides an additional voice as both a water permit holder and an entity with some governmental authority. (D.E. 74 at 7.) Because water regulators and a permit holder are already parties to this litigation, TCC's interests are adequately represented, Plaintiff concludes. (D.E. 74 at 7.)

It is apparent that Plaintiff does not represent TCC's interests. Whether the TCEQ Defendants or Intervenor GBRA can adequately represent TCC's interests, however, requires a closer inquiry.

In similar environmental cases, the Fifth Circuit has repeatedly held that governmental defendants cannot adequately represent the interests of private parties (and vice versa), as the interests of governmental and private entities often diverge.[8] For example, in Sierra Club v. Espy, a case brought against the United States Forest Service relating to logging procedures, the Fifth Circuit allowed the intervention of two trade associations representing timber purchasers. The court rejected the plaintiff's argument that "the government adequately represents the movants' interest because the interests are essentially identical." 18 F.3d at 1207. Rather, the court explained, "the movants have demonstrated . . . that the government's representation of

[8] As Plaintiff notes (D.E. 74 at 7), the Fifth Circuit in Hopwood v. State of Texas, 21 F.3d 603 (5th Cir. 1994) stated, "[w]here the party whose representation is said to be inadequate is a governmental agency, a much stronger showing of inadequacy is required. In a suit involving a matter of sovereign interest, the State is presumed to represent the interests of all of its citizens." 21 F.3d at 605. Hopwood, however, was a Section 1983 action challenging an affirmative action policy, not an environmental case. More recent Fifth Circuit precedent involving ESA causes of action and other environmental cases, as discussed herein, have specifically concluded that governmental parties cannot adequately represent particular private interests. These precedents are more closely on point than is Hopwood.

Case: 10-40610 Document: 00511145399 Page: 13 Date Filed: 07/23/2010

their interest is inadequate. The government must represent the broad public interest, not just the economic concerns of the timber industry. Given the minimal burden on the movants to satisfy this requirement, we conclude that the government's representation of the intervenors' interest is inadequate." Id. at 1207-08. The Fifth Circuit reached a similar conclusion in Sierra Club v. City of San Antonio, 115 F.3d 311 (5th Cir. 1997), an Endangered Species Act case wherein the Sierra Club alleged that certain entities that withdrew water from the Edwards Aquifer were causing harm to and "taking" threatened and endangered species living in the Comal and San Marcos Springs. 115 F.3d at 313. In considering the State of Texas's motion to intervene, the court rejected the Sierra Club's argument that the State's interests were adequately represented by private and local government parties, explaining "[i]t is axiomatic that the interests of the pumpers, who are local cities, businesses, and governmental entities that rely on the aquifer's water supply for their immediate subsistence, will diverge from those of the various state agencies who are charged with taking a state-wide view of the aquifer as it affects wildlife, water resources and quality, and the agricultural industry, as well as those of the state qua state and as parens patriae." 115 F.3d at 315. As another example, the Fifth Circuit in Sierra Club v. Glickman allowed AFBF to intervene as of right in an environmental suit against the U.S. Department of Agriculture ("USDA"). 82 F.3d 106, 110 (5th Cir. 1996). The court explained, "we disagree with the district court that the USDA will adequately represent the AFBF members' interests. . . . [T]he government must represent the broad public interest, not just the economic concerns of [one] industry. For this reason alone, the interests of AFBF members will not necessarily coincide, even though, at this point, they share common ground. . . ." Id. (citing Espy) (internal quotation marks omitted). The Fifth Circuit has applied the same rationale in other intervention cases. See Heaton, 297 F.3d at 425 ("Government agencies such as the FDIC

Case: 10-40610 Document: 00511184539 Page: 14 Date Filed: 07/23/2010

must represent the public interest, not just the economic interests of one industry. That the FDIC's interests and [the defendant's] may diverge in the future, even though, at this moment, they appear to share common ground, is enough to meet the FDIC's burden on the [fourth factor of Rule 24(a)(2)]."); John Doe No. 1 v. Glickman, 256 F.3d 371, 381 (5th Cir. 2001) (allowing intervention under Rule 24(a)(2) and stating, "[t]he USDA is a government agency that must represent the broad public interest, not just the [Animal Protection] Institute's concerns. Given the Institute's minimal burden and USDA's duty to represent the broad public interest, not just the Institute's, we conclude that USDA's representation of the Institute may be inadequate.").

The same principle must apply here. Movant TCC, as a membership association composed of private chemical manufacturing facilities, cannot be adequately represented by Defendant TCEQ officials and state agency GBRA, whose ultimate interests as governmental actors vary significantly from that of consumers and industrial water users. The Court has already recognized that the TCEQ Defendants are "primarily concerned with defending their policy determinations and protecting the State's resources on a larger level," and that GBRA would be focused mainly on its "numerous contractual commitments [and] the exercise of [its] statutory authority." (D.E. 35 at 4.) These interests are different from those of end-users, whether private or commercial, who must focus on ensuring that they continue to receive their allocated water rights without the alterations that Plaintiff seeks to secure.

Given the significant impact this litigation may have upon water users in the region, the Court find that it is necessary to ensure that the interests of private consumers are adequately represented in this litigation. TCC, as a membership association composed of 68 large

Case: 10-40610 Document: 00511184539 Page: 15 Date Filed: 07/23/2010

consumers, most notably five users that together hold the rights to approximately 68,226 acre-feet of water per year,[9] is a logical choice to represent the interests of private users.

In light of this discussion, the Court concludes that the factors under Rule 24(a)(2) strongly favor granting TCC's Motion to Intervene. While TCC has not formally complied with Rule 24(c), which states that a motion to intervene must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought," this requirement has been liberally construed. The Fifth Circuit has allowed interventions even in the absence of a formal motion to intervene, Farina v. Mission Inv. Trust, 615 F.2d 1068, 1074 (5th Cir. 1980), and courts in this District have taken a lenient approach to Rule 24(c). See Liberty Surplus Ins. Companies v. Slick Willies of Am., Inc., 2007 WL 2330294, at *1-2 (S.D. Tex. Aug. 15, 2007) ("[T]he motion to intervene . . . does put the parties on notice of his grounds for intervention. The motion is timely filed. [Plaintiff] does not contend that it would be prejudiced by the intervention. The failure to comply with Rule 24(c) is not a sufficient basis to deny the motion to intervene."); Doctors Hosp. 1997 LP v. Beazley Ins., 2009 WL 3719482, at *4 (S.D. Tex. Nov. 3, 2009) (allowing intervention without a written motion); see also City Bank v. Compass Bank, 2010 WL 1424275, at *7 (W.D. Tex. Apr. 6, 2010) ("[T]he Court adopts a 'lenient approach' to this issue, finding that it can resolve the basic question of Miller's standing to intervene, given the present record, and have the required Rule 24(c) pleadings filed at a later time."). Here, TCC has presented the interests it seeks to protect, and clearly indicates its position in this litigation. It also states that it supports the Motions to Dismiss filed in this action, and that it intends to file its own Rule 12 motion. (D.E. 53 at 12.) Finally, TCC states that it is prepared to file all required

[9] As noted previously, this interest is even greater, as UCC (a member of TCC) represents that it alone has an interest in 162,501 additional acre-feet of water. (D.E. 45 at 4-5.) TCC members' interest in this litigation is thus substantial.

documents promptly after entry of an order allowing its intervention. (D.E. 53 at 12.) This is sufficient to satisfy the requirements of Rule 24(c).

In sum, the Court concludes that Movant TCC shall be permitted to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), and therefore GRANTS its Motion to Intervene. (D.E. 53.) In light of this conclusion, the Court now turns to UCC's, TFB/AFBF's, SAWS's, and CPS Energy's Motions to Intervene. (D.E. 45, 51, 59, 70.)

**C. UCC, TFB/AFBF, SAWS and CPS Energy's Motions to Intervene (D.E. 45, 51, 59, 70)**

**1. Background on Movants**

**a. Union Carbide Corporation**

Movant UCC operates an integrated chemical manufacturing complex located near Seadrift, Texas (the "Seadrift Plant"). The Seadrift Plant is located on 4,700 acres and produces "building-block chemicals that serve as the precursors to many specialty chemical products critical to numerous industries," such as plastics, containers, toys, and health and beauty products. UCC utilizes fresh water in the production of its products at the Seadrift Plant. (D.E. 45 at 3.) UCC states that it has significant water rights from the Guadalupe River Basin dating from the 1940s, and provides an extensive review of its water rights over the past several decades. (D.E. 45 at 3-5.)

Under a September 2002 Agreement between UCC and the GBRA, UCC has a "significant interest" in 172,501 acre-feet of water per year from the Guadalupe River Basin. (D.E. 45 at 5.) Specifically, under the September 2002 Agreement, UCC has (1) "perpetual right to use for consumptive purposes up to 10,000 acre-feet of water per year," which includes the right to sell any portion of this allotment to a third party, and (2) "perpetual right to use 20,000 acre-feet of water for consumptive purposes in the UCC Seadrift Plant and an additional 10,000

Case: 10-40610 Document: 00511184539 Page: 17 Date Filed: 07/23/2010

acre-feet of water if needed." (D.E. 45 at 5.) In addition, under a revenue sharing section of the September 2002 Agreement, for any amount of water co-owned by GBRA, UCC receives a share of revenues received from sales. UCC receives 28.4% of all revenues from GBRA's sale of co-owned Run-of-the-River Rights under Section 3.6 of the 2002 Agreement. (D.E. 45 at 5.) Beyond direct water rights, UCC states that it plays an important planning role in the Guadalupe River Basin. (D.E. 45 at 6-7.)

UCC identifies two "direct, substantial, and legally protectable" interests in this litigation. First, as it has sole ownership rights over 10,000 acre feet of water per year and co-ownership rights over 162,501 additional acre-feet per year, it is one of the largest water rights holders on the Guadalupe River Basin and this legally protectable interest is a direct target of the current litigation. Second, the lawsuit threatens UCC's contracts with the GBRA. Under agreements with the GBRA, UCC is allotted significant additional acre-feet of water, in addition to water it directly owners, and UCC directly benefits from water sold by the GBRA pursuant to revenue sharing provisions within its contract with the GBRA. (D.E. 45 at 11.)

**b. Texas Farm Bureau and American Farm Bureau Federation Background**

Movant TFB describes itself as "a non-profit membership association representing family farmers and ranchers in Texas," with over 422,159 members, and a particular interest in water rights. (D.E. 51 at 6.) Among its members include persons holding water rights granted by the State of Texas to divert and use water from the Guadalupe River Basin and San Antonio River Basin, both of which are at issue in Plaintiff's Complaint. TFB has several different groups of members that have an interest in this litigation: (1) permit holders in the Guadalupe and San Antonio River Basins, with TFB members representing "over 11% of the total permit holders and 18% of the irrigation permit holders"; (2) exempt users, who utilize water for domestic and

Case: 10-40610 Document: 44 Page: 314 Date Filed: 07/23/2010

livestock use; and (3) persons who pump underground water from the Edwards Aquifer, which feeds the San Marcos and Comal Springs, which in turn provide flows to the San Marcos and Comal Rivers, both of which are major tributaries of the Guadalupe River. (D.E. 51 at 6-8.) For each group, this suit and Plaintiff's requested relief would "directly and adversely affect the rights and the economic and personal well-being of TFB members." (D.E. 51 at 7.)

For its part, the AFBF states that it is the nation's largest non-profit general farm organization, of which the TFB is a member. AFBF represents its members in legal, regulatory, and legislative matters relating to the ESA. (D.E. 51 at 9.) As TFB is a member of AFBF, TFB's members are also members of the AFBF. AFBF argues that its members have a direct interest in this suit because Plaintiff's claims, if acknowledged, could have "the potential to apply to virtually every water course or other body of water in the country from which farmers or ranchers have legally recognized rights to withdraw or divert, and use, water for irrigation, livestock, or domestic purposes, if that water resource contributes . . . to the habitat of any listed species." (D.E. 51 at 9.)

**c. San Antonio Water System**

The San Antonio Water System, or SAWS, is a public agency of the City of San Antonio, Texas, providing water services to approximately 1.3 million people. SAWS is a single utility responsible for water, wastewater, and water reuse. SAWS's water and wastewater service areas are established by the TCEQ, acting through Defendants Brian Shaw, Buddy Garcia, and Carlos Rubenstein. SAWS serves retail customers and provides wholesale water supplies to several smaller utility systems within its territory. TCEQ issues SAWS's permits to discharge treated wastewater into tributaries of the San Antonio River and regulate all aspects of SAWS's

wastewater gathering and treatment system. SAWS's authority to collect and treat wastewater and redistribute that reclaimed water for use is also established by TCEQ. (D.E. 59 at 4.)

SAWS identifies itself as a state and national leader in water conservation efforts. As the agency responsible for ensuring the water needs of the growing San Antonio metropolitan area, SAWS states that it must develop up to 141,000 acre-feet of new water supplies by 2060. To do so, it has continued to develop new water supplies. Notably, it has developed surface water supplies from the Guadalupe and San Antonio Rivers. (D.E. 59 at 5.)

SAWS states that it holds in excess of 23,000 acre-feet of surface water rights in the San Antonio River Basin under permits issued by TCEQ that would be directly affected by this lawsuit. An additional 40,00 acre-feet of treated wastewater that SAWS discharges from its water recycling plant into a San Antonio River tributary is subsequently withdrawn for cooling purposes by CPS Energy, San Antonio's municipally owned gas and electric utility. (D.E. 59 at 5.) This withdrawal is pursuant to a TCEQ permit that CPS holds, but is conditioned on CPS Energy's contract with SAWS. (D.E. 59 at 5.)

SAWS explains that it gets most of its water supply from groundwater withdrawn from the Edwards Aquifer pursuant to permits issued by the Edwards Aquifer Authority. Although Plaintiffs sue only TCEQ officials responsible for surface water, the broad relief Plaintiff seeks could "if construed broadly, wind up implicating groundwater use as well as surface-water rights and permits issued by Defendants." (D.E. 59 at 6.) The relief sought would also diminish the availability of surface water supplies to all users throughout the region, SAWS argues. (D.E. 59 at 6.)

Case: 10-40610 Document: 00511184539 Page: 20 Date Filed: 07/23/2010

d. **CPS Energy**

According to its Motion, CPS Energy is the exclusive provide of electrical services to over 1.7 million people in the San Antonio area, including residential, commercial, and industrial users. It owns and operates two power plant complexes in Bexar County situated on large reservoirs, which provide over 60% of CPS Energy's generation capacity. These power plants rely upon an adequate and reliable water supply to operate, primarily for condenser cooling. CPS Energy owns permitted water rights that authorize diversions from the San Antonio River basin sufficient to meet CPS Energy's water needs. Without sufficient water, CPS Energy states that several electrical generating units would cease to operate, impairing its ability to provide electrical service to the greater San Antonio population. (D.E. 70 at 1-3.)

CPS Energy is owned by the City of San Antonio and managed independently by a Board of Trustees. CPS Energy has permits to divert and use up to 37,000 acre-feet of water per year from Calaveras Lake, diverted from the San Antonio River basin, with some additional permitted withdrawals. (D.E. 70 at 3-4.)

2. **Application of Rule 24(a)(2) Factors**

Without the need for extensive analysis, the Court can conclude that Movants UCC, TFB/AFBF, SAWS, and CPS Energy satisfy the first three elements for intervention under Rule 24(a)(2). The Motions are timely, having been filed approximately three to four months after initiation of this action and before any important deadlines in this action;[10] UCC, TFB/AFBF, SAWS, and CPS Energy claim an interest in the subject matter of this action because of the water rights it or its members possess; and all have shown that disposition of this action would impair their ability to protect existing water rights. The difficulty arises, however, with respect

[10] Plaintiff does not dispute timeliness, at least with respect to UCC's Motion to Intervene. (D.E. 58 at 9.)

to the final factor under Rule 24(a)(2), namely that "the applicant's interest must not be adequately represented by existing parties to the litigation." Heaton, 297 F.3d at 422.

As an initial matter, the Movants make much of the factual distinctions between themselves and the existing parties to this litigation, but fail to identify specific legal arguments or positions that they alone would take. Indeed, three motions to dismiss have already been filed in this action, totaling approximately sixty-five pages of briefing, in addition to exhibits totaling hundreds of pages. (D.E. 40, 43, 57.) These motions to dismiss raise numerous arguments, including lack of standing, failure to state a claim, Eleventh Amendment immunity, Fifth Amendment takings considerations, and abstention pursuant to Burford v. Sun Oil Co., 319 U.S. 315 (1943). TCC states that it will join in these motions, and "will file a Rule 12 motion and other pleadings, seeking to dismiss Plaintiff's claims and asserting the position that the relief [Plaintiff] seeks would wrongfully invalidate its members' vested rights." (D.E. 53 at 12.) One party has already submitted an amicus curiae brief. (D.E. 72.) The significant briefing already filed with the Court indicates that the Movant's interests will be adequately represented by the existing parties. None of the Movants have suggested that the briefing already filed with the Court fails to adequately represent their interests.

Turning now to Movants UCC and TFB/AFBF, the Court concludes that the newly allowed intervention of TCC will ensure that the interests of private consumers are adequately represented. TCC will adequately represent UCC's interests, as UCC is a member of TCC, and as an industrial operation, UCC has interests very similar to that of other TCC members. (D.E. 53 at 9.) In fact, TCC identifies UCC's Seadrift Plant as one of the five largest users affected by this litigation. (D.E. 53 at 3.) With respect to the interests of TFB/AFBF, the Court concludes that TCC and TFB/AFBF are similar in that both are membership associations representing water

Case: 10-40610 Document: 00511184539 Page: 22 Date Filed: 07/23/2010

consumers. Even though TCC and TFB/AFBF members use their water rights for different purposes, both have substantially similar interests as private users of water, namely ensuring their continued water rights and preventing any alteration thereof.

While it is true that both UCC and TFB/AFBF filed their Motions to Intervene before TCC, both were alerted to TCC's possible intervention in the Joint Discovery / Case Management Plan filed in this case. (D.E. 15 at 2.) Despite the opportunity to address whether TCC could adequately represent their interests, neither party chose to do so. Moreover, UCC cannot seriously contend that its own interests will not be adequately represented by TCC, an industry association of which it is a member. TFB/AFBF, when given the opportunity to argue against UCC's intervention, failed to offer any argument other than the fact that its "interests are to protect water rights which are primarily for 'consumptive industrial use.'" (D.E. 51 at 17.) Although UCC and other TCC members' uses of the water at issue differs from that of TFB/AFBF members, the Court fails to see the relevance of this difference, particularly as it relates to representation of user interests in this litigation. Taken to its logical conclusion, TFB/AFBF's argument would require the Court to allow any party to intervene so long as its interests differed in any way from the parties already in the lawsuit.[11]

Next, with respect to SAWS and CPS Energy, the Court concludes that the combined representation of the TCEQ Defendants, GBRA, and TCC will adequately protect SAWS and CPS Energy's interests. In its Motion to Intervene, SAWS argues that its position in this case would be "unique," as unlike other entities, its "interests are precariously balanced between the San Antonio River Basin and the Guadalupe River Basin, and the environmental needs of both."

---

[11] In support of its Motion, TFB/AFBF cites Sierra Club v. Glickman, 82 F.3d 106 (5th Cir. 1996), wherein AFBF was allowed to intervene. This case, however, is distinguishable. As noted above, the Fifth Circuit in Glickman allowed AFBF to intervene because the USDA was the only named defendant, and the court explained that the government could not adequately represent private interests. 82 F.3d at 110. Here, however, TCC has been granted the right to intervene, and will adequately represent non-governmental users of water at issue in this case.

Case: 10-40610 Document: 00511184539 Page: 23 Date Filed: 07/23/2010

(D.E. 59 at 14.) SAWS further argues that the "far-reaching impact of the relief sought by [Plaintiff] could negatively affect" SAWS's reclaimed water program "to the detriment of SAWS and other environmental interests, including the very species at issue in this lawsuit." (D.E. 59 at 14.) Similarly, CPS Energy argues that TCEQ Defendants cannot represent their interests because Defendants' interests "are much broader" and they cannot "look out for the particular and critical interests of CPS Energy." (D.E. 70 at 19.) CPS further argues that GBRA will not represent its interests because its statutory authority does not extend to the San Antonio River basin, the basin from which CPS Energy diverts water, and GBRA is not an ultimate consumer of water. (D.E. 70 at 19-20.) CPS Energy acknowledges, however, "GBRA and CPS Energy may have the same general purpose for seeking intervention." (D.E. 70 at 20.) Finally, CPS Energy notes that TCC "seeks to 'represent and protect the statewide chemical industry's common interest' and the 'broader public policy of how the State allocates water,' not the municipal electrical generation interests of CPS Energy. Only CPS Energy represents the interests of its large electrical customer base." (D.E. 70 at 20-21 (quoting D.E. 53 at 2,10).)

The Court disagrees with SAWS and CPS Energy's arguments. While it may be true that Defendants, GBRA, or TCC alone could not adequately represent SAWS or CPS Energy's interests, the three together will represent both prospective intervenors' interests. First, the TCEQ Defendants will play an important role in representing SAWS and CPS Energy's interests. SAWS admits that "Defendants do share some interests with SAWS in ensuring that water rights are not impeded," though it contends that their interests diverge. (D.E. 59 at 14-15.) Apart from general concerns about the TCEQ Defendants' focus in this lawsuit, CPS Energy does not specifically state what legal arguments or positions it would take, for example, that the Defendants would not. In sum, the TCEQ Defendants will play an important role in representing

Case: 10-40610 Document: 44 Page: 320 Date Filed: 07/23/2010

SAWS and CPS Energy's interests as a public agency responsible for ensuring the water needs of a large population.

Intervenor GBRA will also play an important role in representing SAWS and CPS Energy's interests. GBRA was established by the Texas Legislature, and has the responsibility to develop, conserve, and protect the water resources within a 10 county statutory district, beginning at the headwaters of the Guadalupe and Blanco Rivers, and ending at San Antonio Bay. It has broad authority to acquire surface water rights and sell water. GBRA is a water supplier to over 115 municipal, industrial, and agricultural users, including SAWS itself. (D.E. 27 at 8-9.) GBRA holds water rights to 175,501 acre-feet of water annually out of the Guadalupe River, and the right to divert 90,000 acre-feet of water annually stored at the Canyon Reservoir. (D.E. 27 at 9.) As a public entity with a large consumer base, including SAWS itself, GBRA can be trusted to adequately protect SAWS' interests. The mere fact that GBRA's interests lie in the Guadalupe River rather than the San Antonio River, or its interests concern surface water rather than ground water, as SAWS and CPS Energy argue (D.E. 59 at 16; D.E. 70 at 19-20), is not sufficient to conclude that GBRA will not substantially represent SAWS and CPS Energy's interests.

Lastly, Intervenor TCC, as an association of private users, will also adequately protect SAWS and CPS Energy's interests. As noted above, TCC is a statewide trade association of chemical manufacturing facilities in Texas, many of which could be negatively affected by this lawsuit. While it is true that "SAWS represents the interests of its extensive customer base . . . who depend on SAWS for their water supply," and TCC "represent[s] important but more narrowly focused and private commercial interests of . . . the chemical industry," (D.E. 59 at 15) both have the same interest in ensuring that water rights continue unimpeded by this lawsuit.

Case: 10-40610 Document: 00511184539 Page: 25 Date Filed: 07/23/2010

The same is true for CPS Energy, despite it being the only entity to represent "municipal electrical generation interests." (D.E. 70 at 20-21.) SAWS and CPS Energy fail to explain how the distinctions between their missions and that of TCC leads to the conclusion that TCC will not adequately represent their legal interests in this litigation.

While generally "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained," Heaton, 297 F.3d at 422, the Court in this case must conclude that allowing additional interventions would not lead to "greater justice," as it would open the door to any other entities who can identify some slight difference between their mission or purpose and that of existing parties to this litigation. Further interventions are unnecessary, as UCC's, TFB/AFBF's, SAWS's, and CPS Energy's interests are adequately represented through the existing parties. This conclusion is supported by the Certificates of Interested Parties filed in this case by the TCEQ Defendants and GBRA. Both list numerous public and private interests that are "financially interests in the outcome of this litigation," including farms, ranches, and other private users, municipal customers including SAWS itself, industrial customers such as UCC, and publicly traded companies such as Berkshire Hathaway, BP Chemical, and the Dow Chemical Company, as well as "water customers . . . that obtain water from the surface waters of the . . . San Antonio River Basin[]." (D.E. 14-2; D.E. 37 at 1-7.) These numerous public and private interests should be adequately protected by the existing parties, plus Intervenor TCC.

For the reasons stated above, the Court DENIES UCC's Motion to Intervene (D.E. 45), TFB/AFBF's Motion to Intervene (D.E. 51), SAWS's Motion to Intervene (D.E. 59), and CPS Energy's Motion to Intervene (D.E. 70) under Rule 24(a)(2). The Court briefly considers intervention under Rule 24(b)(1)(B).

Case: 10-40610 Document: 00511184539 Page: 26 Date Filed: 07/23/2010

### 3. Permissive Intervention under Rule 24(b)(1)(B)

UCC, TFB/AFBF, SAWS, and CPS Energy seek intervention under Rule 24(b)(1)(B) as an alternative to Rule 24(a)(2). (D.E. 45 at 14-15; D.E. 51 at 15; D.E. 59 at 16-17; D.E. 70 at 22-23.) Plaintiff opposes permissive intervention. (D.E. 58 at 19-20; D.E. 74 at 7-8.)

Federal Rule of Civil Procedure 24(b)(1)(B) provides, "[o]n timely motion, the court may permit anyone to intervene who: (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Rule 24(b)(3) states, "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Permissive intervention pursuant to Rule 24(b)(1) is appropriate when: "(1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." League of United Latin Am. Citizens, Council No. 4434 v. Clements, et al., 884 F.2d 185, 189 n.2 (5th Cir. 1989); Sierra Club v. Fed. Emergency Mgmt. Agency, 2008 WL 2414333, at *6 (S.D. Tex. June 11, 2008) (citing Clements). "When acting on a request for permissive intervention, a district court should consider, among other factors, whether the intervenors are adequately represented by other parties and whether they are likely to contribute significantly to the development of the underlying factual issues. When a proposed intervenor possesses the same ultimate objectives as an existing litigant, the intervenor's interests are presumed to be adequately represented absent a showing of adversity of interest, collusion, or nonfeasance." Clements, 884 F.2d at 189 (internal citations omitted); Cal Data Systems, Inc. v. NCS Pearson, Inc., 2008 WL 1730539, at *2 (S.D. Tex. Apr. 10, 2008) (citing Clements). "Permissive intervention is within a court's discretion." Newby v. Enron Corp., 443 F.3d 416,

Case: 10-40610 Document: 00511184539 Page: 27 Date Filed: 07/23/2010

424 (5th Cir. 2006); Kneeland v. Nat'l Collegiate Athletic Ass'n, 806 F.2d 1285, 1289 (5th Cir. 1987) ("Permissive intervention is wholly discretionary with the [district] court . . . even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied.").

The Court recognizes that its analysis of UCC's, TFB/AFBF's, SAWS's, and CPS Energy's right to intervene under Rule 24(a)(2) also weighs against a finding that they should be allowed to permissively intervene under Rule 24(b)(1)(B). As an initial matter, the Court has already concluded that UCC and TFB/AFBF's interests will be adequately represented by Intervenor TCC, and that SAWS and CPS Energy will be adequately represented by Defendants, GBRA, and TCC. (See supra Part III.B.2.d.) As such, there is no need for intervention by other groups. Further, the Court is concerned that allowing these interventions under Rule 24(b)(1)(B) will further complicate this case without any added benefit, in light of TCC's intervention and the interests of other entities already parties to this litigation. See Farouk Systems, Inc. v. Costco Wholesale Corp., 2010 WL 1576690, at *3 (S.D. Tex. Apr. 20, 2010) (rejecting permissive intervention because it "could add considerable complication and delay to this case"). Finally, as part of its role in managing this litigation, the Court must prevent an overflow of additional attempted interventions, which would be a likely consequence of allowing UCC, TFB/AFBF, SAWS, and CPS Energy to intervene under Rule 24(b)(1)(B). See, e.g., Farouk Systems, Inc., 2010 WL 1576690, at *3 ("[T]he Court is concerned that, should AMLP be permitted to intervene, there may be no basis on which to prevent Farouk's 85 other distributors from also seeking to intervene."); S.E.C. v. Bear, Stearns & Co., Inc., 2003 WL 22000340, at *4 (S.D.N.Y. Aug. 25, 2003) (rejecting permissive intervention by investors, and explaining "[w]ere this Court to grant this motion to intervene, it would be logic-bound to allow all investors and interested

members of the public with differing viewpoints to intervene in the underlying actions."). For these reasons, the Court must exercise its discretion to deny UCC's, TFB/AFBF's, SAWS's, and CPS Energy's Motions to Intervene (D.E. 45, 51, 59, 70) under Rule 24(b)(1)(B).

Lastly, while the Court has denied UCC's, TFB/AFBF's, SAWS's, and CPS Energy's Motions to Intervene, it recognizes that they have important interests in this litigation. To the extent positions they wish to present to the Court are not argued by the existing parties to this litigation, these entities may participate through amicus curiae submissions. Bush v. Viterna, 740 F.2d 350, 359 (5th Cir. 1984) ("Where he presents no new questions, a third party can contribute usually most effectively and always most expeditiously by a brief amicus curiae and not by intervention.") (internal quotation marks omitted); see South Carolina v. North Carolina, __ U.S. __, 130 S. Ct. 854, 875 (2010) (Roberts, C.J., concurring in part and dissenting in part) ("Courts often treat amicus participation as an alternative to intervention."). These entities thus have leave to participate as amicus curiae should they wish to do so.

## IV. Conclusion

For the reasons stated above, the Court (1) GRANTS Texas Chemical Council's Motion to Intervene (D.E. 53); but (2) DENIES Union Carbide Corporation's Motion to Intervene (D.E. 45); (3) DENIES Texas Farm Bureau and American Farm Bureau Federation's Motion to Intervene (D.E. 51); (4) DENIES San Antonio Water System's Motion to Intervene (D.E. 59); and (5) DENIES CPS Energy's Motion to Intervene (D.E. 70).

SIGNED and ORDERED this 17th day o



Case: 10-40610 Document: 00511184540 Page: 1 Date Filed: 07/23/2010

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 2:10-cv-00075** |
| | § | |
| | § | |
| **BRIAN SHAW, et al.,** | § | |
| | § | |
| **Defendants** | § | |

**TEXAS FARM BUREAU
AND AMERICAN FARM BUREAU FEDERATION'S
MOTION FOR STAY OF PROCEEDINGS PENDING APPEAL**

COMES NOW Texas Farm Bureau ("TFB") and the American Farm Bureau Federation ("AFBF"), would-be defendant-intervenor (also jointly referred to as "TFB") in the above-entitled and numbered action, and moves the Court for an order staying further proceedings in this action pending the disposition of TFB's appeal to the United States Court of Appeals for the Fifth Circuit from the Order of this Court dated June 17, 2010 (D.E. 86) denying TFB's Motion to Intervene. Should this Court deny this Motion, TFB intends to seek a stay from the United States Court of Appeals for the Fifth Circuit. Accordingly, TFB requests this Court's prompt consideration and action on this request for a stay of the proceedings, and in support thereof would show the following:

**I. Parties and Ruling Being Appealed.**

TFB members have vested property interests that are potentially affected by the Plaintiff's complaint. Those interests are both separate and distinct from those of any

Case: 10-40610 Document: 00511184549 Page: 2 Date Filed: 07/23/2010

currently-admitted parties to this litigation.[1] Of the approximately 1150 water rights holders in the Guadalupe and San Antonio River Basins, of which 720 are irrigation rights, at least 130 are TFB members owning water rights to irrigate; TFB members comprise over 11% of the total permit holders and 18% of the irrigation permit holders in those river basins. (D.E. 51 at 3-5). TFB members have substantial legally-protected interests in three different categories of water rights that are potentially affected by Plaintiff's suit[2] – members are (a) agricultural water users who hold adjudicated water rights and irrigation rights permits in the Guadalupe and San Antonio River Basins, (b) exempt users of water (not required to have permits or other water rights) from those rivers for domestic and livestock uses, and (c) groundwater users who pump underground water from the Edwards Aquifer, which feeds the San Marcos and Comal Springs, both of which provide substantial flows to the San Marcos and Comal Rivers, which are tributaries of the Guadalupe River. *Id*. at 4-5.

The June 17, 2010 Order of this Court struck the interventions of TFB and AFBF, as well as other "private consumers" of water, holding that their interests will be adequately represented in the proceeding by the Texas Chemical Council ("TCC"). (D.E. 86 at 21).[3] TCC is a trade association of chemical manufacturing facilities in Texas organized to protect that industry's common interests and whose members acquire water for industrial uses through state-issued surface water rights permits. TCC members such as Union Carbide Corporation contract for the purchase of water from, e.g., the Guadalupe-Blanco River Authority ("GBRA"). *Id*. at 4. TCC's Motion to Intervene was

[1] TFB herein incorporates by reference the background facts and arguments from its Motion to Intervene as Defendants and Memorandum in Support of Intervention. (D.E. 51).
[2] *See*, e.g., *Texas Water Rights Comm'n v. L.A. Wright*, 464 S.W.2d 642, 647 (Tex.1971).
[3] If the Court were to reconsider its June 17, 2010 Order and grant TFB's intervention, this Motion for Stay would become moot.

Case: 10-40610 Document: 00511184540 Page: 3 Date Filed: 07/23/2010

granted. *Id*. at 16. As explained below, however, TCC does not and cannot represent the interest of TFB's members.

**II. Standard for Decision.**

This Court has authority to stay its judgment pending appeal. *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). In determining whether to issue a stay pending appeal, a court must assess four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where lies the public interest.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987);[4] *In re Texas Health Enterprises, Inc.*, 255 B.R. 185, 187-88 (Bankr. E.D. Tx. 2000). The Supreme Court recognizes that these four factors cannot be reduced to a set of rigid rules and that it is sufficient merely to show that the applicant can demonstrate a strong case on the merits. *Id.* at 777, 778. The Fifth Circuit recognizes that the movant for a stay "need only present a substantial case on the merits . . . and show that the balance of the equities weighs heavily in favor of granting the stay." *United States v. Baylor Univ. Med. Ctr*, 711 F.2d 38, 39 (5th Cir. 1983). As TFB shows below, each of the four factors weigh heavily in favor of issuing a stay.

**III. TFB Has a Substantial Case on the Merits and is Likely to Succeed on the Merits**.

**A. At a minimum, TFB has demonstrated a substantial case on the merits.**

While TFB believes there is a substantial likelihood it will prevail on the merits of its appeal, the Fifth Circuit requires only a demonstration that there is a serious legal

[4] Although *Hilton* involves a motion for a stay brought under Federal Rule of Civil Procedure 62(c), consideration of the factors enumerated is generally appropriate in this case.

question and that the movant has presented a substantial case on the merits. *Id.* at 39. That standard is satisfied here.

**1. Three of the four requirements for intervention as of right are undisputed.**

Federal Rule of Civil Procedure 24(a)(2) governs intervention as a right. Based on this Rule, the Fifth Circuit developed a four-factor test to govern intervention:

> (1) the applicant must file a timely application; (2) the applicant must claim an interest that is the subject matter of the action; (3) the applicant must show that disposition of the action may impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties to the litigation.

*Heaton v. Monogram Credit Card Bank of Georgia*, 297 F.3d 416, 422 (5th Cir. 2002). As this Court noted in its Order, "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained." *Id.* Rule 24 is to be construed liberally so that any doubts should be resolved in favor of the would-be intervenor. *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 248 (5th Cir. 2009).

This Court has already noted that TFB has undisputedly satisfied the first three elements for intervention, having timely filed its motion for intervention, established an interest in the subject matter, and shown that its ability to protect that interest may be impeded by the disposition of this action. (D.E. 86 at 20). TFB respectfully disagrees, however, with the Court's determination that TFB's unique rights and interest in the outcome of this proceeding can be adequately represented by TCC.

**2. TFB members' interests are not represented by TCC or any other admitted party.**

The Fifth Circuit has held that Rule 24 generally favors intervention, stating that the burden to demonstrate the fourth prong – inadequate representation of the party's

Case: 10-40610 Document: 44 Page: 329 Date Filed: 07/23/2010

interests – is "minimal"; the applicant only needs to show that the representation of its interests "may be" inadequate. *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994). The Court already acknowledged that TFB members have a significant legal interest in the outcome of this proceeding, and that this interest is not represented by the State of Texas or by governmental entity defendant-intervenor GBRA. (D.E. 86 at 12-14; 20-21). Instead, however, of allowing TFB to intervene, the June 17, 2010 Order of this Court allowed only the intervention of TCC, stating that TCC will be able to "ensure the interests of private consumers are adequately represented." *Id*. at 21. In denying TFB's Motion to Intervene, this Court noted that, while TFB and TCC members' "uses of the water at issue differs," the Court "fails to see the relevance of this difference" as it relates to the users' interests in this litigation. (D.E. 86 at 22). TCC and TFB members may all be private users of water, but they represent very distinct water rights and water rights users. TCC represents industrial facilities that use water via surface rights that they either hold or purchase and, unlike TFB, its members do not have rights in irrigation permits, groundwater, or exempt domestic and livestock use. (D.E. 86 at 4).

Significantly, TCC has *expressly disclaimed* that it represents the interests of TFB members. In its Motion to Intervene, TCC states that "[t]he industrial uses of water by TCC's members present different needs and solutions than, for example, residential and agricultural users . . . ." (D.E. 53 at 10). In fact, one goal of intervening industrial, municipal and governmental users could be to preserve their water supply rights at the expense of agricultural users, a particularly disturbing prospect if agricultural users and their legal rights are not represented in this proceeding.

Case: 10-40610 Document: 44 Page: 330 Date Filed: 07/23/2010

No other group represents the interests of agricultural water users, which are the largest single group of permit holders in the San Antonio and Guadalupe River Basins. Agricultural users differ from other water users in a number of ways. Their use is primarily seasonal in nature and therefore will have a different impact on bays and estuaries. Agricultural use also tends to increase during drought periods, making competition with water for the bays and estuaries more direct. Additionally, once crops are growing in the field, the impact of cutting off irrigation water is much more severe than reducing water supplies for many other purposes.

Similarly, only TFB represents the interests of exempt domestic and livestock users and irrigators from the Edwards Aquifer. Exempt domestic and livestock users rely upon rights that are legally distinct and often superior to permitted water rights. Exempt users are a group that Plaintiff has specifically targeted in its pleadings but are not represented by any existing party. *See* D.E. 1 at ¶ 204 ("It is reasonably foreseeable that future use of existing water permits and exemptions authorized by Defendants will result in additional prohibited takes of Whooping Cranes unless and until such activities are enjoined.") and D.E. 1 at ¶ ¶ 186-88.

It is foreseeable that the relief Plaintiff seeks could require restricting TFB's use of Edwards Aquifer groundwater. TFB members who are groundwater irrigators are now entirely unrepresented in this proceeding as SAWS' intervention has been excluded as well. (D.E. 86).

**3. Interests of water right holders diverge for purposes of mediation, settlement and formulation of remedies.**

Representation of TFB members' interests will be inadequate if the Court reaches the remedy stage of proceedings and TFB is not a party. Both TCC and TFB may, at the

Case: 10-40610 Document: 44 Page: 331 Date Filed: 07/23/2010

current stage of litigation, be similarly situated in opposing Plaintiff's petition and request for relief, but this alignment likely could end during mediation[5] or settlement discussions, or if this Court ultimately provides the relief sought by Plaintiff.

Plaintiff seeks the curtailment of water uses, including for irrigators, exempt users, and potentially groundwater users such as TFB members. *See supra* **Section III.A.2**. If TCC is a party but not TFB, TCC's role in fashioning any remedies will almost certainly be to advocate the interests of its own members – the users and holders of industrial use surface water rights. TCC would have no obligation or incentive to advocate on behalf of TFB members' distinct water rights at the remedy stage; in fact, if water use reduction is mandated, TCC (and GBRA as well) could argue that municipal and industrial water uses have higher priority and value than agricultural uses, advocating curtailment or reduction of TFB members' water rights in favor of the rights of TCC members.

In order to effectively mediate or attempt settlement of this proceeding or, should this action proceed to trial and Plaintiff prevails, in order to fashion a remedy in which the interests of all affected parties' legal rights are represented, TFB is a necessary party.

**4. Interests represented by TFB are substantial.**

TFB represents the largest number of water rights holders among the parties who have intervened and sought to intervene. *See supra* **Section I**. Plaintiff seeks to curtail or restrict water rights that are a necessity for the success of many TFB members' agricultural and ranching operations, including exempt domestic and livestock and irrigation uses, and potentially TFB members' Edwards Aquifer groundwater rights. *See supra* **Section III.A.2**. Domestic and livestock use is a substantial, as yet unquantified

[5] Mediation has already been ordered by this Court. (D.E. 34).

group of water users. TFB alone represents this interest, which is currently unrepresented in this case. By allowing TFB's intervention, representation of these multiple interests is efficiently achieved.

**IV. Absent Issuance of A Stay, TFB Will Be Irreparably Injured.**

Without TFB's participation in this proceeding, no party will directly or adequately represent the water rights of exempt domestic and livestock users, irrigation water rights holders, or groundwater users. Absent a stay, given the expedited trial schedule,[6] TFB might be unable to utilize discovery or participate at trial, and could be precluded from appealing the trial's outcome. TFB would also be unable to put on evidence regarding its members' uses of water resources or rebut Plaintiff's claims of those uses' impact on the Whooping Crane. Should the Fifth Circuit ultimately reverse and allow TFB's intervention, TFB would then be forced to "play catch up" absent a stay of proceedings. Further, as discussed *supra* in **III.A.3**, mediation, settlement, and any potential legal remedy could result in curtailment of rights which are fundamental to TFB members. Absent issuance of a stay to allow the Fifth Circuit to rule on TFB's appeal, this proceeding could take place entirely without the participation of necessary intervening parties.

**V. Delay Resulting From A Stay Will Cause No Harm to Plaintiff.**

**A. Plaintiff does not seek temporary relief.**

Plaintiff in this proceeding, The Aransas Project, does not seek preliminary injunctive relief or a temporary restraining order. *See* Plaintiff's Original Complaint (D.E. 1 at 32-33). It alleges no imminent harm sufficient to support a request for interim or expedited relief. A temporary stay of the proceeding in order to determine what

[6] *See* Scheduling Order (D.E. 32).

Case: 10-40610 Document: 00511184540 Page: 9 Date Filed: 07/23/2010

parties should have a right to intervene will cause no harm to Plaintiff or the parties currently admitted as Defendants and Defendant-intervenors GBRA and TCC. Indeed, neither the state defendants nor GBRA oppose a stay.

**B. Drought conditions that impacted freshwater inflows no longer exist.**

Plaintiff briefly acknowledges that the record Texas drought of 2008-2009 caused low freshwater inflows into the San Antonio Bay estuary. (D.E. 1 at ¶ ¶ 85, 101). However, heavy rains that have fallen since September 2009 across much of the state have ended the severe drought conditions that diminished freshwater inflows in the San Antonio and Guadalupe Rivers.[7] The drought of 2008-2009 – one of the most severe on record in much of Texas – has ended, eliminating the complained-of conditions and mitigating any potential harm of a stay of district court proceedings.

**C. TFB plans to seek expedited appeal in order to minimize delay of trial.**

In order to minimize any delay of this proceeding attendant to its appeal, TFB intends to file a motion to expedite its appeal with the Fifth Circuit Court of Appeals pursuant to Fifth Circuit Rule 27.5. TFB seeks a stay of this proceeding only in the interest of justice, and will seek to minimize delay to the extent possible.

**VI. The Public Interest Favors Granting A Stay.**

As stated *supra* in **Sections I** and **III.A.4** of this Motion, TFB represents a significant number of water rights holders in the state of Texas who are agricultural users. These members are distinct from the industrial users represented by TCC both in their use of water as well as the legal character of the specific water rights held. TFB members

[7] *See*, e.g., NOAA U.S. Seasonal Drought Outlook (Valid July 1, 2010 – September 1, 2010), *available at* http://www.cpc.noaa.gov/products/expert_assessment/season_drought.gif (Attached as **Exhibit 1**); James C. McKinley Jr., *Heavy Rains End Drought for Texas*, N.Y. TIMES, January 8, 2010, *available at* http://www.nytimes.com/2010/01/09/science/earth/09drought.html.

hold rights in specific uses that Plaintiff may seek to modify and reduce that are not represented by TCC or any other admitted party. Any mediation, settlement, or legal remedy that Plaintiff seeks would necessarily affect the rights of TFB in ways that are different from and likely conflict with those of TCC.

The rule governing intervention favors allowing intervention in order to attain the greater justice. *Heaton*, 297 F.3d at 422. Public policy would best be served by granting the intervention of TFB so that the legal interests of its members are represented at every phase of this proceeding.

**VII. Prayer**

This case presents a serious legal question which may impact the rights and livelihoods of members of the Texas Farm Bureau and the American Farm Bureau Federation. TFB has presented a substantial case on the merits that its intervention is of right. The equities weigh heavily in favor of staying the proceeding of this Court until the appellate court has an opportunity to address and resolve the legal issue of whether TFB has a right of intervention. Accordingly, this Court should stay this proceeding pending appeal.

Respectfully submitted,

*/s/ Sydney W. Falk, Jr.*

Sydney W. Falk, Jr.
Texas State Bar No. 06795400
Southern District of Texas No. 16128
Email: sfalk@bickerstaff.com
Douglas G. Caroom
Attorney-in-Charge
Texas State Bar No. 03832700
*Application for admission pro hac vice pending*
Email: dcaroom@bickerstaff.com

Case: 10-40610 Document: 00511184540 Page: 11 Date Filed: 07/23/2010

BICKERSTAFF HEATH DELGADO ACOSTA LLP
3711 South MoPac Expressway, Building One, Suite 300
Austin, Texas 78746
Phone: (512) 472-8021
Facsimile: (512) 320-5638

**ATTORNEYS FOR TEXAS FARM BUREAU and AMERICAN FARM BUREAU FEDERATION**

Case: 10-40610 Document: 00511184540 Page: 12 Date Filed: 07/23/2010

## CERTIFICATE OF CONFERENCE

I hereby certify that on July 7, 2010, I conferred with counsel for the parties to this proceeding regarding TFB's motion for a stay of proceedings pending appeal. Plaintiff is opposed to TFB's motion. The state defendants are unopposed to TFB's motion. GBRA takes no position on TFB's motion. TCC is opposed to TFB's motion.

*/s/ Douglas G. Caroom*
Douglas G. Caroom

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served through the Court's ECF electronic filing system to the known users of the Court's ECF filing system identified below on this 12th day of July 2010.

Attorneys for Plaintiff

James B. Blackburn, Jr.
Charles Irvine
Mary Carter
BLACKBURN CARTER, P.C.
4709 Austin Street
Houston, Texas 77004

David A Kahne
LAW OFFICE OF DAVID A. KAHNE
P.O. Box 66836
Houston, Texas 77266

Attorneys for State Defendants

Brian E. Berwick
Cynthia Woelk
John Hulm
TEXAS ATTORNEY GENERAL'S OFFICE
Environmental Protection and Administrative Law Division
P.O. Box 12458
Austin, Texas 78711-2548

Attorneys for Defendant-Intervenor
Guadalupe-Blanco River Authority

Case: 10-40610 Document: 00511184540 Page: 13 Date Filed: 07/23/2010

Edward F. Fernandes
Christopher H. Taylor
HUNTON & WILLIAMS LLP
111 Congress Avenue, Suite 1800
Austin, Texas 78701

Kathy Robb
HUNTON & WILLIAMS LLC
200 Park Avenue
New York, NY 10166

Bruce Wasinger
General Counsel
Guadalupe-Blanco River Authority
933 East Court Street
Sequin, Texas 78155

J.A. "Tony" Canales
Hector A. Canales
CANALES & SIMONTON, P.C.
2601 Morgan Avenue
P.O. Box 5624
Corpus Christi, Texas 78465

Attorneys for Defendant-Intervenor
Texas Chemical Council

Thomas H. Watkins
Kenneth R. Ramirez
Rachel L. Noffke
BROWN MCCARROLL LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701

*/s/ Sydney W. Falk, Jr.*
Sydney W. Falk, Jr.

Case: 10-40610 Document: 00511184540 Page: 14 Date Filed: 07/23/2010

# EXHIBIT 1


U.S. Seasonal Drought Outlook
Drought Tendency During the Valid Period
Valid July 1, 2010 - September 2010
Released July 1, 2010
Persistence
Development
Some Improvement
Persistence
Improvement
Some Improvement
Persistence
Persistence
Some Improvement
Some Improvement
Improvement
Persistence
No Drought Posted/Predicted
KEY:
Drought to persist or intensify
Drought ongoing, some improvement
Drought likely to improve, impacts ease
Drought development likely
Depicts large-scale trends based on subjectively derived probabilities guided by short- and long-range statistical and dynamical forecasts. Short-term events – such as individual storms – cannot be accurately forecast more than a few days in advance. Use caution for applications – such as crops – that can be affected by such events. "Ongoing" drought areas are approximated from the Drought Monitor (D1 to D4 intensity). For weekly drought updates, see the latest U.S. Drought Monitor. NOTE: the green improvement areas imply at least a 1-category improvement in the Drought Monitor intensity levels, but do not necessarily imply drought elimination.

Case: 10-40610 Document: 00511184540 9 Page: 16 Date Filed: 07/23/2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **THE ARANSAS PROJECT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 2:10-cv-00075** |
| | § | |
| | § | |
| **BRIAN SHAW, et al.,** | § | |
| | § | |
| **Defendants** | § | |

**ORDER**

On this day came on to be considered the Motion for Stay of Proceedings Pending Appeal of the Texas Farm Bureau and the American Farm Bureau Federation. (D.E. ___.) Having considered the motion, responses, evidence and applicable authority, the Court finds that the motion for stay should be granted.

IT IS THEREFORE ORDERED that the Motion for Stay of the Texas Farm Bureau and the American Farm Bureau Federation is GRANTED. Further proceedings in this action are stayed pending the disposition of the Texas Farm Bureau and the American Farm Bureau Federation's appeal to the United States Court of Appeals for the Fifth Circuit from the Order of this Court dated June 17, 2010 (D.E. 86).

SIGNED and ORDERED this ____ day of _______________, 2010.

____________________________________
Janis Graham Jack
United States District Judge

Case: 10-40610 Document: 44 Page: 341 Date Filed: 07/23/2010

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>BRYAN SHAW, in his official as CHAIRMAN OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, and<br><br>BUDDY GARCIA and CARLOS RUBINSTEIN, each in their official capacity as COMMISSIONERS OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, and<br><br>MARK VICKERY in his official capacity as EXECUTIVE DIRECTOR OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, and<br><br>AL SEGOVIA, in his official capacity as SOUTH TEXAS WATERMASTER<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 2:10-cv-00075 |

**TEXAS CHEMICAL COUNCIL'S OPPOSITION TO THE MOTION FOR STAY OF PROCEEDINGS PENDING APPEAL**

Now comes the Texas Chemical Council ("TCC") and files this its opposition to the Texas Farm Bureau and American Farm Bureau Federation's (jointly referred to as "TFB") Motion for Stay of Proceedings Pending Appeal (DE 151) and respectfully shows the Court the following:

I.

Intervenor Texas Chemical Council opposes the Motion to Stay simply on the grounds that it believes that the appeal and the trial schedule can proceed simultaneously without

Case: 10-40610 Document: 00511184549 Page: 2 Date Filed: 07/23/2010

irreparable harm to the Movant. Should the Fifth Circuit allow TFB's intervention, such a ruling would likely occur prior to the time of the remedies portion of the proceedings. TFB's ability to "catch up" would not be difficult on all the issues of concern to TFB. The existence of this lawsuit creates great uncertainty among all of the water users involved and makes it impossible for these entities to be assured of a dependable source of water. Such uncertainty affects all of their plans and operations. Any delay in the trial schedule increases the damage of that uncertainty. TCC believes that balancing the equities between TFB's necessary "catch up," should they prevail, is outweighed by the damage caused by any unnecessary delay of the trial schedule.

II.

However, as full disclosure, TCC would inform the Court that TFB is correct when it identifies the following three categories of their members: (a) agricultural water users who hold adjudicated water rights and irrigation rights permits in the Guadalupe and San Antonio River Basins; (b) exempt users of water (not required to have permits) from those rivers for domestic and livestock uses; and (c) ground water users who pump underground water from the Edwards Aquifer. TCC has no members which fit into any of those three categories. It is further true that the results desired by the members of TCC could possibly be different than the results desired by the members of TFB.

III.

Because TCC believes that the equities weigh heavily in favor of not extending the length of time that this case would pend, it asks that the Court deny the motion for stay.

Case: 10-40610 Document: 44 Page: 343 Date Filed: 07/23/2010

Dated: July 12, 2010

Respectfully submitted,

BROWN McCARROLL, L.L.P.

By: */s/Thomas H. Watkins*

THOMAS H. WATKINS
Attorney-in- Charge
State Bar No. 20928000
Southern District of Texas I.D. No. 15332
Email: twatkins@mailbmc.com
KENNETH R. RAMIREZ
State Bar No. 16502200
*Admitted Pro Hac Vice*
Email: kramirez@mailbmc.com
LORINDA G. HOLLOWAY
State Bar No. 00798264
Southern District of Texas ID No. 37157
Email: lholloway@mailbmc.com
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 703-5752 (direct telephone)
(512) 479-1101 (facsimile)

ATTORNEYS FOR INTERVENOR
TEXAS CHEMICAL COUNCIL

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed pursuant to the electronic filing requirements of the United States District Court for the Southern District of Texas and served on all parties/attorneys of record by the Court's CM/ECF System or by the method designated below on the 12th day of July, 2010:

| | |
|---|---|
| Mr. James B. Blackburn<br>Mr. Charles Irvine<br>Ms. Mary Carter<br>BLACKBURN CARTER, P.C.<br>4709 Austin Street<br>Houston, TX 77004<br><br>**Counsel for Plaintiff, The Aransas Project** | Mr. David A. Kahne<br>LAW OFFICE OF DAVID A. KAHNE<br>P. O. Box 66386<br>Houston, TX 77266<br><br>**Counsel for Plaintiff, The Aransas Project** |

Case: 10-40610 Document: 00511184549 Page: 4 Date Filed: 07/23/2010

| | |
|---|---|
| Brian E. Berwick<br>Barbara B. Deane<br>Assistant Attorneys General<br>Environmental Protection and Administrative Law Division<br>P. O. Box 12548<br>Austin, TX 78711-2548<br><br>**Counsel for Defendants** | Mr. Edward F. Fernandes<br>HUNTON & WILLIAMS LLP<br>111 Congress Avenue, Suite 1800<br>Austin, TX 78701<br><br>**Counsel for Intervenor, Guadalupe-Blanco River Authority** |
| Maida O. Lerner<br>Hunton & Williams LLP<br>1900 K Street NW<br>Washington, DC 20006<br>*Via U.S. First Class Mail*<br><br>**Counsel for Intervenor, Guadalupe-Blanco River Authority** | Andrew J. Turner<br>Hunton & Williams LLP<br>1900 K Street NW<br>Washington, DC 20006<br>*Via U.S. First Class Mail*<br><br>**Counsel for Intervenor, Guadalupe-Blanco River Authority** |
| Ms. Kathy Robb<br>HUNTON & WILLIAMS LLP<br>200 Park Avenue<br>New York, NY 10166<br><br>**Counsel for Intervenor, Guadalupe-Blanco River Authority** | Mr. Bruce Wasinger<br>Guadalupe-Blanco River Authority<br>933 East Court Street<br>Sequin, TX 78155<br>*Via U.S. First Class Mail*<br><br>**Counsel for Intervenor, Guadalupe-Blanco River Authority** |
| Mr. J. A. "Tony" Canales<br>CANALES & SIMONSON, P.C.<br>2601 Morgan Avenue<br>P. O. Box 5624<br>Corpus Christi, TX 78465<br><br>**Counsel for Intervenor, Guadalupe-Blanco River Authority** | |

*/s/ Thomas H. Watkins*
THOMAS H. WATKINS



4455518.1
10296.94198

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-10-75 |
| | § | |
| BRYAN SHAW, *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

On this day came on to be considered Texas Farm Bureau and American Farm Bureau Federation's Motion for Stay of Proceedings Pending Appeal. (D.E. 151.)

On June 17, 2010, this Court denied the Texas Farm Bureau and American Farm Bureau Federation's ("TFB/AFBF") Motion to Intervene. (D.E. 86.) On June 29, 2010, TFB/AFBF filed an appeal of the June 17, 2010 Order with the United States Court of Appeals for the Fifth Circuit. (D.E. 125.) TFB/AFBF now requests that this Court stay the proceedings in this action pending the disposition of the appeal. (D.E. 151.)

In determining whether to issue a stay pending an appeal, a court must consider four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776 (1987); see Arnold v. Garlock, Inc., 278 F.3d 426, 438-39 (5th Cir. 2001); Draughon v. Dretke, 2005 WL 3591008, at *1 (S.D. Tex. Dec. 30, 2005) (citing Hilton). While "each part must be met, the appellant need not always show a probability of success on the merits; instead, the movant need only present

Case: 10-40610 Document: 00511184542 Page: 2 Date Filed: 07/23/2010

a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." Arnold, 278 F.3d at 438-39 (internal quotation marks omitted).

The Court declines to issue a stay in this case, primarily because TFB/AFBF has failed to make "a strong showing that [they are] likely to succeed on the merits." Hilton, 481 U.S. at 776, or even presented "a substantial case on the merits." Arnold, 278 F.3d at 438-39. The Court fully considered TFB/AFBF's arguments in their Motion to Intervene, and rejected those arguments. The Court relies upon its analysis of TFB/AFBF's Motion to Intervene provided in its June 17, 2010 Order. (D.E. 86 at 20-22, 26-28.) TFB/AFBF has not presented any new arguments that call into question this Court's prior ruling.

The Court also briefly notes that TFB/AFBF has failed to meet the other factors relevant to issuance of a stay. Because their interests will be adequately represented by existing parties to this litigation, TFB/AFBF cannot demonstrate that they will be "irreparably injured absent a stay." Issuance of a stay will, however, injure Plaintiff's interests in this litigation, as well as those of water users. (D.E. 151 at 12 (listing Plaintiff as opposing the Motion to Stay).) Intervenor Texas Chemical Council ("TCC") has stated, "[t]he existence of this lawsuit creates great uncertainty among all of the water users involved and makes it impossible for these entities to be assured of a dependable source of water. Such uncertainty affects all of their plans and operations. Any delay in the trial schedule increases the damage of that uncertainty." (D.E. 152 at 2.) Further, now pending before the Court are four separate motions to dismiss filed by the TCEQ Defendants, Intervenor Guadalupe Blanco River Authority, and TCC. (D.E. 40; 43; 57; 120.) An oral argument on these motions has been set for July 28, 2010. (D.E. 154.)

Issuance of a stay could delay the Court's ruling on these important motions by several months. Finally, the public interest favors the prompt resolution of this case, both with respect to the protection of the endangered species at issue (the Whooping Cranes) and the important state water rights at issue.

For the reasons stated above, TFB/AFBF's Motion for Stay of Proceedings Pending Appeal is DENIED. (D.E. 151.)

SIGNED and ORDERED this 14th day of July, 2010.

Janis Graham Jack
United States District Judge